Frank Askin, Esq.
Penny M. Venetis, Esq.
CONSTITUTIONAL LITIGATION CLINIC
Rutgers Law School
15 Washington Street
Newark, New Jersey 07102
(201) 648-5687
FA: 6724

Martin Glenn, Esq.
Michael J. Holden, Esq.
O'MELVENY & MYERS LLP
153 East 53rd Street
New York, New York 10022
(212) 326-2000
MJH: 9954

Attorneys for Plaintiffs



FILED

6/16/97

AT 8:30_____M
WILLIAM T. WALSH
CLERK

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

---

HAWA ABDI JAMA, ABU BAKAR, JOSEPH ACKAH,
CHARLES ADDAI, BENJAMIN ANANG, KWEKU AWOTWE,
YVETTE NSUKAMI BADJOKO, GONZALO CRESPO,
JOSEPH DEBRAH, CECILIA KOU JEFFREY,
ANANTHARAJAH JEYAKUMAR, ABRAHAM KENNEH,
NAGENDRAN MANOHARAN, THOMAS KYEU MANU,
DENNIS RAJI, SHAMIMU NANTEZA, AGATHA SERWAA,
JASMEL SINGH, FOLORUNSHO WASIU ALIBI, and
SARAH TETTEH YOWER,

                  Plaintiffs,

        vs.

UNITED STATES IMMIGRATION AND
NATURALIZATION SERVICE, ESMOR CORRECTIONAL
SERVICES, INC., JOHN DOE McCLEAN, NORMAN
UZZLE, MICHAEL D. ROZOS, JOHN DOE BOYER,
JOHN DOE FREISS, JOHN DOE SILVA, JAMES
SLATTERY, AARON SPEISMAN, WILLARD STOVALL,
JOHN LIMA, JAMES POULAND, DIANE McCLURE,
RICHARD STALEY, JOHN DOE BROWN, JOHN DOE
BROWNDIE, JANE DOE CLARK, JOHN DOE EDIDER,
JOHN DOE FEDER, JOHN DOE FIGEL, JOHN DOE
GARCIA, JOHN DOE GILL, JOHN DOE HAWKINS,
JOHN DOE HAYES, JOHN DOE HIGGS, JOHN DOE
HUGHES, JOHN DOE HUNTER, JOHN DOE JACKSON,
JOHN DOE JOHNSON, JOHN DOE KUTZ, JOHN DOE
MELENDEZ, JANE DOE MICHELLE, JOHN DOE
MOHAMMED, JOHN DOE NKENKE, JANE DOE PHIL,
JOHN DOE SNEED, JOHN DOE STRATFORD, JOHN DOE
VANDERPOOR, JOHN DOE WILLIAMS, JOHN DOE
WILSON, JOHN DOE WALLINGTON, and JOHN and
JANE DOES 1-50,

                  Defendants.

CIVIL ACTION NO:

97.3093 (DRD)

**COMPLAINT**

## PRELIMINARY STATEMENT

1.     This lawsuit is being brought by men and women who fled from political persecution and violence in their countries only to encounter cruel and abusive treatment at the hands of the United States government and its agents.  These men and women applied for political asylum in the United States, pursuant to this country's laws.  Instead of finding a safe haven here, they were subjected to unremitting physical and psychological abuse, including beatings, sexual abuse, and racial hatred, at the hands of Defendant Immigration and Naturalization Service ("I.N.S.") and its agents.

2.     Defendant I.N.S. warehoused these men and women in a detention center in Elizabeth, New Jersey.  Pursuant to a multimillion-dollar contract (hereinafter the "Contract"), this facility was run by Defendant Esmor Correctional Services, Inc.  ("Esmor Corporation"), a private prison corporation.  At this detention center (hereinafter "Esmor Elizabeth") Plaintiffs were served food that was not fit for human consumption, and were given dirty and ill-fitting clothing, including underwear that contained vestiges of human waste.  In the "dorm rooms" where these men and women slept, dining tables and beds were inches away from filthy toilets and showers.  The cruelty inflicted on these men and women lasted 24 hours a day.  Guards who worked at Esmor Elizabeth would not let the men and women sleep.  Overhead bright fluorescent lights were kept on night and day.  The guards also blared music and television programs and held loud parties throughout the night.  The guards would deliberately wake the men and women up as they nodded off to sleep and would conduct head counts during the night to taunt the asylees.

3.    When the men and women asked for supplies to clean their clothes or the dorms, or complained about not being able to sleep, or not being able to practice their religious rituals, they were thrown into "segregation" -- tiny solitary confinement rooms where they were shackled, often to their beds, and deprived of access to sunlight and exercise.

4.    The men and women complained about these abusive conditions to officials of Defendant I.N.S. stationed at Esmor Elizabeth and Esmor Corporation supervisors. They took no action to correct these abuses. After suffering under these inhuman conditions for 11 months, in the early morning of June 18, 1995, the men and women at Esmor Elizabeth could no longer endure the harsh conditions under which they were detained, and rebelled.

5.    A subsequent report issued by the I.N.S. acknowledges that the events of June 18, 1995 ("Events") were sparked by the inhuman conditions at the Esmor Elizabeth facility. After the Events, the I.N.S. closed Esmor Elizabeth and discontinued its Contract with Defendant Esmor Corporation. Subsequently, the men and women detained there were transferred to other detention facilities throughout the United States. Some of the men and women have received political asylum, some still are detained by the I.N.S., while others have been deported.

6.    This action challenges Defendants' policies and practices of: (a) using excessive physical force against Plaintiffs; (b) subjecting Plaintiffs to psychological and emotional abuse; (c) placing Plaintiffs in solitary confinement or "segregation" without adequate due process protections; (d) permanently depriving Plaintiffs of their property, including valuables and legal documentation necessary to support their claims for

2

political asylum; (e) refusing to grant Plaintiffs access to their attorneys or access to the courts; (f) failing to provide Plaintiffs with adequate medical care; (g) failing to provide Plaintiffs with an adequate diet; (h) failing to provide Plaintiffs with adequate and clean clothing; (i) failing to provide access to exercise and recreational activities; (j) compelling Plaintiffs to engage in forced unpaid labor; and (k) refusing to allow Plaintiffs freedom to practice their religions.

7. This action also alleges that Defendants I.N.S. and the Esmor Corporation breached their contractual duty to Plaintiffs, who were the intended beneficiaries of the Contract. They also breached their duty to the Plaintiffs by negligently hiring and retaining employees who they knew or should have known were abusing and violating Plaintiffs' rights.

8. Defendants include the I.N.S., the Esmor Corporation, and officers and employees of the I.N.S. and the Esmor Corporation. Each defendant either unrelentingly and continuously brutalized Plaintiffs in a way that violated their constitutional and human rights, or manifested deliberate indifference towards the violation of Plaintiffs' rights.

9. Plaintiffs bring this action for money damages to redress Defendants' violations of Plaintiffs' rights under the laws of the United States, the First, Fifth, and Thirteenth Amendments of the Constitution of the United States, the laws and Constitution of the State of New Jersey, the Religious Freedom Restoration Act, the Federal Tort Claims Act, and international law, including the following international human rights treaties: the International Covenant on Civil and Political Rights, the

American Convention on Human Rights, the Universal Declaration of Human Rights, and the Convention Concerning Forced or Compulsory Labour.

## JURISDICTION

10.     This action is brought pursuant to 42 U.S.C. § 1983 and 18 U.S.C. § 401. This court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1332(a)(2) (diversity of citizenship); 8 U.S.C. § 1329 (jurisdiction over disputes arising under the Immigration and Naturalization Act); and Article III, Section 2[1] of the United States Constitution (jurisdiction over matters arising from violations of international treaties).

11.     Subject matter jurisdiction of this Court is based also upon 28 U.S.C. § 1346(b) in that the action includes tort claims against the I.N.S., a United States agency. Plaintiffs filed tort claims notices against the I.N.S. on April 3, 1997 and are waiting to learn the results of the agency's investigations.

12.     A declaratory judgment is sought pursuant to 28 U.S.C. § 2202.

13.     Venue is proper in this Court as all of the Plaintiffs were detained in this judicial district at Esmor Elizabeth and the Defendants' illegal acts occurred in this judicial district.

## PARTIES

14.     Plaintiffs are foreign nationals who arrived in the United States seeking political asylum prior to June 18, 1995. Plaintiffs, who were fleeing for their lives, had to leave their countries under assumed identities, and did not have proper documentation

4

to enter the United States. Because Plaintiffs did not have proper documentation upon arrival at airports in the New York metropolitan area, they were placed into custody at Esmor Elizabeth by the I.N.S. At all times relevant to this complaint, Plaintiffs were not accused of or convicted of any criminal activity.

15.     Plaintiff HAWA ABDI JAMA is from Somalia. Jama arrived in the United States on August 24, 1994 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Jama is approximately 27 years old. Jama remained at Esmor Elizabeth from August 24, 1994 until the Events of June 18, 1995, after which she was transferred to York County Prison in York, Pennsylvania. Jama has been granted asylum and lives in Clarkson, Georgia.

16.     Plaintiff ABU BAKAR is from Sierra Leone. Bakar arrived in the United States on August 3, 1994 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Bakar is approximately 30 years old. Bakar remained at Esmor Elizabeth from August 3, 1994 until the Events of June 18, 1995, after which he was transferred to Lehigh County Prison in Allentown, Pennsylvania and then to Berks County Prison in Leesport, Pennsylvania. Bakar was granted political asylum and lives in Philadelphia, Pennsylvania.

17.     Plaintiff ABRAHAM KENNEH is from Liberia. Kenneh arrived in the United States on December 9, 1994 via Newark International Airport, and was detained at Esmor Elizabeth upon arrival. Kenneh is approximately 27 years old. Kenneh remained at Esmor Elizabeth from December 9, 1994 until the spring of 1995. He was transferred to Lehigh County Prison in Allentown, Pennsylvania and then Berks County

Prison in Leesport, Pennsylvania, where he was detained until April 1997. Kenneh has been released by the I.N.S. and lives in Queens, New York.

18.     Plaintiff JOSEPH ACKAH is from Ghana. Ackah arrived in the United States on August 21, 1994 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Ackah is approximately 28 years old. Ackah remained at Esmor Elizabeth from August 21, 1994 until the spring of 1995, when he was transferred to Lehigh County Prison in Allentown, Pennsylvania and then Berks County Prison in Leesport, Pennsylvania. Ackah has been returned to Ghana, at the behest of the I.N.S.

19.     Plaintiff CHARLES ADDAI is from Ghana. Addai arrived in the United States on August 10, 1994 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Addai is approximately 30 years old. Addai remained at Esmor Elizabeth from August 10, 1994 until the Events of June 18, 1995, after which he was transferred to Lehigh County Prison in Allentown, Pennsylvania and then Berks County Prison in Leesport, Pennsylvania. Addai has been returned to Ghana, at the behest of the I.N.S.

20.     Plaintiff BENJAMIN ANANG is from Ghana. Anang arrived in the United States on May 25, 1995 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Anang is approximately 28 years old. Anang remained at Esmor Elizabeth from May 25, 1995 until the Events of June 18, 1995, after which he was transferred to Lehigh County Prison in Allentown, Pennsylvania. Currently, Anang is being detained at Berks County Prison in Leesport, Pennsylvania, at the behest of the I.N.S.

6

21.     Plaintiff KWEKU AWOTWE is from Ghana.  Awotwe arrived in the United States on April 29, 1995 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival.  Awotwe is approximately 37 years old. Awotwe remained at Esmor Elizabeth from April 29, 1995 until the Events of June 18, 1995, after which he was transferred to Lehigh County Prison in Allentown, Pennsylvania.  Currently, Awotwe is being detained at Berks County Prison in Leesport, Pennsylvania, at the behest of the I.N.S.

22.     Plaintiff YVETTE NSUKAMI BADJOKO is from Zaire.  Badjoko arrived in the United States on November 20, 1993 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth after a short period of I.N.S. detention at Wicomico County Prison in Salisbury, Maryland.  Badjoko is approximately 30 years old. Badjoko remained at Esmor Elizabeth until the Events of June 18, 1995, after which she was transferred to the I.N.S. Varick Street Detention Center in New York City and then to York County Prison in York, Pennsylvania.  Currently, Badjoko is being detained at Pike County Jail in Hawley, Pennsylvania, at the behest of the I.N.S.

23.     Plaintiff GONZALO CRESPO is from Ecuador.  Crespo arrived in the United States on April 1, 1995 via John F. Kennedy International Airport.  Crespo is approximately 36 years old.  Crespo was detained at John F. Kennedy International Airport for almost 48 hours without food or drink and then was transferred to Esmor Elizabeth.  Crespo later was transferred to Lehigh County Prison in Allentown, Pennsylvania.  Currently, Crespo is being detained at Berks County Prison in Leesport, Pennsylvania, at the behest of the I.N.S.

7

24.     Plaintiff **JOSEPH DEBRAH** is from Ghana. Debrah arrived in the United States on November 14, 1994 via John F. Kennedy International Airport, and was detained at Wackenhut Facility in Queens, New York, upon arrival. Debrah is approximately 39 years old. Debrah was transferred to Berks County Prison in Leesport, Pennsylvania and then to Lehigh County Prison in Allentown, Pennsylvania before he arrived at Esmor Elizabeth in the spring of 1995. Debrah remained there for approximately five and one-half weeks, after which he was transferred to Lehigh County Prison in Allentown, Pennsylvania. Currently, Debrah is being detained at Berks County Prison in Leesport, Pennsylvania, at the behest of the I.N.S.

25.     Plaintiff **CECILIA KOU JEFFREY** is from Liberia. Jeffrey arrived in the United States on April 13, 1995 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Jeffrey is approximately 41 years old. Jeffrey remained at Esmor Elizabeth from April 13, 1995 until the Events of June 18, 1995, after which she was transferred to the I.N.S. Varick Street Detention Center in New York City. Currently, Jeffrey is being detained at York County Prison in York, Pennsylvania, at the behest of the I.N.S.

26.     Plaintiff **ANANTARAJAH JEYAKUMAR** is from Sri Lanka. Jeyakumar arrived in the United States on October 28, 1994 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Jeyakumar is approximately 28 years old. Jeyakumar remained at Esmor Elizabeth from October 28, 1994 until the spring of 1995, when he was transferred to Lehigh County Prison in Allentown, Pennsylvania. Currently, Jeyakumar is being detained at Berks County Prison in Leesport, Pennsylvania, at the behest of the I.N.S.

8

27.     Plaintiff NAGENDRAN MANOHARAN is from Sri Lanka. Manoharan arrived in the United States on November 4, 1994 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Manoharan is approximately 26 years old. Manoharan was detained at Esmor Elizabeth at various times between November 5, 1994 and the spring of 1995. Currently, Manoharan is being detained at the Berks County Prison in Leesport, Pennsylvania, at the behest of the I.N.S.

28.     Plaintiff THOMAS KYEU MANU is from Nigeria. Manu arrived in the United States on May 8, 1995 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Manu's age is unknown. Manu remained at Esmor Elizabeth from May 8, 1995 until the Events of June 18, 1995, after which he was transferred to Lehigh County Prison in Allentown, Pennsylvania. Currently, Manu is being detained at Berks County Prison in Leesport, Pennsylvania, at the behest of the I.N.S.

29.     Plaintiff DENNIS RAJI is from Nigeria. Raji arrived in the United States on April 10, 1995 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Raji is approximately 30 years old. Raji remained at Esmor Elizabeth from April 10, 1995 until the Events of June 18, 1995, after which he was transferred to several detention facilities. Currently, Raji is being detained at the York County Prison in York, Pennsylvania, at the behest of the I.N.S.

30.     Plaintiff SHAMIMU NANTEZA is from Uganda. Nanteza arrived in the United States on September 13, 1994 via Newark International Airport, and was detained at Esmor Elizabeth upon arrival. Nanteza is approximately 22 years old. Nanteza remained at Esmor Elizabeth from September 13, 1994 until the Events of June

9

18, 1995, after which she was detained in various county prisons in Pennsylvania, at the behest of the I.N.S., until May of 1997. In May of 1997, the I.N.S. deported Nanteza, in violation of an order issued by the United States District Court for the Middle District of Pennsylvania. A motion is pending before that court that will determine whether the I.N.S. will be required to bring Nanteza back to the United States.

31. Plaintiff AGATHA SERWAA is from Ghana. Serwaa arrived in the United States on April 25, 1995 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Serwaa is approximately 34 years old. Serwaa remained at Esmor Elizabeth from April 25, 1995 until the Events of June 18, 1995, after which she was transferred to the Varick Street Detention Center in New York City. Currently, Serwaa is being detained at Pike County Jail in Hawley, Pennsylvania, at the behest of the I.N.S.

32. Plaintiff JASMEL SINGH is from India. Singh arrived in the United States on September 14, 1994 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Singh is approximately 28 years old. Singh was at Esmor Elizabeth from September 14, 1994 until the Events of June 18, 1995, after which he was transferred to Lehigh County Prison in Allentown, Pennsylvania. Currently, he is being detained at Berks County Prison in Leesport, Pennsylvania, at the behest of the I.N.S.

33. Plaintiff FOLORUNSHO WASIU ALIBI is from Nigeria. Alibi arrived in the United States on September 2, 1994 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Alibi is approximately 30 years old. Alibi remained at Esmor Elizabeth from September 2, 1994 until the spring of 1995,

10



when he was transferred to Lehigh County Prison in Allentown, Pennsylvania. Currently, Alibi is being detained at Berks County Prison in Leesport, Pennsylvania, at the behest of the I.N.S.

34. Plaintiff SARAH TETTEH YOWER is from Ghana. Yower arrived in the United States on January 30, 1995 via John F. Kennedy International Airport, and was detained at Esmor Elizabeth upon arrival. Yower is approximately 39 years old. Yower remained at Esmor Elizabeth from January 30, 1995 until the Events of June 18, 1995, after which she was transferred to York County Prison in York, Pennsylvania. Yower has been returned to Ghana, at the behest of the I.N.S.

35. Defendant I.N.S. is a federal agency that apprehended all Plaintiffs at airports in the New York City area, and confined them at Esmor Elizabeth. The I.N.S., at all times complained of, was responsible for overseeing that Plaintiffs and other asylum seekers detained at Esmor Elizabeth were treated in accordance with the Contract and the laws of the United States and New Jersey and with international human rights law.

36. Defendants JOHN DOE McLEAN, NORMAN UZZLE, MICHAEL D. ROZOS, JOHN DOE BOYER, JOHN DOE FREISS, and JOHN DOE SILVA are officers of the I.N.S. whose duties included on-site supervision and administration of the Esmor Elizabeth facility and its staff. These Defendants were present or should have been present at Esmor Elizabeth on a continuous basis. (Hereinafter, Defendants McLean, Uzzle, Rozos, Boyer, Freiss, and Silva will be referred to collectively as "I.N.S. Official Defendants" or "Defendant I.N.S. Officials.") Defendant I.N.S. Officials were responsible for ensuring that mandates governing the detention of individuals by the

11

I.N.S. were carried out in conformance with the law. These defendants also were responsible for overseeing the Contract to ensure the care, custody and safe treatment of Plaintiffs and other asylum seekers. The I.N.S. Official Defendants acted with deliberate indifference towards the widespread continuous and unrelenting pattern of abuse exhibited by Defendant Esmor Corporation and its employees towards the Plaintiffs and other asylum seekers. Defendant I.N.S. Officials are being sued in their individual capacities.

37.    Defendant ESMOR CORRECTIONAL SERVICES, INC., also known as Correctional Services Corporation ("Esmor Corporation"), is a Florida corporation. At all times referred to in this complaint, Defendant Esmor Corporation was doing business in New Jersey and was acting as an agent of Defendant I.N.S. pursuant to the Contract. Defendant Esmor Corporation, through its senior officials, promulgated and implemented policies -- including policies regarding the use, reporting and investigation of force by uniformed staff, and the provision of food, medical, laundry and other program services mandated by the Contract and the law. In addition, Senior Esmor Corporation officials knew or should have known of the widespread pattern of brutality exhibited towards Plaintiffs and other asylum seekers at Esmor Elizabeth, and tolerated and failed to stop this brutality. This tolerance of widespread continuous and unrelenting brutality constitutes the Esmor Corporation's unwritten policies and customs endorsing the brutality.

38. Defendants JAMES F. SLATTERY and AARON SPIESMAN are executive officers of the Esmor Corporation. Defendant WILLARD STOVALL was the Facility Administrator of the Esmor Elizabeth facility. Defendant JOHN LIMA was the Assistant Facility Administrator of the Esmor Elizabeth facility. Defendants JAMES

12

POULAND, DIANE McCLURE, and RICHARD STALEY were at all relevant times supervisory employees of the Esmor Corporation. (Hereinafter Defendants Slattery, Speisman, Stovall, Lima, Pouland, McClure, and Staley will be referred to collectively as "Esmor Officer Defendants" or "Defendant Esmor Officers.") Defendant Esmor Officers were responsible for the care, custody, and safe treatment of Plaintiffs and other asylum seekers, consistent with the Contract and other legal mandates governing the detention of individuals by the I.N.S. They also were responsible for all matters relating to the training, supervision, oversight, and discipline of the guards at Esmor Elizabeth. At all times referred to in this complaint, Defendant Esmor Officers were acting within the scope of their employment as employees and agents of Defendants Esmor Corporation and I.N.S. The Esmor Officer Defendants acted with deliberate indifference towards the continuous and unrelenting widespread pattern of abuse exhibited by the guards at Esmor Elizabeth towards the Plaintiffs and other asylum seekers. Defendant Esmor Officers are being sued in their individual and official capacities.

39.    Defendants JOHN DOE BROWN, JOHN DOE BROWNDIE, JANE DOE CLARK, JOHN DOE EDIDER, JOHN DOE FEDER, JOHN DOE FIGEL, JOHN DOE GARCIA, JOHN DOE GILL, JOHN DOE HAWKINS, JOHN DOE HAYES, JOHN DOE HIGGS, JOHN DOE HUGHES, JOHN DOE HUNTER, JOHN DOE JACKSON, JOHN DOE JOHNSON, JOHN DOE KUTZ, JOHN DOE MELENDEZ, JANE DOE MICHELLE, JOHN DOE MOHAMMED, JOHN DOE NKENKE, JANE DOE PHIL, JOHN DOE SNEED, JOHN DOE STRATFORD, JOHN DOE TATE, JOHN DOE VANDERPOOR, JOHN DOE WILLIAMS, JOHN DOE WILSON, and JOHN DOE WALLINGTON were employed by the Esmor

13

Corporation as guards in the Esmor Elizabeth facility.[1]   Defendants John and Jane Does 1-50 are guards who were employed by Defendant Esmor Corporation in the Esmor Elizabeth facility and whose names are unknown at this time.  (Hereinafter Defendants John Doe Brown, John Doe Browndie, Jane Doe Clark, John Doe Edider, John Doe Feder, John Doe Figel, John Doe Garcia, John Doe Gill, John Doe Hawkins, John Doe Hayes, John Doe Higgs, John Doe Hughes, John Doe Hunter, John Doe Jackson, John Doe Johnson, John Doe Kutz, John Doe Melendez, Jane Doe Michelle, John Doe Mohammed, John Doe Nkenke, Jane Doe Phil, John Doe Sneed, John Doe Stratford, John Doe Tate, John Doe Vanderpoor, John Doe Williams, John Doe Wilson, John Doe Wallington, and John and Jane Does 1-50 will be referred to collectively as "Defendant Guards.")  At all times referred to in this complaint, Defendant Guards were acting within the scope of their employment as employees and agents of Defendants Esmor Corporation and I.N.S.  Defendant Guards violated the Plaintiffs' civil rights and human rights by brutalizing them in a continuous and unrelenting manner.  The Defendant Guards are being sued in their individual and official capacities.

---

[1] See supra note 1.

14

## FACTUAL ALLEGATIONS

### Background

40.    The Esmor facility in Elizabeth, New Jersey opened in August 1994, under a contract between the I.N.S. and Defendant Esmor Corporation. The intended purpose of the Esmor Elizabeth facility was to house persons while their political asylum applications were pending. The facility was designed to hold 300 asylees, with an "emergency" capacity of 327. In March of 1995, the I.N.S. ordered that the facility's occupancy be reduced to below 300. On the day of the June 18, 1995 Events, 315 asylees were being warehoused in the Esmor Elizabeth facility.

41.    Prior to the Events, Defendant I.N.S. investigated Defendant Esmor Corporation's performance under the Contract. Defendant I.N.S. found that Defendant Esmor Corporation materially breached the Contract in numerous ways, and decided not to renew the Contract. (These breaches are documented by the I.N.S. in an interim report it published on July 20, 1995, hereinafter the "Interim Report," attached hereto as Exhibit A.) These breaches led to the I.N.S.'s decision not to renew the Contract. As discussed in detail throughout this complaint, each of these breaches of contract by Defendant Esmor Corporation caused harm to Plaintiffs. Among these breaches of contract were the following:

a.    The Contract required Defendant Esmor Corporation to treat asylum seekers humanely and to protect the asylum seekers' physical well-being and mental health. (See Contract, subsection 12, p. 51.) In violation of the Contract, Defendant Esmor Corporation failed to provide Plaintiffs

15

protection from personal abuse, corporal punishment, personal injury, disease, property damage, and harassment (see Interim Report, pp. 7 and 10);

b. The Contract required that clean, suitable, and presentable clothing be issued to the asylum seekers twice weekly. (See Contract, subsection 7, p. 38.) In violation of the Contract, Defendant Esmor Corporation gave Plaintiffs dirty and soiled ill-fitting clothing on an irregular basis, but never more than once per week. Defendant Esmor Corporation also failed to provide the Plaintiffs with appropriate footwear (see Interim Report, p. 28);

c. The Contract required that the Esmor Corporation provide personal hygiene products to the asylum seekers at no cost. (See Contract, subsection 7, p. 38.) In violation of the Contract, Defendant Esmor Corporation failed to provide to the Plaintiffs toiletries, including soap, shampoo, toothpaste, and feminine hygiene products (see Interim Report, p. 6);

d. The Contract required that the physical plant provide natural light for the segregation units, as well as an outdoor recreational area. (See Contract, subsection 5, p. 30.) In violation of the Contract, Defendant Esmor Corporation failed to provide natural light in the area above the segregation units. In addition, the recreational area was surrounded by a tall brick wall that provided only limited views of the sky. As a result,

16

Plaintiffs had minimal access to natural light (see Interim Report, pp. 25-26);

e.     The Contract required that the Esmor Corporation interview, screen for security clearance, and train all personnel for 40 hours before employing them.  (See Contract, subsection 2, pp. 17-23; subsection 3, pp. 24-25.)  The Contract also required that all new security personnel be provided with a total of 160 hours of orientation and training.  (See Contract, subsection 3, page 24.) In violation of the Contract, Defendant Esmor Corporation hired guards who did not meet specified minimum requirements, including security clearance; employed guards before providing them with the mandatory 40-hour training course; and failed to provide any additional training after hiring the guards.  Also in violation of the Contract, there was inappropriate supervision of guards.  (See Interim Report, pp. 10, 15, and 18-19.)  Thus, guards were able to abuse the Plaintiffs and violate their rights.

f.     The Contract required that guards be assigned to all posts within the facility.  (See Contract, pp. 13-14.)  Defendant Esmor Corporation failed to hire an adequate number of guards to properly maintain the facility (see Interim Report, p. 14);

g.     The Contract required that a written, itemized inventory of the asylum seekers' personal property be kept and that all property be returned to asylum seekers upon release.  (See Contract, subsection 14, p. 53.)  In violation of the Contract, Defendant Esmor Corporation failed to

17

reimburse Plaintiffs for personal property, money, or valuables for which Plaintiffs had receipts. The I.N.S. found that Esmor Corporation personnel lost, damaged, or stole asylum seekers' property (see Interim Report, p. 9);

h.   The Contract required that Defendant Esmor Corporation maintain efficient and accurate records, including a log of all incidents or unusual occurrences. (See Contract, subsection 4, pp. 26-27.) In violation of the Contract, Defendant Esmor Corporation failed to maintain accurate records of incidents involving abuse of Plaintiffs. (See Interim Report, pp. 12-13.) In addition, contrary to the Contract, Defendant Esmor Corporation withheld from the I.N.S. information regarding violations or attempted violations of the standard of conduct, as well as criminal activity of Esmor Elizabeth personnel (see id.);

i.   The Contract required that the Esmor Corporation provide appropriate health care to the asylum seekers. (See Contract, subsection 8, pp. 39-43.) In violation of the Contract, Plaintiffs did not receive adequate health care, including screening for tuberculosis, and often had to wait inappropriately long to see a doctor for initial or follow-up treatment (see Interim Report, pp. 21-24);

j.   The Contract required the Esmor Corporation to hold hearings before placing any asylum seekers in administrative segregation or solitary confinement. (See Interim Report, p. 8.) Contrary to the Contract, the Esmor Corporation sent Plaintiffs to administrative segregation without charging them or offering them an opportunity to be heard. (See id.)

18

### The Physical Layout of Esmor Elizabeth Violated Plaintiffs' Privacy Rights and Exposed them to Unsanitary Conditions

42.    Esmor Elizabeth was separated into several large rooms, or dorms. Between 20 and 40 asylees were packed into each dorm. The dorms were separated from each other, and the communal hallways of Esmor Elizabeth, by thick clear glass. The dorms were not kept clean and smelled of human waste and other filth. Plaintiffs took it upon themselves to clean their living space, but were denied cleaning materials. In desperation, Plaintiffs sometimes used toothpaste and shampoo to clean the dorms. When Plaintiffs politely requested cleaning materials, they were beaten by Defendant Guards.

43.    The shower and toilet in each dorm at Esmor Elizabeth were in the same room as the Plaintiffs' beds and dining area. The shower and toilet area were not equipped with a curtain or divider. Plaintiffs ate their meals inches away from the filthy shower and toilet area. As they ate, they could observe and smell other asylum seekers using the toilets. In addition, Plaintiffs using the toilets and showers had no privacy, and could be observed by their fellow asylees as well as by security guards.

44.    The Interim Report notes that the women's dorms, including the shower and toilet areas, were particularly visible to the hallway areas. (See Interim Report p. 26.) Many of the women Plaintiffs had never appeared naked before strangers before, and suffered severe emotional harm as a consequence of being forced to expose their bodies to strangers. On a continuous basis, male Defendant Guards would ogle at and make fun of the female Plaintiffs while they were in the bathrooms and showers, and make sexual and crude comments about their bodies.

19

45.     The dorms lacked telephones and recreational materials. Plaintiffs did not have any way of diverting themselves as they sat in their filthy dorm rooms.

## Defendants Deprived Plaintiffs of Fresh Food

46.     Defendants deprived the Plaintiffs of adequate nutrition and deliberately served them spoiled food on a continuous basis. Plaintiffs who worked in the kitchen, including Plaintiff Bakar, were told to serve pre-packaged meat and food well past the expiration date on the packages. Kitchen workers were ordered to serve sour milk, even though fresh milk was in the refrigerator. Plaintiffs were not given sufficient quantities of food, and requests for additional food routinely were rejected.

47.     Plaintiffs became ill as a result of eating the spoiled food. Plaintiff kitchen workers were told by Defendants Esmor Officers and Defendant Guards not to report food problems to I.N.S. inspectors who visited the facility. Nonetheless, on an ongoing basis, Plaintiffs reported the food problems to various Defendant I.N.S. Officials during regularly scheduled meetings.

## Defendants Deprived Plaintiffs of Adequate Clothing and Personal Hygiene Necessities

48.     On a continuous basis, Defendants denied the Plaintiffs adequate clothing. Although the Contract required that Plaintiffs and other asylum seekers be supplied with clean clothing twice a week, the Plaintiffs were given a change of clothes only weekly or every few weeks. Plaintiffs who wanted clean clothing were left with no other alternative but to wash their own clothing in the dorm sinks. On a continuous basis, Plaintiffs were

beaten by Defendant Guards for washing their clothes or for requesting detergent or soap.

49.    Frequently, garments, including underwear, were dirty and soiled with human waste when Plaintiffs received them.  Both men and women were given men's underwear.  The underwear was often several sizes too big.  Women Plaintiffs often received underwear with large question marks drawn in the crotch area.

50.    On a continuous basis, Plaintiffs were denied basic personal hygiene necessities, such as soap, shampoo, towels, sheets, toothpaste, and feminine hygiene products.  The number of toilet and shower facilities was insufficient to serve the Plaintiff population.

## Defendants Denied Plaintiffs Their Right to Legal Assistance

51.    Defendant Guards hindered the Plaintiffs' ability to reach their immigration attorneys by telephone.  Defendant Guards refused to allow Plaintiffs to use the telephone to discuss their cases with their asylum counsel.  Oftentimes, this caused Plaintiffs to miss their asylum hearings.

52.    Plaintiffs did not have access to a law library or any legal materials.

53.    Defendant Guard Williams frequently denied Plaintiffs use of the telephone in retaliation for complaints Plaintiffs made at meetings between the Plaintiffs and Defendants Esmor Officers and I.N.S. Officials.

54.    On a continuous basis, Defendant Guards failed to transport Plaintiffs to their asylum hearings on time.  This resulted in the postponement of Plaintiffs' asylum cases and a prolongation of their detention.

21

## Defendants' Physical and Mental Abuse of Plaintiffs

55.    The Defendant Guards engaged in a continuous pattern and practice of abuse and degradation of the Plaintiffs.  Defendant Guards frequently beat the Plaintiffs, oftentimes in response to Plaintiffs' requests for food, clothing, cleaning supplies, or use of the bathrooms.  Defendant Guards also placed Plaintiffs in solitary confinement, without hearings.  There, Plaintiffs were denied access to exercise, recreation, and natural light.  Defendant Guards placed the Plaintiffs in shackles and other restraints when they were in solitary confinement -- at times chaining Plaintiffs to their beds -- and during visits with family members and attorneys.

56.    Defendant Guards, as part of a continuous pattern and practice of abuse, also subjected Plaintiffs to extreme mental and emotional abuse.  Defendant Guards verbally abused Plaintiffs by using racial and ethnic epithets and incessant profanity.  Defendant Guards on the night shift did not permit the Plaintiffs to sleep.  They blared the televisions and radios and kept the lights on 24 hours each day.  Defendant Guards often woke Plaintiffs and other asylum seekers up whenever they nodded off to sleep for the purpose of taunting the Plaintiffs and other asylum seekers.

57.    Defendant Guard Sneed, as part of a continuous pattern and practice of abuse, woke the Plaintiffs of Dorm D before sunrise and forced them to stand facing a wall, with their legs spread, for up to an hour each time.  The frisks conducted by Defendant Guard Sneed would begin at the Plaintiff's ankle.  Upon reaching the genitalia area, Defendant Guard Sneed would forcefully yank the Plaintiffs' genitals in an upward motion, causing Plaintiffs excruciating pain.  Throughout this daily early-morning procedure, Plaintiffs were subjected to the constant verbal abuse of Defendant Guard

22



Sneed and other Defendant Guards. If a Plaintiff made any motion or sound that Defendant Guard Sneed found offensive, Defendant Guard Sneed would send Plaintiffs to solitary confinement, without a hearing.

58.    When Plaintiff Ackah lived in Dorm D, he was responsible for part of the cleaning duties. On one occasion, Defendant Guard Sneed ordered Plaintiff Ackah to clean the bathroom. When Plaintiff Ackah explained that he already had completed his cleaning assignment, Defendant Guard Sneed punched him hard in the stomach. Defendant Guard Sneed then pushed Plaintiff Ackah and bashed Plaintiff Ackah's head against a wall. While beating Plaintiff Ackah, Defendant Guard Sneed screamed racial epithets at Plaintiff Ackah, such as "Fucking African! Go back to your own country! We don't need you here!" Plaintiff Ackah reported the incident to Defendant Guard Johnson, who took no action and merely told Plaintiff Ackah that "Sneed is a bad officer." Plaintiff Ackah later filed grievances with Defendant Esmor Officers and with Defendant I.N.S. Plaintiff Ackah never received a response to his complaint.

59.    Defendant Guard Higgs severely beat Plaintiff Awotwe. Defendant Guard Higgs punched, slapped, and kicked Plaintiff Awotwe in response to Plaintiff Awotwe's inquiry as to why Defendant Guard Higgs was rummaging through Plaintiff Awotwe's documents supporting his claim for political asylum.

60.    Defendant Guard Clark physically abused Plaintiff Jama by beating her with a hard boot in the presence of other Plaintiffs and another Defendant Guard. Defendant Guard Clark pulled Plaintiff Jama's hair and then pushed Plaintiff Jama against the wall where she kicked Plaintiff Jama repeatedly all over her body.



61.    Defendant Guard Michelle punched Plaintiff Jeffrey in the abdomen when Plaintiff Jeffrey complained of severe menstrual cramps.

62.    Defendant Guard Wallington, Defendant Guard Nkenke, and one other Defendant Guard attacked Plaintiff Raji in the middle of the night near the "booking desk." Defendant Guard Wallington shackled Plaintiff Raji's hands and feet to his bed for two hours. Plaintiff Raji then was placed in solitary confinement for several weeks without receiving a hearing.

63.    On one occasion, Plaintiff Manu witnessed Defendant Guard Browndie brutally beat another asylum seeker, Addisson, for requesting to use the toilet. Defendant Guard Browndie repeatedly smashed Addisson's head against the wall, causing a severe head wound and profuse bleeding.

64.    Defendant Guards shackled Plaintiff Bakar each time he took out the garbage or cleaned the visitation room, the corridor, or the "booking room." Plaintiff Bakar's hands, feet, and waist were chained every time he was taken to the doctor. Defendant Guards shackled Plaintiffs Anang and Debrah whenever either Plaintiff had to make a court appearance.

65.    Plaintiffs Jama, Jeffrey, Nanteza, and Yower were shackled each time they visited with their family members or attorneys.

66.    Defendant Guards repeatedly used ethnic and racial slurs when referring to the Plaintiffs. They called them "African monkeys," and said that they came from the "jungle" and that they should go back to Africa if they did not like the conditions at Esmor Elizabeth.

67.    Defendant Guard Tate and other Defendant Guards would not allow Plaintiffs to use the toilets when they woke up in the morning. These Defendant Guards would make them wait until the next Defendant Guards began their shift several hours later.

<u>Defendants' Sexual Abuse of Plaintiffs</u>

68.    As part of a continuous pattern and practice of abuse, the Defendant Guards often used their positions of authority to sexually abuse and humiliate Plaintiffs.

69.    Plaintiffs Jeffrey, Nanteza, and Yower and the other women Plaintiffs in their dorm were sexually abused by Defendant Guards who would inappropriately touch their bodies and breasts when they counted the Plaintiffs each night. When the Plaintiffs asked the Defendant Guards to stop touching them in a sexual manner, the Defendant Guards responded that they considered these molestations to be privileges of their jobs.

70.    Defendant Guards requested sexual favors from the women Plaintiffs. Women Plaintiffs lived in fear of the Defendant Guards. Women Plaintiffs who did not perform such favors were treated poorly and were denied access to the telephone to contact their lawyers. Defendant Guards coerced some women into performing sexual favors so that they could use the telephones and receive fresh food from outside the facility.

71.    Defendant Guards would sexually harass and assault the women Plaintiffs who worked in the laundry room. Plaintiff Jeffrey asserts that Defendant Guard Johnson repeatedly touched her breasts whenever she was at work.

25

72.    Plaintiff Bakar asserts that he was sexually assaulted by Defendant Guard Gill. Plaintiff Bakar asserts that he awoke to find Defendant Guard Gill fondling his penis and touching his body. Plaintiff Bakar asserts that he immediately reported this incident to Defendant Guard Johnson, who was in charge of the dormitory, and that he received no response. Throughout the rest of Plaintiff Bakar's stay at Esmor Elizabeth, other Defendant Guards taunted Plaintiff Bakar for having been sexually assaulted.

### Unlawful Forcible "Strip-Searches" of Plaintiffs

73.    Defendant Guards, as part of a continuous pattern and practice of abuse, searched Plaintiffs en masse. These searches, which included strip-searches and body-cavity searches, were done in a manner designed to humiliate and degrade Plaintiffs.

74.    Defendant Guards Brown, Wallington, Figel, Wilson, and Jackson, Esmor Officer Defendant Lima, and various other John Doe Defendants forcibly strip-searched the Plaintiffs in Dorms A through H. This included Plaintiffs Ackah, Addai, Alibi, Manoharan, and Bakar. The Defendant Guards entered the dormitories wearing black riot dress, rather than their customary uniforms. The Defendant Guards ordered the Plaintiffs to strip, line up against the wall, and spread the cheeks of their buttocks, while a dog sniffed them. Defendant Guard Brown video-taped the entire search, including the body-cavity search. Defendant Guards fondled the penises of the Plaintiffs during the strip-search. Throughout the ordeal the Defendant Guards continuously insulted the Plaintiffs with profane language and ethnic and racial slurs about their African heritage. Esmor Officer Defendant Lima supervised this search.

## Unlawful Solitary Confinement of Plaintiffs

75.    As part of a continuing pattern and practice of abuse, Defendant Guards locked Plaintiffs in solitary confinement cells, which they referred to as "segregation." Defendants Guards sent Plaintiffs to segregation without warning or explanation and for unspecified periods of time, ranging from several days to several months. Plaintiffs were held for 24 hours a day in approximately 6 x 10-foot cells that lacked natural light. While in segregation, Plaintiffs often were shackled to their beds. The Plaintiffs received no exercise and were denied reading material while in segregation.

76.    Plaintiff Raji was beaten, shackled, and placed in segregation by Defendant Guard Wallington because Defendant Guard Wallington had overheard Plaintiff Raji complaining to the Chief of Security and to other Plaintiffs about the theft of his money by Esmor Elizabeth personnel. Plaintiff Raji remained in segregation for three weeks without ever being informed of the charges against him and without having a hearing. While in isolation, Plaintiff Raji was not permitted to go outside and exercise and was denied reading material.

77.    Plaintiff Kenneh was placed in segregation for approximately 16 days. Plaintiff Kenneh did not receive a hearing before being placed in segregation. While in segregation, one Defendant Guard commented to another guard that Defendant Guards could treat asylum seekers "any way they liked," because they were in the country "illegally." Another Defendant Guard then commented that asylum seekers "must pay the price" and "must suffer" for coming to the United States illegally. Plaintiff Kenneh did not receive a hearing before his placement in segregation. While in segregation, Plaintiff Kenneh received no exercise and was denied reading material.

78.     Defendant Guard Johnson placed Plaintiff Awotwe in segregation after Defendant Guard Higgs assaulted Plaintiff Awotwe. Plaintiff Awotwe was not told why he was placed in segregation, nor was he told how long he would be kept there. Also, he was not given a hearing. Plaintiff Awotwe was never allowed to leave his cell and had no exercise during his time in segregation. In addition, he was denied reading material. While in segregation, Plaintiff Awotwe could hear the cries of other Plaintiffs who were confined in nearby cells.

79.     Defendant Guards shackled Plaintiff Bakar's legs and locked him in the "booking room." Plaintiff Bakar was left in the cold room overnight for 12 hours without food, heat, a bed, or a blanket. At no time did anyone inform Plaintiff Bakar why he was left alone in the cold "booking room."

80.     Plaintiff Anang witnessed the Defendant Guards beat Francis, an asylee who refused to take his clothes off for a strip-search. Defendants punched Francis all over his body, particularly in his stomach, and placed him in segregation for two weeks. Francis said he was not given a hearing before being placed in segregation, and also was denied reading material. He was not permitted to exercise.

81.     Defendants placed Plaintiff Jama in segregation for two days after she was assaulted by Defendant Guard Clark. Defendant Clark had beaten Plaintiff Jama with a boot before placing her in segregation. Plaintiff Jama was not given a hearing before being placed in segregation. While in segregation, Plaintiff Jama did not receive any exercise and was denied reading material.

82.     Plaintiff Alibi took a medical request slip (which was located on Defendant Guard Sneed's desk in Dorm D) to report an illness to the Esmor Elizabeth medical

28

staff. Defendant Guard Sneed accused Plaintiff Alibi of "spying." Defendant Guard Sneed then placed Plaintiff Alibi in segregation, where he beat Plaintiff Alibi. Plaintiff Alibi was not given a hearing before being placed in segregation. While in segregation, Plaintiff Alibi received no exercise and was denied reading material.

83.    Plaintiff Kenneh witnessed Defendant Guard Mohammed accuse Adam, an asylee from Somalia, of taking the remote control of the television. Defendant Guard Mohammed punched Adam repeatedly and Adam subsequently was placed in segregation for 15 days. Adam told Plaintiff Kenneh that he did not receive a hearing before being placed in segregation. While in segregation, Adam did not receive any exercise and was denied reading material.

### Defendants Coerced Plaintiffs To Perform Strenuous Labor For Which They Never Were Compensated

84.    Pursuant to well-settled law, Plaintiffs, who were detained immediately upon entering the country, were not authorized to work in the United States or while in I.N.S. custody. In violation of Plaintiffs' rights, and the law, Defendants forced Plaintiffs to perform strenuous labor and did not compensate the Plaintiffs for their work.

85.    During the construction of dormitories at Esmor Elizabeth, Plaintiffs Ackah, Addai, and other Plaintiffs performed manual labor, including carrying and installing heavy items such as metal for structural work, air conditioners, appliances, gym equipment, and other machines. Also, they were ordered to work for several hours each day assembling new beds, putting the beds in the proper dormitories, painting rooms,

29

fixing the gym, and cleaning the facility. The Plaintiffs did not receive compensation for their work.

86.    Plaintiff Awotwe was compelled to work in the kitchen at Esmor Elizabeth daily from 5:00 a.m. until 1:00 p.m. Plaintiff Awotwe was paid only one dollar per day for his labor.

87.    Plaintiff Bakar worked in the kitchen daily for 11 months. He was promised one dollar per day for his labors, but has never received any payment. Plaintiff Bakar was not permitted to take a day off when he was feeling sick. Plaintiff Bakar was threatened with beatings by Defendant Guards if he did not arrive at 5:00 a.m. for kitchen duty.

88.    Plaintiffs Jeyakumar, Manoharan, and Bakar cleaned bathrooms and dormitories, and swept and mopped floors every day at Esmor Elizabeth. Plaintiffs Jeyakumar, Manoharan, and Bakar never received any payment for their labor.

89.    Plaintiff Jama worked in the laundry room daily from September 1, 1994 until November 1, 1994. Plaintiff Jama worked every day from 7:30 a.m. until 2:30 p.m. and was paid only 10 dollars for two months of work.

90.    Plaintiff Jeffrey worked in the laundry room daily from September 1, 1994 until November 1, 1994. Plaintiff Jeffrey worked every day from 7:30 a.m. until 2:30 p.m. and never received any compensation for her work.

30

## Defendants Deprived Plaintiffs of Their
### Right to Exercise Their Religions

91.    As part of a continuing pattern and practice of abuse, Defendant Guards prevented Plaintiffs from practicing their religious rituals. The Defendant Guards prohibited the women Plaintiffs from praying in the dormitory and ordered them to pray in the gym. The women Plaintiffs could not pray in the gym because they were given access to it only when it was being used for competitive sports. The gym was too loud and not conducive to the quiet contemplation required for prayer.

92.    The Defendant Guards also prohibited the women Plaintiffs from observing Muslim rituals that required them to wear head coverings when they prayed. Defendant Guards denied requests by the women Plaintiffs for sheets to wear on their heads when they prayed. When women Plaintiffs used their bed sheets as head coverings, Defendant Guards repeatedly yanked the sheets from the their heads, interrupting their prayers.

93.    Defendant Guards prevented Plaintiffs from observing Ramadan, the holiest holiday of the Islamic faith. During Ramadan, Muslims are required to fast during the day. They can only eat after sunset. Breakfast, lunch, and dinner at Esmor Elizabeth all were served before sunset. Defendant Guards refused to allow Muslim Plaintiffs who were fasting to save their dinner until after sunset. As a result, these Plaintiffs received no food for the whole day; only to continue fasting the following day. Defendant Guards' actions forced Plaintiffs to choose between going hungry for days and violating their religious practices and beliefs.

## Defendants Deprived Plaintiffs of Their Personal Property

94.     Plaintiffs took everything that they could carry when they fled their native countries for the United States.  Some Plaintiffs converted their savings into precious metal objects or jewelry for easier transportation.  Defendant Guards took this property when Plaintiffs arrived at Esmor Elizabeth and gave them property vouchers in return.  When Plaintiffs were moved from Esmor Elizabeth after the Events, their property was not returned to them or transferred to them.  Indeed, the Interim Report noted that Defendant Esmor Corporation did not supervise its employees properly in administering the Plaintiffs' and other asylum seekers' accounts.  (See Interim Report, pp. 31-32.)

95.     On or about April 10, 1995, Defendant Guard Wallington punched Plaintiff Raji and forced him to sign a receipt that misrepresented the amount of money that Plaintiff Raji had in his possession when he arrived at Esmor Elizabeth.  Defendant Guard Nkenke witnessed Defendant Guard Wallington's coercion of Plaintiff Raji and assisted in a scam to deprive Plaintiff Raji of his money by promising him asylum.  As a result of the conduct of Defendant Guards Wallington and Nkenke, Plaintiff Raji was deprived of $7448.45 of his money.  Before and after the June 18, 1995 Events, Plaintiff Raji made repeated attempts to access his money by writing to Defendant I.N.S.  To date, his missing money has not been returned to him.

96.     Plaintiff Bakar's bag was taken from him by Defendant Guards when he arrived at Esmor Elizabeth.  He was given a voucher for his bag.  Plaintiff Bakar's bag contained video cassettes, a gold pen encrusted with two diamonds and valued at $2500, a gold watch, two suits, and three pairs of leather shoes.  Although Plaintiff Bakar has requested his bag from Defendant I.N.S. several times, it never was returned to him.

97.     Plaintiff Jeyakumar had $2900 worth of jewelry and a $400 leather jacket when he arrived at Esmor Elizabeth.  His property was taken from him by Defendant Guards when he entered the facility, and he received a voucher.  His property was not returned to him after the Events.  When he requested his property from Defendant I.N.S. after the Events, he was told that the whereabouts of the property were unknown.

98.     Plaintiff Manoharan's bags were taken from him by Defendant Guards when he arrived at Esmor Elizabeth.  Even though he has located one of his bags, that bag and its contents were ruined.  His other bag, which was not returned to him after the Events, contained such valuables as jewelry, a typewriter, and important documents.

99.     Several Plaintiffs were told by friends and relatives that the friends and relatives mailed them cash to use in the facility's commissary.  The Plaintiffs never received this cash.

100.    Plaintiff Awotwe had a suitcase that contained jewelry when he arrived at Esmor Elizabeth.  His bag was taken from him by Defendant Guards and he received a voucher for his property.  His possessions were not returned to him after the Events. He has requested this property from the I.N.S., but his property never has been returned.

101.    Plaintiff Nanteza's property was taken from her by Defendant Guards upon her arrival at Esmor Elizabeth.  Plaintiff Nanteza received a voucher for her property. Plaintiff Nanteza requested that Defendant I.N.S. return her possessions after the Events, but she has not received any of her property.  Among the missing property is jewelry, clothing, religious cassettes, and a Bible.

102.    Plaintiff Manu's personal possessions, including a camera, a set of earphones, a leather suitcase, and clothing, were taken from him by Defendant Guards

33

when he arrived at Esmor Elizabeth. He received a voucher for his property. Plaintiff Manu has been able to retrieve his suitcase but not its contents. The suitcase was returned damaged.

103. Defendant Guards threw away Plaintiff Jeffrey's engagement and wedding rings while she was at Esmor Elizabeth. Defendant Guards also took away Plaintiff Jeffrey's suitcase, which contained her clothes and shoes. They gave her a voucher for this property. Her property has not been returned to her despite her repeated requests to the I.N.S.

104. Plaintiff Serwaa's belongings were taken from her by Defendant Guards at Esmor Elizabeth. These belongings included shoes, a leather coat and clothes. She received a voucher for her property. Her property has not been returned to her despite repeated requests to the I.N.S.

105. On January 20, 1995, Esmor Officer Defendants Lima and Rozos informed Plaintiff Kenneh that his financial account of $3465.00 was frozen in order to pay for the medical treatment of another asylum seeker whom Plaintiff Kenneh had been accused of injuring. From January 20, 1995 to March 3, 1995, Plaintiff Kenneh had no access to his funds. Plaintiff Kenneh still does not have full access to his funds.

106. After the Events of June 18, 1995, individuals under the employment and supervision of Defendants I.N.S. and Esmor Corporation stood at the facility's door with large waste bins and took documents and other property belonging to the Plaintiffs. This property included documentation critical to Plaintiffs' asylum proceedings. When Plaintiffs attempted to preserve their property and documents, the property and documents were forcibly taken from them and thrown into the waste bins. Even

34

documents that Plaintiffs identified as being related to their asylum claims were thrown into the bins.

### Defendants Denied Plaintiffs Adequate Medical Treatment

107.   Plaintiffs were told that in order to see a doctor they had to fill out medical request forms. Plaintiffs frequently had to wait several days or weeks from the time they submitted a medical request form until they were examined. Plaintiffs who suffered from chronic illness such as heart disease and diabetes were not given medication for their illnesses. The medical staff at Esmor Elizabeth dispersed only Tylenol for every medical ailment. As a result of waiting an unreasonable time to see a doctor and receiving inadequate health care, plaintiffs were harmed.

108.   Plaintiff Jama sustained stomach and head injuries when she was severely assaulted by Defendant Guard Clark. Plaintiff Jama was offered only Tylenol for her injuries.

109. Plaintiff Badjoko has high blood pressure, but was never checked by a physician or given medication for her condition, even though she submitted several medical request forms to see a doctor.

110.   Plaintiff Raji received severe beatings for reporting that Defendants Esmor Officers and Guards took his property and currency. Plaintiff Raji was beaten by Defendant Guards and placed in solitary confinement. He requested to see a doctor many times. He was not permitted to fill out a medical request form and was denied access to the doctor for treatment of his injuries.

35

111.    Plaintiff Raji was exposed to tuberculosis when he was transferred to another I.N.S. detention facility in Allentown, Pennsylvania where there was a tuberculosis outbreak. Plaintiff Raji was given tuberculosis medication while in the Allentown facility. Upon being taken back to Esmor Elizabeth, he requested tuberculosis medication and was denied it. Plaintiff Raji was never tested for tuberculosis at Esmor, even though he requested screening and medication.

112.    For several months, Plaintiff Bakar submitted medical request forms detailing his severe abdominal pain. When he was finally examined, he had to have an emergency hernia operation.

### The Complicity and/or Acquiescence by Defendants I.N.S. Officials, Esmor Corporation, and Esmor Officers in the Pattern of Abuse

113.    Defendants I.N.S. Officials and Esmor Officers were fully aware, or should have been aware of the physical and mental brutality inflicted on the Plaintiffs by Defendant Guards. Throughout the 11 months that Esmor Elizabeth was operational, Defendant I.N.S. Officials, including Defendants Rozos, Uzzle, and Silva, held meetings, sometimes on a weekly basis, that were attended by Plaintiffs from various dorms, including Plaintiffs Ackah, Awotwe, Manu, and Jeffrey. During these meetings, Plaintiffs repeatedly informed these Defendants that they were subjected to constant physical, mental, and sexual abuse by Defendant Guards, that the food was spoiled, that the clothing was filthy and inadequate to keep the Plaintiffs warm, that it was too cold in the facility, that they were denied health care and access to their counsel, that their property was missing, and that they were subjected to strip-searches. Defendant Rozos responded

36

each week that he could not do anything to remedy the problems because he was not an Esmor officer, and that he would discuss the abuses with Esmor Officer Defendant Stovall, the Esmor Elizabeth administrator. In addition, the Contract gave Defendant I.N.S. Officials complete access to all records kept by Defendant Esmor Corporation regarding operation of the Esmor Elizabeth facility.

114. Defendant I.N.S. Officials had a duty to check these records to ensure that Plaintiffs' rights were not being violated by Defendant Esmor Corporation and its employees or agents. The Interim Report, attached hereto as Exhibit A, states that Defendants I.N.S. and I.N.S. Officials notified Defendant Esmor Corporation of at least some of the abuses inflicted on the Plaintiffs by the Esmor Corporation's employees and agents, putting it on actual notice of these abuses. Moreover, on a regular basis, whenever Plaintiffs and other asylum seekers saw Defendant Esmor Officers, they complained to them of the abuses they suffered at the hands of Defendant Guards. No action was taken to protect the Plaintiffs from the ongoing and continuous brutality discussed throughout this complaint.

115. Defendants I.N.S. Officials and Esmor Officers, as well as the command structure of Defendants I.N.S. and Esmor Corporation, knew or should have known that the pattern of brutality that violated Plaintiffs' rights was extreme and outrageous, and existed at Esmor Elizabeth. Defendants' failure to take measures to curb this pattern of brutality constitutes an acquiescence in the unlawful behavior of the Defendant Guards. The widespread extent of these practices, and general knowledge of their existence, and the failure of these Defendants to take remedial action after the misuse of force was brought to their attention, constitutes deliberate indifference to the rights and safety of

the Plaintiffs and other men and women in their care and custody. These Defendants' conduct was a substantial factor in the continuation of the pattern of brutality, and a proximate cause of the violations (constitutional, human, statutory, and common law) alleged in this complaint.

116.    The pattern of unrestrained physical and mental brutality by Defendant Guards, the failure of Defendants I.N.S. Officials and Esmor Officers to stop this brutality, and the failure of Defendants Esmor Corporation and I.N.S. to conduct unbiased and thorough investigations of this brutality and to engage in prompt and meaningful discipline of its employees, became so institutionalized as to demonstrate a policy or custom of deliberate indifference that tacitly authorized and permitted the physical and mental brutality of Plaintiffs and other asylum seekers at Esmor Elizabeth. It was this policy or custom, by which the Esmor Corporation employees at Esmor Elizabeth remained free to brutalize the asylum seekers at Esmor Elizabeth and cover up their unlawful conduct, that caused the deprivation of Plaintiffs' (constitutional, human, statutory, and common law) rights.

117.    Defendants I.N.S. and Esmor Corporation failed and refused to hold accountable Defendants I.N.S. Officials, Esmor Officers, and Guards in the face of evidence of frequent, significant misconduct. This failure is a proximate cause of the harm suffered by the Plaintiffs and other asylum seekers at Esmor Elizabeth.

## CLAIMS AGAINST DEFENDANT I.N.S.

### 1st Cause of Action

118.    Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 117 above.

119.    Defendant I.N.S. is responsible, under the theory of respondent superior of New Jersey state law, and consequently, the Federal Tort Claims Act, for the intentional torts -- including battery, assault and  intentional infliction of emotional distress -- of Defendants Esmor Corporation, Esmor Officers, and Esmor Guards.  The torts committed against the Plaintiffs arose from the actions the Esmor Defendants were employed to perform while fulfilling the Contract with Defendant I.N.S., and occurred solely within Esmor Elizabeth, while these defendants were fulfilling their contractual obligation to Defendant I.N.S.

### 2nd Cause of Action

120.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 119 above.

121.    Defendant I.N.S. breached its contractual duties of care to Plaintiffs, who were intended third party beneficiaries of the Contract.  As a result of the breach, Plaintiffs suffered severe physical and mental harm.

39

### 3rd Cause of Action

122.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 121 above.

123.   Defendant I.N.S. by its failure to exercise ordinary care in the selection, training, supervision and evaluation of Defendants Esmor Corporation, Esmor Officers, and Guards is liable under the laws to the state of New Jersey and the Federal Tort Claims Act for the harm caused to Plaintiffs as a result of these acts and omissions.

### 4th Cause of Action

124.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 above.

125.   Defendant I.N.S. had a duty to ensure that Plaintiffs' personal property, which was confiscated from Plaintiffs upon their detention at Esmor Elizabeth, remained safe and could be recovered by Plaintiffs when they were released from I.N.S. detention.

126.   Defendant I.N.S. failed to protect Plaintiffs' personal property. Pursuant to New Jersey state law and the Federal Tort Claims Act, Defendant I.N.S. is responsible for reimbursing Plaintiffs for the value of their missing property.

### 5th Cause of Action

127.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 126 above.

128.   By failing to take appropriate steps to curb the widespread pattern of brutality against Plaintiffs at Esmor Elizabeth, Defendant I.N.S. violated Plaintiffs right

40

to be treated with humanity and with respect; their right to have their physical, mental, and moral integrity respected; and their right to life, liberty, and security in direct violation of the International Covenant on Civil and Political Rights, Article 10(1), and in violation of customary international law as informed by the American Convention on Human Rights, Article 5(1), and the Universal Declaration of Human Rights, Article 3.

## 6th Cause of Action

129.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 128 above.

130.    By failing to take appropriate steps to curb the widespread pattern of abuse of Plaintiffs being placed in solitary confinement without a hearing, Defendant I.N.S. deprived Plaintiffs of their liberty rights, in direct violation of the International Covenant on Civil and Political Rights, Article 9(4), and in violation of customary international law as informed by the American Convention on Human Rights, Article 8(1).

## 7th Cause of Action

131.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 130 above.

132.    By failing to ensure that Plaintiffs' personal property was protected and that Plaintiffs were not deprived of their personal property without compensation, Defendant I.N.S. violated customary international law as informed by the American

41

Convention on Human Rights, Article 21(2), and the Universal Declaration of Human Rights, Article 17(2).

## 8th Cause of Action

133. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 132 above.

134. Defendant I.N.S. substantially burdened Plaintiffs' rights to the free exercise of their religion guaranteed by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq., by failing to take appropriate steps to curb the widespread pattern of brutality of Plaintiffs who attempted to practice their religions.

## 9th Cause of Action

135. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 134 above.

136. By failing to take appropriate steps to curb the widespread pattern of brutality of Plaintiffs who attempted to practice their religions, Defendant I.N.S. deprived Plaintiffs of their right to manifest their religion or belief in worship, observance, and practice, in direct violation of the International Covenant on Civil and Political Rights, Article 18(1)-(2), in violation of customary international law as informed by the American Convention on Human Rights, Article 12(1)-(2), and the Universal Declaration of Human Rights, Article 18.

42

<u>10th Cause of Action</u>

137.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 138 above.

138.   By failing to take appropriate steps to curb the widespread pattern of brutality of Plaintiffs who were forced to engage in unpaid labor, Defendant I.N.S. violated the International Covenant on Civil and Political Rights, Article 8(2), and violated customary international law as informed by the Convention Concerning Forced or Compulsory Labour, Article 1(1), the American Convention on Human Rights, Article 6(1)-(2), and the Universal Declaration of Human Rights, Article 4.

## CLAIMS AGAINST DEFENDANT I.N.S. OFFICIALS

### 11th Cause of Action

139.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 138 above.

140.   Defendant I.N.S. Officials violated Plaintiffs' Fifth Amendment due process rights by failing to curb the widespread pattern of brutality at Esmor Elizabeth, which included the following:

(a)   Plaintiffs were arbitrarily beaten by Defendant Guards;

(b)   Plaintiffs were placed in solitary confinement for indefinite periods of time without any hearing, method of recourse, or appeal;

(c)   Plaintiffs were sexually assaulted by Defendant Guards;

(d)  Plaintiffs were coerced into performing sexual acts in return for services due to them under the Contract and special privileges;

43

(e)     Plaintiffs were ogled and demeaned by Defendant Guards who watched them and made lewd remarks as they used the toilets and showered;

(f)     Plaintiffs were subjected to unwarranted and unreasonable searches, including strip-searches, some of which were videotaped;

(g)  Plaintiffs were continuously subjected to verbal abuse by Defendant Guards, including racial and ethnic slurs;

(h)     Plaintiffs were not provided with adequate clothing and personal hygiene supplies;

(i)     Plaintiffs' personal property was either confiscated or destroyed while they were detained at Esmor Elizabeth;

(j)  Plaintiffs were consistently served spoiled food;

(k)  Plaintiffs were denied adequate and appropriate medical attention;

(l)  Plaintiffs were denied access to their counsel.


## 12th Cause of Action

141.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 140 above.

142.    Defendant I.N.S. Officials violated Plaintiffs' rights under Article I, Paragraphs 1 and 20 of the New Jersey Constitution by failing to curb the widespread pattern of brutality at Esmor Elizabeth, which included the following:

(a)     Plaintiffs were arbitrarily beaten by Defendant Guards;

(b)     Plaintiffs were placed in solitary confinement for indefinite periods of time without any hearing, method of recourse, or appeal;

44

(c)    Plaintiffs were sexually assaulted by Defendant Guards;

(d)    Plaintiffs were coerced into performing sexual acts in return for services due to them under the Contract and special privileges;

(e)    Plaintiffs were ogled and demeaned by Defendant Guards who watched them and made lewd remarks as they used the toilets and showered;

(f)    Plaintiffs were subjected to unwarranted and unreasonable searches, including strip-searches, some of which were videotaped;

(g)    Plaintiffs were continuously subjected to verbal abuse by Defendant Guards, including racial and ethnic slurs;

(h)    Plaintiffs were not provided with adequate clothing and personal hygiene supplies;

(i)    Plaintiffs' personal property was either confiscated or destroyed while they were detained at Esmor Elizabeth;

(j)    Plaintiffs were consistently served spoiled food;

(k)    Plaintiffs were denied adequate and appropriate medical attention;

(l)    Plaintiffs were denied access to their counsel.


## 13th Cause of Action

143.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 142 above.

144.    By failing to curb the widespread pattern of brutality at Esmor Elizabeth, Defendant I.N.S. Officials violated Plaintiffs' right to be treated with humanity and with respect; right to have their physical, mental, and moral integrity respected; and their

45

right to life, liberty, and security in direct violation of the International Covenant on Civil and Political Rights, Article 10(1), and in violation of customary international law as informed by the American Convention on Human Rights, Article 5(1), and the Universal Declaration of Human Rights, Article 3.

### 14th Cause of Action

145.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 144 above.

146.    Defendant I.N.S. Officials acted with deliberate indifference towards Plaintiffs' human rights by failing to ensure that Plaintiffs received a hearing before being placed in solitary confinement.  Defendant I.N.S. Officials' conduct, in this respect, is a direct violation of the International Covenant on Civil and Political Rights, Article 9(4), and a violation of customary international law, as informed by the American Convention on Human Rights, Article 8(1).

### 15th Cause of Action

147.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 146 above.

148.    Defendant I.N.S. Officials acted with deliberate indifference towards Plaintiffs being deprived of their personal property without any compensation. Defendant I.N.S. Officials' conduct, in this respect, violated customary international law as informed by the American Convention on Human Rights, Article 21(2), and the Universal Declaration of Human Rights, Article 17(2).

46

## 16th Cause of Action

149.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 148 above.

150.    Defendant I.N.S. Officials violated Plaintiffs' rights under the First Amendment of the United States Constitution by acting with deliberate indifference towards the widespread pattern of brutality inflicted on Plaintiffs when they attempted to exercise their religions.

## 17th Cause of Action

151.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 150 above.

152.    Defendant I.N.S. Officials violated Plaintiffs' rights under Article I, Paragraph 3 of the New Jersey Constitution by acting with deliberate indifference towards the widespread pattern of brutality inflicted on Plaintiffs when they attempted to exercise their religions.

## 18th Cause of Action

153.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 152 above.

154.    Defendant I.N.S. Officials, by acting with deliberate indifference towards the widespread pattern of brutality inflicted on Plaintiffs when they attempted to exercise