# The Elizabeth, New Jersey Contract Detention Facility Operated by ESMOR Inc.

## *Interim Report*

## I. Introduction

On May 30 the Headquarters Detention and Deportation Division (HQDDP) was directed by Commissioner Meissner to conduct a program review and investigation of the ESMOR contract detention center located in Elizabeth, New Jersey. HQDDP assembled an Assessment Team drawn from the following Immigration and Naturalization Service (INS) Programs: Headquarters Detention and Deportation (HQDDP); Headquarters Office of Internal Audit (HQOIA); Eastern Region Detention and Deportation (RODDP); and Administrative Center Burlington Administration (ACBADM) - Contracting. An Assistant General Counsel, Office of the General Counsel (HQCOU) was requested to assist the Team with legal issues and a review of the Executive Office for Immigration Review (EOIR).

On June 7 through 10, a review was conducted of the Elizabeth NJ. Detention Facility, which is operated by ESMOR Incorporated (hereinafter ESMOR). Areas of particular concern were the facility's physical plant, its overall operation, and INS oversight of the facility. The review was in response to numerous complaints and allegations of abuse, inappropriate conditions of confinement, and of the failure of ESMOR and INS officials to take appropriate corrective action. Complaints were received by ESMOR, the Newark District Office, and Congressman Robert Menendez, in whose district the facility is located. The complaints were further highlighted, prior to and during the review, in several articles in local newspapers. Congressman Menendez, *pro bono* attorney organizations, unidentified ESMOR guards, and relatives of detainees also made complaints to the INS in the detainees behalf.

On June 19, Commissioner Meissner directed the Assessment Team to expand its investigation of the ESMOR facility to include the detainee disturbance which occurred on June 18. The expanded investigation examined the probable causes of the disturbance, adequacy of response by ESMOR and INS personnel, and emergency plans that were in effect at the time of the disturbance.

The damage to the facility caused during the disturbance rendered the facility temporarily unusable for housing detainees. On July 8, ESMOR advised INS that repairs to the facility have been completed. ESMOR has requested an inspection by INS at its earliest convenience. While the physical facility may be available to INS, there are still many open operational and contractual issues to be addressed prior to the facility once again becoming fully operational.

## II.    Background and History

### A.    Why Does INS Use Contract Detention Facilities?

In developing its detention strategy, INS has developed the concept of balanced detention resources. INS utilizes Government owned and operated Service Processing Centers, local jail space, and contract detention facilities in order to meet its detention needs. INS has used contract detention facilities since 1984, to complement Government owned facilities. There has never been a previous instance of a disturbance at a contract facility of the magnitude experienced at the ESMOR contract facility.

Contract detention facilities comprise nearly 1,100 bed-spaces. This is roughly 16 percent of the approximately 7,000 total bed-spaces INS has available to detain aliens under deportation proceedings.

Contract facilities offer a number of advantages to the Government. By soliciting private contractors to provide bedspace, INS gains the ability to deploy detention capability into needed locations in a relatively short time. Normally a contract facility can be advertised, awarded, and in operation in 18-24 months, whereas a Government facility requires 4-5 years to appropriate, construct, and staff.

One of the biggest advantages of contracts is that they can range from one year to several years. All contracts have provisions for termination, and longer contracts can include provisions for periodic renewal and renegotiation of terms. Some contracts allow the vendor to fill unused space with detainees from other jurisdictions, reducing the requirements for additional facilities. The INS has shared bedspace with the U.S. Marshals Service and the Bureau of Prisons at several of its contract detention facilities.

The use of contract detention facilities is a technique for transferring some detention activities from the Government agencies to the private sector. This is an effective means to maximize the resources available to the INS.

## B.    Solicitation History - Why ESMOR Was Awarded the Contract

In June 1992 INS Headquarters Office of Contracting and Procurement produced a solicitation package for the procurement of a 300 bed detention facility in the New York/Newark area. The procurement package contained a Statement of Work (SOW) provided by HQDDP. This SOW was developed to be the national guideline for INS detention facilities.

The solicitation was advertised in the Commerce Business Daily in September 1992. The request for proposals were due and received on December 14, 1992. The award was predicated upon a combined technical and price formula scoring. In determining the overall score for each proposal a technical committee reviewed the submissions and provided their evaluations of the contractors strengths and weakness to the Administrative Center Burlington (ACBADM) Regional Contracting Officer. The contractors were given the opportunity to address the areas of concern and provide a revised technical proposal. The technical team re-evaluated the proposals and provided their assessments on March 5, 1993. Oral discussions were conducted on *price and technical issues* and Best and Final Offers (BAFO) were requested from each contractor. The technical committee evaluated the BAFOs and provided the final technical score to the ACBADM Regional Contracting Officer.

ESMOR received a total of 145 out of a possible 200 points for their specific technical approach. The price proposals were evaluated by ACBADM utilizing price analysis techniques in determining the price reasonableness of the contractor's proposals. The contract was awarded to ESMOR New Jersey Inc. in August 1993 for a base year amount of 9.3 million dollars. The term of the contract was for a one year period beginning August 3, 1994 plus four one year option periods.

## C.    Why Was the Facility Built?

The INS determined that a substantial increase in recent years of malafide applicants (principally asylum seekers without a credible claim) at both John F. Kennedy International Airport (JFKIA) in New York City and Newark International Airport (NEWIA) in Newark, New Jersey was directly related to the inability of the INS to detain these persons. As part of an overall effort to better control our borders and discourage illegal immigration, the INS issued and awarded a contract to build and operate a 300 bed detention facility to hold aliens attempting unlawful entry at JFKIA and NEWIA.

Prior to the opening of the ESMOR detention facility, the New York District was releasing an average of 650 to 700 aliens per month from JFKIA. Since the opening of the ESMOR facility and the increased availability of bedspace, releases at JFKIA and NEWIA, caused by the lack of bedspace, are believed to have sharply decreased. Exact release figures were requested but not received as this report is written. The number of applicants for admission in the New York District,

who were inspected by INS and determined to be malafide, dropped from a high of 14,000 cases per year to 7,000 cases in Fiscal Year 1994.

## D. Location and Description of Facility

The ESMOR detention facility is located in a warehouse district in Elizabeth, New Jersey, within the jurisdiction of the INS Newark District. The facility is rated for a total of 300 detainees. There is sufficient square footage throughout the facility to support a daily population of 300 detainees and an emergency population of 327 detainees. At the time of the disturbance, INS was maintaining an average of 300 detainees in the facility; with 315 on the day of the disturbance. Persons detained at the facility were chiefly aliens who were placed under exclusion proceedings when they attempted to enter the U.S. at JFKIA or NEWIA with fraudulent documents or no documents. Many of these detainees were applicants for asylum who did not make a credible asylum claim to INS.

The facility contains several dormitory style sleeping areas with adjacent day rooms. Each dormitory has appropriate restroom facilities for use by the detainees. Male and female dormitories are separated in a manner which provides for privacy between genders and is designed to prevent viewing from unauthorized areas. In addition to the dormitory areas, the facility is equipped with support service areas which include a full service medical clinic, full service kitchen preparation and cleaning area, recreation areas (indoor and outdoor), a law library, and a laundry area.

## III. Assessment of ESMOR Operations

The following areas were addressed during the review of ESMOR's operations:

| | | page | |
|----|-------------------------------------|------|----|
| A. | Detainee Welfare | | 5 |
| B. | Policies / Practices / Emergency Plan | | 8 |
| C. | Reporting and Internal Controls | | 12 |
| D. | Staffing and Personnel Issues | | 14 |
| E. | Training | | 18 |
| F. | Food Service | | 20 |
| G. | Medical Care | | 21 |
| H. | Access to Counsel / EOIR / INS | | 24 |
| I. | Physical Facility | | 25 |
| J. | Contract Compliance | | 27 |

July 20, 1995

As part of the overall assessment of ESMOR, the Assessment Team reviewed operations, support programs within the facility, and ESMOR's ability to identify and deal with day-to-day problems. Additionally, ESMOR's ability to interact and communicate with INS and the Executive Office for Immigration Review (EOIR) was evaluated based on concerns of the District, Eastern Region Detention and Deportation (RODDP), and Headquarters prior to and during the assessment.

The Team reviewed other problem areas as necessary. Two assessment visits were conducted; the first on June 7 through June 10 and again after the disturbance of June 18. The Team evaluated complaints from the office of Congressman Robert Menendez, and those provided by *pro bono* attorney groups, and featured in news media accounts concerning ESMOR. Additional complaints that were provided to the Assessment Team during the review by detainees and facility staff were also investigated.

## A.    Detainee Welfare

The INS has made clear its profound commitment to hold alien detainees only in conditions that are humane, safe, and secure. This commitment extends to all detention settings, i.e., INS Service Processing Centers, local jails, and contract detention facilities. Inhumane actions by personnel responsible for the detention of aliens, or actions which are clearly detrimental to the welfare, safety, and security of detainees, are insupportable and totally unacceptable to the INS.

The Assessment Team conducted interviews with 24 detainees, five attorneys, various ESMOR guards, ESMOR Management and INS personnel. From these interviews the Assessment Team discovered that detainees were subjected to harassment, verbal abuse, and other degrading actions perpetrated by some ESMOR guards. There were allegations of physical abuse perpetrated by a small number of ESMOR guards. Of particular concern were the number of complaints regarding maltreatment of detainees by ESMOR employees working the midnight shift. The Assessment Team found that complaints of verbal abuse and general disrespect by ESMOR personnel towards detainees, visitors, and attorneys were credible and that such actions were common on all shifts. The complaints referencing physical abuse typically focused on actions by midnight shift employees. The Assessment Team concluded that these occurrences were not caused by uncontrollable or spontaneous anger on the part of ESMOR guards. Rather, the evidence suggests that these incidents were part of a systematic methodology designed by some ESMOR guards as a means to control the general detainee population and to intimidate and discipline obstreperous detainees through the use of corporal punishment.

Several attorneys reported to the Assessment Team that detainees were being harshly treated. These attorneys, Stephanie Marks, Joyce Phipps, Carmen Mendiola, and Gloria Alfonso stated that during visits to ESMOR they had observed visible marks and bruises on some of the detainees whom they represented. Further, these attorneys said it was not uncommon for them to see detainees pushed up against the wall and treated roughly by contract guards in other ways.

In addition to the available direct evidence of the attorneys, the Assessment Team was able to locate a relevant witness who has provided specific information, as part of an ongoing criminal investigation, concerning many other allegations of abuse. However, various other ESMOR employees simply refused to talk candidly to Assessment Team members out of fear of retaliation or potential prosecution. Others were conveniently unavailable. Still others were clearly less than candid. The following are some examples of abuses reported to the Assessment Team.

**Example 1:** In post-disturbance interviews female detainees reported that they had been issued male underpants. On these underpants, which were generally too large, a large question mark had been made in the area of the crotch.

**Example 2:** Detainees reported that on numerous occasions specific ESMOR personnel refused to issue sanitary napkins to female detainees who were menstruating.

**Example 3:** Detainees and attorneys reported that, in contravention of facility policy, ESMOR guards frequently awakened detainees in the middle of the night, often several times per night. This was done on the pretext of conducting head counts and/or security checks. The true motive manifestly was to harass the detainees. When INS officers at the facility were made aware of this abusive behavior through interviews with detainees, they insured it ceased immediately.

**Example 4:** Theft of detainee property by an ESMOR guard was reported. The INS Assessment Team immediately notified the Office of the Inspector General.

Some of the detainees interviewed were unwilling to provide sworn statements because they feared retaliation. Nonetheless, the Assessment Team found the complaints to be credible and has requested that the Office of Internal Audit (HQOIA) assist with a follow-up investigation. Although no formal allegations of abuse have been filed at this time, HQOIA is pursuing leads that were developed during the assessment. HQOIA will continue to independently investigate, beyond the completion of this report, any additional or unresolved claims or allegations that come within its jurisdiction. The Federal Bureau of Investigation (FBI) has initiated a Civil Rights Investigation to determine if any prosecution is warranted for civil rights violations. The primary focus of the FBI investigation will be ESMOR guards who may have acted in violation of Federal law. Other local law enforcement agencies are reviewing the disturbance for possible prosecution.

As indicated earlier, some ESMOR employees whom the Team interviewed expressed fears that cooperation with investigators would make them vulnerable to job termination and possibly criminal prosecution. It was discovered that some ESMOR mid-level supervisors and guards specifically cautioned their colleagues of the need to remain silent when questioned by members of the Assessment Team. This was referred to in at least one employee muster as "maintaining the blue

wall" (a term sometimes attributed to law enforcement officers, to connote their intention to withhold information from investigators). Nevertheless, the investigation by the Assessment Team uncovered the identities of those ESMOR guards principally responsible for the maltreatment of detainees. The abuser group consisted of five guards and two guard-lieutenants. Six were removed from the contract, terminated, or allowed to resign by ESMOR. These cases are being examined by INS Office of Internal Audit for possible prosecution. The seventh guard was identified as a participant in a single instance of what some characterized as "non-serious harassment." This took place prior to June 18. The facts of the incident did not sustain a probative finding of harassment. The exact incident was murky and conflicting information was presented by witnesses. It is clear that the incident involved only a short verbal confrontation between the guard and a detainee, and the situation was quickly suppressed by other ESMOR guards who separated the disputers.

Based on an overall review, and confronted with the types of misconduct noted above, the Assessment Team concludes no real control was exercised over ESMOR guards by their mid-level supervisors. While the abuse and harassment of detainees happened at hands of a small group of ESMOR guards, and usually during the night shift after facility managers had left for the day, this does not exculpate ESMOR management from responsibility for the actions of its employees.

### Recommendations:

a.    ESMOR should be required to submit to the INS for review and approval a policy and procedure which describes what steps will be taken to notify the INS COTR of any incidents which involve a detainee. Some examples are:

- assault by a detainee on an ESMOR employee (or vice versa) or other detainee.

- incidents requiring placement of detainees in segregation.

- incidents requiring the use of non-routine restraints inside the secure perimeter of the facility, i.e., combative detainees, precautionary due to threat of violence etc.

- incident, or complaint by detainee, alleging misconduct by ESMOR personnel. All incident reports are to be followed with detailed investigations and conclusions as well as identification of disciplinary action taken where complaints are proved.

b.    ESMOR should be required to provide INS copies of complaints made against ESMOR employees. They must include complaints by the general public, attorneys, or other private or public interest groups. This would apply to complaints concerning treatment of detainees and/or conditions of confinement. ESMOR must also provide

to the INS COTR for his follow-up, a copy of their response if any, and a report of what actions they took to resolve the complaint.

## B.   Policies / Practices / Emergency Plan

Deficiencies related to policies, practices, and the emergency plan were found during the review of the ESMOR facility and operations.

**Policies:**

On March 17 RODDP was advised by Officer Norman Uzzle, the INS COTR (the Contracting Officer's Technical Representative is the on-site person who monitors contractor compliance with the contract), that ESMOR had initiated a practice of using leg restraints on every detainee as a means of preventing escapes during visitation and court hearings. Uzzle notified RODDP by faxing them a March 16 newspaper article that outlined the practice. On March 23, ESMOR was notified by INS' Administrative Center Burlington (ACBADM), which administers the ESMOR contract, to cease this practice. The reason for the delay in issuing the notice was that ACBADM had to await an investigation of the incident.

During April, RODDP was notified by Officer Uzzle that ESMOR management had initiated a practice of charging aliens for lost items which ESMOR is required to supply under the terms of the contract. Examples of these items were eating utensils, clothing, drinking cups, etc. Officer Uzzle only became aware of this situation when he discovered a memo notifying the detainees of this practice. ESMOR was requested to provide information to ACBADM regarding this practice. ESMOR responded by rescinding the policy.

Another serious policy violation was alleged during a confidential interview with an ESMOR guard. The guard revealed that placement of detainees into segregation without a charging document was a frequent occurrence. This would be a violation of ESMOR's policy and procedures as well as the standards of the American Correctional Association (ACA) which INS requires contract detention facilities to follow (although the facility is only required to "seek ACA accreditation" within nine months of opening). According to the interviewed guard, the segregation unit was used as a means both of punishing detainees for relatively minor offenses, and for more general harassment. This activity took place primarily on the night shifts. Similar unsolicited charges were made by various attorneys interviewed by the Assessment Team. Attorneys further charged that when an attorney would question the placement of a detainee into segregation and demand an explanation, the attorney would be denied this information by ESMOR managers. Significantly, however, the detainee would quickly be released back into the general population. The credibility of these charges was validated when on June 14 Officer Uzzle notified ESMOR that he had found, in the segregation unit, a detainee who had no offenses listed on his information sheet.

The Assessment Team cannot, without further review and detainee interviews, determine the scope of this practice. ESMOR advised the Team that disciplinary files were destroyed during the recent disturbance. Thus, it is virtually impossible to provide any documentation regarding which detainees received a disciplinary panel hearing. Further detainee interviews, which may provide additional information, are being conducted by INS Special Agents in the Philadelphia District where the aliens are currently detained. The results of these investigations were not available as this report was written.

**Practices:**

**Missed flight and missing property -**

Aliens who had been served with a final notice for removal and for whom departure arrangements had been made often missed their flights. This was generally due to two specific causes. First, early in the contract period, ESMOR personnel often missed flights or forgot to deliver aliens to the airport. Corrective action was taken to better coordinate airport turnarounds and removals from the facility. Second, ESMOR personnel attempted to deport aliens without returning their funds, valuables, and property; a clear violation of both INS' and ESMOR's policy and procedures. Many aliens, properly, refused to get on aircraft without their funds and valuables. They were returned to the facility. Where the delays caused by this procedure resulted in additional man-days being charged to the INS, appropriate deductions were subsequently made by the INS COTR.

Through a review of the INS COTR's files, the Assessment Team found this continued to be a problem even though ESMOR had been notified by the COTR in May that corrective action was needed.

**Policy changes without notification -**

The INS Assessment Team found that ESMOR demonstrated a pattern of initiating changes in policy without prior notification to the INS via its COTR, as required under the contract. This practice of modifying existing policies and/or implementing new ones without properly notifying INS or receiving INS concurrence materially hindered INS' ability to effectively perform its oversight functions. Moreover, some of the decisions made by ESMOR had a serious negative impact upon relations between the INS and the general public since, in the public perception, INS is inextricably linked to the operations of the Elizabeth facility.

**Emergency Plan:**

The Assessment Team made a preliminary review of the ESMOR facility emergency plan and its implementation. The Team interviewed Mr. Willard Stovall, ESMOR Facility Administrator, and Officer Michael Rozos, INS Officer in Charge at the Facility. The facility emergency plan was

reviewed for comment, prior to the opening of the facility, by INS representatives from the Newark and New York Districts. Recommended changes were given to ESMOR for incorporation into a final policy. There is no evidence of any follow-up by the Newark District to see if any of these changes were incorporated.

The Assessment Team found that a serious contract deficiency exists, in that there is no requirement in the contract for INS to approve policies and procedures for this detention facility; including the emergency plans. Even so, ESMOR did not properly implement the plan when needed. ESMOR personnel were either poorly trained in or unaware of the policy and procedures contained in the emergency plan. The Assessment Team found that Newark District did not properly monitor ESMOR's training for emergencies throughout the contract period to ensure a proper level of competence in the guard staff.

Numerous elements listed under ESMOR Policy 8-1 as factors which may contribute to a riot were extant in the facility prior to June 18. ESMOR was aware of the existence in the facility of circumstances listed as warning signs in their policy, having been so informed, along with INS staff at ESMOR, by members of the Assessment Team during the period June 7-10. Those elements identified by the Assessment Team were:

1. Complaints about food.
2. Dissatisfaction with certain staff.
3. Complaints about medical treatment.
4. Complaints regarding privileges.
5. Any large increase in detainee complaints (as featured in disciplinary reports).
6. Misinformation relayed to detainees.

Additionally, the Assessment Team reminded both ESMOR and INS staff that conditions existed that were also later identified as being part of ESMOR Policy 8-1. The plan includes the following caution: "Prompt detection and reporting of a bad climate within the detention facility may allow timely changes and avoidance of incidents that could lead to riots. Indicators might be a detainee's sullen, restless, easily excitable behavior and his avoiding contact with employees."

The Team found that, in large degree, the failure of the policy and procedures was attributable to the lack of training and experience in the case of most of the ESMOR guards. The deficiency in the amount of guard training added to the already volatile environment. Moreover, many of the guards had no actual experience in the detention and handling of people. Faced with an emerging disturbance, the employees adopted an every-person-for-himself mentality and fled the facility.

The Assessment team has further reviewed procedures which are outlined in the emergency plans under "Steps to be Taken" page 3 of Policy 8-1, ESMOR Emergency Plans. As outlined under

the procedures, the facility riot plan should have been promptly activated in conformity with the following:

1. Containment of Rioters:

   a. Staff should take immediate steps to secure any avenue of escape
   b. All areas should be secured to localize and prevent the disorder from spreading
   c. Assessment of the situation should be made prior to committing staff which could result in their being taken hostage.

However, the Assessment Team concluded after interviews of ESMOR personnel and Officer Uzzle that ESMOR guards did not take any steps on their own to prevent escape or secure the perimeter. ESMOR guards took no action to prevent the disorder from spreading. Guards withdrew from the facility and took no action other than to call the local emergency services via 911. Furthermore, the ESMOR duty supervisor failed to take appropriate steps which would ensure ESMOR staff and innocent detainees were not placed in undue jeopardy. The Team concluded that the duty supervisor followed no procedure to account for personnel under his charge, and ensure that all personnel departed the facility. ESMOR staff further failed to properly evacuate and remove female detainees who were clearly not involved in the initial disturbance. Their failure to respond appropriately to this emergency and follow ESMOR policy directly caused one female guard to be taken hostage and placed the female detainees in potentially life-threatening circumstances.

The Assessment Team concluded that the duty supervisor made a serious error in his decision to order an evacuation of guards under the existing circumstances. Moreover, his decision was not made in conformity with ESMOR Policy 8-1.

INS Response Force

Within the ESMOR Emergency Response Policy (8-1), reference is made to an INS response force. Within the Newark District, there is no approved INS Emergency Response Force or Team. What does exist is simply an ad hoc identification of appropriate personnel, including Special Agents, Detention and Deportation personnel and other INS enforcement personnel, who may be contacted during an emergency. The Assessment Team found no evidence of any specialized training performed within the District which would prepare these personnel to work as a single unit in the event of an emergency at ESMOR.

Availability of Plan to Emergency Services

In statements and reports published in the news media immediately after the disturbance, City of Elizabeth, County, and Emergency Services officials claimed that ESMOR and INS had failed to provide necessary emergency plans and information related to the facility.

The Assessment Team found that prior to the opening of the facility, ESMOR and INS officials met with City of Elizabeth Emergency Services personnel. These meetings included the Fire and Police Departments. Then ESMOR Facility Administrator, John Lima, provided physical plant plans and tours of the facility. Additional tours were provided to Special Weapons and Tactical Team representatives as a means to acquaint them with the facility, in case their services were ever needed. Subsequent meetings with local officials were held periodically throughout 1994. Both Mr. Lima and Officer Rozos verified that these meetings had taken place as characterized above. Copies and documentation referencing these meetings have been requested. The Assessment Team concludes that ESMOR and INS did establish appropriate liaison with local Emergency Services entities and provided them with sufficient information upon which to safely and effectively respond to an emergency at the ESMOR facility.

### Recommendations:

a. ESMOR should be required to notify the INS COTR in writing of every change in policy and procedures subject to the contract.

b. INS should physically inspect the segregation unit daily.

c. INS should require ESMOR to develop and implement a sound transportation policy which ensures that aliens depart on scheduled flights with all property, funds and valuables, as required under the contract.

d. ESMOR must provide tighter controls over the processing, storage, and accounting of personal property. ESMOR needs to develop an auditable procedure for assuring the proper safeguards of all detainee property.

e. The contract should be modified to require that INS more closely monitor the quality of ESMOR training.

f. The District should develop an emergency response plan to react to emergent situations at the facility.

g. Require formal INS approval of all contract policies and procedures.

## C.   Reporting and Internal Controls

The Assessment Team found that because of a longstanding ESMOR practice of keeping information from INS, the Service had little knowledge of specific problems or concerns of detainees the custody of ESMOR. The Facility Administrator, Willard Stovall consistently referred to the facility as "my house" in a manner indicative of his apparent belief that INS should not participate

in day-to-day matters related to detainees. The Assessment Team determined that the strained relationship between the INS COTR and Mr. Stovall was chiefly due to ESMOR's failure to provide INS COTR Uzzle with vital information and, its unresponsiveness in taking timely required corrective actions. This finding is supported in memoranda provided to the Assessment Team by Officer Uzzle. At the time of the assessment, there was no sign of any sort of partnership between ESMOR and INS in the operation of the facility. Regular and timely communication between ESMOR and the INS was nearly non-existent.

As reported to the Assessment Team by Officer Uzzle in person, followed by his memorandum, "One evening late in May or early June, I was having a conversation with ESMOR's Facility Manager, Willard Stovall. In that conversation he stated that it was ESMOR's Corporate policy to keep INS in the dark as much as possible about any problems or incidents which occurred with regard to the facility, i.e., ' if INS doesn't ask for it, don't volunteer or give them anything.' Before Mr. Stovall made this statement, he stated it was 'off the record."

It is clear that Mr. Stovall was well aware of the practice of withholding information from the INS. For example, ESMOR routinely failed to notify the INS COTR of the terminations and resignations of ESMOR staff. ESMOR is not required under contract to notify INS of the specific reasons why employees are removed from the employee roster, however, ESMOR must notify INS of the date each person leaves and the name of the departing employee. Furthermore, staffing information provided to the Assessment Team by ESMOR did not match names on daily schedules. Prior unsuccessful attempts, on at least three documented occasions, by ACBADM and RODDP to obtain accurate employee records from ESMOR resulted in remedial action by the Region to remove from the facility ESMOR guards who had not received the proper security clearance.

The Assessment Team concluded that ESMOR commonly failed to provide, and in some instances withheld from INS, access to important information regarding daily operations and problems in the facility.

## Recommendations:

a.    ESMOR should provide to INS all incident and disciplinary reports on ESMOR personnel. If necessary, the contract should be modified to reflect this to ensure compliance. (Re: In terminations, suspensions, and any other personnel actions taken, the finding must be reported) Through this procedure INS would have had a much clearer picture of contract employee behavioral problems.

b.    The contract should be modified to allow the COTR more direct authority to intervene in practices which may adversely affect the INS. Four days is an unacceptable period of time to wait for corrective notices.

### D.    Staffing and Personnel Issues

**Staffing Inadequacies:**

The staffing levels at the ESMOR facility were determined by the technical proposal submitted by ESMOR and accepted by the Government. Their proposal stated that the facility required 127 full time equivalent (FTE) employees to operate on a 24 hour basis. It should be noted that ESMOR was only required to meet the number of FTEs they proposed, while the actual number of staff on their payroll was left to ESMOR's discretion. It is noted throughout this assessment that ESMOR utilized excessive amounts of overtime in order to meet the requirements of their proposal.

The Assessment Team noted that excessive overtime, a high rate of employee turnover, and new background investigation requirements protracting the time period for obtaining clearances were factors in creating a shortage of ESMOR guards. Over the course of the facility's operation, ESMOR increasingly relied on overtime to compensate for staffing shortages. Approximately two months ago, ESMOR accelerated a practice of "double-shifting", i.e., requiring employees to work two consecutive eight hour shifts. The Assessment Team found, based on statements by ESMOR Facility Administrator Willard Stovall, that this was done in order to cover mandatory posts. Mr. Stovall conceded, after presentation of the facts by the Assessment Team, that ESMOR did not have sufficient personnel and was covering the deficiency with large amounts of overtime.

During the assessment, ESMOR personnel were routinely observed at locations other than their assigned posts. On three separate occasions during the assessment, the main entrance post (a two-person post) was understaffed. The single guard on duty (not the same person in each instance) was visibly frustrated. In another instance, people entering the facility were setting off a metal detector while the ESMOR guard assigned to monitor the device was at the coffee wagon outside the door. The metal detector is a principal deterrent to prevent the introduction of weapons or contraband into the facility.

Recreation was often supervised by having either the roving guard maintain a stationary post or by having the nearest dorm guard provide for both recreation and dormitory security. The result was that some housing units were left unsupervised.

Officer Uzzle and Officer Boyer, Acting Officer In Charge, reported that within hours of the departure of the Assessment Team from Newark, they observed some ESMOR guards leaving their posts unattended or in the process of leaving them unattended until they realized they were under observation. These discrepancies were noted and the Regional Contracting Officer was notified.

**Population Level in Facility:**

In March the facility population was reduced by INS due to concerns by ACBADM and RODDP that ESMOR was unable to perform adequately at a population level of 300 detainees. One

---

of the Region's concerns was that the facility was under-staffed and ESMOR seemed unable to provide an appropriate level of staffing or was unwilling to devise a strategy to maintain the appropriate minimum staffing level.

In April after ESMOR demonstrated that its personnel had received security clearances, and after problems had been addressed concerning the excessive number of escapes (27 between August 3, 1994 and January 15, 1995), excessive medical referrals (noted by Public Health Service), and training issues, INS once again permitted an increase in the facility population.

Staffing During the Disturbance:

At the request of the Assessment Team, RODDP reviewed documentation detailing ESMOR staffing for two consecutive eight hour shifts on June 18, the night of the disturbance. RODDP found that nine of the 13 ESMOR guards on duty were in their second consecutive eight-hour shift. This is particularly significant in view of the fact that several days before the disturbance INS Regional and District officials had begun actively considering lowering the facility population by the transfer of 75 detainees. This action was under consideration because of concerns over ESMOR's inability to properly staff the facility without requiring guards to work double shifts. On the Friday afternoon before the disturbance, INS notified ESMOR that 11 guards could not work due to lack of suitability waivers. In response to this notification, ESMOR assured INS District officials that a sufficient number of guards were available to work the weekend shift without compromising the staffing requirements or negatively impacting security.

ESMOR knew, or should have known, of its inadequate staffing situation and how hazardous it could be to continue to operate in that mode. Additionally, ESMOR reasonably should have known, and properly responded to, the expected decrease in staff efficiency that must inevitably result when staff are required to work double shifts over a extended period (in this case, for months).

It is the finding of the Team that, based on existing knowledge of ESMOR staffing practices, the Newark District and RODDP did not exercise due caution in verifying ESMOR's claim that they had available, and had assigned sufficient staff to cover the facility on the weekend of June 17-18.

Recruitment of Guards:

A problem cited by ESMOR was recruiting qualified personnel to perform the duties in the facility. The Assessment Team has requested Newark District to conduct a review of current personnel records (provided by ESMOR) to verify what qualifications staff members had for security positions involving the detention of aliens or persons in custody. ESMOR's failure to recruit sufficiently qualified applicants and to dismiss questionable or marginal personnel, was a contributing factor in the abuse of detainees. ESMOR failed to provide a recruiting plan that addressed its staffing problems in a realistic manner. According to the records of Administrative Center Burlington Office of Security (ACBSEC), this facility has an approximate personnel turnover

rate of 60 percent. ESMOR should have addressed its serious labor problem in a more responsible manner.

## Classification and Salary of Guards:

Contract guard positions required under the contract are defined by the Department of Labor as "Security Guard II" for minimum salary determination. It appeared that this salary level did not support an adequate level of qualified applicants to operate the facility.

The duties and responsibilities of a guard in a detention setting are closely analogous to those of a Correctional Officer or Detention Enforcement Officer. The "Security Guard II" position relates more closely to a guard in a warehouse. In brief, the "Security Guard II" standard related more to one who guards "things", where ESMOR obviously needed guards who deal with people as well as things. The typical warehouse guard does not earn a wage that is as high as a guard who is also responsible for the welfare and security of persons.

ESMOR's salary structure was adopted as part of their competitive pricing strategy. As such, it was responsible in part for ESMOR being awarded the contract. However, it appears that the level of salary was not realistic and could not, in the area where ESMOR is located, ensure the availability of well qualified applicants. It is evident that many, if not most, of the guards hired by ESMOR did not meet the requirements of the contract or were only marginally qualified. In the end, they proved unable to maintain control of the facility or ensure detainee and facility safety and security.

Mr. Willard Stovall ESMOR Facility Administrator told the Assessment Team that he was unable to replace a number of undesirable employees because ESMOR did not have a pool of qualified applicants from which they could draw immediate replacements... Several of the undesirable employees were later identified as guards who were suspected of abusive behavior toward detainees.

## Security Clearances:

Evidence indicates ESMOR employed individuals as guards in the facility after merely submitting their investigative paperwork to INS. This resulted in uncleared guards working in the facility and was another reason why the detainee population was reduced in March. The contract clearly states that this practice is not permissible. This practice should have been detected and prevented by the COTR and the Regional Security Officer. ESMOR was told to cease this practice in March, after ACBADM, RODDP, and ACBSEC compared ESMOR employment records against ACBADM security records. This problem was corrected before the population level was restored. In June a list of personnel approved by Security was again compared to a list of personnel on the job site. The comparison, performed by Eastern Region Detention and Deportation (RODDP) and Administrative Center Burlington Administration (ACBADM), once again showed numerous

uncleared personnel were on duty at the facility. Before INS could take specific action to correct this situation, the June 18 disturbance intervened.

The process and procedures for requesting and approving security clearances were seriously flawed at all levels including the ACBSEC, the District, and ESMOR. The error rate of investigative forms received from ESMOR by the Regional Administrative Center Security Officer (ACBSEC) was unacceptably high. Nearly every investigation was delayed by days if not weeks for corrections. INS and ESMOR share some of the responsibility here, for if the proper procedure had been followed, the completed forms should have been reviewed and corrected by ESMOR and the COTR prior to being received by the ACBSEC. This would have resulted in a much lower error rate and significantly decreased processing time.

The ACBSEC forwarded fingerprints to the Headquarters Office of Security (HQSEC) by regular mail. This process took as long as seven days in some cases. Furthermore, there was no consistency in the manner for which waivers were granted, and follow-up by the ACBSEC and the COTR was poor.

On two separate occasions, RODDP and ACBADM intervened and removed numerous ESMOR personnel from the facility as a direct result of the failure of ESMOR to obtain the appropriate security clearances for its employees. On those occasions, the Region was unable to obtain an accurate list of current employees from ESMOR and similarly unable to obtain an accurate list of cleared applicants or employees from the ACBSEC. As a result, those employees working at the facility and for whom no security clearance had been granted, were ordered off the site until the appropriate security clearance was obtained.

### Recommendations:

a. ESMOR must provide satisfactory written evidence of appropriate staffing levels to INS under the terms of the contract. An INS review should be conducted monthly for the life of the contract to ensure compliance with minimum staffing requirements set out in the contract.

b. INS should require ESMOR to provide an exact staffing plan for detainee populations of 200, 250, and 300 before the facility is reopened. These staffing plans should be monitored, and ESMOR should be required to comply with reporting requirements including, but not limited to, notifications of personnel on staff, suspensions, and terminations. If necessary the contract should be modified to reflect this change.

c. Newark District should more closely monitor the facility population level and, with Region, act more quickly to reduce the population level when necessary.

d.   The contract should be modified to reflect the necessary classification change in the guard series, to attract better qualified applicants.

e.   Newark District/Region should exercise increased vigilance to ensure all ESMOR on-duty staff have proper clearances or waivers.

f.   Based upon the past performance of the Security Officer and the lack of confidence expressed by RODDP, HQSEC should continue its review and assessment of the Administrative Center Burlington Office of Security and, if necessary, institute systemic improvements.

g.   Remedial training or hands-on informational training should be provided to ensure there is no repetition of problems utilizing the security clearance procedures.

## E.   Training

Under the terms of the contract, ESMOR is required to provide a minimum of 40 hours of orientation and basic training to all employees prior to placement on the job. All newly selected ESMOR security personnel are required to complete a minimum of 160 hours (including the 40 hours noted above) of training within the first year of employment. The Assessment Team made the following findings based upon memoranda and charts obtained from ESMOR management, ESMOR personnel files, and INS Regional records.

Prior to the opening of the ESMOR facility, a comprehensive training program was initiated using a curriculum reviewed and approved by the then INS COTR Officer Michael Rozos. The curriculum as presented exceeded the requirements by eight hours for a total of 168 hours during the first year of employment for all security personnel.

ESMOR records indicate training was provided as required to employees hired in June, 1994 (the facility was opened August 3, 1994). There were no trackable records to indicate ESMOR complied with the contract requirement after the initial training session was provided. Therefore, the Assessment Team requested a full review of facility personnel files to determine dates when personnel entered on duty and whether or not they received the required training.

This review determined that ESMOR was assigning personnel to security assignments without meeting any minimum training requirements. The last known training session according to ESMOR records was held from March 23 through March 27. The Assessment Team found that the training class was scheduled by ESMOR only after INS discovered approximately 32 percent of the security personnel assigned to ESMOR did not have the required security clearance, and informed ESMOR that they could no longer use these personnel inside the facility. ESMOR took this opportunity to provide them with the initial required training. Fourteen ESMOR personnel

received training at that time, consisting of forty hours of orientation and basic training required for new employees. Of the 14, all had been employed as security guards with the company at least two months. Ten had been employed in or prior to November 1994. This was a violation of the contract's requirement that all new personnel must receive forty hours of orientation and pre-employment training before being assigned to a duty post. Furthermore, there is no evidence of any type of on-the-job training (OJT). While OJT is not specifically mentioned in the contract, it is common for new employees to receive training and some type of review by supervisor or senior employee to ensure they understand how to apply any training they have received.

The Assessment Team questioned ESMOR Facility Administrator Willard Stovall regarding how many on-duty personnel had not received the appropriate training. Mr. Stovall admitted that he currently had four persons performing security duties who had not received the required training. Mr. Stovall said he was expecting more new hires and desired to present the training to a single group.

A certain level of interpersonal skills are essential for anyone dealing intimately both with a detained population and the public. The attitude of many ESMOR personnel towards visitors, attorneys, and the Assessment Team brought into question the effectiveness of their training in this area. An incident took place prior to June 18 that is an example of the prevailing lack of interpersonal skills among many ESMOR guards. The incident involved local Elizabeth City Councilman, Mr. Orlando Edreira, who was requested by INS to meet with the Assessment Team at the ESMOR facility. It was clearly explained to the ESMOR guard standing post in the reception area that Councilman Edreira would be coming to meet with INS officials. Still, when the Councilman arrived, the guard refused him access. Councilman Edreira had presented the guard with unquestionable proof of his identity, i.e., valid city credentials, including a badge. He clearly stated his business, and that he was there by invitation of INS. The guard, having denied the Councilman entry, did not then take the customary and appropriate action of notifying INS that a city official was in the reception area. As a result of the guard's inexplicable intransigence the INS Assessment Team was unaware of the Councilman's arrival. The guard's actions created an unnecessary embarrassment for the Service, and served to anger and alienate a city official whose good offices are of importance in securing INS interests in the community.

ESMOR management should reasonably have been able to deduce, by the number of complaints received from visiting attorneys and the general public, that there were serious problems in the area of staff to detainee and staff to public relations. ESMOR should have addressed this through remedial training.

It is the finding of the Assessment Team that ESMOR did not comply with the standards of training as outline in subsection three of the contract in that, the contractor is required to provide a minimum of forty hours of INS approved training prior to assigning an employee to any post. As indicated above, ESMOR failed to do so in numerous cases. Additionally, ESMOR is required to provide a total of 160 hours of total training during the first year. ESMOR did not have sufficient

---

personnel resources to accomplish the required training without adversely affecting its ability to properly man posts within the facility.

## Recommendations:

a. ESMOR should be required to submit proof of a comprehensive training plan which ensures that all ESMOR personnel will receive the appropriate amount of training and orientation in a timely manner.

b. ESMOR should be required to submit a monthly report detailing the amount of training, type of training provided, and names of employees receiving the training.

c. The INS COTR must more closely monitor the ESMOR training program and records to ensure the accuracy and completeness of the information provided by ESMOR.

## E.    Food Service

Food Service is provided via a full service food preparation area located on-site. Food service responsibilities are sub-contracted by ESMOR to Aramark Food Service Corporation. Detainees are provide three meals each day at regular intervals. A total average caloric intake of 3,300 calories per day is provided to the detainees. This is in excess of the contract requirement. The food is prepared on-site and delivered to the dormitories in an appropriate manner. Menus and daily diet requirements are certified by a registered dietician, as required in the contract, to ensure that daily nutrition requirements are met. Additional commissary food items are available for a nominal charge.

The Assessment Team examined food preparation and storage, including verifying that proper temperatures were maintained. Food related implements, equipment, and machinery were examined (including partial disassembly) to check for cleanliness. The Team found all physical components of food preparation, service, storage, and disposal to be adequate or more than adequate.

There were numerous detainee complaints about the food. Primarily, the complaints centered around the actual preparation, variety, and taste of the food. Some detainees complained the food was too spicy and caused stomach aches. They also complained that when they advised ESMOR personnel and management of this, ESMOR responded by providing more food but did not address the preparation and taste issues.

The Assessment Team found no spoiled food or canned food with expiration dates exceeded. The Assessment Team determined that ESMOR was unresponsive to the detainees request to change the menu or the manner in which the food was prepared. The detainees often responded by refusing

to eat the meal and throwing it away. With the number of complaints generated during the assessment, ESMOR management should have addressed this issue in a more aggressive manner. However, it is noted that most on-duty ESMOR staff and many on-site INS staff availed themselves, for a modest charge, of the opportunity to eat at the facility. They ate exactly the same food as the detainees. The Assessment Team sampled a meal at the facility and found the food palatable and acceptable.

### Recommendations:

a.   ESMOR and INS should create a system to more closely monitor detainee complaints about food, determine if the complaints have merit, and provide the detainees with specific responses.

## G.   Medical Care

At the request of INS RODDP three medical assessments of the facility were conducted within the last five months. RODDP was concerned that the facility was making excessive medical referrals to emergency rooms and other outside medical services.

Two assessments were conducted in February. One by a team from the INS Health Services Division (HSD) administered by the Public Heath Service (PHS). The other by Doctor W. Cheung, PHS Clinical Director, Varick Street Service Processing Center Medical Clinic. In May, Doctor Cheung also conducted a follow-up assessment. The following are the findings of those assessments.

### Findings of February Assessment by HSD Team:

1.   Inappropriate referrals for off-site medical care of cases that could and should have been treated in the facility's clinic. Under the contract, off-site medical care expenses are chargeable to INS not ESMOR.

2.   Lack of documentation in the health care record with regard to treatment rendered and necessity of off-site referrals.

3.   Referrals to dental without documented assessment and need for referral.

4.   PPD screening (Purified Protein Derivative-the standard medical test to screen for tuberculosis) for tuberculosis was not consistent and some detainees were not properly screened.

July 20, 1995

5. Health appraisals were not being carried out on all detainees within 14 days as required by the contract. (In one case a detainee had not received a medical screening until four months after he was booked into the facility)

6. The progress notes in all cases were that of an RN. The notes indicated the condition of the detainee, but contained no objective information, assessment, or treatment plan. No follow-up appointments were noted in the record.

7. Follow-up with regard to off-site care was not documented except in one or two instances. This documentation was that of an RN indicating that the Designated Health Authority had reviewed the findings.

8. Follow up with regard to laboratory work, x-rays, on-site dental work or serious medical conditions was not documented. . . .

9. While off-site and laboratory referrals were appropriate in some instances (e.g., eye problems, enlarged testicles, blood in stool), the majority of records contain no documentation supporting the referral for off-site care.

## Findings of February Assessment by Doctor Cheung:

1. The facility had 12-hours-per-week physician services from a single doctor, and staff of seven nurses (three full-time and four, part-time) for approximately 300 detainees.

2. The physician's time was apportioned to provide physical examinations for new arrivals, with any unused time devoted to sick calls. (These levels of service meet or exceed the contract requirements)

3. The facility did not conduct regular daily sick call sessions or periodic follow-up sessions.

4. All off-site medical referrals were done by MD's orders, or at the discretion of RNs and/or ESMOR guards.

5. 70 percent of off-site referrals were not appropriate and should have been treated in the facility's clinic.

6. Sick call slips were stapled to the left flap of each medical chart, and no corresponding notes indicating the services rendered were seen in staff progress notes.

7. There were blank spaces in between progress notes in the majority of the charts.

July 20, 1995

8.  All progress notes were written in non-soap format. ("soap" is a medical term of art referring to a generally accepted standard method of medical record keeping. It is a problem oriented way of medical charting - Subjective, Objective, Assessment, and Plan)

Dr Cheung concluded: "In the absence of existing evidence that sick call sessions were conducted daily and periodic follow up care was provided for any acute and chronic medical conditions by the qualified health care providers, it seemed obvious that all the problems had to be solved by sending them out to off-site medical facility."

## Findings of May Assessment by Doctor Cheung:

1.  A new physician came on board in March, and the physician work hours were increased to 20 hours per week.

2.  The frequency of off-site referrals was substantially reduced compared to those referenced in the previous assessment.

3.  There were overall marked improvements in medical record keeping and the recording of health assessments.

4.  The contents of the charts reflected the quality of care to be optimal and compatible to that of community health care providers.

5.  Although the format of medical record assembly was different from the INS-HSD's guidelines, all medical records were kept in a well-managed sequential order.

A copy of each medical assessment report was provided to ESMOR, and INS requested ESMOR to make appropriate changes to comply with the terms of the contract.

## Findings of the INS Assessment Team:

As part of its overall review of ESMOR, the INS Assessment Team examined facility medical services. Based upon findings by PHS and Dr. Cheung, the Team concluded that individual medical evaluations of detainees who were seen during sick calls were timely and well done. However, as stated by Dr. Cheung, sick call was not conducted on a daily basis nor were there always necessary medical follow-ups as required under the terms of the contract.

The Team noted a conflict of findings between the PHS Assessment and that of Dr. Cheung. While the PHS Assessment Team characterized sick call as excellent, Dr. Cheung noted a failure of ESMOR to provide daily sick call and follow-up for detainees. In response to the Team's inquiry,