PHS said the decision of the medical authority (Dr. Cheung) would take precedence over the finding of the Medical Assessment Team with regard to the sufficiency of sick call.

Oversight of the medical operation was acceptable. When problems were suspected, Eastern Region PHS, in coordination with HQPHS, provided for a professional and thorough review which resulted in better health care service and ensured consistency within the parameters of the contract.

The Team found that many medically-related complaints were raised by the Office of Congressman Menendez, Councilman Orlando Edreira, and various attorneys. There was also a pattern by ESMOR of inappropriate use of off-site medical services. The following recommendation is based on these findings.

### Recommendations:

a.    PHS should take over the functions of all medical services provided on-site. Resources have been identified and such a move would be both cost effective and prudent given the consequences should a detainee not receive appropriate care while in Service custody.

### H.    Access to Counsel / EOIR / INS

The Assessment Team was advised by attorneys that access to their clients was severely hampered by the manner in which ESMOR enforced its visitation and telephone policies. The Assessment Team consulted with INS COTR Uzzle and ESMOR Facility Administrator Stovall. The Team also reviewed visitation logs and the detainee telephone system.

The Assessment Team found that there was a lack of consistency in ESMOR's administration of attorney visits to their clients. Further, there was little effective communication between attorneys and ESMOR and between attorneys and INS officers located at ESMOR. ESMOR changed the visitation policy without reasonable notification to counsel. Attorneys did not feel welcome to visit their clients. On two occasions, attorneys said, they were challenged without due cause by ESMOR guards who threatened them with expulsion from the facility. ESMOR could not produce a written policy reflecting the changes to attorney visitation. This led to confrontations between ESMOR and attorneys. The occurrence of confrontations was authenticated by attorney Joyce Phipps and ESMOR officials.

In some instances, attorneys were required to wait up to three hours to visit with clients. This was primarily due to a limited amount of attorney visitation space (although the space met contractual requirements) and a high number of consultations. The Team found ESMOR did not make a sufficient effort to reconcile the problem with attorneys. ESMOR overlooked or ignored

simple solutions to the problem such as asking attorneys to pre-schedule visits when possible, or providing information about when the facility was least busy.

Access was further hindered by the method of telephone service. The contract did not require that *pro bono* legal services be programmed into the system. Accordingly, detainees were hindered in obtaining counsel via direct calls because *pro bono* services do not accept collect calls. This also caused undue delays in their administrative hearings because Immigration Judges routinely granted continuances to aliens who wanted to but had not obtained representation. ESMOR accepted the recommendation of the Assessment Team without question, and these services were scheduled to be activated by June 21.

### Recommendations:

a.    ESMOR should post in a convenient place the visitation policy and any subsequent changes in policy.

b.    Attorneys who regularly practice immigration law, along with free legal service groups, should be notified by mail of any changes in the visitation policy. INS should be able to provide lists of free legal service groups.

c.    ESMOR should consider a method of scheduling a certain number of attorney visits. This could be done on a mutually acceptable schedule.

## I.    Physical Facility

### Application of American Correctional Association (ACA) Standards:

The facility was designed by a recognized ACA certified architect to conform with the INS solicitation requirements and ACA physical plant standards as described in the ACA's *Third Edition, Adult Local Detention Facility Standards.*

Prompted by 27 escapes in the first four months of operation ESMOR modified all dormitories. They also invested a significant amount of money in a motion detection alarm system designed to detect intrusions into unauthorized areas. These two modifications helped reduce escapes to one in the following six months. That single escape was related to a failure of ESMOR personnel to follow policy by leaving a detainee outside the secure perimeter of the facility. This was a violation of INS' explicit written directive.

Review of the facility by the Assessment Team discovered the following items which either did not conform to the physical plant requirements of the contract, or to ACA standards referenced

as a guide in the contract for physical plant standards, or that may be subject to a legal sufficiency challenge:

1.  At least two of the dormitories did not have sufficient access to natural light. In male dormitories, a minimal number of skylights were present but were inadequate. The remainder of the dormitories had windows at a height of approximately 25 feet, and there was no significant view to the outside other than the sky. Several of the female dormitories were located in the interior of the building and it is questionable whether or not a sufficient amount of indirect lighting was available.

2.  Under the terms of the contract, there is a requirement for access to natural light in the segregation area. A requirement for three skylights over this area was noted in the contract and appeared on the "Best and Final Offer" that was originally reviewed by the Technical Review Team. There is no natural light in this area.

3.  The outdoor recreation area is approximately 1,520 square feet, as required. It consists of a flat cement area with one basketball hoop and a volleyball net. However, only one activity can be conducted at a time due to the limited area available. The area is surrounded by walls approximately 30 feet high. There are multiple openings which allow in sunlight and fresh air. There is very little circulation of fresh air due to the depth and design of the recreation area. Because of the high walls and limited area, it is often difficult for more than 20 to 25 detainees to remain in the area without interfering with one another's activities. It is questionable whether this area would meet the legal definition of an outdoor recreation area.

4.  No writing areas or chairs were provided in the segregation cells. The only furniture present was a bed, a toilet, and a wash basin.

5.  In several of the dormitories, toilets were visible from some of the tables provided for detainee meals and recreation. Both as a matter of privacy and of good taste privacy panels should have been devised to correct this situation.

6.  Privacy walls in the female dormitory areas were approximately 36 inches high and afforded less privacy than walls in the men's dormitories. Female showers were visible from the corridor and could be viewed from areas outside the female area.

Other than as noted above, the facility was in good order and the physical plant was in good condition prior to the disturbance. Dormitories were designed in a manner which provides for a degree of privacy and comfort. The food service, medical, administrative, and lavatory sections were generally well designed and spacious allowing for easy travel and good general access. The facility was spread out in a manner which allows for excellent lines of sight throughout the walk-ways and

dormitory areas. There was no evidence of overcrowded conditions, as alleged in several media reports.

*Recommendations:*

    a.    ESMOR should be required to comply with the contract in adherence to ACA standards.

    b.    INS' procedures to accept a facility for operation need to be strengthened.

## J.   Contract Compliance

Note: Within this section each violation cited is followed immediately by the corrective actions taken and/ or recommendations.

On June 10, during the Assessment Team's review of the current contract, numerous instances of noncompliance were noted. The ACBADM Contracting Officer for this contract was requested to take immediate action on the following deficiencies. (Note: Other recommendations, noted elsewhere in this report, may also have contractual implications.)

1.   Subsection 2. Personnel - Item C.(5); page 17 of the contract

Violation: The contractor failed to report all violations or attempted violations of the standard of conduct or any criminal activity to the COTR. It was found that ESMOR had withheld information from the INS COTR. The failure to provide timely and accurate information misled INS officials into believing that no violations were occurring. Reference the incident reports noted in the REPORTS and DETAINEE WELFARE sections of this report.

*Recommendations:*

    a.    Both the Facility Administrator and the INS COTR have been advised of this situation. It was recommended that the INS COTR institute daily requests about all incidents between detainees and guards and that the Facility Administrator report any incidents or allegations of misconduct to the INS COTR in a timely manner, as outlined under the terms of the contract.

2.   Subsection 5. Physical Plant - Item D.3.(b)(3); page 31 of the contract

Violation: Detainees assigned to the administrative segregation unit did not have continuous access to natural light.

*Recommendations:*

    a.    The contract requires that a total of three skylights be installed in the area above the segregation unit. No skylights have been installed. The ACBADM Contracting Office needs to pursue the addition of the skylights in the segregation area.

3.    Subsection 7. Sanitation and Hygienic Living Conditions - Item F; page 38 of the contract

    Violation: Clean clothing must be provided twice weekly. Detainees complained of only one change of clothing per week. This was verified by the contractor. The contractor claims that detainees often damaged the clothing, making it difficult to meet this demand.

    Action Taken: As required under the terms of the contract, ESMOR was notified by the ACBADM Contracting Office to take immediate corrective action.

4.    Subsection 7: Sanitation and Hygienic Living Conditions - Item L; page 38 of the contract

    Violation: The contractor must provide, at no cost to the detainees, appropriate footwear and undergarments, as needed. The contractor claimed that a limited supply of changeout clothing was available due to vandalism. Detainees were, on the average, only receiving one clean pair of underwear per week. In addition, it was discovered after the disturbance that female detainees had been issued male underwear which in most cases was several sizes too large.

    Action Taken: As required under the terms of the contract ESMOR was notified by the ACBADM Contracting Office to take immediate corrective action.

5.    Subsection 10. Security and Control - Item D.(5); page 47 of the contract

    Violation: There must be a written record of each shift concerning the following: (1) the personnel on duty; (2) a detainee population chart; (3) shift activities (meals, recreation, religious services, etc.); (4) entry and exit of attorneys and other visitors; and (5) unusual occurrences. The current method of logging incidents is not sufficient for INS oversight. There is no general accounting of all activity by the control logbook. It is virtually impossible for the INS to identify potential trends and problems under ESMOR's current method of logging daily activities and incidents.

## *Recommendations:*

a. The INS COTR needs to work with the Facility Administrator to ensure a single logbook which contains at least a minimum of the following information is kept within the control area and is available to the INS COTR or other reviewing INS Officer upon demand: (1) the personnel on duty; (2) detainee counts and security checks; (3) shift activities; and (4) any incidents, assaults, emergencies, or similar situations.

b. ESMOR must ensure a more appropriate method of maintaining logbooks which allow for Central Control to receive information at a single location regarding all significant incidents.

6. Subsection 11. Supervision of detainees - Item B; page 50 of the contract

Violation: Detainees are not permitted to supervise, control, or exercise any authority over other detainees. ESMOR has created a detainee committee to represent detainee grievances. Both the INS and ESMOR were attending these sessions. The Assessment Team review indicated that only a portion of detainee grievances were being heard and the detainees, for the most part, felt that the grievances in question were not always representative of the majority. Moreover, non-participating detainees expressed the belief that those detainees on the committee were "special" and "privileged", and were representing only "their own [interests]." This type of committee also places some detainees in a position of constructive authority and power which can be exerted over the rest of the population.

## *Recommendations:*

a. The INS COTR will place a grievance box in each dormitory for the sole use of detainees. Detainees will be able to provide, directly to the INS, complaints, allegations, or other information which previously has not been provided by the contractor. The INS representative should no longer participate in the meetings between ESMOR and the detainees. It is the strong recommendation of the Assessment Team that this practice cease and emphasis be placed on instituting a two-way grievance system under which the INS would acknowledge receipt of complaints and indicate that they are being looked into. Such a system would facilitate the process of documenting the contractor's follow-up on complaints in a written form; provision being made for illiterate and/or non-English speaking detainees to present their complaints.

July 20, 1995

7.    Subsection 11. Supervision of Detainees - Item E; page 50 of the contract

Violation: Assigned duty posts were abandoned or left unmanned by ESMOR employees in order to take breaks or accomplish other tasks. A shortage of personnel necessitated dorm guards leaving their posts to accommodate detainee phone calls outside the dormitory area. On the second day of the assessment, nine of the 17 guards assigned to work in the facility were observed simultaneously taking breaks outside. On a separate occasion the Acting Officer in Charge, Earline Boyer noted a female guard leaving her assigned post. This female guard was the only guard working what was supposed to be a two-guard post. When this guard left her post, unsecured female detainees were observed unsupervised in several areas. A review of staffing for the facility indicates personnel shortages were a daily occurrence. A preliminary review by RODDP at the request of the Assessment Team indicated that an average of six, and as many as eight, guards were being required to work double shifts each day.

*Recommendations:*

a.    The COTR needs to monitor daily personnel assignments more closely.

b.    The use of staff on double shifts is a hazardous practice and should be limited under the terms of the contract to those instances approved by the COTR for emergent circumstances.

c.    Guards should not be allowed to work more than four hours beyond the normal eight-hour tour of duty.

d.    When it becomes apparent that inadequate personnel are available to ensure appropriate coverage, the COTRs should request that RODDP consider a decrease in the daily population until ESMOR can provide evidence of compliance and a continued ability to provide personnel for each post.

e.    The contract fails to define "tour of duty" or address the limits of the tours. A contract modification should be initiated to correct this deficiency.

8.    Subsection 12. Detainee Rights, Rules, Discipline, and Privileges - Item E; page 52 of the contract

Allegations: There have been repeated claims of assaults on detainees by ESMOR guards, as well as numerous claims of harassment, and/or verbal abuse. The allegations have been made by several attorneys, and some ESMOR guards who requested not to be identified. Allegations ranged from continued verbal abuse by some of the ESMOR personnel, to accounts of physical abuse. The Assessment Team, interviewed numerous persons regarding these allegations. The Team had the

opportunity to judge the testimony presented and observe the demeanor of those persons involved, including attorneys, detainees, and guards, some of whom acted as confidential informants. The Team finds the overall testimony on these matters sufficient to warrant further investigation. If the allegations are true, this is in violation of the contract which requires the contractor to provide detainees protection from personal abuse, corporal punishment, personal injury, disease, property damage, and harassment. This also represents possible criminal violations.

### *Recommendations:*

a.  Increase INS oversight of the contract to 24 hours a day, seven days a week, to ensure proper performance and conduct of ESMOR staff.

b.  Place grievance boxes in each dormitory for aliens to provide information and complaints directly to the COTR or his designee.

c.  ESMOR must be required to provide timely reporting to the INS of any violation of detainee rights.

Action Taken: The facility as well as HQOIA were notified and an investigation is pending. The investigation by the Assessment Team uncovered the identities of seven guards who seemed to be principally responsible for the maltreatment of detainees. These allegations are being investigated as part of a Civil Rights Investigation pending with the FBI. Those guards who were identified have been precluded from working on this contract pending the outcome of the investigation. (Subsection 2, para H., d, 2.)

9.  Subsection 14. Admission, Orientation, Release, and Property Found - Item H; page 53 of the contract

Violation: The terms of the contract require that any detainee be reimbursed immediately by the contractor for any personal property, monies and/or valuables for which the detainee has a receipt that the contractor is unable to return due to loss, theft, misplacement, etc. ESMOR attempted to place aliens on return flights without their funds and valuables. This became known to the INS COTR when it was discovered that the INS was being charged for detention of aliens who had removal orders and return tickets to their countries of origin. These aliens were being returned to the facility after they had refused to board their scheduled flights. When an inquiry was made to ESMOR, it was discovered that the aliens were refusing to board departing flights until they received their funds and valuables. ESMOR was placed on notice that the INS would not pay for any detention beyond the expected date of an alien's departure when failure to remove that alien was a direct result of loss of detainee funds, valuables, or property. Where it was found that property, valuables, or money was in fact missing, ESMOR reimbursed the detainees as required under the contract.

### Recommendations:

a.    ESMOR must provide tighter controls over the processing, storage and accounting of personal property. ESMOR needs to develop an auditable procedure for assuring the proper safeguards of all detainee property.

b.    Any discrepancies in these records must be reconciled prior to their day of departure.

c.    It may be possible for the contractor to adopt INS' own rigid control procedures for handling detainee funds and valuables.

10.    Section F.8.   Monetary Adjustments for Inadequate Performance - Item F.8.b.1; page 66 of the contract

Violation:  The contract provides for monetary adjustments for the following violations: "Failure to man posts, post abandonments, omissions of required contract reliefs, exceeding restriction on tours of duty by more than four hours, posts which are unprotected after removals made pursuant to determination of unfitness according to Section C, Subsection 2, paragraph H.d, posts manned by guards who are sleeping or intoxicated."

On numerous occasions during the assessment visit and after the Assessment Team left, ESMOR guards were not at assigned posts or were observed leaving their posts to perform other functions.  Also, as stated earlier, an average of six, and as many as eight posts each day, were staffed by personnel working a second shift.  The manner in which supervisors assigned overtime created undue hardships on some of the guards. One female guard said that on at least two occasions, supervisors refused to relieve her. She was not allowed to leave the female unit until she "volunteered to stay" an additional shift. This coercion is also reported to have occurred with the male guards, until a sufficient number of "volunteers" were found.

### Recommendations:

a.    The INS needs to modify the contract to reflect that the official tour of duty is eight hours.  The contract must spell out exactly when overtime and double shifting are permissible.

b.    The COTR needs to immediately put the contractor on notice of any such violations.

c.    Any adjustments taken on the contractor's monthly invoice should be supported by a detailed description of the violation and the amount being withheld.

While these non-compliances were noted during the assessment, there are additional underlying problems with the contract statement of work that need to be addressed.

The Statement of Work (SOW) was produced as a national standard for all detention contracts. This SOW was developed by INS Headquarters and provided to Eastern Region for inclusion in the solicitation package. The Regional Procurement and Detention offices expressed, to Headquarters, numerous concerns about the language and scope of the SOW, and they recommended specific changes. Headquarters was reluctant to alter any language since the SOW was to be a standard used at all INS detention locations.

The SOW developed was based on a performance type of specification rather than a more rigid design type of specification. The SOW describes the services that are minimally acceptable to meet the Government's requirements. In determining compliance issues, the contractor must only demonstrate that they (the contractor) meet the minimal levels. If the contractor is performing at these levels they should be meeting the Government's acceptable level of service. This type of specification works well for routine sorts of tasks. It is not structured to provide a level of Government involvement and direction necessary to assure the INS' interests and objectives are accomplished by the most effective means. The performance type of specification leaves too much discretion in the hands of the contractor. The contractor determines how best to carry out the required services. For example, the government does not mandate the number of security personnel required to staff a facility. Depending on the design of the facility layout, the contractors submit a staffing pattern that will meet the direct supervision and associated operational functions for that specific design.

The Assessment Team concluded that serious problems and deficiencies were present throughout the contract period. In general, ESMOR lacked essential consistency in its practices, and application of policies governing the operation of the facility. Furthermore, ESMOR's failure to provide vital information to the INS hindered the overall operation of the facility. The course of action pursued by ESMOR left INS in the unfortunate position of having to respond to issues and complaints of which, in many instances, INS had no prior knowledge. The Team found that ESMOR evidenced a continuing cycle of contract violations, failure to identify and correct problems, and general failure to follow sound management practices. Management of this facility by ESMOR was poor.

## IV.   Assessment of INS Operations Related to ESMOR

The Assessment Team reviewed INS' operations related to ESMOR in the following areas:

A.   The Newark District
B.   Juvenile Detention                    page   34
C.   ACBSEC - Security Clearances                 40
                                                  42

July 20, 1995

D.    Community Relations                                    42
E.    RODDP / ACBADM                                         44
F.    The Hearing Process                                    44
G     Newark Asylum Pre-screening Program (APSO)             54

The Assessment Team initially set out to review the oversight of ESMOR by the Newark District. Areas of primary concern included oversight of the contractor, interaction between the INS COTR and ESMOR, and a general review of the manner in which some custody decisions were made by the District.

As a result of the disturbance on June 18, the review was expanded to also include an assessment of all components, including the management of "A" Files, removals, detainee liaison, EOIR issues, and community liaison.

The Eastern Region is continuing its review of files transferred from Newark/ESMOR to the Philadelphia District. These files relate to the aliens who were detained at ESMOR at the time of the disturbance, and were later transferred into the Philadelphia District. The report of findings from the Philadelphia file review will, upon its completion, become an addendum to this report.

The following information was assembled through site visits, interviews of INS and ESMOR personnel and with detainees, review of memoranda, and discussion of problems and issues with the Executive Office for Immigration Review (EOIR), ESMOR management, and the Newark District.

## A.    The Newark District

### INS Staffing at the Facility:

At the time of the assessment the Newark Detention and Deportation Branch at the ESMOR facility was staffed by three Detention Enforcement Officers (DEO), three Deportation Officers, one Deportation Docket Clerk, two Deportation Assistants, one Supervisory Deportation Officer who also functioned as a COTR, and two Supervisory Detention and Deportation Officers (one the Officer in Charge [OIC] who also functioned as a COTR, the other a Supervisor of Detention Operations.) The facility has current vacancies for one Deportation Assistant and one Supervisory Detention and Deportation Officer. Of the staff described here, only the COTRs had oversight authority of the facility. Other staff performed solely INS duties related to actions outside the facility, i.e., making flight arrangements for departures, arranging for travel documents, or organizing detainee transfers.

Prior to the opening of the Elizabeth facility, the Newark District was allocated seven DEO positions, all of whom worked out of the district office. The ESMOR contract provided that contract

guards perform most alien transport between the facility and JFKIA and NEWIA. When the facility opened, Newark District was allocated an additional three DEO positions to perform airport-related alien transport duties not assigned under the contract to ESMOR guards, e.g., criminal exclusion cases destined for local jails. An INS office for DEOs was included in the facility's design.

The original staffing structure adopted by then District Director Tillman did not allow for close oversight of this multimillion dollar contract. The COTR duties at this location are far too extensive and time consuming to be combined with OIC duties associated with the management of a docket that eventually became 430 exclusion cases (additional exclusion cases from JFKIA and NEWIA are also detained in county jails in the Philadelphia District with venue remaining in Newark).

A history of extensive INS staffing changes at the facility, adversely affected the District's oversight of the facility. On or about March 13, Officer Rozos was detailed from his OIC/COTR position to that of Acting Assistant District Director for Investigations. Simultaneously, Supervisory Special Agent (SSA) Alan Freiss was reassigned from his duties as the Deputy Assistant District Director for Investigations to the position of Acting OIC at the ESMOR facility. Norman Uzzle, Supervisory Deportation Officer, was then assigned the duties of COTR for the facility in addition to his first line supervision duties. This staffing change more closely resembled original plans submitted by RODDP and HQDDP for INS management staffing of the facility.

This new focus on role of the COTR had the effect of promptly uncovering questionable conduct and practices by ESMOR that directly affected the safety and well-being of the detainees. ESMOR's response to Officer Uzzle's oversight and continuous flow of corrective action requests was to ask INS management to remove him from his position.

On April 24, Uzzle was relieved of his supervisory responsibility and directed to perform only COTR functions. On May 22, Earline Boyer, Supervisory Deportation Officer was reassigned from the District Office to the position of (Acting) OIC at ESMOR. SA Freiss was returned to his permanent duty post. The arrival of Officer Boyer provided for a second Contracting Officer on site to assist with monitoring of the facility and INS functions.

Twenty-four-hour-per-day oversight of a contract detention facility by an on-site COTR, or other accountable INS staff, is not the current INS policy nationally for these types of contracts. However, four days prior to the initial arrival of the Assessment Team, the Newark District began providing 20 hour coverage to monitor the facility interior. The results of this decision were excellent. Detainees' complaints dropped, and those who were interviewed by the Assessment Team said that instances of both verbal and physical abuse subsided. The presence of INS personnel acted as a deterrent to abuse and was welcomed by most of the detainees.

The Team concluded that three changes in INS leadership over the course of a ninety day period contributed to oversight problems. During these personnel changes, ESMOR distanced itself

July 20, 1995

from INS oversight and did not communicate information concerning the operation of the facility. Changes in the manner of oversight by different INS COTRs allowed ESMOR to make operational changes, in some cases contrary to the contract, which were detrimental to INS' interests.

### *Recommendations:*

a.  The facility staffing plan should be modified to meet current and future needs at this facility.

b.  The current position of SDO should be converted to SDDO 13 with responsibility for both detention and deportation functions.

c.  The position of SDDO (GS-12) should be converted to a Chief of Detention Operations (GS-12) and converted from 1801 series to 1802 series (No Deportation Officers are supervised by this position).

d.  If it is the intention of the Newark District to continue using District DEOs at the ESMOR facility, it should be determined how much of their time is currently being devoted to user fee cases and removals and an appropriate number of positions converted from appropriated account expenses to user fee expenses.

e.  Sufficient INS presence should be required in the facility on a 24 hour, seven-day-a-week basis.

f.  If recommendation "e" is implemented by authorizing user fee DEOs, then those DEOs assigned to the District should be returned to those functions for which they were originally allotted.

### Facility Oversight - The INS Contracting Officer's Technical Representative (COTR)

It was apparent to the Assessment Team that serious problems regarding the INS oversight of the ESMOR facility began prior to the temporary departure of Officer in Charge (OIC) and first COTR Michael Rozos to Newark District Investigations Branch, where he was assigned as Acting Assistant District Director for Investigations. However, further erosion of the operation was accelerated by the sudden departure of Officer Rozos and his replacement on March 13 with a less experienced COTR, Norman Uzzle.

Prior to April 24, when Officer Uzzle became full-time COTR, Mr. Willard Stovall, Facility Administrator told Officer Uzzle that changes in ESMOR procedures were typically agreed to verbally with little or no follow-up at the District or Regional levels. This type of practice, if permitted, would be disadvantageous to the INS because no written record would exist that

documented changes in policy, procedures, or practices in the facility. Officer Uzzle stated to the Team that he informed Mr. Stovall verbally and by memorandum that such a practice is unacceptable and would not be tolerated. The previous INS COTR, Michael Rozos was questioned concerning Mr. Stovall's assertion that changes were usually agreed to verbally. According to Officer Rozos, when he was COTR all changes were documented and maintained in accordance with the contract.

While the communication between INS and ESMOR remained unsatisfactory, Officer Uzzle was able to identify various problems with ESMOR's performance and relay this information to the Contracting Officer who then took the appropriate action. Specific problems noted were (1) a back-log of medical bills which had not been submitted to Region for payment; (2) unauthorized disclosure by the Facility Administrator concerning detainee medical issues he was neither qualified nor authorized to provide; (3) ESMOR guards providing legal advice to detainees; (4) documented funds and valuable discrepancies within the facility; (5) insufficient property safeguards; and (6) unanswered correspondence.

On May 22, Officer Boyer joined the INS ESMOR staff as Acting OIC and Second COTR.

The Assessment Team found that after the departure of Officer Rozos difficulties arising from ESMOR's failure to report problems to the COTRs were exacerbated by the COTRs' lack of specialized operational experience in a detention setting. Such experience is an important adjunct to the ability to effectively monitor a contract detention facility. Although both Officer Uzzle and Officer Boyer are exemplary Officers, and had attended and successfully completed the requisite training for their positions, they lacked the depth of experience in the detention field to enable them to independently identify many problems within the facility. There is no training mechanism available within INS other than on-the-job which could have provided them with the knowledge and understanding needed to monitor the contract in a fully comprehensive manner.

## Deportation Docket / Removals / Statistics:

At the time of the disturbance, the Branch handled an average of 430 detained cases on their docket. This included an average of 300 detained cases at ESMOR and 130 cases detained at Lehigh County Jail in Pennsylvania.

The Philadelphia District has been tasked by the Eastern Region with completing a comprehensive file review of detainees who were detained at ESMOR. On June 7 the Regional Director instructed the Newark District Director to complete and maintain statistics with regard to the detention and removal of aliens interdicted by JFKIA and NEWIA. An integral part of these statistics was the compilation and validation of the total number of admissions and removals for JFKIA and NEWIA cases.

The Team found evidence of a steady increase, during the last five months, in the removal rate for exclusion cases detained at ESMOR. This indicated that EOIR, INS' Trial Attorneys, and

July 20, 1995

the Deportation Division were beginning to work in a more coordinated manner as the facility's "growing pains" subsided. The Newark District provided to the Assessment Team documentation showing a total of 550 removals (exclusions or deports) during the period August 3, 1994 (when the facility opened) to June 18, 1995 (the date of the disturbance). In addition, 35 stowaway cases and 87 withdrawal cases were also completed (removed) from the ESMOR facility in the same period.

The scheduling of EOIR hearings remained problematic during the Assessment Team's visit. One day there were three Immigration Judges hearing cases in both courtrooms and a conference room. The following day, a total of only three hearings were scheduled.

Of great concern to the Team was the inability of the Service to remove an alien who desired to withdraw from proceedings and simply return home. Aliens under exclusion proceedings would often have to wait up to four weeks after a written request to withdraw from proceedings. This exceeded the national average by three weeks, and was of course reflected in a higher average length of stay.

## Detention Decisions and Coordination:

The manner in which some District custody decisions were made, regarding where detainees would be located, caused concern to the Assessment Team. There were complaints that aliens still under proceedings, with local attorney representation, were being transferred to Lehigh County Jail, which is about one and one half hours away and located in the Philadelphia District. At the same time, detainees with no scheduled upcoming court dates and pending appeals were being held at ESMOR. There was a lack of consistency by the Newark Deportation Staff in deciding where detainees would be placed, this resulted in unnecessary movement of detainees.

Coordination of detainee movements between Newark and Philadelphia Districts was problematic. For example, the Assessment Team observed a detainee case terminated by the Immigration Judge solely because the detainee was late for court. The detainee had not been transported by INS to the facility until the date of the hearing. A Trial Attorney assigned to the facility told the Assessment Team that this was not the first time such a termination had occurred.

In addition to the review by the Assessment Team, the Eastern Regional Director has ordered a complete case file review of all detained cases assigned to ESMOR. The Assessment Team will be provided with the results of this project and an addendum to this report will be forwarded upon receipt and review.

## Relations with Attorneys:

Complaints from some attorneys concerning their lack of access to their clients prior to court appearances went largely unanswered by both INS and ESMOR. In meetings with attorneys, the Assessment Team was presented with three unanswered letters to the District Office, as examples

of what attorneys indicated was the District's lack of response to their grievances. One letter was a request for INS intervention in alleged abuses by ESMOR personnel of the attorney's detained client.

Attorneys also expressed frustration and exasperation over the amount of time they consumed in attempts to merely locate their clients, and in dealing with a constant barrage of detainee complaints concerning their treatment while in ESMOR. Attorneys claimed there was little communication or assistance offered by INS personnel pertaining to their concerns.

The Assessment Team noted that the Newark District did meet with attorneys concerning the formation of a *pro bono* group. The group requested at that time to provide "know your rights presentations" to aliens detained at the ESMOR facility. This request was not worked out to the satisfaction of either the District or the pro bono group. The District complained that many of the attorneys were not always forthright in their concerns with the INS and that the attorneys did not respond to request from the INS to provide at least an outline of dialogue they wished to discuss. A second meeting was held at the district office on June 22 and was attended by various attorneys, American Immigration Lawyers Association (AILA), and District personnel in an attempt to establish a *pro* bono program within the district.

The district reported to the Team that in a majority of case inquiries by the various attorneys and *pro bono* groups representing aliens, the inquiries were requests focused on obtaining the release of the detainee rather than discussing the merits of the case.

## Oversight by the Administrative Center and Regional Office (RODDP):

Oversight at the Regional level, by both ACBADM and RODDP, was made more difficult by a lack in efficacious communication with the District. Both Regional entities frequently found themselves responding to issues that came to their attention from the local news media and other outside sources. The constant challenge of responding to issues which should have come from ESMOR through the District, denied Region the ability to undertake unhurried unpublicized investigations, and hindered their ability to deal with each issue in a completely objective manner.

## Recommendations:

a.  All ESMOR's Post Orders, Policies, and Procedures should be further re-reviewed and approved by RODDP and HQDDP concurrently within 30 days of the release of this report.

b.  COTRs should receive some practical training by working in an existing contract facility before being assigned to a new facility.

c.    The District needs to work harder to improve attorney and community relations.

## B.    Juvenile Detention

**INS' Juvenile Detention Policy:**

Code of Federal Regulations, Title 8, section 242.24 contains INS' rules and regulations regarding the detention and release of juveniles. The regulations define a juvenile as an alien under the age of eighteen. INS' policy concerning the detention of juveniles is contained in the December 13, 1991 memorandum, entitled "National Policy Regarding Detention and Release of Unaccompanied Alien Minors." from then Commissioner Gene McNary to Regional Operations Liaison Officers, District Directors, And Chief Patrol Agents.

The national policy memorandum directs that all alien minors awaiting processing may be held by INS authorities in INS detention facilities having separate accommodations for juveniles or, if such accommodations are unavailable, in suitable state or county juvenile detention facilities. It further states that no alien minor may be held in a detention facility, whether an INS facility or otherwise, longer than 72 hours, unless the alien minor is charged or convicted of a criminal offense other than entry without inspection, is adjudicated a delinquent, has engaged in violent or disruptive behavior, is an escapee from another facility, is an unrepresented Salvadoran or cannot be moved for other extraordinary or compelling reasons.

**The ESMOR Detainees:**

As a result of the ESMOR disturbance on June 18, all of the aliens detained there were transferred the same day to facilities in the Philadelphia District. When the detainees arrived in the Philadelphia District, eight of them claimed to be juveniles. Detention and Deportation Branch personnel interviewed each of the eight, and reviewed the related Alien Files...

During interviews, two of the aliens quickly admitted to being over 18 years of age. Of the six remaining, Philadelphia Officers believed one was a juvenile and transferred him to a juvenile facility. He was later paroled to the custody of United States Citizen relatives.

The five aliens who continued to claim to be juveniles during the interview, were referred for forensic dentistry examinations to determine their ages. The forensic test revealed one individual's estimated age to be at least 21 years. The other four were found to be in the "vicinity of 18 years or less." These four were placed by the Philadelphia District at the Berks Youth Center in Leesport, Pennsylvania. On July 3 and 5, the Philadelphia District paroled three of the four to the custody of United States Citizen relatives. Efforts are ongoing to contact relatives for the remaining juvenile.

The individual whom the forensic test revealed to be an estimated age of at least 21 years, claimed to be a 14 year old United States citizen. He remains in custody at Berks County Youth Center, in a segregated area. Counsel for this alien will be requested to have the alien submit to wrist x-rays for corroboration of the dentist's opinion. As for his claim to U.S. citizenship, it was determined that he was an imposter, using the valid passport of a 14 year old citizen.

## Newark's Response:

The Newark Districts' response to the allegation that juveniles had been held at ESMOR was that when an alien alleges that he is a minor the individual is immediately interviewed by a deportation officer to make a determination of age. However, most detainees at ESMOR have either presented fraudulent documents or no documents. If based on a visual inspection and interview the Deportation Officer believes that the detainee is a minor, arrangements are then made for placement in a youth facility. However, if after the interview the detainee has not satisfied the officer that he is a minor, the detainee is classified as an adult. Any case that is borderline is assessed in favor of the detainee and a determination of minority is made.

The Newark District stated that as these are exclusion cases, the "burden of proof" falls to the alien. If subsequent to the initial allegation of being a minor new information is submitted a complete review is done again. If a document is submitted by the alien to support his claim, and verification is needed, or the document appears counterfeit or altered, the document is sent to the INS Forensic Document Lab for analysis. The District also states that claims to an underage status are usually made only after the initial hearings or during the asylum process. If a parole request is denied, an alien often submits a claim to minority status, or claims to have a medical problem.

## The Assessment Team's Findings:

The Newark District's method of determining custody of juveniles has several lapses. It mistakenly placed a burden of proof on the alien to prove he was a juvenile. Any alien suspected of being a juvenile must be separated from adults and then placed in a juvenile facility. However, because of the type of fraudulent documentation aliens detained at ESMOR arrive with, it is unclear when in the detention process an alien claimed to be a juvenile.

## *Recommendations:*

a.   The Newark District should be directed to closely adhere to both the regulations in 8 CFR 242.24, and the 1991 policy memorandum regarding the detention of juveniles; placing particular emphasis on fact that the 72 hour limit for detention of alien minors commences when INS assumes custody of the juveniles.

**C.**   Administrative Center Burlington - Office of Security re: Security Clearances

In March approximately 32 percent of the ESMOR staff, including the Facility Administrator Mr. Stovall, did not have the proper security clearances or waivers. ESMOR complained that the process of hiring personnel was difficult due to the long background investigation procedure required by the INS. The Assessment Team found ESMOR's complaint to lack credibility as a principal reason for under-staffing. The background investigation requirement is clearly stated in the terms of the contract, which specifies that the INS must be provided with properly completed clearance forms at least ten weeks before the expected entry on duty of any person. Furthermore, it was explained to ESMOR that a waiver may be obtained, for persons with no derogatory information in their background, usually within 30 days if the paperwork is properly completed and forwarded in a timely manner.

Of the 19 ESMOR security clearance packets pending approval in the INS Office of Security (ACBSEC) at the time of this investigation, 12 were improperly filled out. ACBSEC security personnel were originally detailed to the facility for one week when the contract was awarded to train ESMOR personnel, so as to avoid precisely this situation. The INS is not responsible for delays caused by incomplete paperwork submitted by ESMOR. ESMOR has now hired a personnel specialist to assist with review and completion of the paperwork required by the Office of Security. A personnel specialist would also be able to help ESMOR recruit persons better qualified for detention guard work.

*Recommendations:*

**a.**   HQSEC should continue its review and assessment of the Administrative Center Burlington Office of Security and, if necessary, institute systemic improvements.

**b.**   Remedial training or hands-on informational training should be provided to ESMOR to ensure there is no repetition of problems in properly utilizing the security clearance system.

**D.**   Community Relations

As related to the Assessment Team by Congressman Menendez and *pro bono*-attorney representatives, effective community relations by the Newark District was sorely lacking. *Pro bono* organizations felt the District failed to appropriately respond to serious problems within the ESMOR facility. Congressman Menendez and attorneys said they did not feel the District Director was forthright in his response to their concerns and that their complaints were mostly unanswered or ignored. Further, they complained that they were unable to schedule routine tours of the facility.

The Assessment Team interviewed Warren Lewis, Newark District Director. Mr. Lewis provided open access to all operations and instructed his staff to provide all documentation requested, which they did. A review of the documentation showed the District was working diligently to correct the very sorts of complaints highlighted by the Congressman and attorneys. However, the Team found little evidence that the results of these efforts (or the fact that such efforts were being taken) were being transmitted to the Congressman and the attorneys. While the District was at times restricted in the type of response it could offer, based on directives from the Eastern Region concerning responses to the media and issues which could result in litigation, nevertheless, much more could have been done to directly reassure and respond to concerned community interests. Good work was being done but the community was not told of it. While the Assessment Team was there, the District did offer to arrange a tour of the facility for Congressman Menendez and other interested members of the community.

The Team found that the District, partly via reassignments of personnel within its own organization, was attempting to gain better control of the problems within ESMOR. The lack of approved appointments to key positions such as the Deputy District Director (DDD) and the loss of his Assistant District Director for Detention and Deportation (ADDD) left Newark with serious management deficiencies, although the deficits were in large part compensated for by the hard work of competent employees placed in acting positions.

Based on the information provided to the Assessment Team, we conclude that the District should have taken a more proactive approach to community relations. The District should have seen that serious problems were developing and responded in a more meaningful manner to concerned parties.

### Recommendations:

a. The Newark District should develop a better working relationship with the Congressional delegation, attorneys, the local community, and others who have a vested interest in the manner for which INS conducts its business.

b. In support of recommendation "a", the District should form a Community Working Group, composed of individuals from INS, ESMOR, and members of the entities noted in "a". This group could meet monthly, or as needed, to ensure community participation in issues of community interest.

c. The District should work with ESMOR to provide easier (but controlled) access to the facility for concerned parties in the community.

**E.**    **Eastern Region Detention and Deportation (RODDP) and**
**Administrative Center Burlington Administration (ACBADM)**

Over the course of the contract, ACBADM has maintained oversight of the contract and intervened when necessary to ensure contract compliance. ACBADM had almost daily contact with the COTRs and ESMOR concerning problems brought to their attention by the Newark District, RODDP, the news media, and various other sources. Regional personnel were committed to responding to complaints which increased weekly over the course of the contract.

ESMOR has generally complied with corrective action demands. These demands have included such items as: (1) corrective action to prevent an almost continuous chain of 27 escapes such as were experienced during the first four months of operation; (2) cessation of the use of leg restraints during visitation; and (3) ESMOR's policy of charging detainees for lost items such as spoons, clothing, cups, and other items. While ESMOR was generally responsive in making required corrective actions, INS could not always identify issues needing corrective action, because ESMOR kept information from INS.

In March 1995 RODDP reduced the facility's population while it attempted to resolve staffing, security, off-site medical referral concerns, and other issues brought to the attention of ESMOR by Regional Contracting and Regional Detention and Deportation personnel. When it became apparent that additional INS oversight was needed at the facility, a second COTR was added to the contract. Officer Boyer was assigned to this COTR position. Throughout this period, there was no indication that ESMOR voluntarily provided any information to INS relating to incidents. But they failed to inform the COTR of many problems which the Assessment Team later determined had been occurring with gross regularity. It was apparent to the Assessment Team that ESMOR management was not in full control of its mid-level supervisors or guards at the time of the assessment.

*Recommendations:*

a.    INS must ensure that ESMOR is providing accurate verifiable information. Currently daily communication is made only to discuss an existing problem. An open line of communication needs to be maintained on a daily basis instead of weekly, whether or not a current problem exists. A full-time INS presence is needed at this site.

**F.**    **The Hearing Process**

The Assessment Team reviewed documents and statistics provided by INS and the Executive Office for Immigration Review (EOIR) concerning detainee hearings and length of stay in detention. The team also participated in interviews with INS and ESMOR personnel. EOIR interviewed its

personnel, including some Immigration Judges, and met with INS officials and members of the Assessment Team to present their views. The Assessment Team has attempted to develop, through cooperative efforts with EOIR, a substantially complete picture of the hearing process at the ESMOR facility and the causes of delay in that process. Nevertheless, this report does not address some areas in which disagreement between the Assessment Team and EOIR could not be resolved in a short time-frame. For this reason, and because the INS and EOIR are independent agencies, the Assessment Team suggests and recommends that a cooperative review should be conducted to examine the INS-EOIR relationship, to identify and resolve problem areas.

### Background:

An inefficient administrative hearing process at the ESMOR facility resulted in lengthy processing times and extended periods of detention. As a result, detention costs were high, the removal rate was lower than expected, and INS enforcement goals were compromised. All three operational components, INS, ESMOR, and EOIR contributed to this problem. The INS' contract with ESMOR failed to include necessary provisions to ensure an efficient hearing process. These contract defects could have been avoided if the INS had involved EOIR more closely in drafting and reviewing the contract provisions, to include those pertinent to the hearing process. At the same time, EOIR did not fully staff the ESMOR facility with judges and clerks, and the INS Office of the General Counsel was unable to fully staff the facility with trial attorneys and clerks for the same reason. This may have been due in part to a late decision by INS to hear all New York user-fee cases, including persons detained in other locations, at the ESMOR facility.

As a result of these planning deficiencies, the local INS, EOIR, and ESMOR operations personnel were placed in a difficult position from the inception of facility operations. Under the strain of these pressures, local personnel became involved in disputes over operational matters and failed, in some respects, to maintain a professional working relationship. ESMOR failed to ensure that detainees were presented in court in a timely and efficient manner. ESMOR also failed, for a substantial period of time, to fully cooperate with the INS and EOIR in establishing a hearing schedule that would meet the needs of all involved parties. This is in direct contrast to ESMOR operations in Seattle, Washington, where close and productive working relationships have been formed. The INS COTR was not fully effective in remedying these problems with ESMOR or in mediating the local disputes among the various operational components.

After the Newark District Director presented these issues to the INS Regional Office, INS, EOIR, and ESMOR management made concerted efforts to remedy the situation. These efforts led to steady improvements in the hearing process, but progress was slow due to the size of the obstacles that had to be overcome. Meanwhile, the administrative hearing process was not proceeding in a timely manner and many detainees were experiencing delays in their cases. At the time of the disturbance, the operational difficulties had markedly improved due to constant efforts and hard work to remedy the situation. Further improvements were planned. Nevertheless, many detainees who had experienced delays remained in the facility.

**Statistics On Removals:**

The average length of detention at ESMOR is estimated at 110 days (including newly arrived detainees and detainees with cases pending). The total of 1153 cases filed with EOIR evaluated against the approximately 88,000 mandays charged by ESMOR, indicates a per detainee average length of stay in the facility of 78 to 80 days. This number, however, does not account for the fact that many aliens were housed at different times in two separate locations. The actual total length of detention is probably closer to between 100 and 115 days or more based upon the actual number of cases processed. From the time ESMOR opened in August 1994 through mid-June 1995, there was an average docket of 256 active cases. EOIR completed 892 of 1153 cases received through the Immigration Judge level. Of the 892 cases completed, 809 received final orders (including release and removal orders), and 83 are pending appeal. Of the 809 final orders, a total of 663 orders for removal were issued. Of the 663 orders for removal, Newark records indicate 550 were removed under an orders of exclusion. Compared with other INS facilities housing excludable aliens, this is a low number of removals even for a new facility.

**Statistics On Delays in the Hearing Process:**

Statistics provided by EOIR and Newark District records demonstrate delays in the hearing process at ESMOR. On average, detainees were scheduled for their first hearing before an Immigration Judge (referred to as a "master calendar" hearing) two weeks after the INS filed the charging document with the immigration court. EOIR generally aims to schedule first hearings for exclusion cases within three days. The nationwide average is eight days for all detained cases and 14 days for detained exclusion cases. In over a third of the cases, it took more than three weeks for the detainee to receive an initial hearing. Over the last three months of facility operation, this average rose. In April the average time to a first master calendar hearing was 18 days, in May 24 days, and in June initial hearings were being scheduled an average of 28 days out. This increase was due in part to the increase in case receipts for April (120), May (108), and June (92 in the first two weeks) compared to January (41), February (36) and March (48). This increase would have soon stabilized, with an accompanying sharp decline in the waiting period to an initial hearing.

The statistics also indicate that the initial hearings were often set at widely varying time intervals. For example: (1) of eight cases received by EOIR on October 3, 1994, four were scheduled to appear within three days, three were scheduled 16-17 days out, and one was scheduled 23 days out; (2) of 17 cases received by EOIR on April 24, 1995, eight were set for the next day, five were set two weeks out, and four were set over three weeks out; and (3) of seven cases received on May 9, 1995, two were set for the next day, two were set 10 days out, two were set 24 days out, and one was set 30 days out. The variances may have been caused in part by requests from attorneys to reschedule the initial hearing, upward adjustments in master calendar time to account for high numbers of case receipts in a short time period, and/or expedited hearings for some detainees who notified ESMOR or the INS of their decision not to contest exclusion.

For those cases in which a detainee applied for relief from deportation (the relief sought was almost exclusively asylum), EOIR statistics indicate that the average length of time from the initial hearing to an Immigration Judge decision was about four and one half months (134 days). For the period from February 1, to June 22 the average was over five months (160 days). At the time of the disturbance (June 18), this situation appeared to be improving significantly. The number of pending asylum applications had dropped from a high of 249 to 72. In addition, of the 47 cases which were pending more than 90 days, 37 were scheduled for individual hearings within three weeks.

As a result, a detainee who applied for asylum could expect, on average, to be detained for about five months before receiving a decision from an Immigration Judge. Close to a third of the cases in which an asylum application was submitted (including those cases where the application was later withdrawn) took six months (180 days) or more. EOIR's goal is to complete these cases within three months. The nationwide average for exclusion cases where an application for relief is filed is four months. EOIR statistics indicate that 394 detainees filed asylum applications, and that 72 of these were withdrawn before a decision was reached by the Immigration Judge.

Detainees who appealed an Immigration Judge's decision to the Board of Immigration Appeals (BIA) could expect an average of three additional months of detention. EOIR statistics indicate that 151 appeals were filed.

Detainees who did not apply for relief from deportation could expect to be detained, on average, for 20 days before receiving an exclusion order from an Immigration Judge (this average may be somewhat misleading, as it includes cases where the detainee indicated the intention to file an asylum application, but later decided not to file). The nationwide average for all detained cases is 13 days.

**Causes of Delay in the Hearing Process:**

**INS shortfalls**

The INS contributed to delays in the hearing process by failing to include sufficient provisions in the contract with ESMOR to: (1) ensure that ESMOR would present detainees on time for hearings; (2) ensure that the hearing schedule specified in the contract provided sufficient time periods for immigration hearings; and (3) ensure sufficient flexibility on the part of ESMOR to accommodate the continuation of individual hearings past the normal courtroom schedule where necessary to efficiently conclude a hearing. Sufficient input was not obtained from EOIR concerning these contract provisions, affecting the efficiency of the hearing process. The contract also failed to ensure that the court holding room was constructed with a bathroom. The lack of a bathroom in this room made it difficult for ESMOR to use this room effectively.

Even though the contract was deficient in some respects, the INS COTR appears to have been unable to resolve some of these problems with ESMOR in a timely manner, and was not fully