Mary Beth Hogan, Esq.
Drew M. Dorman, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Hawa Abdi Jama, et al., : | |
| : | Civil Action |
| Plaintiffs, : | No: 97-3093 (DRD) |
| : | |
| vs. : | |
| : | |
| United States Immigration and : | |
| Naturalization Service, et al., : | |
| : | |
| Defendants. : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' *DAUBERT* MOTION TO PRECLUDE THE TESTIMONY OF GARY W. DELAND**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT...........................................1

ARGUMENT.......................................................5

I.  DeLand Fails to Meet the Qualification Requirement of
    Rule 702...................................................7

    A.   DeLand Lacks the Expertise to Testify With Regard
         to INS Detention Facilities..........................8

    B.   DeLand Lacks the Expertise to Testify With Regard
         to Medical Care and Contract Law....................12

II. DeLand's Testimony Fails to Meet the Reliability
    Requirement of Rule 702...................................14

    A.   DeLand Lacks the Expertise with Regard to INS
         Detention Facilities to Offer a Reliable Opinion.....19

    B.   DeLand Fails to Support His Opinions Adequately
         With Any Objective Standard.........................20

    C.   DeLand Fails to Base His Opinions on Sufficient
         Facts or Data.......................................21

III. DeLand Impermissibly Offers So-Called Expert Opinions
     Based on Common Sense....................................29

IV. DeLand Impermissibly Opines On The Credibility of
    Witnesses.................................................31

V.  DeLand Impermissibly Opines On Legal Issues..............31

    A.   DeLand's Opinions Contain Improper Legal
         Conclusions.........................................33

    B.   DeLand Improperly Relies On, Cites, And Draws
         Legal Conclusions From Case Law.....................37

CONCLUSION....................................................39

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Berckeley Investment Group Ltd. v. Colkitt*,
    455 F.3d 195 (3d Cir. 2006)..................................32

*Bickerstaff v. Vassar College*,
    196 F.3d 435 (2d Cir. 1999)............................18, 21

*Burkhart v. Washington Metropolitan Area Transit Authority*,
    112 F.3d 1207 (D.C. Cir. 1997)..............................32

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
    350 F.3d 316 (3d Cir. 2003)..................................17

*Crowley v. Chait*,
    322 F. Supp. 2d 530 (D.N.J. 2004).......................16, 31

*D&D Associates, Inc. v. Board of Education of
    N. Plainfield*, 411 F. Supp. 2d 483 (D.N.J. 2006).........8, 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993).......................................1, 14

*Ebenhoech v. Koppers Industries, Inc.*,
    239 F. Supp. 2d 455 (D.N.J. 2002)............................7

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000).................7, 15, 16, 17, 21

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997).........................................18

*Heller v. Shaw Industries, Inc.*,
    167 F.3d 146 (3d Cir. 1999).................................15

*Huey v. United Parcel Serv., Inc.*,
    165 F.3d 1084 (7th Cir. 1999)...............................17

*In re Air Crash Disaster at New Orleans*,
    795 F.2d 1230 (5th Cir. 1986)...............................18

*In re Paoli R.R. Yard PCB Litigation*,
    35 F.3d 717 (3d Cir. 1994).................6, 14, 15, 16, 17

*Jama v. United States*,
    343 F. Supp. 2d 338 (D.N.J. 2004)...........................22

ii

*Joy v. Bell Helicopter Textron, Inc.*,
    999 F.2d 549 (D.C. Cir. 1993)........................15, 18, 21

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).........................................6

*Lewis v. York County Prison Admin.*,
    No. 3:06-0040, 2007 U.S. Dist. LEXIS 12291
    (M.D. Pa. Feb. 23, 2007)..................................35

*Milanowicz v. Raymond Corp.*,
    148 F. Supp. 2d 525 (D.N.J. 2001)..................15, 17, 20

*Murray v. Marina District Development Co.*,
    No. 06-583, 2006 U.S. Dist. LEXIS 92769
    (E.D. Pa. Dec. 22, 2002)..................................29

*Player v. Motiva Enterprises, LLC*,
    No. 02-3216, 2006 U.S. Dist. LEXIS 2288
    (D.N.J. Jan. 20, 2006)...............................7, 8, 12

*Reichhold, Inc. v. United States Metals Refining Co.*,
    No. 03-453, 2007 U.S. Dist. LEXIS 14000
    (D.N.J. Feb. 22, 2007)..................................6, 15

*Rhodes v. Chapman*,
    452 U.S. 337 (1981).......................................39

*Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003)................................7

*Shaw v. Strackhouse*,
    920 F.2d 1135 (3d Cir. 1990)...........................18, 21

*Torres v. County of Oakland*,
    758 F.2d 147 (6th Cir. 1985).............................32

*U.S. v. Jacques Dessange, Inc.*,
    No. S2 99 CR. 1182, 2000 U.S. Dist. LEXIS 3597
    (S.D.N.Y. 2000)...........................................29

*U.S. v. Leo*,
    941 F.2d 181 (3d Cir. 1991)...........................31, 32

*U.S. v. Scop*,
    846 F.2d 135 (2d Cir. 1988)..............................32

*U.S. v. Theodoropoulos*,
    866 F.2d 587 (3d Cir. 1989)..............................29

iii

*U.S. v. Tin Yat Chin*,
   371 F.3d 31 (2d Cir. 2004)...................................15

*U.S. v. Velasquez*,
   64 F.3d 844 (3d Cir. 1995)....................................7

*Walker v. Gordon,*
   46 F. App'x 691, 695 (3d Cir. 2002)........................14

### FEDERAL RULES AND STATUTES

Fed. R. Evid. 702.........................................*passim*

Fed. R. Evid. 704 advisory committee notes.....................32

Prison Litigation Reform Act, 42 U.S.C. § 1997.................35

### MISCELLANEOUS

*Roget's II The New Thesaurus* 358, 510 (3d Ed. 1995)...........25

4 Weinstein's Federal Evidence § 704.04.......................32

iv

Plaintiffs Hawa Abdi Jama, Jeyakumar Anantharajah, Abu Bakar, Cecilia Jeffrey, Abraham Kenneh, Shaminu Nanteza, Dennis Raji, Agatha Serwaa, and Sarah Tetteh Yower respectfully submit the following memorandum in support of their motion to exclude the testimony of defendants' expert, Gary W. Deland ("DeLand") pursuant to Rule 702 of the Federal Rules of Evidence ("Rule 702") and the Supreme Court's Decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

### PRELIMINARY STATEMENT

This lawsuit arises out of the gross mistreatment the plaintiffs endured while they were detained at the Esmor Elizabeth Facility ("Facility").  The Facility was operated by the defendant, Esmor Correctional Services Corporation ("Esmor"), under contract with the United States Immigration and Naturalization Service ("INS").  The Facility was open from July 1994 to June 1995, and during this period of time the detainees, including the plaintiffs, were subjected to physical and mental abuse and to inhumane living conditions.  To contest the plaintiffs' allegations, defendants have proffered the expert testimony of three expert witnesses, including DeLand. Defendants have offered the other two experts, Lawrence H. Mendel and Stuart Grassian, on the subjects of medical care and mental health, respectively.  Their testimony is the subject of simultaneously filed motions to exclude.

DeLand, based on his experience in the corrections
industry, offers opinions on ten subjects related to the
plaintiffs' claims: (1) the Use of Detention Standards to
Establish Authoritative Benchmarks for the Operation and
Management of Detention Facilities; (2) Administrator Liability;
(3) Free Exercise of Religion; (4) Property; (5) Access to
Courts and Counsel; (6) Conditions of Confinement; (7) Working
Detainees; (8) Discipline and Segregation; (9) Claims of
Brutality, Abuse and Excessive Force; and (10) Searches.  (*See*
Report.)[1]

The problems with DeLand's testimony are multiple and
serious, particularly regarding its failure to meet the two
major requirements of Rule 702: specialized expertise and
reliability.  DeLand also offers "expert" opinions that are no
more than common sense, and improperly opines on the credibility
of witnesses and legal issues.  Accordingly, his testimony
should be excluded in its entirety.

First, despite his experience in the corrections industry,
DeLand lacks specialized expertise with regard to INS detention
facilities.  Indeed, DeLand does not have any academic training
or credentials or any personal or practical experience regarding

---

[1]   DeLand's Expert Witness Report ("Report"), dated August 14,
2006, and DeLand's curriculum vitae ("DeLand CV") are
appended to the Certification of Drew M. Dorman in support of
this motion as Exhibit 1.

INS detention facilities.  (*See* DeLand CV.)  DeLand's experience in the corrections industry, a punitive system for addressing criminal offenders, has very limited applicability to the Facility or to the detainees.  The Facility had absolutely no corrections rationale, and the detainees were civil detainees simply awaiting hearings on their immigration status, not criminals.  DeLand himself admits that INS detention facilities are different from criminal facilities and that INS detainees are different than criminal offenders.  (*See, e.g.*, DeLand Dep. at 16:24-17:9, 317:21-318:2.)[2]  He also acknowledges that these differences necessarily affect the policies and procedures that a facility should implement.  (*Id.* at 139:22-140:16, 143:23-144:9.)  Yet, without either academic training or practical experience at such a facility, DeLand lacks the specialized expertise to opine on whether or not the Facility's policies and procedures and the implementation of these policies and procedures were appropriate and adequate for the special needs of the detained population.

Second, DeLand's testimony does not satisfy the reliability standard.  The fact that an expert, particularly a non-scientific expert such as DeLand, has limited qualifications

---

[2]  The transcript of DeLand's deposition and the errata sheet are appended to the Certification of Drew M. Dorman in support of this motion as Exhibit 2.

reduces the reliability of his or her testimony.  DeLand's lack of specialized expertise with regard to the type of facility at issue in this case renders his opinions unreliable.

The reliability of DeLand's testimony is further diminished by his failure to support his opinions with any objective standard for assessing INS detention facilities.  Indeed, DeLand does not attempt to test his opinions against any specific published standards, including any corrections standards. Rather, his only benchmark is his own experience in the corrections industry.  In fact, even though DeLand was explicitly aware that Esmor's contract with the INS required it to comply with the American Correctional Association ("ACA") standards for Adult Local Detention Facilities (DeLand Dep. at 73:19-22), and DeLand himself acknowledges that the ACA standards have "emerged as the most recognized standard[s] in the United States" (Report, Opinion A-1 at 6), he nevertheless rejects these standards and fails to apply them in reaching any of his conclusions. (*See* DeLand Dep. at 57:16-19, 58:23-59:3; *see also* Report, Opinions A-1 to A-5 at 5-13.)

Moreover, DeLand fails to support many of his opinions with sufficient facts or data, omissions that weigh heavily against the reliability of his testimony.  For instance, DeLand consistently fails to consider the most relevant documents and testimony in the case, much of which reveals the abusive

treatment that plaintiffs suffered while at the Facility.
Furthermore, a number of DeLand's conclusions about what
actually occurred or existed at the Facility are based solely on
the Esmor INS Elizabeth Facility Policies and Procedures Manual
("Esmor Policies and Procedures Manual"), not on evidence that
reveals what actually occurred or existed at the Facility.  If
DeLand had considered the relevant documents and testimony in
the case, he would have realized that he not only failed to
consider sufficient facts or data, but in addition, that his
conclusions were wrong.

Finally, DeLand's proposed testimony includes opinions that
are no more than a common sense application of the facts, and
opinions on both witness credibility and legal standards.
Because none of these are proper subjects of expert testimony in
this Circuit, DeLand's opinions in this regard should be
excluded.

**ARGUMENT**

The admissibility of expert testimony is governed by Rule
702, which states:  "If scientific, technical, or other
specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience,
training or education, may testify thereto in the form of an
opinion or otherwise."  Fed. R. Evid. 702.  As the Third Circuit

5

explained in *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir. 1994), two substantive requirements guide the determination of admissibility under Rule 702: qualifications and reliability. *Id.* at 741. Furthermore, Rule 702 "imposes a special obligation" on the court to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Courts have not hesitated to exercise this "gatekeeping" function to exclude expert testimony when proposed experts: (1) lack the specialized expertise to render opinions on the particular issues for which they are being offered; (2) base their opinions on unreliable methodologies and/or insufficient facts or data; (3) offer "expert" opinions that are no more than common sense; (4) opine on the credibility of witnesses; or (5) opine on ultimate legal issues. DeLand's report and testimony suffer from all of these failings and, therefore, should be excluded in their entirety. Even if the Court were to conclude that specific portions of DeLand's testimony were admissible, the Court should nevertheless exclude those portions of his testimony that fail to meet the requirements of Rule 702. *See Reichhold, Inc. v. United States Metals Ref*. *Co.*, No. 03-453, 2007 U.S. Dist. LEXIS 14000 (D.N.J. Feb. 22, 2007) (Debevoise,

6

S.J.); *Ebenhoech v. Koppers Indus.*, Inc., 239 F. Supp. 2d 455, 465-69 (D.N.J. 2002).

**I.   DeLand Fails to Meet the Qualification Requirement of Rule 702**

The first requirement of Rule 702, the qualification prong, requires that an expert "possess specialized expertise." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  Such specialized expertise may be drawn from academic training or practical experience.  *Elcock v. Kmart Corp.*, 233 F.3d 734, 743-44 (3d Cir. 2000).  Although courts have discretion, the inquiry is not a mere formality, and courts must carefully examine the credentials of proposed experts to ensure that they have the specialized expertise necessary to render opinions on the particular issues for which they are being offered as experts. *Id.*  This requirement is designed to ensure "the trustworthiness of the expert's testimony." *U.S. v. Velasquez,* 64 F.3d 844, 849 (3d Cir. 1995).

Thus, proposed experts should be deemed unqualified and their testimony excluded when their area of expertise is "adjacent to, but not actually encompassing, the subject matter of the testimony." *Player v. Motiva Enters., LLC*, No. 02-3216, 2006 U.S. Dist. LEXIS 2288, at *20 (D.N.J. Jan. 20, 2006).  In *Player*, the court concluded that a licensed appraiser who had over twenty years of experience appraising uncontaminated

7

properties was not qualified to testify with regard to

contaminated properties because there was "no evidence

indicat[ing] that he [had] any experience appraising

contaminated properties." *Id.* at *21; *see also D&D Associates,*

*Inc. v. Bd. of Educ. of N. Plainfield*, 411 F. Supp. 2d 483, 487

(D.N.J. 2006) (concluding that attorney was not qualified to

render expert opinion on construction and bidding laws, even

though he had over thirty years of experience as attorney,

including practical experience in real estate and zoning law).

## A. DeLand Lacks the Expertise to Testify With Regard to INS Detention Facilities

DeLand's experience in the corrections industry, a punitive

system for addressing criminal offenders, does not provide him

with the required specialized expertise with regard to INS

detention facilities that would permit him to offer expert

opinions regarding the Facility.  DeLand does not have any

academic training or credentials with regard to INS detention

facilities.  (*See* DeLand CV.)  Moreover, even though all of his

opinions stem solely from his professional experience (*see*

Report at 1-2), DeLand acknowledges that he has never worked in

an INS detention facility (DeLand Dep. at 43:13-15), never

consulted with regard to an INS detention facility (*id.* at

43:16-23), and never written anything with regard to an INS detention facility. (*Id.* at 43:24-44:1, 48:13-16.)[3]

Furthermore, DeLand stated that in preparing his report he relied on his "layman's understanding of prisoners' rights as defined in federal case law." (Report at 2; *see also* Report at 5 ("I believe that experts should not be oblivious to the basic legal requirements of correctional law.").) However, DeLand acknowledges that he has never reviewed any case law with regard to INS detention facilities or INS detainees. (DeLand Dep. at 63:1-23.)[4] Moreover, DeLand has never reviewed any relevant literature or attended any conferences to inform himself of the special needs and issues that affect INS detention facilities or INS detainees. (*Id.* at 48:20-50:16, 46:15-48:5, 69:12-15.) As DeLand stated during his deposition, "I couldn't tell you any one thing that anybody from INS has ever told me that I brought to bear in this case, the fact that there's probably nothing." (*Id.* at 47:25-48:3.)

---

[3]   DeLand also acknowledges that he has never worked in a facility that had only civil detainees (DeLand Dep. at 46:12-14) and has never written anything with regard to a facility that had only civil detainees. (*Id.* at 48:17-19.)

[4]   DeLand also acknowledges that he did not review any Third Circuit case law (DeLand Dep. at 62:17-22) or any case law that was specific to civil detainees. (*Id.* at 62:23-25, 63:20-23.)

DeLand's experience in the corrections industry does not compensate for his utter lack of specialized expertise with regard to INS detention facilities.  In fact, his experience has very little applicability.  As DeLand stated during his deposition, "corrections people are in the business of correcting."  (DeLand Dep. at 248:13-14.)  By contrast, the Facility had absolutely no corrections rationale, and the detainees were civil detainees simply awaiting hearings on their immigration status, not criminals.  DeLand's own testimony aptly explains why his lack of specialized expertise with regard to INS detention facilities should prevent him from opining on INS detention facilities, particularly the Facility.  DeLand expressly states that INS detainees have "a status different than the status you ordinarily see in jails and prisons" (*id.* at 317:24-25), and further acknowledges that the Facility was different from other detention systems "by virtue of who is being housed [and] the mission of the facility." (*Id.* at 16:24-17:9.)  In addition, DeLand states:

> [I]n any set of circumstances, when you look at the mission of the facility and what you're going to be dealing with, there will be some adjustment to policy and procedure . . . So anytime you look at who you're housing, if there are special language needs or you need to be familiar with what problems you may face due to cultural issues, obviously those will impact policy and procedure or, at the very least, the manner in which policy and procedure will be carried out.

10

(*Id.* at 139:22-140:16; *see also id.* at 143:23-144:9
(acknowledging that policies and procedures should reflect "the
realities of handling [an INS detention] population"); *id.* at
317:21-318:2 (admitting that because of the unique population at
INS detention facilities, he did not know what the standard
would be for conducting strip searches at intake).)

    Despite DeLand's own testimony, his report assumes, without
critical analysis, that INS detention facilities should be
operated and judged just like a prison or jail and that INS
detainees should be treated just like criminal prisoners.
Indeed, DeLand acknowledges that in preparing his report he had
never really thought of the Facility as a different kind of
facility than a jail or prison.  (DeLand Dep. at 17:15-24.)
DeLand made this assumption without conducting any independent
research or statistical analysis of detainees at this or any
other INS detention facility and without considering any
relevant third party research or statistical analysis.
Moreover, DeLand even failed to test his assumptions against the
testimony of Esmor employees (*id.* at 22:14-20), including
Willard Stovall (*id.* at 138:2-4), the Facility Administrator,

who stated that he did not consider the detainees to be dangerous. (Stovall Dep. at 1404:18-20.)[5]

Even specific portions of the ACA standards, which applied to the Facility under the contract between the INS and Esmor, must be adjusted based on the Facility's particular mission and population. In addition, to further accommodate the Facility and the detainees, the contract supplemented the ACA standards with many additional provisions, including the Esmor Policies and Procedures Manual. Absent training or experience with either the mission or the population of Esmor, DeLand, like the appraiser in *Player* or the lawyer in *D&D Associates*, lacks the specialized expertise to qualify as an expert with regard to INS detention facilities. Despite acknowledging this lack of experience, DeLand has made no attempt to inform himself of the special needs and issues affecting INS detention facilities and INS detainees. Accordingly, his testimony with regard to the Facility should be excluded.

### B.   DeLand Lacks the Expertise to Testify With Regard to Medical Care and Contract Law

DeLand does not possess the specialized expertise with regard to health and medical care or contract law that Rule 702 requires. DeLand is not a medical doctor, and he does not have

---

[5]   The referenced portions of Stovall's deposition are appended to the Certification of Drew M. Dorman in support of this motion as Exhibit 3.

academic training or practical experience with regard to health and medical care.  In fact, nowhere does DeLand claim to be an expert in health and medical care — although this does not stop him from offering the following opinions on health and medical matters:

- "It is my opinion that detainees were provided medical care at the Elizabeth Facility, and that the system as described in written policies and procedures met basic medical care requirements for a correctional or detention facility." (Report, Opinion F-5.1 at 50.)

- "It is my opinion that limited natural light and *fresh* air do not prevent detainees from receiving the primary benefits of exercise." (Report, Opinion F-6.2 at 53.)

Nor is DeLand a lawyer, and he does not have academic training or practical experience with regard to contract law. DeLand nevertheless opines on contract law, in particular the interpretation of Subsection 2(D)(1) of the contract between Esmor and the INS:

- "It is my opinion that INS had the authority to control the selection and hiring process; thus, could remedy any problems related to hiring by denying clearances to the candidates for employment." (Report, Opinion B-2.2 at 19.)

DeLand bases this opinion on his interpretation of the contract between Esmor and INS, which he, despite lacking any relevant expertise, concludes "would seem to put the onus on INS to conduct independent screening and evaluation of candidates to

13

approve them for clearances and to ensure that the Esmor selection process was adequate." (*Id.*)

Because of DeLand's lack of qualifications or experience with regard to health and medical care or contract law, his above-cited testimony on those subjects should be excluded.

## II.  DeLand's Testimony Fails to Meet the Reliability Requirement of Rule 702

Even if DeLand's general corrections experience was sufficient to satisfy the "qualification" requirement of Rule 702, his testimony nevertheless would fail Rule 702's next requirement, that expert testimony be reliable. *Daubert*, 509 U.S. at 589.  As the Third Circuit has explained, an "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *In re Paoli*, 35 F.3d at 742 (internal citations omitted).  In determining whether expert testimony is reliable, the court "is not to weigh the evidence relied upon or determine whether it agrees with the conclusions reached," but rather "to evaluate whether the methodology utilized by the expert is reliable." *Walker v. Gordon,* 46 F. App'x 691, 695 (3d Cir. 2002).

The Third Circuit employs a flexible test for reliability that permits consideration of any of a number of well-established factors to determine whether an expert's opinion is reliable, including: (1) whether a method consists of a testable

14

hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.  *In re Paoli*, 35 F.3d at 742 n.8.  Two of these factors, qualifications and objective standards, are particularly helpful in determining the reliability of non-scientific testimony, such as the testimony offered by DeLand.  *See, e.g., Elcock*, 233 F.3d at 747-49; *Milanowicz v. Raymond Corp.*, 148 F. Supp. 2d 525, 532-33 (D.N.J. 2001).  However, the Third Circuit has made it clear that these factors do not constitute a definitive list, but rather, merely provide guidance to the district courts in reaching their reliability determination.  *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999).  Indeed, courts have consistently concluded that an expert's opinion based on insufficient facts or data is unreliable.  *See, e.g.*, *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004); *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 569 (D.C. Cir. 1993); *Reichhold*, 2007 U.S. Dist. LEXIS 14000, at * 17.

15

An expert's "level of expertise" may affect the reliability of his or her opinion. *In re Paoli*, 35 F.3d at 741. In fact, the qualifications of a non-scientific expert play a particularly important role in evaluating the reliability of the proposed testimony. *Crowley v. Chait*, 322 F. Supp. 2d 530, 536 (D.N.J. 2004). In *Elcock*, for example, the Third Circuit concluded with "misgivings" that the district court had not abused its discretion in finding that a psychologist experienced in assisting disabled individuals obtain work was sufficiently qualified to testify to the possible outcomes of vocational rehabilitation for the injured plaintiff, even though the court concluded that his qualifications were "thin" and "marginal at best." *Elcock*, 233 F.3d at 741, 749. In reaching its determination, the court acknowledged that the proffered expert lacked any formal training and that his personal experience was limited, but nevertheless stated that "when taken together with his review of the literature in the field and his attendance at conferences" he was sufficiently qualified.[6] *Id.* at 744. However, despite qualifying the expert, the court revisited the expert's qualifications under the reliability prong and determined that his testimony was ultimately unreliable. *Id.* at

---

[6]   The court noted that it also would have upheld a decision by the district court to exclude the expert as not sufficiently qualified. *Elcock*, 233 F.3d at 744.

750.  "In light of our substantial discussion . . . explaining how [the expert's] qualifications were marginal at best . . . we believe that this factor also weighs in favor of excluding [his] testimony." *Id.* at 749; *see also Calhoun v. Yamaha Motor Corp.*, U.S.A., 350 F.3d 316, 324 (3d Cir. 2003) (concluding that expert was "unable to give reliable testimony" on design of jet skis because he had "paucity" of specific knowledge and experience with product).

Reliability of expert testimony also turns on whether the expert's opinion is based on an objective standard and not merely "subjective belief or unsupported speculation." *In re Paoli*, 35 F.3d at 742 (internal citation omitted).  In *Milanowicz*, the court concluded that although an engineer appeared to have adequate qualifications, his testimony lacked reliability, reasoning that although he "lists a number of design standards at the beginning of his report, he does not specifically reference any of them in the body of his report." 148 F. Supp. 2d at 537.  Accordingly, and after considering other reliability factors, the court excluded the testimony, concluding that the expert "employed no defined methodology and did not provide 'good grounds' for his conclusions." *Id.* at 540; *see also Elcock*, 233 F.3d at 747-48 (finding expert testimony unreliable when expert failed to explain the standards used to reach his conclusions); *Huey v. United Parcel Serv.*,

17

*Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999) (explaining that "expertise" in topic is insufficient to make "expert" opinion admissible and that expertise must be applied in analysis).

Finally, Rule 702 expressly requires that expert testimony be based on "sufficient facts or data." Fed. R. Evid. 702. Thus, although the factual basis of an expert's opinion can be the subject of an assessment for credibility, rather than admissibility, courts have consistently concluded that an expert's opinion based on significantly incorrect or incomplete facts should be excluded. *See, e.g.*, *Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999) (upholding determination that expert evidence should be excluded because it omitted major facts and data); *Joy*, 999 F.2d at 569 (*quoting In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1233 (5th Cir. 1986)) (stating that in view of factual flaws in expert's testimony, court should resist "the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it 'the weight it deserves'"); *Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990) (stating that opinions based on facts unsupported by record were properly excluded). As the Supreme Court stated in *General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997): "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the

18

existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."

DeLand's testimony fails the reliability standard in three critical respects: he lacks the required expertise; he fails to ground or support his opinions with any objective standard; and his opinions are based on significantly incorrect or incomplete facts.  Accordingly, his testimony is unreliable and should be excluded in its entirety.

### A.   DeLand Lacks the Expertise with Regard to INS Detention Facilities to Offer a Reliable Opinion

DeLand's lack of experience or training in the type of facility at issue in this case not only renders him unqualified, but also makes his opinions unreliable.  With no training or experience outside the corrections industry, a punitive system for addressing criminal offenders, DeLand's opinions on policies, procedures and practices at a non-correctional facility are inherently unreliable.  They are particularly unreliable given that DeLand acknowledges the difference between a population in a corrections setting and the population of an INS facility, and still did nothing to inform himself of the special needs and issues such INS facilities and INS detainees face.  (*See supra* at 9-14.)

19

**B.    DeLand Fails to Support His Opinions Adequately With Any Objective Standard**

The reliability of DeLand's testimony is further diminished by his failure to support his opinions with any objective standard for assessing an INS detention facility.  DeLand does not even attempt to test his opinions against any specific published standards, including any corrections standards. Indeed, even though DeLand was explicitly aware that Esmor's contract with the INS required it to comply with the ACA standards (DeLand Dep. at 73:19-22), and DeLand himself acknowledges that the ACA standards have "emerged as the most recognized standard[s] in the United States" (Report, Opinion A-1 at 6), he nevertheless rejects these standards and fails to apply them in reaching any of his conclusions. (*See* DeLand Dep. at 57:16-19, 58:23-59:3; *see also* Report, Opinions A-1 to A-5 at 5-13.)  Rather, similar to the expert in *Milanowicz*, DeLand merely lists the ACA standards at the beginning of his report, (*see* Report at 4) and subsequently fails to apply them to the facts of the case in the rest of his report.

In support of his decision to disregard the ACA standards, DeLand cites two Supreme Court cases that he claims stand for the principle that "courts should not rely upon the standards in ruling on *prisoner-rights claims*." (Report, Opinion A-1 at 6 (emphasis added).)  By inappropriately attempting to apply case

20

law for prisoner claims to INS detention facilities and INS detainees, DeLand inadvertently illustrates the primary reason that he is unqualified as an expert.  His mindset and opinions are based solely on his experience in the corrections industry and do not relate to an INS detention facility holding civil detainees who are new to this country.  And by refusing to apply the ACA standards — the standards Esmor was expressly required by contract to follow at the Facility — DeLand is substituting his own subjective belief for the specific standards that applied to the Facility, a misguided approach that renders his opinions unreliable.  *See Elcock*, 233 F.3d at 747-48.

### C. DeLand Fails to Base His Opinions on Sufficient Facts or Data

Finally, the gap between the relevant evidence and many of DeLand's opinions rises to the level of unreliability that led to the exclusion of expert testimony in *Joy*, *Shaw*, and *Bickerstaff*.  In fact, DeLand formulates many of his conclusions without considering the most relevant documents and testimony in the case.  Specifically, DeLand failed to review any of the defendants' testimony (DeLand Dep. at 22:14-20) and acknowledges that he never requested or intends to request any of their depositions. (*Id.* at 23:9-24.)  Similarly, DeLand only "very briefly" reviewed the sworn testimony of the plaintiffs.  (*Id.* at 20:20-21:16.)  Moreover, although DeLand listed a number of

21

documents as being among those that he reviewed (Report at 2-4),
he failed to consider adequately many of the most relevant ones,
including specific training records (DeLand Dep. at 173:8-12,
175:1-5), grievance reports (*id.* at 297:18-304:3), and perhaps
most importantly, the Elizabeth, New Jersey Contract Detention
Facility Operated by Esmor Interim Report ("INS Report"). (*Id.*
at 36:25-37:6.)[7]   Indeed, DeLand states that he did not use the
INS Report in formulating any of his opinions.  (*Id.* at 197:5-9,
39:7-9.)

     As a result, serious factual errors underlie much of
DeLand's commentary.  For instance, DeLand concluded that he had
"seen *nothing* to cause" him to believe that the detainees "were
disciplined in an arbitrary or capricious manner" (Report,
Opinion H-2.2 at 59 (emphasis added)) and that "there is *no
record* of a policy or practice of excessive force" at the
Facility. (Report, Opinion I.-2.3 at 61 (emphasis added).)  Yet
the testimony of one of the defendants that DeLand declined to
review contradicts this conclusion.  Philip Johnson, a guard at
the Facility, testified that SERT guards were instructed to
enter dormitories and make the detainees go "through some pain .

---

[7]   Shortly after the uprising at the Esmor facility, the INS
issued the INS Report acknowledging that the conditions at
the Esmor facility were abusive.  This Court found that the
INS Report was admissible evidence. *Jama v. United States*,
343 F. Supp. 2d 338, 377 (D.N.J. 2004).

. . [and] make them feel it" (Johnson Dep. at 512:22–513:5) and
that guards on the night shift were told that "[t]he only way
these people are going to understand, they don't understand
English, but everyone understands a beat down." (*Id.* at 439:12–
15.)[8]  The gap between DeLand's opinion about arbitrary or
capricious punishment and excessive force and the reality of the
conditions at the Facility is also made apparent by reference to
the INS Report, which found with regard to the Facility, among
other things, that: the "placement of detainees into segregation
without a charging document was a frequent occurrence" and that
the "segregation unit was used as a means both of punishing
detainees for relatively minor offenses, and for more general
harassment" (INS Report at 8); and that the use of force at the
Facility was "part of a systematic methodology designed by some
Esmor guards as a means to control the general detainee
population and to intimidate and discipline obstreperous
detainees through the use of corporal punishment." (*Id.* at 5.)[9]

    DeLand also failed to consider the relevant facts and
testimony of the case in concluding that "James Slattery, Aaron

---

[8]   The referenced portions of Johnson's deposition are appended
      to the Certification of Drew M. Dorman in support of this
      motion as Exhibit 4.

[9]   The documents from the record referred to in this brief are
      appended to the Certification of Drew M. Dorman in support of
      this motion as Exhibit 5.

Speisman, and Richard Staley as corporate officials lack the
responsibility and the capability of micro-managing the
Elizabeth Facility."[10]  (Report, Opinion B-1.2 at 14.)  But
DeLand did not even review the depositions of these three Esmor
corporate defendants.  (DeLand Dep. at 159:12-14.)  Nor did he
interview them or conduct any research on Esmor.  (*Id.* at
159:15-17, 132:10-18.)  Thus, DeLand did not know how frequently
the Esmor corporate defendants actually visited the Facility or
how frequently they spoke with Facility personnel.  (*Id.* at
160:5-22.)  In fact, DeLand admitted that he did not know
whether or not these defendants did or did not micro-manage the
Facility.  (*Id.* at 161:17-22.)  Aside from the fact that this
particular testimony is entirely unsupported, and therefore
unreliable, it is also well beyond the scope of DeLand's
expertise, as DeLand does not have any academic training or
practical experience to allow him to opine on matters with
regard to the administration of a corporation like Esmor.[11]  (*See*
DeLand CV; *see also* DeLand Dep. at 157:19-159:11.)

---

[10]   During the relevant time period, Slattery was the President
       and Chief Executive Officer, Speisman was an Executive Vice
       President and Secretary, and Staley was a Senior Vice
       President.

[11]   DeLand's opinions regarding the adoption and implementation
       of a training program are similarly deficient.  (*See* Report,
       Opinions B-4.1 at 22-24 and B-4.5 at 27-28.)  During his
       deposition DeLand stated: "I did not have available to me
       specific training records on specific individual officers,

Moreover, a number of DeLand's opinions regarding what actually occurred or existed at the Facility should also be excluded for the simple reason that they are based solely on the Esmor Policies and Procedures Manual, <u>not</u> on any evidence that actually revealed the practices that occurred or the conditions that existed at the Facility.[12]  Indeed, under DeLand's head-in-the-sand approach, a facility would pass muster simply by maintaining a set of appropriate written policies and procedures, even if those policies and procedures were completely ignored or violated in practice.  DeLand's failure to consider the relevant documents and testimony in this case not

nor could I testify as to whether each officer credited with a training class actually went.  But I can say that the Esmor facility had a training program that required training in a variety of areas which I would consider very important to being able to properly manage a corrections facility.  The extent to which that was carried out or implemented at each level by each supervisor or whatever, you know, would be quite different than what the program itself was." (DeLand Dep. at 173:8-21.)

[12]  In an attempt to obfuscate clear differences between the requirements of Esmor's policies and procedures and the actual practices that existed in the Facility, DeLand engaged in some verbal gymnastics at his deposition by contending that "implemented" and "executed" had two very different meanings.  (*See* DeLand Dep. at 209:23-210:5 ("As I've said in previous answers to similar questions, there's adopting, there's implementing, and then at some level, there's execution of the process.").)  However, in the real world "implemented" and "executed" are synonyms.  *See Roget's II The New Thesaurus* 358, 510 (3d Ed. 1995).

only reveals that his opinions are based on insufficient facts or data, but it also leads him to reach incorrect conclusions.

For instance, DeLand opines that "Defendants Slattery, Speisman, Staley and Lima adopted and implemented reasonable screening and hiring practices." (Report, Opinion B-2.1 at 17.) As support for his conclusion, DeLand cites only to the Esmor Policies and Procedures Manual. (*Id.* at 17-19.) However, DeLand failed to consider evidence that actually revealed what occurred or existed at the Facility – and the evidence reveals that a number of employees worked at the Facility without the appropriate training requirements or security clearances expressly required by the contract. For example, DeLand failed to consider the INS Report, which concluded that "Esmor was assigning personnel to security assignments without meeting any minimum training requirements" (INS Report at 18) and that guards had been working at the Facility without the required INS security clearance. (*Id.* at 2 and 16); *see also* WS 01596-97 (February 27, 1995 Memo from G.J. Riordan, INS Administrative Contracting Officer, to Slattery, stating that INS security waivers had not been cleared or had been revoked); WS 01349-50 (January 30, 1995 Memo from Michael Rozos, INS Officer in Charge at the Facility, to Stovall, "I have delivered several Notices of Revocation of Waivers....  I have observed some of those same employees still working under the terms of the contract.");

26

GD0272-73 (June 15, 1995 Memo Steven A. Smith, INS Officer of Security, to Norman Uzzle, INS Contracting Officer's Technical Representative ("COTR"), stating that several Esmor employees are not qualified to work under contract because there was no record of their completed pre-employment suitability investigation.)  In addition, since DeLand declined to review any of the defendants depositions (DeLand Dep. at 22:14-20), he also failed to consider the testimony of Staley, who stated that a "large number" of the guards' applications were never appropriately cleared. (Staley Dep. at 244:12-14.)[13]

Similarly, DeLand concludes that "Esmor officials did not deprive Plaintiffs of adequate food." (Report, Opinion F-4 at 49-50.)[14]  Once again, DeLand failed to consider evidence that actually revealed what occurred or existed at the Facility, and the documents DeLand declined to review are to the contrary. For instance, following a June 1995 inspection of the Facility, the INS warned Stovall that Esmor had to increase the quantity of food served to the detainees.  See EE 085569-70 (June 12,

---

[13]  The referenced portions of Staley's deposition are appended to the Certification of Drew M. Dorman in support of this motion as Exhibit 6.

[14]  For this opinion, DeLand also states that the diet was reviewed by a registered dietician and the INS COTR, but fails to clarify whether the review entailed reviewing merely the proposed menu or the actual food eaten by the detainees on a daily basis, including whether it was spoiled.

1995, Memorandum from Stovall to Esmor Staff, attaching Esmor Task List).  Further, Stovall acknowledged receiving complaints from a number of detainees that they were not receiving enough food.  *See* EE085556 (June 7, 1995 Stovall Memo).  The gap between DeLand's opinion and the relevant facts is also highlighted by Stovall's notes that the detainees were served spoiled food, including milk that had been expired for two to four weeks.  *See* WS 00184 (Stovall handwritten notes); EE 088350-51 (March 12, 1995 Stovall Memo).

The following are some additional examples in which DeLand's opinions are based solely on the Esmor Policies and Procedure Manual, <u>not</u> on evidence that actually revealed what occurred or existed at the Facility:

- "It is my opinion that Defendants Slattery, Speisman, Staley and Lima adopted and implemented adequate and competent written policies and procedures to guide staff."  (Report, Opinion B-3.1 at 20.)

- "It is my opinion that Esmor Defendants have adopted and implemented a chain of command to facilitate efficient supervision of staff members."[15]  (Report, Opinion B-5.1 at 28.)

- "It is my opinion that the Esmor Defendants adopted and implemented an employee evaluation system as a part of managing and supervising employees."  (Report, Opinion B-5.2 at 28.)

---

[15]  For this opinion, DeLand fails to cite any support, even the Esmor Policies and Procedure Manual.

- "It is my opinion that Esmor officials facilitated the supervision process by maintaining personnel records." (Report, Opinion B-5.3 at 30.)

Accordingly, to the extent that these opinions purport to indicate what actually occurred or existed at the Facility, they should be excluded as unreliable.

## III. DeLand Impermissibly Offers So-Called Expert Opinions Based on Common Sense

Expert testimony that merely applies common sense to the facts of the case is unhelpful to the trier of fact, and thus, should be excluded. *Murray v. Marina Dist. Dev. Co.*, No. 06-583, 2006 U.S. Dist. LEXIS 92769, at *12 (E.D. Pa. Dec. 22, 2002); *see also U.S. v. Jacques Dessange, Inc.*, No. S2 99 CR. 1182, 2000 U.S. Dist. LEXIS 3597, at *2 (S.D.N.Y. 2000) (stating that "'[a]lthough expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts,' expert testimony is properly excludable as not helpful to the trier of fact when 'persons of common understanding are [] capable of comprehending the primary facts and of drawing correct conclusions from them'"). Indeed, the "overriding limitation on expert testimony" is the requirement that expert testimony be helpful to the trier of fact. *U.S. v. Theodoropoulos*, 866 F.2d 587, 591 (3d Cir. 1989).

On several occasions in his expert report, DeLand improperly attempts to offer purportedly expert testimony based

on the application of common sense to the facts of the case.

For instance, DeLand offers the following opinions:

- "It is my opinion that Stovall had no role in the writing or adopting of the Esmor manual." DeLand bases his opinion on the fact that the manual was "written and adopted" before Stovall was hired. (Report, Opinion B-3.3 at 21.)

- "It is my opinion that training, regardless of how well designed and delivered, cannot guarantee perfect outcomes." (Report, Opinion B-4.4 at 26.)

- "It is my opinion that any guards involved in misconduct would make every effort to limit the potential for discovery by facility or corporate officials." (Report, Opinion D-3 at 36.)

- "It is my opinion that proper delegation requires that corporate administrators such as Slattery, Speisman, and Staley provide a reasonable degree of structure and direction to their subordinates. This structure and direction should be in the form of written policies and procedures, staff training, and staff supervision." (Report, Opinion B-1.5 at 16.)

- "It is my opinion that Esmor officials did not deprive detainees of shelter." (Report, Opinion F-2.1 at 44.) To support his opinion, DeLand states: "I have not inspected or toured the Elizabeth facility, although I have received and reviewed photographs taken of various parts of the facility. Quite clearly, the Elizabeth facility provided shelter for detainees." (*Id.*)

Each of these opinions requires nothing more than the application of common sense to the specific facts. Accordingly, these opinions should be excluded as unhelpful to the trier of fact.

## IV.   DeLand Impermissibly Opines On The Credibility of Witnesses

A determination of the credibility of witnesses is a task reserved exclusively for the jury, and it is an improper subject for expert testimony.  *Crowley*, 322 F. Supp. 2d at 553-54 (internal quotations and citation omitted) (prohibiting expert from opining on credibility and describing determination of witnesses' credibility as "the quintessential jury function").  Two of DeLand's opinions fall into this category.  The first, that "many of the religion-related claims were of questionable validity," (Report, Opinion C-1 at 32) is based in part on DeLand's assumption that the defendants are being truthful when they assert that they made accommodations for Ramadan, while plaintiffs' factual allegations are insufficiently specific.  The second, that "some detainee claims appear to have been exaggerated," (Report, Opinion C-2 at 33) is based completely on DeLand's view that the plaintiffs lack credibility.  In both instances, DeLand strays from proper expert opinion into the realm of improperly opining on witness credibility.  As a result, these opinions should be excluded.

## V.   DeLand Impermissibly Opines On Legal Issues

Although under the Federal Rules of Evidence an expert can testify as to ultimate factual issues, it is axiomatic that "it is not permissible for a witness to testify as to the governing law."  *U.S. v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991); *see also*

31

*Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("[T]he District Court must ensure that an expert does not testify as to the governing law of the case."); 4 *Weinstein's Federal Evidence* § 704.04 ("In general, testimony about a legal conclusion, or the legal implications of evidence is inadmissible under Rule 704.").  The Third Circuit has stated specifically that an expert may not offer opinions as to legal duties that arise under the law, *Leo*, 941 F.2d at 196, as to what the law requires, *Berckeley Inv. Group*, 455 F.3d at 218, or as to whether a defendant has complied with the law.  *Id.* Moreover, expert testimony may be excluded when the expert uses a term with a legal significance different from the lay understanding of the term.  *See, e.g., Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997); *U.S. v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988).

It is also impermissible for an expert to tell the jury what result to reach.  *See* Fed. R. Evid. 704 advisory committee notes (stating that federal rules of evidence "stand ready to exclude opinions phrased in terms of inadequately explored legal criteria").  "The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury." *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985).

## A.   DeLand's Opinions Contain Improper Legal Conclusions

Much of DeLand's testimony improperly draws legal conclusions and improperly refers to case law that may or may not be the governing law of this Circuit.  Consequently, this testimony threatens to confuse the jury and usurp the role of the Court in instructing the jury on the governing law.  As a result, the Court should exclude these aspects of DeLand's testimony.

The following opinions of DeLand contain legal conclusions and therefore should be excluded.

- That certain defendants did not have legal responsibility for management of the Facility. (Report, Opinion B-1.2 at 14-15.)

- That the INS had the legal obligation and authority to control the selection and hiring process (Report, Opinion B-2.2 at 19), and that the defendants' training program met INS requirements. (Report, Opinion B-4.5 at 27-28.)

- That inadequate training could not be a proximate (legal) cause of any staff misconduct. (Report, Opinion B-4.2 at 24-25.)

- That plaintiffs' claims under the Religious Freedom Restoration Act for denial of the free exercise of religion are "of questionable validity" (Report, Opinion C-1 at 32), and that plaintiffs' religious practices were not "substantially burdened." (*Id.* at 33.)

- That the criminal law and the policies and procedures of prosecutors' offices can address the theft of detainee property. (Report, Opinion D-1 at 34-36.)

- That plaintiffs have received full legal compensation for their property loss. (Report, Opinion D-5 at 38.)

33

- That the defendants have met their legal obligation to provide plaintiffs with access to courts and counsel (Report, Opinion E-1 at 38-39), and that the lack of a law library, an inadequate law library, or inadequate access to an existing law library did not violate that obligation as a legal matter. (Report, Opinion E-5 at 42-43.)

- That plaintiffs may not recover damages if they fail to show that they have suffered physical injury. (Report, Opinion F-3 at 49.) In several other opinions, DeLand erroneously states that plaintiffs have failed to show physical injury, implying that for this reason they may not recover damages. (*See, e.g.*, Report, Opinions E-4, E-5, F-6.1, and F-6.2.)

- What due process means, that "due process is not required for non-punitive segregation" (Report, Opinion H-2.1 at 57), and that "if a detainee is segregated for punitive reasons minimal due process is required." (Report, Opinion H-2.2 at 58.)

- That the standard for evaluating the appropriateness of personal searches of detainees consists of "the degree of intrusion, justification for the search and level of intrusion, and the manner in which searches were conducted." (Report, Opinion J-3 at 62.)

- That a number of actions were or were not "reasonable," which is the conclusion the jury will be asked to draw for Plaintiffs' state law negligence claims. (See, *e.g.*, Report, Opinions B-2.1, B-3.4, B-3.5, B-4.1, B-4.2, D-4, F-2.3, and F-2.4) (offering legal conclusions as to reasonableness).

DeLand's legal opinions and conclusions are improper for a variety of reasons. First, DeLand's legal opinions act to usurp the Court's role in providing the governing law to the jury. Second, DeLand's legal opinions, even if they happen to be correct, could easily mislead and confuse the jury. For example, his use of legal terminology such as "substantial

34

burden," "proximate cause," "due process," and "reasonable," in addition to drawing improper legal conclusions for the jury, would be likely to confuse and mislead the jury.

Third, DeLand's legal opinions are frequently wrong and could result in serious jury confusion. For example, DeLand relies on the Prison Litigation Reform Act, 42 U.S.C. § 1997, to support his understanding that the plaintiffs cannot recover damages without a showing of physical injury. But the PLRA, which was passed after the closing of the Facility, applies only to prisoners, not to INS or other civil detainees. *See, e.g.*, *Lewis v. York County Prison Admin.*, No. 3:06-0040, 2007 U.S. Dist. LEXIS 12291, at *4-*5 (M.D. Pa. Feb. 23, 2007) ("It is well established that a civil detainee, including an alien detained by the Federal government pending removal, is not a prisoner for the purposes of the PLRA; indeed, every court that has addressed the issue has held that the PLRA does not apply to civil detainees."). In fact, DeLand's legal opinions repeatedly and improperly confuse the rights of prisoners with the rights of INS civil detainees — which is no doubt a result of his improper qualifications. For example, in addition to his misapplication of the PLRA, his opinion that defendants did not violate plaintiffs right of access to court and counsel by providing no law library, an inadequate law library, or inadequate access to a law library, depends in part on his

35

understanding of the legal rights of prisoners.  (Report, Opinion E-5 at 43.)   So too, his opinions that privacy is inconsistent with the requirements of "incarceration" (Report, Opinion F-7.1 at 54-56), and that searches are a necessary part of prison life (Report, Opinion J-1 at 61-62), improperly depend on his understanding of the legal rights of prisoners.

Similarly, DeLand relies on a misunderstanding of this Court's opinion of November 10, 2004, to imply that the plaintiffs have been fully compensated on their property claims, disregarding potential liability for the time plaintiffs were deprived of their property and for the negligence of the defendants in supervising the property room.  DeLand's manifest legal errors illustrate the prejudice plaintiffs would suffer if such testimony were allowed to reach the jury, and they underscore the rationale for prohibiting experts from testifying about governing law.  Finally, aside from the errors themselves, DeLand's lay legal opinions are simply well beyond the scope of his expertise and are, at best, irrelevant.  (*See, e.g.*, Report, Opinion D-1 at 34-36) (offering legal opinion that theft of detainee property could be handled through criminal prosecution).

36

**B.    DeLand Improperly Relies On, Cites, And Draws Legal
Conclusions From Case Law**

DeLand — who is not a lawyer and who possesses no legal
training — testified that his understanding of the law helped
him in forming the majority of his opinions.  (DeLand Dep. at
61:12-62:3.)  Throughout DeLand's report, he references and
quotes Supreme Court case law.  (*See* Report, Opinions A-1, B-
4.4, E-5, F-6.1, F-6.2, F-7.1, and J-3.)  However, he testified
that he did not review Third Circuit law.  (DeLand Dep. at
62:17-22.)  Nor did he review any law regarding civil detainees.
(*Id.* at 62:23-64:4.)  It is not clear whether the case law that
DeLand cites is still good law or indeed whether it applies to
or governs this case.  In reality, his approach is nothing more
than an attempt to instruct the jury on what is purportedly
required under the law, thereby invading the province of this
Court.  Furthermore, because DeLand's opinions purport to be
based on the authoritative opinions of the Supreme Court, a
significant risk exists that the jury may give improper weight
to this testimony.  In addition, this testimony is outside the
scope of the subject of the practices of detention facilities,
and it is unnecessary to DeLand's testimony.  For example:

- DeLand opines that "it is important to understand what
is meant by standards to be able to properly evaluate
whether they have any value in establishing
operational benchmarks." (Report, Opinion A-1 at 5-
6.)  He then cites two cases to support his rejection
of conventional correctional standards, stating that

37

the Supreme Court has "ruled that none of the so-called standards established constitutional minima and that courts should not rely upon the standards in ruling on prisoner-rights claims." (*Id.* at 6.)  This opinion attempts to use Supreme Court precedent and the Constitution to instruct the jury to ignore the ACA standards that governed the INS contract.  Moreover, these cases involved prisoners, not civil detainees at facilities that were required to apply the ACA standards.  (*See* DeLand Dep. at 78:7-79:8.)

- DeLand opines that "training, regardless of how well designed and delivered, cannot guarantee perfect outcomes." (Report, Opinion B-4.4 at 26.)  He improperly provides a lengthy quote from a Supreme Court opinion which he asserts "provides a more realistic understanding of what can and cannot be accomplished by an agency's training program." (*Id.* at 27.)  In fact, this quotation is an improper attempt to instruct the jury on the requirements for liability based on a claim of inadequate training.

- DeLand opines that "Plaintiffs' rights of access to courts and counsel were not violated due to the lack of a law library, an inadequate law library, or inadequate access to an existing law library." (Report, Opinion E-5 at 42.)  As support for this opinion, he cites a Supreme Court case and a Tenth Circuit opinion for the principle that "even U.S. prisoners do not have a free-standing right to a law library," (*Id.* at 43) implying that plaintiffs have no claim on this basis.  As noted above, the legal rights of prisoners to a law library, and cases addressing that issue, is both an improper subject for expert testimony and not relevant to a determination of the rights of INS detainees.

- DeLand opines that "detainees were provided an opportunity for exercise." (Report, Opinion F-6.1 at 52.)  He improperly supports his argument that plaintiffs did not need an outdoor exercise yard to receive adequate exercise by citing a Supreme Court case that he asserts recognizes the utility of day rooms in lieu of an outdoor exercise yard.  But DeLand's cite is to the concurring opinion, not to the majority opinion.  Moreover, the prison at issue, unlike the Esmor facility, included an outdoor

38

recreation field, visitation area, and garden. *Rhodes v. Chapman*, 452 U.S. 337, 340-41 (1981).  Finally, at no point in this decision did the Court recognize the utility of a day room *in lieu of* an outdoor exercise yard.

- DeLand opines that "limited natural light and *fresh* air do not prevent detainees from receiving the primary benefits of exercise." (Report, Opinion F-6.2 at 53.)  He improperly attempts to place the imprimatur of the Supreme Court on this opinion by claiming that his views are consistent with the Court's holdings in two prisoner cases regarding outdoor recreation.

- DeLand opines that "privacy is inconsistent with the requirements of incarceration." (Report, Opinion F-7.1 at 54.)  He improperly cites two Supreme Court opinions that relate, as noted above, to the incarceration of prisoners, not to the detention of INS detainees, to support this view.

- DeLand opines that "the appropriateness of personal searches should be evaluated considering the degree of intrusion, justification for the search and level of intrusion, and the manner in which searches were conducted." (Report, Opinion J-3 at 62.)  He cites a Supreme Court case to support his opinion that searches are justified by the nature of correctional facilities.  Not only should DeLand not be permitted to testify as to the law, but here again he relies, as noted above, on law relating to correctional settings, not to civil detention settings like the Facility, that lack the serious security and contraband issues present in prisons.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion to preclude DeLand's testimony should be granted.

39

Respectfully submitted,

Drew M. Dorman, Esq.

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY  10022
(212) 909-6000

Attorneys for the Plaintiffs, Hawa
Abdi Jama, Jeyakumar Anantharajah,
Abu Bakar, Cecilia Jeffrey,
Abraham Kenneh, Shaminu Nanteza,
Dennis Raji, Agatha Serwaa, and
Sarah Tetteh Yower