EXHIBIT 1

Part 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **HAWA ABDI JAMA**, et al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **Civil Action No. 97-3093 (DRD)** |
| | ) | **Expert Witness Report of** |
| **UNITED STATES**, et al, | ) | **Gary W. DeLand** |
| | ) | |
| Defendants. | ) | |

# Part I
# Introduction

A.   I was retained by counsel for Defendants Esmor, **James Slattery, Aaron Speisman, Richard Staley, John Stovall**, and **John Lima** to review various pleadings, reports, policies and procedures, and other records related to the instant case and to then opine regarding the issues raised by Plaintiffs.

B.   In preparation for serving as an expert I am relying on:

1.   34 years of corrections experience, including, but not limited to, Executive Director, Utah Department of Corrections; Jail Commander, Salt Lake County Jail; Executive Director, Utah Sheriffs' Association (which includes, supervising the Utah Jail Inspection Program and updating state jail standards); technical assistance provider and trainer for the National Institute of Corrections, American Jail Association, Americans for Effective Law Enforcement, National Indian Police Academy, Fred House Corrections Academy (State of Utah), Utah Sheriffs' Association's Advanced Management Training Institute; the Ministry of Justice, Iraqi Correctional Services; jail and prison standards writer; policy and procedures writer for several agencies;

2.   ongoing professional interaction with various state corrections officials, county and other local jail administrators, criminal justice researchers and writers, and other corrections experts and officials;

DeLand Report: Hawa Abdi Jama v. U.S. - 1

3.      my experience in writing policies and procedures, writing jail standards, and
        development of corrections academies and other training programs;

4.      my layman's understanding of prisoners' rights as defined in federal case law;[1]
        and

5.      my review of files and documents provided by counsel for defendants, including:

### Correspondence

| | |
|---|---|
| Cover letter from Michael Lambert (Esmor) to G.J. Riordan (INS) (training records) | 03/24//95 |
| Cover letter from Sean Mack to The Honorable Ronald J. Hedges (re: expert reports) | 06/01/01 |
| Fax cover sheet from Matthew B. Hsu to Gary DeLand   (request for production of documents) | 07/17/06 |
| Cover letter from John B. Livelli to Gary DeLand (additional files) | 08/04/06 |
| Cover letter from Andrea Duckworth, Paralegal, to Gary DeLand (photographs) | 08/10/06 |

### Pleadings

| | |
|---|---|
| First Amended Complaint | 09/23/97 |
| Defendant Willard Stovall's Amended and Supplemental Responses to Plaintiffs' Amended First Set of Interrogatories and Third Request for Production of Documents Submitted to Defendant Esmor Officers | 04/10/00 |
| Corrected Memorandum in Support of Defendants' Motion for Summary Judgement Or, in the Alternative for Judgement on the Pleadings in Behalf of Defendants Esmor, Slattery, Speisman, Lima, and Staley | 01/23/03 |

---

[1] **Any reference I make to case law in this report is provided only when my understanding of the case law was a factor in forming any of my opinions. Obviously, the court is the final authority for determining what the law is regarding the individual issues in this case.**

| | |
|---|---|
| Statement of Undisputed Facts Submitted by Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant to Local Court Rule 56.1 | 01/23/03 |
| Defendant Willard Stovall's Statement of Undisputed Material Facts | 01/23/03 |
| Brief on Behalf of Defendant Willard Stovall in Support of Motion for Summary Judgment | 01/23/03 |
| Documents Submitted in Support of Defendant Willard Stovall's Motion for Summary Judgment | |
| Jama Plaintiffs' Counter Statement of Facts in Response to Defendant Willard Stovall's Statement of Undisputed Material Facts | 11/26/03 |
| Reply Brief on Behalf of Willard Stovall in Further Support of Motion for Summary Judgment | 05/28/04 |
| Plaintiffs' Request for Production of Documents to Defendants and Gary Deland | 06/30/06 |

**Expert Reports - Plaintiff**

| | |
|---|---|
| Eugene Miller, Expert Penologist's Report (w/CV) | 05/30/01 |
| R.W. Powitz, Expert Report (w/CV) | 07/31/02 |
| | |

**Miscellaneous**

| | |
|---|---|
| The Elizabeth, New Jersey Contract Detention Facility Operated by ESMOR Inc.: Interim Report | 07/20/95 |
| miscellaneous training curricula, sign-in sheets, tests, certificates, and related records | |
| various incident reports, grievance reports, segregation inspection logs, memoranda, and other documentation relating to segregation | |
| photographs of the facility | |

DeLand Report: Hawa Abdi Jama v. U.S.  - 3

| | |
|---|---|
| miscellaneous documents, including memoranda, policies, forms and log relating to facility conditions, detainee stress, medical care, walkabout notes, communication with INS, disciplinary reports, cleaning schedules, recreation schedules, floor logs, supervisor shift reports, dormitory representative meeting notes, staff meeting notes, post logs, shift supervisor reports, Ramadan planning reports, detainee request forms, menu, physical plant time line (a maintenance scheduling report), training records and documents, psychiatric and medical information, and personnel actions. | |

**Standards**

| | |
|---|---|
| *Performance-Based Standards for Adult Local Detention Facilities,* Fourth Ed., American Correctional Association | 06/2004 |
| *Standard Minimum Rules for the Treatment of Prisoners*, United Nations | 1955 |

**Policies and Procedures**

| | |
|---|---|
| *Esmor INS Elizabeth Facility Policies and Procedures Manual* | |
| Esmor New Jersey Employee Handbook | |

**Depositions**

| | |
|---|---|
| Eugene Miller deposition | |
| Transcripts of Jama Plaintiffs   (CD) | |

C.   I am cognizant of the Supreme Court's caution regarding experts that, the "generalized opinions of experts cannot weigh as heavily in determining contemporary standards of decency as 'the public attitude toward a given sanction.'"[2] I also recognize that opinions of experts as to desirable prison conditions, do not establish contemporary standards of decency or constitutional minima.[3]  Experts can, however, be useful in providing the

---

[2]**Rhodes v. Chapman**, 452 U.S. 337, 348 n. 13 (1981), quoting **Gregg v. Georgia**, 428 U.S. 153, 173 (1976).

[3]**Bell v. Wolfish**, 441 U.S. 520, 543 n. 27 (1979).

DeLand Report: Hawa Abdi Jama v. U.S.  - 4

practical and real-world operational context against which the trier of fact can evaluate competing claims and interests. I will, therefore, supplement each of my opinions with "Comments and Basis for Opinion," to provide the rationale and facts supporting each of the opinions I render.

D.    As I understand my role as an expert witness, it is to provide opinions relating the issues/claims being litigated and to articulate the basis for each opinion offered. As I understand it, when formulating opinions, expert witnesses should provide their *professional* rather than *personal* opinions. Opinions of experts may be of little validity if they involve nothing more than personal philosophies applied to correctional issues. Professional opinions should be developed by applying objective criteria to evaluate the legitimate interests of prison officials (i.e., safety, security, order, discipline, operational efficiency) against the rights claimed plaintiffs.

E.    I will make a limited number of references to case law; however, when such references are made I do not presume to interpret the legal requirements for the court, nor to offer legal conclusions. Obviously, the court is the authority for interpreting the law regarding the issues in this case. **Any such references to case law in this report are provided only when my layman's understanding of the case law was a factor in helping me form any of my opinions. Just as corrections administrators who violate clearly established law, risk losing their good-faith based qualified immunity, I believe that experts should not be oblivious to the basic legal requirements of correctional law. Such ignorance places experts at greater risk of offering opinions which are in direct opposition to legal requirements.**

F.    My fee schedule for this case is:

| $ 250.00 | per hour for file review, report writing and other work done in my office. |
| $ 2,000.00 | per day for each day onsite or traveling (plus actual expenses) |
| $ 2,000.00 | per day for onsite depositions (or depositions cancelled less than seven days in advance). |
| | Payment due at time of deposition. |

## Part II
## Expert Opinions

**SECTION A**    **OPINIONS RELATED TO THE USE OF DETENTION STANDARDS TO ESTABLISH AUTHORITATIVE BENCHMARKS FOR THE OPERATION AND MANAGEMENT OF DETENTION FACILITIES**

**Opinion A-1**    **It is my opinion that it is important to understand what is meant by**

DeLand Report: Hawa Abdi Jama v. U.S.  - 5

*standards* to be able to properly evaluate whether they have any value in establishing operational benchmarks.

## Comments and Basis for Opinion

Since so-called standards are in play in the instant case, it is useful to understand what standards are and standards are not. What are *standards*? Where do standards come from? What is their legal standing? Is there a consensus among corrections professionals regarding best practices in corrections? How are standards validated?

During the 1970s, a plethora of national detention guidelines--standards--were written by a variety of organizations. Some of the organizations had a membership made up primarily of criminal justice practitioners (American Correctional Association, National Sheriffs' Association, LEAA's National Clearinghouse , the U.S. Department of Justice). Standards, however, were also promulgated by several organizations which were made up of persons from other professions (e.g., the American Bar Association, the American Medical Association, National Public Health Service). The second group had very limited, if any, expertise or working knowledge of jail or prison management.

The persons who participated in the development of the various standards were well intentioned and, undoubtedly, believed that the adoption of their philosophical agendas would improve the operation and management of any jails and prisons that did so. It should come as no surprise, however, that with so many different groups of self-appointed *experts* churning out standards, there was substantial inconsistency and disagreement among various groups' standards regarding best corrections practices. Interest among the various organizations to continue to advance their standards began to wane after a pair of rulings in 1979 and 1981 by the U.S. Supreme Court.[4] These decisions ruled that none of the so-called standards established constitutional minima and that courts should not rely upon the standards in ruling on prisoner-rights claims. Currently, there are only two sets of national standards which receive significant attention from corrections officials, (1) those promulgated by the American Correctional Association (ACA) which are reasonably comprehensive and provide separate sets of standards for many different types of corrections operations; and (2) the standards promulgated by the National Commission on Correctional Health Care which focus only on medical and mental health care for prisoners. Since ACA offers the only comprehensive or system-wide standards, it has emerged as the most recognized standard in the United States and some foreign countries.

Although I have reservations regarding the value of adopting these standards, I believe compliance with some (perhaps many) of the individual provisions of the standards may have a salutary effect on some aspects of a corrections facility's operation. It is my

---

[4]**Bell v. Wolfish,** 441 U.S. 520 (1979); **Rhodes v. Chapman,** 350 U.S. 337 (1981).

DeLand Report: Hawa Abdi Jama v. U.S.  - 6

strongly held opinion, however, that these standards are not a viable benchmark against which to determine whether a facility is being operated in a constitutional or otherwise legal manner. I base my opinion on the following reasons.

1.    Each set of standards is based on the philosophy, doctrine, or beliefs of the organization that promulgated the standards (or the few members of the organization given the responsibility to develop the standards).

2.    The detention standards which have been developed by various organizations differ regarding what is deemed to be a best or even acceptable corrections practice.

3.    International standards are even less well suited as operation minima or guidelines than standards developed in the United States.

4.    Because these guides are referred to as *standards*, many persons assume that means the standards are based on a consensus among corrections professionals and experts; however, there is no consensus among practitioners as to what are the best corrections practices.

5.    None of the organizations have promulgated corrections standards that create, define, or mirror constitutional minima. Thus, compliance with or accreditation under any of these standards does not ensure that the user is compliant with constitutional or other legal requirements and does not provide a defense against prisoner-filed litigation.

**Opinion A-2**       **It is my opinion that detention standards reflect the agendas, philosophies, doctrines, and beliefs of the organizations that created them; however, they do not provide the scientific or objective validation for individual provisions of the standards or even the rationale that drives each provision.**

### Comments and Basis for Opinion

I have over the past 25 years been involved in the writing of standards, the review and critique of standards, training standards writers, and implementation of standards. I have participated to varying degrees in the development or evaluation of standards in more than a dozen states. I have also provided training and/or evaluation of standards for the National Institute of Corrections and the American Correctional Association. One constant in the development of the various standards has been the tendency to promote the philosophies and agendas of the responsible organizations. While it is my opinion that it is both legitimate and understandable that the nature of individual standards reflect and are influenced by the beliefs, judgments, doctrines, and/or moral concepts of the

organizations which promulgate such standards, that does not mean that the standards establish mandatory minimum requirements to which the various jails and prisons are obligated to adhere.

To permit these various national standards to determine detainees' or prisoners' rights would be tantamount to allowing these organizations to trump the Constitution and usurp legislative authority in defining the rights of prisoners. Regardless of how well meaning these organizations may be, their standards should only be mandatory for achieving accreditation or compliance with the ideals of the organization. In fact, among the nine or ten *national* detention standards that have appeared over the last quarter century, all but two have dropped off the radar[5] and are now, at most, footnotes in the historical record of the evolution of corrections management and reform.

**Opinion A-3**     **It is my opinion that the various standards differ regarding what is deemed to be acceptable or required to comply with the organization's version of best corrections practice; thus, allowing standards to set the benchmarks would result in confusion as to exactly what the minimum requirements are.**

### Comments and Basis for Opinion

During the 1970s and early 1980s it was not uncommon for plaintiffs to offer one or more of the various standards as a means of persuading courts that corrections officials' policies, procedures, practices, and actions were contrary to industry standard; thus, below legal minima. During this period, it was not uncommon for courts to rely upon specific provisions of these national standards to make judicial decisions regarding conditions of confinement (e.g., area-per-prisoner requirements, double bunking, exercise space, environmental conditions), prisoner safety, communication with persons in the free world, and other prisoner-rights issues. Plaintiffs could pick and choose among the several standards. Would it be the standards of the ACA? . . . U.S. Department of Justice? . . . American Medical Association? . . . National Public Health Service? . . . or even the United Nations?

**Opinion A-4**     **It is my opinion that *international standards* are even less well suited to evaluate the validity of policies, procedures, practices, or conditions in U.S. jails and prisons.**

### Comments and Basis for Opinion

---

[5]When the U.S. Supreme Court ruled that these standards do not create constitutional minima and could not be used as a benchmark against which to judge corrections policies, practices, and conditions there was little incentive for most of the organizations to stay in the game.

DeLand Report: Hawa Abdi Jama v. U.S. - 8

I have had the opportunity to work on corrections projects of one kind or another involving Canada, Iraq, and South Africa. I also had the opportunity to review a proposed prison project for the United Arab Emirates, but did not sign on to the project. Of those projects, only in Iraq were international standards in anyway used. Canada had its own unique code governing corrections; the South African representatives were looking at pragmatic, workable approaches for the design and operation of a correctional facility, and the UAE representatives advised us that the basic model for design and operation they favored should be based on the U.S. system. In Iraq, the only use of international standards was a training session which discussed the United Nations's *Standard Minimum Rules for the Treatment of Prisoners*. Beyond reviewing the U.N. standards with the new Iraqi corrections officers, the standards played no real role in the building of the Iraqi Correctional Services.[6]

Plaintiffs' expert **Eugene Miller** references United Nations standards; however, he relies primarily on the standards of the American Correctional Association and the Counsil of Europe's prison rules to evaluate Esmor's INS Elizabeth Facility. It is my strongly held opinion that as difficult as it is for a one-size-fits-all *national* standard to be used to govern American jails and prisons, it is even less feasible to rely on standards intended to govern or guide corrections officials in all the nations of the world. The bases for my opinion regarding the viability of international standards include:

1. **The U.N. standards are out of date.** The U.N.'s *Standard Minimum Rules for the Treatment of Prisoners* are half-a-century old. The standards were published in 1955, over 50 years ago.

2. **A one-size-fits-all set of standards simply cannot accommodate the various legal, cultural, and other differences of all nations.** Cultural, legal, and religious differences in the nations of the world vary dramatically. The American way of managing corrections would be very much at odds with the needs and policies found in other nations. This reality was acknowledged by the First United Nations Congress on Prevention of Crime and the Treatment of Offenders, which promulgated the U.N. standards. The U.N. Congress offered the caveat, "In view of the great variety of legal, social, economic, and geographical conditions of the world, it is evident that not all of the rules are capable of application in all places at all times."[7]

3. **To accommodate the various cultural and other differences among nations, self-contradicting standards exist.** Some things which Western Nations

---

[6]Formerly called the Ministry of Justice Prisons Department, we renamed it the Iraqi Correctional Service. At last report, that name was still in use.

[7]United Nations *Standard Minimum Rules for the Treatment of Prisoners*, § 2.

DeLand Report: Hawa Abdi Jama v. U.S. - 9

would readily embrace would be considered to be heresy in some Middle-East nations. For example:

- "There shall be no discrimination on grounds of race, colour (sic), sex, language, religion, political or other opinion, national or social origin, property, birth or other status."[8] That is a lofty and laudable standard; however, before the ink was dry on the language, the writers recognized that in the real world, it would never fly, so they added, "On the other hand, it is necessary to respect the religious beliefs and moral precepts of the group to which the prisoner belongs."[9] Thus, the second half of the discrimination standard is written to accommodate national cultural differences. The apparent contradiction begs the question how you can ban discrimination, but "on the other hand" must respect the religious and beliefs of the group to which a detainee/prisoner belongs, if the culture or religion supports or embraces:

  - apartheid;

  - caste systems;

  - retribution against infidels and nonbelievers; and

  - other practices which are discriminatory, but are a part of the cultural and religious beliefs of the "group to which the prisoner belongs."

4. **International standards are not enforceable.**      If an international standard is adopted or referenced would it then be necessary to call as expert witnesses the persons who conceived and administer the standards to testify as to the scope and meaning of individual provisions of each standard? Would it be necessary to defer to the international experts regarding the appropriate policies, procedures, and practices governing U.S. corrections facilities when non-American detainees/prisoners are incarcerated in the facilities?

5. **International standards are arbitrary in that they lack a statement of the rationale that provides the basis for the individual provisions of the standard.**      It is difficult to validate standards if the basis or rationale for the standard has not been articulated. U.N. standards say *what* should be done, but there is no discussion as to why any provision of a set of standards is required.

---

[8]United Nations *Standard Minimum Rules for the Treatment of Prisoners*, § 6 (1).

[9]United Nations *Standard Minimum Rules for the Treatment of Prisoners*, § 6 (2).

DeLand Report: Hawa Abdi Jama v. U.S. - 10

For example, U.N. standards do not allow housing two prisoners in the same cell, but do permit dormitory housing where many prisoners share the same room.[10] The UN standards provide no rationale as to why one person per cell is acceptable and many people per cell is acceptable, but two prisoners in a cell a unacceptable.

6.   **Many of the standards are ill-defined, thus, provide little actual guidance as to what is required to comply with the standard.**   Perhaps a by-product of trying to make one size fit all, the standards are not very well defined or explained.  A few of the many examples include:

- Regarding the living environment, "All accommodation provided for the use of prisoners . . . shall meet all requirements of health . . . particularly to **cubic content of air, minimum floor space, lighting, heating and ventilation.**"[11]  If this is to truly be a *standard* then it should provide guidance as to:

  - the volume of air required to comply with the standard;

  - the minimum area per inmate required to meet the standard;

  - the range of foot candles of light required (and whether the light levels are specific to different areas of the cell or living area, e.g., areas where reading may be likely to occur);

  - the range of acceptable temperatures in living areas; and

  - the volume of air exchange in a given amount of time necessary to meet the ventilation requirements.

- Regarding prisoner discipline, "The following **shall always be determined** by the law or **by the regulation of the competent administrative authority**:

  - "(a)   **Conduct constituting a disciplinary offence** (sic);

  - "(b)   The **types and duration of punishment** which may be inflicted;

---

[10]United Nations *Standard Minimum Rules for the Treatment of Prisoners*, § 9 (1).

[11]United Nations *Standard Minimum Rules for the Treatment of Prisoners*, § 10 (emphasis added to the original).

"©)     The **authority** competent to impose such punishment."[12]

This leaves a great deal of latitude which would result in a wide range of interpretations. Disciplinary punishments which would shock the conscience of U.S. corrections officials would be acceptable in some other nations.

**Opinion A-5**      **It is my opinion that there is no consensus among officials regarding best corrections practices.**

### Comments and Basis for Opinion

Viewing the corrections system from the inside, one of the most obvious realities is that there is no consensus among officials regarding the best policies, practices, and/or operational objectives. Anyone attending meetings of the Association of State Corrections Administrators (ASCA), the Standards Committee of the American Correctional Association, the National Sheriffs' Association, the American Jail Association (AJA), or gatherings of other practitioner engaged in resolving or discussing corrections policy questions will find that consensus is often unattainable.

A studied and objective view from outside the system provides similar observations.   In his highly acclaimed study of prison management, *Governing Prisons: A Comparative Study of Correctional Management*,  John J. DiIulio, Assistant Professor of Politics and Public Affairs, Princeton University, found very wide differences in the management approaches of different corrections systems. And, concerning any consensus regarding the value and content of the standards promulgated by various organizations, he wrote:

It is no disrespect . . . to  the ACA to point out that **neither the ACA nor any other group has accumulated anything that even remotely resembles a body of proven knowledge about how to manage prisons well.** In the first place, there is **no discernable consensus among correctional practitioners** that the ACA's voluminous publications and accreditation activities are based on an accurate assessment of how best to operate prisons.[13]

From my experience, the standards promulgated by government agencies, professional groups, and international organizations though laudable in their intent, do not provide the

---

[12]United Nations *Standard Minimum Rules for the Treatment of Prisoners*, § 29 (emphasis added to the original).

[13]John J. DiIulio, *Governing Prisons: A Comparative Study of Correctional Management* (New York: The Free Press, 1987), pp. 248-249 (emphasis added to the original).

*Holy Grail* for corrections management.

## SECTION B          OPINIONS RELATED TO ADMINISTRATOR LIABILITY

### B-1    Delegation of Responsibility and Authority

**Opinion B-1.1**          **It is my opinion that the operation and management of any jail or prison facility offers very difficult challenges to administrators to reasonably ensure safety, security, order, and discipline within the facility while providing humane care to detainees; however, the degree of difficulty is dramatically higher for Elizabeth facility officials who house detainees from a wide array of nations, who speak a multitude of languages and dialects, and whose cultural expectations are very different from those that generally exist in the United States.**

#### Comments and Basis for Opinion

Facilities which involuntarily incarcerate prisoners of any kind are very difficult to manage in a safe, secure, and orderly manner. Those persons who are detained commonly resist rule and regulations and the efforts of facility officials to maintain order and control. In the Elizabeth facility officials far greater operational difficulties existed than would be the case in an American jail or prison, because officials received incoming aliens:

•        about whom they had incomplete knowledge of their criminal history, attitudes, propensities, threat level, and medical/mental health needs;

•        who came from widely different cultures and religions; and

•        who spoke dozens of different languages and dialects.

Cultural differences also may contribute to sanitation problems, violence, and resistence to legitimate orders and rules, false expectations or fears, and different expectations with regard to personal privacy, religious practices, searches, access to personal property, timeliness of court proceedings, and other issues. The problems involved in handling such detainees are much, much greater than those encountered in handling a population of primarily U.S. citizens who mostly speak English as their primary language, have generally similar cultural experiences, and share a common history. It is much easier for after-the-fact evaluations by critics who need only offer generalizations and superficially plausible opinions as to how responsible officials should have performed. Even though they have not experienced the difficult challenges of managing the detainees themselves, they have no difficulty declaring what actions should have been taken and claiming officials were indifferent to the basic human needs of detainees. The performance of the

DeLand Report: Hawa Abdi Jama v. U.S. - 13

defendants must be evaluated against the difficult nature of the mission.

I think it is also important to note that one of the defendants, **Willard Stovall**, did not start to work for the Elizabeth Facility until January 25, 1995 (just five months before Esmor lost its contract to operate the facility). Even then, he was brought in initially only to review security, but was subsequently asked to serve as facility administrator until a replacement could be found. **Stovall** did ultimately assume responsibility as the facility administrator. Even in an *ordinary* corrections facility, the facility administrator faces intense demands on his time. The Elizabeth facility, as previously discussed, is not an ordinary facility. The degree of difficulty facing **Stovall** was substantially greater, because he was walking into a situation where there were some existing operational issues existed. Expecting **Stovall** to resolve existing issues within the five months that he was administrator is an unrealistic expectation, especially while he was engaged in the process of trying to acquire an effective working knowledge of the facility, staff, institutional history, policies and procedures, misconduct claims (real or false), interaction with INS, and the other intricacies of the Elizabeth facility–in addition to the day-to-day demands of managing the facility. It is not surprising that **Stovall** often put in 14-hour days.

**Opinion B-1.2**     **It is my opinion that James Slattery, Aaron Speisman, and Richard Staley as corporate officials lack the responsibility and the capability of micro-managing the Elizabeth Facility.**

**Comments and Basis for Opinion**

Corporate officials are responsible for a wide variety of executive (corporate-level) functions and duties, and those duties cannot be neglected so that they can engage in micro management of a single facility within the Esmor corporate structure. Executive duties include developing the basic operational mission, objectives, policies, and operational philosophy of the parent corporation; marketing the company's services; adopting official policies and procedures; facilitating training; managing corporate finances; and conducting other administrative and strategic functions.   It is unreasonable to expect that **Slattery, Speisman**, or **Staley** can or should try to personally govern the thousands of minute-by-minute communications, interactions, and transactions between Elizabeth Facility staff and detainees. Neither can they single-out any one detainee or group of detainees (such as the plaintiffs in the instant action) and focus all of their attention on them and their circumstances.

Effective and efficient utilization of their finite time and scope of control demands that they focus on the running of the corporation not micro managing individual facilities. It is, thus, necessary that they assign operational responsibility to others who have the specific duties, responsibilities, and authority to act at the facility leave.   Efficient management requires that they delegate the day-to-day tasks, duties, and authority to

trained subordinates. To do otherwise would substantially reduce, if not cripple their execution of the duties of chief executives. Certainly, when they become aware of problems, they cannot ignore them; however, that does not mean that they drop their own essential duties and run to the scene of each problem in each facility to try to manage problems themselves.

**Opinion B-1.3**       **It is my opinion that the most efficient and effective way for Slattery, Speisman, and Staley to manage the corporation was to delegate to qualified, trained subordinates the responsibility for the individual facilities and functions within the corporation. While delegation is an indispensable management function, it also separates administrators from real-time knowledge of events, decisions, and actions as they occur.**

### Comments and Basis for Opinion

To govern the corporation **Slattery, Speisman,** and **Staley** were required by operational necessity to delegate the authority and responsibility for those functions to subordinates. While delegation is an absolute necessity in managing organizations of any size, such delegation prevents the chief administrators from being involved in the day-to-day actions, decisions, and incidents which occur within the organization. The delegation of responsibility for the operation results in a significant degree of isolation of the chief administrator from the day-to-day functions. This reality does not equate to organizational dysfunction, because the persons to whom these responsibilities are delegated will, as a general rule, know and understand much more about their specific duties and responsibilities than will the corporate officers.

**Opinion B-1.4**       **It is my opinion that the most efficient and effective way for Stovall and Lima to manage Elizabeth Facility was to delegate to trained subordinates the responsibility for the day-to-day functions of the facility.**

### Comments and Basis for Opinion

To manage the Elizabeth facility **Lima** and **Stovall** relied on delegation of authority and responsibility to others. Such delegation includes allocating finite resources to manage, supervise, control, and care for the entire detainee population, all housing areas, and each facility function. Plaintiffs characterize **Stovall**'s management style as militaristic and one which relied heavily on chain of command. Plaintiffs claim **Stovall** "retain[ed] blind faith in his 'chain of command.'"[14] Is chain of command a military invention or

---

[14]Jama Plaintiffs' Counter-Statement of Facts in Response to Defendant Willard Stovall's Statement of Undisputed Material Facts, p. 6.

something unique to the military?  What is the purpose of chain of command and bureaucratic management?

The concept of bureaucratic management and chain of command has been around at least since ancient Egypt.  The function of this hierarchical design is the efficient organization and coordination of the effort of large numbers of staff.  The characteristics of this process include:

- clearly delineated jurisdictional areas governed by rules, regulations, or law;

- granting of authority commensurate with the responsibilities assigned;

- specific operational requirements for each organizational component (often set forth in job descriptions or post orders);

- established span-of-control limits for each supervisory position; and

- specific methods for implementing or accomplishing assigned duties.

A substantial majority of large organizations (i.e., government, businesses, universities, professional organizations) utilize the bureaucratic chain of command, because even with its limitations, it is the most effective way of managing large numbers of persons.

**Stovall**, of course, was intimately involved in the workings of bureaucratic command.  I am not sure what Plaintiffs mean by "blind faith" in the chain of command.  Administrators such as **Stovall** and **Lima** who work within that operational system will obviously understand its value and necessity, but will also be very much aware of (and often frustrated by) its limitations.

It is my opinion that it was appropriate and necessary for **Stovall** and **Lima** to delegate the responsibilities and tasks of running the facility to subordinates.  It was also appropriate and, generally, more efficient for **Stovall** to assign to others the process of remedying the problems, complaints, and other issues raised by detainees during his *walkabouts* or by grievance or other means of communication.

**Opinion B-1.5**   **It is my opinion that proper delegation requires that corporate administrators such as Slattery, Speisman, and Staley provide a reasonable degree of structure and direction to their subordinates. This structure and direction should be in the form of written policies and procedures, staff training, and staff supervision.**

**Comments and Basis for Opinion**

Delegating authority without reasonable direction and guidance makes it much more difficult to eliminate or reduce inconsistency and lack of uniformity, inadequate performance, and inadequate understanding of operational necessities. It is important that administrators provide:

- written guidance and direction to staff as a means of reasonably ensuring that staff members understand the duties and responsibilities of their posts and positions;

- training to help staff to better understand duties, legal issues, safety and security, interaction with detainees, and other operational functions; and

- supervision to better ensure staff compliance with the requirements of policy.

Each these processes is important to the management process, although they cannot guarantee that each staff member will perform in a competent, professional, or otherwise proper manner. Staff members are human beings. As such they bring to the job a wide variety of backgrounds, education, skills, cognitive ability, attitudes, impulse control, and other characteristics. Anyone who has managed large numbers of subordinates knows the frustration of not being able to manage each member every minute that he or she is on the job. No matter how well directed by written policy, training, and supervision, individual staff members are capable of violating rules, engaging in misconduct, and, very often, making it very difficult to detect their misconduct or to prove misconduct once it is detected.

## B-2    Staff Hiring and Screening

**Opinion B-2.1**      **It is my opinion that Defendants Slattery, Speisman, Staley and Lima adopted and implemented reasonable screening and hiring practices.**

### Comments and Basis for Opinion

Plaintiffs allege, "Defendant Esmor Corporation, by its failure to exercise ordinary and reasonable care in the selection . . . of Defendants Esmor Officers and Guards, is liable to plaintiffs . . . ."[15]

Plaintiffs were not specific in their complaint regarding how Esmor failed to "exercise ordinary and reasonable care" in the selection and hiring of staff; that is, which officers they believe to have been inappropriately hired and what they believe to have been the disqualifying factors in their background. Thus, instead of trying to evaluate nonspecific hiring claims, I have reviewed the hiring procedures themselves; the official policies and procedures authorized/adopted by the corporation for selection and hiring.

---

[15]First Amended Complaint, ¶ 215.

Among the key elements of the hiring process are:

1.  **Compliance with federal employment law.**      Esmor's hiring procedures
    reference the Title VII of the Civil Rights Act of 1964, Executive Order
    11246/11478, § 503/504; Rehabilitation Act of 1973, § 402; Vietnam Era
    Veterans Readjustment Assistance Act, 1974; and Federal Age Discrimination
    Act of 1964.[16]  The intent of corporate officers that Elizabeth Facility officials
    comply with federal employment law listed above is evident in the language of
    policies statements[17] and procedural requirements.[18]

2.  **Screening if applicants.**      Policy requires that:

    •   hiring be nondiscriminatory;

    •   hiring be initiated by a written application which collects information
        including, but not limited to, identifying information, educational
        achievement, prior work experience, personal references, and criminal
        history;

    •   applicants will receive a KSA (knowledge, skills, and ability) evaluation;

    •   screening and evaluation documentation is maintained for three years;

    •   applicants will be subjected to interviews conducted by a selection panel
        or assigned individual interviewer;

    •   persons who successfully complete the interview process are subjected to a
        background, reference, and criminal history check;

    •   a list is created with successful applicants being ranked according to the
        competence demonstrated during the interview process and the KSA
        qualification requirements;

    •   an Affirmative Action Selection Report is completed;

---

[16]3-16.2, Authority, "Employee Recruitment and Selection," Esmor INS Elizabeth
Facility Policies and Procedures Manual.

[17]3-16.4, Policy, "Employee Recruitment and Selection," Esmor INS Elizabeth Facility
Policies and Procedures Manual.

[18]3-16.5, Procedures, "Employee Recruitment and Selection," Esmor INS Elizabeth
Facility Policies and Procedures Manual.

- a personnel file is created for each person hired including 17 different file attachments which document the screening, selection, and hiring process.[19]

These are the policies and procedures that governed the actions of **Lima, Stovall,** and other Elizabeth facility officials when selecting and hiring staff. Plaintiffs also allege, Esmor officials "breached their duty to Plaintiffs by negligently hiring and retaining employees they knew or should have known were abusing and violating Plaintiffs rights."[20] There are two parts to this allegation, (1) "**hiring** . . . employees they knew or should have known were abusing and violating Plaintiffs rights"; and (2) "**retaining** employees they knew or should have known were abusing and violating Plaintiffs rights." Obviously, unless Esmor was **rehiring** officers formerly found guilty of rights abuses, it would not be possible for them to have hired officers already guilty of abuse of Plaintiffs. As to the issue of **Lima** or **Stovall** having retained officers who were "found guilty of rights abuses," I will address that in Opinion B-4.5.

**Opinion B-2.2**   **It is my opinion that INS had the authority to control the selection and hiring process; thus, could remedy any problems related to hiring by denying clearances to the candidates for employment.**

### Comments and Basis for Opinion

It is noteworthy that in addition to Esmor's policies and procedures, the Immigration and Naturalization Service (INS) contract states, "The government shall have and exercise full and complete control over granting, denying, withholding or terminating clearances for employees."[21] This provision of the contract would seem to put the onus on INS to conduct independent screening and evaluation of candidates to approve them for clearances and to ensure that the Esmor selection process was adequate. It would be reasonable for Esmor to assume that absent instructions from INS to modify or otherwise improve the process, that existing selection and hiring policies were adequate. Likewise, unless INS denied or withheld clearances for newly hired officers, it was reasonable for Esmor officials to assume INS was satisfied with their individual selections. Thus, there would seem that there was at least implicit approval by INS of Esmor's general process for selection and hiring of staff and explicit approval of individual hires.

---

[19]3-16.5, Procedures, "Employee Recruitment and Selection," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[20]First Amended Complaint, ¶ 8.

[21]Contract, Subsection 2(D)(1), as quoted in Statement of Undisputed Facts Submitted By Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant To Local Court Rule 56.1, ¶ 26.

DeLand Report: Hawa Abdi Jama v. U.S. - 19

**B-3     Policies and Procedures**

**Opinion B-3.1          It is my opinion that Defendants Slattery, Speisman, Staley and Lima adopted and implemented adequate and competent written policies and procedures to guide staff.**

<u>**Comments and Basis for Opinion**</u>

I have reviewed the *Esmor INS Elizabeth Facility Policies and Procedures Manual*.  The manual I reviewed included 20 chapters, 17 of which included multiple sections or topics. The chapters titles included:

- General Administration
- Fiscal Management
- Personnel
- Training
- Management Information and Research
- Records
- Physical Plant
- Safety and Emergency Procedures
- Security and Control
- Special Management Inmates
- Food Service
- Sanitation and Hygiene
- Medical and Health Care Services
- Resident Rights
- Rules and Discipline
- Communication, Mail, and Visiting
- Reception and Orientation
- Classification
- Resident Volunteer Programs
- Resident Services and Programs

The Esmor manual was adopted after being approved by both Esmor and INS.[22]  Based on my review of the Esmor manual, it is my opinion that the manual provides a competent set of directives which provide guidance and instruction to staff regarding the policies, procedures, rules, regulations, and processes necessary to carry out their duties and responsibilities at the Elizabeth facility.  I make additional reference to the manual at various points in this report.

_____

[22]*Esmor INS Elizabeth Facility Policies and Procedures Manual*, §1-1.5(D).

**Opinion B-3.2**     **It is my opinion that procedures were in place to ensure staff access to the manual and to verify that they have read it.**

**Comments and Basis for Opinion**

Esmor requires that "One copy of the facility's policy and procedure manual shall be maintained at all times in an area accessible to all staff at all times."[23]  Each time a policy, procedure, technical manual, handbook, or post order is issued, it will be posted within four day of its effective date.  Staff are required to read the material within three days and to sign that they have read the material.  They are further required to inquire of their supervisor if they have any questions regarding the policy.[24]

**Opinion B-3.3**     **It is my opinion that Stovall had no role in the writing or adopting of the Esmor manual.**

**Comments and Basis for Opinion**

Notwithstanding my opinion that the Esmor manual is an adequate and competent set of policies and procedures, it is important to note that the manual was written and adopted months before **Stovall** was hired by Esmor; thus, he is not responsible for its content. "Plaintiffs do not dispute that Stovall had no involvement in the negotiation or drafting of the INS-Esmor Contract . . . and that Stovall had no involvement in the drafting or approval of the Esmor Policy and Procedures Manual, Esmor Employee Manual or the Esmor Detainee Handbook."[25]

**Opinion B-3.4**     **It is my opinion that Stovall made reasonable efforts to improve the operations by negotiating with the INS COTR modifications in the contract.**

**Comments and Basis for Opinion**

Defendants point out that **Stovall** tried to make the contract more workable.  Working with **Michael Rozos,** INS COTR, verbal modifications were made to some provisions of the contract.  However, the modifications were rescinded by **Rozos'** successor **Norman Uzzle.**

---

[23]*Esmor INS Elizabeth Facility Policies and Procedures Manual*, §1-2.5(A).

[24]*Esmor INS Elizabeth Facility Policies and Procedures Manual*, §1-2.5©).

[25]Reply Brief on Behalf of Defendant Willard Stovall in Further Support of Motion for Summary Judgment, p. 4.

DeLand Report: Hawa Abdi Jama v. U.S.  - 21

**Opinion B-3.5**      **It is my opinion that Stovall made reasonable efforts to improve policy, procedure, and practices by seeking to become ACA accredited.**

### Comments and Basis for Opinion

Previously in this report, I addressed the standards of the American Correctional Association and opined that they are not constitutional minima, do not bullet-proof administrators against litigation, and that the standards are not the national benchmarks which must be achieved by officials. There is, however, one particularly beneficial aspect to seeking ACA accreditation. The process of achieving accreditation requires a complete evaluation of existing policies and procedures. If INS and Esmor were to have gained accreditation, that review may have led to some fine-tuning of policies and procedures and possibly the contract. Certainly, at that point **Stovall** would have then had an active role in any rewriting of policies. It is pretty typical that policies and procedures have to be modified to achieve accreditation; not because existing policies are unconstitutional or flawed, but because they would have had to become consistent with the specific provisions of the standards themselves.

Regardless of my own opinions regarding the value of the ACA standards as benchmarks, the fact that **Stovall** was pursuing accreditation says much about his desire to improve the operation. **Stovall** obviously does believe in the standards and accreditation, and was working to achieve that goal. And, in fairness the accreditation process requires such a detailed review of existing practices, that the process alone has value.

To the extent that Plaintiffs or their experts might find fault with **Stovall** that despite working toward accreditation he had failed to achieve it, such criticism would simply mean that **Stovall**'s critics do not understand the effort and **time** that is required to complete the accreditation process. In the short time that **Stovall** was at the Elizabeth facility and the shorter time that would have been available between his initiating efforts seek accreditation and the end of the contract between INS and Esmor, it would have been entirely unrealistic to think that he could have accomplished his goal.

**B-4      Staff Training**

**Opinion B-4.1**      **It is my opinion that Defendants Slattery, Speisman, Staley, Stovall, and Lima adopted and implemented a reasonable training program.**

### Comments and Basis for Opinion

Esmor was required by INS:

> to provide all new security personnel with a minimum of **160 hours** of

DeLand Report: Hawa Abdi Jama v. U.S. - 22

orientation and training during their first year of employment and prior to being independently assigned to a particular post. All employees in this category shall be given an additional **40 hours** of training each subsequent year of employment.[26]

According to Defendants, before the facility opened, security staff had completed the 160 hours of training required by the contract in a training course taught by officials from other detention facilities.[27] The 160-hour course included:

- constitutional law;
- ethics and authority of guards;
- personnel identification;
- entry and exit control;
- property control;
- espionage methods;
- report writing;
- communication;
- security observation;
- medical assistance and health care services;
- use of force;
- self defense;
- response to crimes;
- fingerprinting;
- human relations;
- handling disorderly conduct;
- incidents;
- roles of law enforcement; and
- orientation.[28]

It should be noted that **Miller** opines in his report that "good pre-service training would

---

[26]First Amended Complaint, ¶ 42(f); Contract, Subsection 3(A), as quoted in Statement of Undisputed Facts Submitted By Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant To Local Court Rule 56.1, ¶¶ 29-30.

[27]In a letter to G.J. Riordan, INS, Michael Lambert, Esmor Vice President, indicated that some employees had not receive training on the entirety of the subject material, saying that "CPR and Human Relations are extremely technical and require us to utilize outside instructors." Lambert stated those employees were scheduled to complete their training during their first year on the job.

[28]Statement of Undisputed Facts Submitted By Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant To Local Court Rule 56.1, ¶ 31.

DeLand Report: Hawa Abdi Jama v. U.S. - 23

have included instruction on inmate rights."[29]  In fact, the pre-service course does include a constitutional law class. The curriculum provides several courses which deal with detainee rights (i.e., use of force, searches, restraints, health care, property control), and the curriculum offer a very specific inmate rights course titled, "Detainee Rights and Legal Issues." That course offers four hours of instruction covering, "[l]egal rights of detainees and legal issues related to confinement as they relate to the operation of the facility.  Responsibility of staff to report violations."

The 40-hour program included:

- law;
- use of handcuffs;
- hand-to-hand confrontation;
- use of deadly force;
- conducting strip searches; and
- receipt of written materials.[30]

The training program described by Defendants provides the basic core instruction necessary for preparing new security staff to perform duties. Since the course also had to be approved by INS, it is reasonable to assume that the training met its requirements, as well.  I also reviewed the training provided for SERT members which provides the basic instruction appropriate for that assignment.

**Opinion B-4.2**  **It is my opinion that nothing in the record which I have reviewed (including the report of Plaintiffs' expert, Miller) would lead to a reasonable inference that allegedly inadequate training was the proximate cause of any staff misconduct.**

### Comments and Basis for Opinion

Plaintiffs allege that Defendants "did not meet specified training requirements" for guards and "failed to provide any additional training after hiring guards."[31]  Plaintiffs' expert, **Miller**, states in his report that **Diane McClure**, an Esmor executive, testified that the training was "fudged."  He also reports that "a number of officers," none of whom he identifies or quotes in his report, testified that "they never received anything close to the

---

[29]E. Eugene Miller, Expert Penologist's Report, 05/30/01, p. 22.

[30]Statement of Undisputed Facts Submitted By Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant To Local Court Rule 56.1, ¶ 32.

[31]First Amended Complaint, ¶ 42(g).

required amount of training."[32] **Miller** stops short of opining that the training did not occur, saying, "[I]f the staff did actually receive such pre-service training" then there is a problem with recruitment and supervision.[33] Plaintiffs claim the training did not fully comply with contract requirements, while Defendants offer **Lima**'s sworn testimony that it did.[34] I have reviewed training documents for various staff members which document the training, tests taken and the FTO Orientation and Training. That process requires each topic to be completed, successfully completed, and signed off by the supervisor who provided the training and evaluated the success of the member in completing requirements.

Assuming for the sake of argument that one or more officers/guards received less than 100 percent of the training required in a timely manner, it would create a potential issue between INS and Esmor. I will, however, discuss the training issue independent of the INS contract. It is my opinion that the primary question should be whether any claimed training *inadequacies* were the proximate cause of Elizabeth facility detainees being subjected to brutality or other conditions which would be unlawful.

The only other argument against the training amounts to little more than a conclusion that since something went wrong, staff members must have been untrained or inadequately trained. As **Miller** avers in his report, "If the training were not, in fact, provided, it might account for some of the blatantly unprofessional and untoward conduct of staff" and "[i]f such training had been given, it might have made staff more tolerant of people . . . who were from foreign countries and widely divergent cultural backgrounds."

Not every harm that befalls a detainee justifies a conclusion that it was the fault of a flawed training program. I have been heavily involved in helping to design and implement training programs for a number of jurisdictions. In my experience, there has never been a training program that could not be improved or which cannot be accused by critics of being inadequate or flawed. Simple conclusory pronouncements of inadequacy, however, fall far short of cogent evidence that the training is so defective that it caused staff to injure detainees or otherwise violate detainees' rights.

**Opinion B-4.3**     **It is my opinion that training programs should provide instruction to staff regarding those topics which they know to a moral certainty are necessary to reasonably protect the lives, safety, and clearly**

---

[32] E. Eugene Miller, Expert Penologist's Report, 05/30/01, p. 22.

[33] E. Eugene Miller, Expert Penologist's Report, 05/30/01, p. 22.

[34] Lima deposition, pp. 94, 146, cited in Statement of Undisputed Facts Submitted By Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant To Local Court Rule 56.1, ¶ 31.

> established rights of the detainee population; however, no matter how
> competent and well-designed a program may be the level of
> comprehension and achievement will vary widely among trainees.

### Comments and Basis for Opinion

Training of detention staff should provide instruction, skills, and direction to staff and
provide the basis for them to understand and implement their responsibilities. Training is
however, an inexact science and Esmor officials cannot ensure with absolute certainty
that each instructor will provide trainees with a flawless training presentation. Regardless
of the quality of various training programs, there will be differences in the relative value
they provide to individual staff members. In addition, no matter how well training
material is presented, the extent to which individual trainees will benefit from the training
will depend to a significant degree on the cognitive capabilities, level of attention,
commitment to learning, and motivation of the involved trainees. And, regardless of how
well trained and directed officers/guards may be, the Elizabeth facility employs human
beings as guards and supervisors, and human beings are prone to imperfect performance.
Even the best staff will make mistakes or otherwise fail to execute their duties exactly as
required.

Nationally, training programs vary considerably in curriculum, length of training, quality
of instruction, effectiveness, philosophies and methods for conducting training and
developing needed skills. However, there is no perfect, flawless, or even best approach to
training detention staff. What matters is that the training program ensures instruction in
those topics that officials know to a moral certainty will be needed by security
staff/guards to reasonably protect the safety and any clearly established rights of
detainees.

**Opinion B-4.4**      **It is my opinion that training, regardless of how well designed and
delivered, cannot guarantee perfect outcomes.**

### Comments and Basis for Opinion

Training of detention officers is a function fraught with many variables which can
influence training outcomes. Despite well-designed lesson objectives, lesson plans, and
testing there is no guarantee that all training will be absolutely consistent from one
training session to another. The content, emphasis, and class discussions will inevitably
vary to some degree based on the emphases and methods of various instructors. The
training will, unfortunately be received and understood differently by individual security
officer/guards and, as a result, the lessons may, on the job, be implemented in different
ways by different officers.

When conducting training of trainers or providing technical assistance to agencies
regarding their training systems I draw heavily on my experience in developing,

administering, conducting, and evaluating training. But, I also share language from a Supreme Court case which, I believe, helps put the corrections training in context and provides a more realistic understanding of what can and cannot be accomplished by an agency's training program.

> [T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability . . . for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program . . . .[35]

> Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder, particularly since matters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances.[36]

**Opinion B-4.5**     **It is my opinion that the training program adopted by Defendants Slattery, Speisman, and Staley and implemented by Lima and Stovall was adequate and met the requirements set by INS.**

### Comments and Basis for Opinion

Since INS had to pre-approve Esmor's the training curriculum prior to the opening of the Elizabeth Facility, it is reasonable to assume that it met their requirements as adopted. The training program which was adopted by Esmor (described in Opinion B-4.1)

---

[35]**City of Canton v. Harris,** 489 U.S. 378, 390-391 (1989) (internal citations omitted). (As I stated in fn.1, any reference I make to case law in this report is provided only when my understanding of the case law was a factor in forming any of my opinions.

[36]**Canton v. Harris** 489 U.S. 378, 391 (1989).

DeLand Report: Hawa Abdi Jama v. U.S. - 27

appeared to be adequate to prepare entry-level detention officers with the information necessary to work in the Elizabeth Facility. The training exceeded that required for pre-service training in many jurisdictions nationally. In addition to the annual 40-hour training course, detention officers also received on-job training (OJT) which started immediately after starting work. The OJT provided by field training officers (FTOs) who demonstrated and instructed officers regarding individual post functions and tasks. When the tasks were mastered, the FTO initialed that particular topic on the FTO training list indicating the officer's mastery.

## B-5   Staff Supervision

**Opinion B-5.1**   **It is my opinion that the Esmor Defendants have adopted and implemented a chain of command to facilitate efficient supervision of staff members.**

### Comments and Basis for Opinion

Esmor, like any other group of people who work together, must be organized in a manner that provides a hierarchy of authority and responsibility to permit communication and orders to flow vertically and horizontally through the organization. To accomplish that need Esmor, like other corrections organizations, has established a chain of command which provides the most effective means of directing, notifying, and otherwise communicating with subordinates, and facilitating communication and feedback up the chain of command as well. The chain of command permits structured interaction between corporate leadership and the various entities which comprise the organization. It also accomplished the same function within the Elizabeth facility and within the various organizational subunits of the facility.

Also see Opinion B-1.4.

**Opinion B-5.2**   **It is my opinion that the Esmor Defendants adopted and implemented an employee evaluation system as a part of managing and supervising employees.**

### Comments and Basis for Opinion

Employee evaluation systems provide a means of systematically evaluating the key performance factors against which staff members were measured. Typically, administrators create a structured form which rates each employee according to how well they have discharged their duties and met the requirements of policies, procedures, and post orders.

Esmor administrators adopted policies and procedures, post orders, and an evaluation form to accomplish the evaluation process. The stated purpose of the evaluations was,

"To ensure that employees are provided with an objective appraisal of their performance at least once a year."[37]  It was the policy of the Esmor that, "The organization unit head shall evaluate each year, either directly or through middle management, the job performance of each employee within thirty (30) days of the employees annual anniversary date, for the preceding 12 month period."[38]  Among other things, the evaluation process required:

- evaluations to be conducted by persons who had been trained in conducting the evaluations and who were superior in rank to the person being evaluated;[39]

- the employee received a copy of the performance evaluation and a conference between the evaluator and employee to discuss the evaluation;[40]and

- the evaluation was retained in the employee's personnel file.[41]

Employees were rated on a scale of one to four, on performance factors which include:

- job knowledge/skills;

- quality of work;

- productivity;

- record keeping/documentation;

- dependability;

---

[37]3-7.1, "Employee Performance Evaluations," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[38]3-7.4, "Employee Performance Evaluations," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[39]3-7.5(B)(2)(3),  "Employee Performance Evaluations," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[40]3-7.5(C)(D),  "Employee Performance Evaluations," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[41]3-7.5©),  "Employee Performance Evaluations," Esmor INS Elizabeth Facility Policies and Procedures Manual.

- adaptability;[42]

- initiative;

- attendance;

- relations with others; and

- safety.

The rating factors were very similar to those commonly used in criminal justice organizations with which I am familiar. It is my opinion that performance evaluations are an important part of the employee supervision process. The Esmor system was reasonable and adequate to provide an important tool for managers and supervisors to supervise subordinates.

**Opinion B-5.3**      **It is my opinion that Esmor officials facilitated the supervision process by maintaining personnel records.**

**Comments and Basis for Opinion**

Another important aspect of staff supervision is providing a means of collecting, saving, and protecting employee information. Esmor maintained personnel records and had adopted policies and procedures governing that process.[43] Personnel files included, but were not limited to the following information.

- payroll records;

- performance appraisals;

- medical information;

- disciplinary actions;

- commendations;

- training records; and

---

[42]Undoubtedly, a very important quality considering the nature of the Elizabeth facility operation and its very diverse detainee profile.

[43]3-9, "Personnel Records," Esmor INS Elizabeth Facility Policies and Procedures Manual.

DeLand Report: Hawa Abdi Jama v. U.S. - 30

• correspondence related to the employee.

**Opinion B-5.4**       **It is my opinion that Esmor officials facilitated the supervision process by having a probationary period of employment during which they can more closely observe and evaluate employees before giving them full-time status.**

### Comments and Basis for Opinion

Although Elizabeth Facility staff were at-will employees,[44] Esmor had formalized a six-month evaluation process for new employees. Satisfactory completion of this process resulted in members achieving full-time status. Less than satisfactory performance could result in termination or extension of the probationary status. Since staff were at-will employees, the primary benefit of the probationary period was to focus greater attention on employee performance during their initial employment.[45]

**Opinion B-5.5**       **It is my opinion that Esmor officials facilitated the supervision process by adopting standards of conduct, ethics requirements, and an employee discipline system.**

### Comments and Basis for Opinion

Standards of conduct provided notice to staff of both required and prohibited performance and conduct requirements.[46] I have reviewed the conduct standards. The code of conduct also discusses the use and documentation of employee corrective actions.[47] The Professional Ethics[48] chapter complements the Standards of Conduct chapter.

---

[44] 3-15, "Employment at Will," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[45] 3-22, "Employment Probationary Period," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[46] 3-3, "Employee Standards of Conduct," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[47] 3-3(D-G), "Employee Standards of Conduct," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[48] 3-6, "Professional Ethics," Esmor INS Elizabeth Facility Policies and Procedures Manual.

**SECTION C        OPINIONS RELATED TO FREE EXERCISE OF RELIGION**

**Opinion C-1        It is my opinion that many of the religion-related claims were of
                     questionable validity.**

<u>Comments and Basis for Opinion</u>

The manner in which the causes of action were written in the First Amended Complaint
make it difficult to understand exactly what each of the individual Plaintiffs were
claiming as a violation of his or her religious rights.  Nor was **Miller**'s expert report
helpful.  **Miller** alleges a small number of very general violations of detainees' religious
rights with only one of the allegations specifically attributed to a named Defendant.

- **Claim:  Abu Bakar claims he saw meat being prepared in the kitchen that
  came from boxes with pork listed as an ingredient.**[49]        **Miller** does not say
  how **Bakar** learned that pork was an ingredient; was he was told by someone
  else?  Does he read English, thus read it himself?  Even if true, that would hardly
  establish a violation of Muslim detainees rights.  While it would create a
  substantial burden on the practice of Muslim detainees to require them to eat pork
  or other forbidden dietary items, that does not mean that pork should be denied to
  other detainees who enjoy pork or who have no religious restrictions against
  eating pork.

- **Claim: Ramadan accommodations were not made for Muslim detainees.**
  **Miller** claims that "accommodations of the meal schedule were not made for
  Muslim detainees during the holy month of Ramadan."  Defendants dispute the
  claim and among other things cite a memorandum from **Lima** which contradicts
  **Miller**'s claim.

  > Ramadan observance will be conducted during
  > February 1 through March, 1995.  During the
  > observance of Ramadan detainees who participate
  > will not eat during the day.  Meals will be served at
  > 0500 hours and 1730 hours for participants.  The
  > kitchen will prepare meals as required to include a
  > sack lunch with the evening meal to consume
  > during the night.[50]

---

[49]E. Eugene Miller, Expert Penologist's Report, 05/30/01, p. 11.

[50]Memorandum from John M. Lima to All Staff, quoted in Statement of Undisputed Facts
Submitted By Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant To Local Court
Rule 56.1, ¶ 64.

I reviewed records which listed Ramadan attendees by their detainee number who participated in Ramadan. **Miller**'s claim is also at odds with the policies and procedures manual which provides for special diets, including special religious diets.[51] Other claims are made by **Miller**; however, they are not specific as to time, place, or what he deemed to be inappropriate (e.g., interference with ablution rituals, group singing by charismatic Christians, mishandled religious texts, and search dogs sniffed religious books). I will not address these issues individually, because **Miller** does not indicate which, if any, of the named Plaintiffs were effected, and the claims are not identified by time, place, or person. Another allegation made by Plaintiffs' was that neither Muslim nor Hindu clerics were brought to the facility despite requests from Plaintiffs. According to **Stovall**, he and others at the facility repeatedly tried to get the clerics to visit the facility, but none were interested because Elizabeth was considered a short-term facility.[52]

Absent allegations which are more specific as to time, place, nature of request, and the person to whom the request was made, nothing I have seen in the record justifies an inference that **Stovall** was indifferent to detainees' needs nor that there was a policy or obvious practice of unreasonably interfering with detainees' religious expression. Under both **Stovall** and **Lima**, efforts were made to accommodate religious needs (e.g., facilitating the celebration of Ramadan, providing prayer rugs, permitting detainee prayer and meetings, and religious diets, and seeking out clergy to serve detainees' religious needs). Nothing that I have reviewed would cause me to infer that either **Stovall** or **Lima** authorized policies or practices that substantially burdened the efforts of detainees to practice their religious beliefs.

**Opinion C-2**    **It is my opinion that some detainee claims appear to have been exaggerated.**

**Comments and Basis for Opinion**

It has been my experience that some detainee religious requests are sincere and others are not; however, all requests must be considered against the realities of the nature of incarceration. Even legitimate requests can have a negative impact on safety, security, order, and discipline (e.g., large congregate services which allow interaction between detainees of different classifications or who for other reasons cannot be safely kept together; religious practices which would violate state or federal law; requests for exotic or difficult to obtain food or other religious items; preaching or proselyting to other detainees who do not wish to hear the message). **Miller** claims that female Muslims were not permitted to cover their heads. Based on my review of the file, however, it appears

---

[51] 11-1, "Special Diets," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[52] Stovall deposition, pp. 2180-2182, referenced in Reply Brief on Behalf of Defendant Willard Stovall in Further Support of Motion for Summary Judgment, p. 23.

that the female detainees were only prevented from covering their entire bodies. It furthers the safety and security interests of the Facility to ensure that detainees remain recognizable. Covering the entire body with sheets whether truly required by their religion or not is contrary to that legitimate penological interest. During the time that I was involved in standing up and supervising the operation of civilian prisons and detention centers in Iraq, we incarcerated a significant number of Muslim women (Sunni, Shi'ite, and some smaller sects). We went to great lengths to accommodate prisoners' religious needs and requests while protecting security and safety in that very dangerous environment; however, it was necessary to be able to recognize the prisoners for safety and security purposes.

Incarceration clearly is uncomfortable and unpleasant, and obviously, incarceration can result in substantial boredom. These inconveniences are part of being confined, and some of the remedies for discomfort or boredom may substantially increase the level of risk in the facility for both staff and detainees. Overcoming boredom and other accommodations of detainees' desires do not outweigh the legitimate facility interests of safety, security, order, and discipline. For example, female Muslim detainees (and, in many cases, male detainees) may be offended and greatly bothered by being subjected to strip searches or rub searches. Yet, these are core elements of the safety and security efforts of jails, prisons and other detention facilities. It would be very foolish to carve out an exception to accommodate the wishes of excludable alien detainees simply because of a difference between security needs and the culture of the detainee's home nation. Persons cannot demand admission to a foreign country, then have a legitimate expectation that the host nation can or will accommodate all of their demands.

Even if some religious practices are somewhat limited to protect safety or security, nothing I have reviewed would suggest that detainees were forbidden to worship according to their religious beliefs. If some practices have to be delayed or occur in less than ideal settings, then that is the price of incarceration. For example, with regard to **Bakar**'s pork complaint, if, in fact, pork was being served under the INS approved Esmor policies he could request to be served a pork-free religious diet. The mere presence of several Muslims in the Elizabeth facility did not establish the facility as a pork-free environment.

**SECTION D**          **OPINIONS RELATED TO PROPERTY**

**Opinion D-1**          **It is my opinion that if any Esmor staff misappropriated detainee money or property, as alleged, the theft could be handled as a violation of criminal law; however, such cases are often difficult to prosecute.**

**Comments and Basis for Opinion**

Plaintiffs claim that guards at the Elizabeth Facility misappropriated property from the

detainees. According to their Complaint property was taken, but not returned when they left Elizabeth.[53] There are a number of allegations of theft of substantial amounts of money from several detainees. Such claims, if true, could potentially have been prosecuted as criminal violations. Such prosecutions, however, are often very difficult to prove.

In 1985, a few months after assuming control of the Utah State Department of Corrections, I was informed my investigators had uncovered information which created a strong belief that a particular Captain who supervised what was then called Unit One was corrupt and was allegedly engaged in a laundry list of misconduct—much of it criminal. My investigators engaged in a lengthy investigation supported by the Federal Bureau of Investigation, the U.S. Attorney's Office, and a couple of other agencies. After 12 months we arrested and successfully prosecuted 27 persons (some staff, some prisoners, some parolees, and some confederates who worked with them on the outside).

 Over the next several months, the continuation of that investigation yielded a number of other arrests (including more staff). Ironically, after more than a year of investigation by an experienced team of investigators and prosecutors, the Captain who was the initial and primary target of the investigation was never charged with any of the crime. By then we knew, but could not prove that he had engaged in criminal misconduct. We ultimately, brought him for an interview before which we gave him a Garrity warning. When we asked him about the first of the many allegations (e.g., smuggling drugs, theft, fencing stolen goods, and smuggling a gun into the prison) he resigned and refused to answer any questions. Thus, despite the general success of the investigation, the best we were able to accomplish with the dirty Captain who was the cause of the investigation was to force his resignation (and the loss of his retirement pension).

Earlier in my career I served several years as a criminal investigator and immediately following my appointment as Executive Director, I recruited to the Utah Department of Corrections an experienced team of criminal investigators from various law enforcement agencies. I also had the contacts and association with other agencies which allowed me to tap so many other resources. Most corrections administrators do not have that background, nor do they have the resources available to do anything as extensive as what we did. Yet, in the end, we still failed to criminally charge Captain Chavez, we only forced him out. The end result with **Wallington** appears to have been remarkably similar.

Based on my reading of the file, it is my opinion that **Stovall** investigated possible theft and misconduct by **Wallington** (and other staff). According to Defendant **Stovall**:

> [P]laintiffs do not dispute that **Stovall** conducted a detailed

---

[53]First Amended Complaint, ¶¶ 95-107.

investigation of alleged misconduct on the night shift; that he
talked to everyone on the night shift, that he tried to control access
to the property room by limiting its hours of operation, that he
reprimanded **Wallington**; and that he forced **Wallington** to
resign.[54]

**Opinion D-2**        **It is my opinion that there is nothing on the record that would support
an inference that corporate or facility administrators were involved in,
authorized, approved of, or acquiesced to the misappropriation of
detainees' money or property.**

### Comments and Basis for Opinion

It appears that some of the detainees' claims of missing money and property were valid
and can be attributed to theft or mishandling.  However, I am aware of nothing to indicate
that **Slattery, Speisman, Staley, Lima**, or **Stovall** were ever accused of complicity.
Neither is there credible evidence that any of them authorized, approved of, or knowingly
acquiesced to the misappropriation of detainees' money or property.

**Opinion D-3**        **It is my opinion that any guards involved in misconduct would make
every effort to limit the potential for discovery by facility or corporate
officials.**

### Comments and Basis for Opinion

It was certainly beyond the ability of corporate officers such as **Slattery, Speisman**, or
**Staley** to guarantee that no officer employed by Esmor would ever engage in criminal or
other misconduct.  To believe it possible for administrators to absolutely guarantee that
such conduct will never happen on their watch is naive and requires suspension of human
nature.  I am aware of no profession--legal, medical, law enforcement, political, religious,
or any other--that has never experienced countless examples of criminal or other
misconduct.  Certainly, dealing with such issues would have been something more
directly dealt with by facility managers.  **Lima** and **Stovall** were responsible for the
facility-level operation; however, even they lacked the ability to ensure that each and
every staff member would perform his duties flawlessly or avoid criminal behavior.  And,
both would have experienced difficulty detecting and causing the prosecution of such
incidents.  A warden or other administrator of a facility is required to work at least 40
hours per week.  Even if a very devoted official were to work 50, 60, or even 70 hours per
week, that would still leave scores of hours each week when the facility administrator is
absent from the facility.  And even when the administrator is on site, he can observe or

---

[54]Reply Brief in Behalf of Defendant Willard Stovall in Further Support of Motion for
Summary Judgment, p.18.

DeLand Report: Hawa Abdi Jama v. U.S. - 36

have real-time awareness of only a small fraction of the activities, interactions, and events that are occurring at any given time in the facility.

That staff members dishonest enough to engage in such thefts or other misconduct (whether or not criminal) would take necessary measures to conceal their involvement in such activities is so obvious that it requires little discussion. Persons engaged in criminal misconduct naturally do so in a clandestine manner. Only persons who the miscreant guard trusts to remain quiet or who he wishes to involve in the misconduct would be made aware or allowed knowledge of the misconduct. Certainly, such officers would want to avoid detection and the likelihood of arrest and prosecution; thus, it would highly unlikely that they would act in a manner easily discoverable by **Lima** or **Stovall** or other administrators.

The difficulty of catching **Wallington** was compounded by the failure of other officers who did have knowledge or suspicion to notified facility administrators in a timely manner. For example, Officer **Wright** notified **Stovall** of allegations of misconduct on the part of **Wallington** on June 14, 1995, which according to Defendants was after **Stovall** had already forced **Wallington**'s resignation the previous month.[55]

| **Opinion D-4** | **It is my opinion that Esmor has adopted policies and procedures which provide a reasonable and appropriate process for receiving, inventorying, receipting, and safely storing detainee property until it is appropriate to release the property to the detainee from whom it was taken or other legitimate jurisdiction.** |

### Comments and Basis for Opinion

Any officers engaged in theft of detainees' property would have been acting contrary to the written Esmor policies and procedures regarding detainees' property and officer conduct. Esmor officials have adopted INS-approved policies and procedures governing how officers shall receive, inventory, receipt, and secure the money and property surrendered by detainees at admission or seized during their incarceration.[56] Those policies also require release of any detainee property which can be legally released to them.[57] For example, staff could not release money or property seized by law enforcement or other officials acting according to competent legal authority (e.g., stolen property, illegal contraband, or evidence used in a criminal investigation).

---

[55]Reply Brief in Behalf of Defendant Willard Stovall in Further Support of Motion for Summary Judgment, pp. 18-19.

[56]17-1, Esmor INS Elizabeth Facility Policies and Procedures Manual.

[57]17-3, Esmor INS Elizabeth Facility Policies and Procedures Manual.

**Opinion D-5**     **It is my opinion that any detainee who suffered the loss of property whether by theft or mishandling should have been compensated for such losses.**

### Comments and Basis for Opinion

The procedure with which I am familiar in jails and prisons is to inventory all money and property, have the person from whom the property/money was taken sign that the inventory is accurate, and upon release those items on the money/property inventory (which can legally be returned to the detainee) are released back. I am familiar with some circumstances where theft, loss, or damage has occurred and with many others where persons being released mistakenly or intentionally claim that they had a greater amount of property when they were booked than appeared on the inventory or that an expensive watch, jewelry, or other item had been replaced with a cheaper one.

In reviewing District Court Judge **Debevoise**'s November 10, 2004, Opinion, I read references to Plaintiffs settling property claims against the United States. If, in fact, each detainee's money and property losses have been compensated as a part of that settlement, then it would appear that each detainee has been made whole and has achieved the damages sought.[58] Thus, I am not sure what else, under the circumstances, would be required to satisfy the remaining detainee property claim issue.

**SECTION E**          **OPINIONS RELATED TO ACCESS TO COURTS AND COUNSEL**

**Opinion E-1**     **It is my opinion that Esmor policies and procedures provide access to courts and counsel.**

### Comments and Basis for Opinion

Plaintiffs allege that Elizabeth Facility officials "refus[ed] to grant Plaintiffs access to their attorneys or access to courts"[59] It is the stated intent of the Elizabeth Facility Policies and Procedures Manual to ensure that all detainees have access to the courts and their legal representatives.[60] It is my opinion that access was accomplished by permitting

---

[58]Memoranda from Lima dated August 3, 1995, August 7, 1995, and November 20, 1995, regarding reimbursement of funds.

[59]First Amended Complaint, ¶ 7. Also, ¶¶ 145(l), 147(1), 182(l),184 (l), 221(l), 223(1), 258(1), 260(1).

[60]14-1, "Legal Rights of Detainees," Esmor INS Elizabeth Facility Policies and Procedures Manual.

DeLand Report: Hawa Abdi Jama v. U.S. - 38

detainees to telephone attorneys,[61] correspond with attorneys,[62] and to receive visits from attorneys.[63]

**Opinion E-2**      **It is my opinion that Plaintiffs were permitted to telephone their attorneys from the Elizabeth Facility.**

<u>Comments and Basis for Opinion</u>

Plaintiffs are not specific in their First Amended Complaint regarding the specifics of the alleged infringement on detainees access to attorneys and courts.  Plaintiffs' expert **Miller** made criticisms of detainees general access to telephones.  His criticisms included:

- **Claim:  The Elizabeth Facility initially did not have telephones in the dorms. They were located in the hall outside the dorm.**      Because telephones were outside the dorms, it was necessary for detainees to be escorted from dorms to telephones.  I would certainly agree that it would have been more convenient for detainees (and staff) if telephones were located inside the housing units; however, inconvenience hardly amounts to denial of access.  It appeared from my review of the file, that the telephone contractor would not permit their telephone to be installed in the day room, at that time.  In any event, **Miller** states that at some point even that inconvenience was relieved, because telephones were installed in the dormitories.[64]  It should also be noted, that often in jails, prisons, and other detention facilities some monitoring may occur of personal telephone calls, so detainees would have had to be escorted to other non-monitored telephones for privileged calls anyway.  The inconvenience of the detainees who had to be taken outside their dorms to make calls, would hardly be atypical of procedures and practices in many American jail, prison, and other detention facilities.

- **Claim: The hours during which the telephones could be used were inadequate for detainees needs.**      **Miller** claims the telephones were on for "limited hours" often "not during business hours."  At the same time, in what appears a bit contradictory, **Miller** states the telephones were on "several hours per day."  **Miller** also alleges that some unnamed detainees who worked in the

---

[61]Refer to Opinion E-2.

[62]Refer to Opinion E-3.

[63]Refer to Opinion E-4.

[64]E. Eugene Miller, Expert Penologist's Report, 05/30/01, pp. 32-33.

facility could make no calls at all.[65]   However, **Miller**'s claims were contradictory because he says the phones were on several hours per day, yet not available during business hours, nor nonbusiness hours when prisoners returned from work assignments.

**Miller** also fails to explain the bases for his conclusions (1) the phones were *frequently* off during business hours; (2) what he considers to be *frequent*; (3) what hours the phones were on/off each day; (4) which plaintiffs, if any, were prevented from calling their attorney; (5) on what occasions named plaintiffs were denied calls; (6) whether, if a plaintiff was unable to make a call on one or more occasions, the call was placed at a reasonable time interval thereafter; and (7) which named Plaintiffs were prejudiced or harmed by any specific delay in making a call.

- **Claim:  The telephone system "was not very good."**     **Miller** claims "[T]he telephone system was not very good and people had trouble reaching South Jersey on it, let alone other parts of the country and the world."[66]  **Miller** does not say how the *not-very-good* system denied the detainees' access to their attorneys. As for **Miller**'s concern that they could not call other parts of the country or world, it would be reasonable to assume that the attorneys representing the named plaintiffs in their cases were located in or near the New Jersey area. There is also information in the record that **Stovall** was engaged in efforts to improve telephone service for detainees.  In any event, **Miller** does not claim any named plaintiff was denied access to American courts or counsel by having "trouble reaching . . . other parts of the country and world."

It would also be important to note that the Esmor officials do not run the corporations which provide telephone service at the jail.  Just as sometimes happens with telephone service in homes, businesses, public phone booths, or, frequently, cell phones, people may be inconvenienced by less than stellar service. Certainly, I have reviewed no information that would support an inference that Esmor is intentionally preventing access between detainees and their attorneys. According to written Esmor policy, detainees should be provided "[a]ccess to uncensored telephone . . . service for the conduct of legal matters."[67]

---

[65]E. Eugene Miller, Expert Penologist's Report, 05/30/01, p. 33.

[66]E. Eugene Miller, Expert Penologist's Report, 05/30/01, p. 33.

[67]14-14(B)(1), "Legal Rights of Detainees," Esmor INS Elizabeth Facility Policies and Procedures Manual.

DeLand Report: Hawa Abdi Jama v. U.S. - 40

**Opinion E-3**        **It is my opinion that Plaintiffs were permitted to correspond with their attorneys.**

### Comments and Basis for Opinion

Plaintiffs are not specific in their First Amended Complaint regarding how access to attorneys and courts was infringed, and I did not read in the report of Plaintiffs' expert **Miller** any claims that correspondence was denied. Esmor policy is clear that detainees should be permitted "[a]ccess to . . . mail service for the conduct of legal matters"[68] and "[u]nrestricted and uncensored correspondence" with the courts.[69]

**Opinion E-4**        **It is my opinion that Plaintiffs were permitted to visit and communicate with their attorneys at the Elizabeth Facility.**

### Comments and Basis for Opinion

Plaintiffs are not specific in their First Amended Complaint regarding how they claim access to attorneys and courts was infringed and I did not read in the report of Plaintiffs' expert **Miller** any claims that visitation was denied to Plaintiffs. I did note one angry memorandum from **Stovall** to a subordinate who had caused a detainee to miss an attorney visit because the attorney has been told his client was no longer in the detention facility. **Stovall** berated the offending guard and made arrangements to ensure that the attorney would be fully accommodated when he returned for his visit. Miller's only claims are that:

- **Visiting hours were "arbitrary and constantly changing."**[70]        It is unclear to me what **Miller** means by arbitrary and constantly changing. The statement could mean anything. Were the hours set based on the whims of each different shift? Does he simply mean that the hours were different than what detainees and their attorneys would prefer? Were visiting hours set capriciously with no rationale or basis for the decision? Even if, for the sake of argument, visiting hours were "arbitrary" and subject to change, was any named plaintiff harmed or prejudiced by some unjustified modification of visiting hours? If so, which Plaintiff, when did it happen, and what was the harm suffered by the Plaintiff?

---

[68]14-14(B)(1), "Legal Rights of Detainees," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[69]14-14(A)(3), "Legal Rights of Detainees," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[70]E. Eugene Miller, Expert Penologist's Report, 05/30/01, p. 33.

- **Officers stationed inside visiting room, "compromising severely the confidentiality of the attorney-client relationship."[71]** **Miller,** referring to the testimony of "several plaintiffs," opines that guards stood where they could overhear attorney-detainee discussions; however, nowhere in his report does **Miller** say exactly were the guards were standing in relation to the attorney and detainee. Policy correctly allows observation of the conversation. The mere presence of a guard, even if out of hearing range, may have made one or more detainees uncomfortable; however, I did not see any reports of or references to any contemporaneously filed complaints by attorneys that guards eavesdropped on their visits with detainees. It is reasonable to assume that any attorney whose privilege with his client was obviously being compromised would register a complaint and memorialize the complaint in writing to create a record of the problem–especially, if the problem was not immediately rectified. Elizabeth policies were clear that detainees' visits with attorneys should be private. Policy allows officers to "visually observe" but not "listen [to] nor record" the attorney-detainee discussions.[72]

Clearly the Esmor policies adopted and/or implemented by **Slattery, Speisman, Staley, Stovall,** and **Lima** require confidentiality for attorney-detainee visits. Assuming, for the sake of argument, that on one or more occasions that rule was not fully complied with by a staff member, **Miller'**s report does not:

- identify a single named Plaintiff whose visit may have been compromised by eavesdropping;

- identify a single named Defendant who is alleged to have infringed on the confidentiality of an attorney visit of a specific named Plaintiff; or

- explain how any named Plaintiff was prejudiced or harmed by the alleged eavesdropping.

**Opinion E-5**     **It is my opinion that Plaintiffs' rights of access to courts and counsel were not violated due to the lack of a law library, an inadequate law library, or inadequate access to an existing law library.**

<u>**Comments and Basis for Opinion**</u>

Plaintiffs state in their First Amended Complaint that "Plaintiffs did not have access to a

---

[71]E. Eugene Miller, Expert Penologist's Report, 05/30/01, p. 34.

[72]14-1.3©); 14-1.4(B)(4); 14-1.5©), "Legal Rights of Detainees," Esmor INS Elizabeth Facility Policies and Procedures Manual.

law library or any legal materials."[73]  **Miller** states that a law library was not available until a short time prior to the closing of the facility, and that what legal materials were available were inadequate.  I offer no opinions regarding when a law library was provided, whether it was adequate, or how much access detainees had to the library.  However, it is my professional opinion that even if, for the sake of argument, the excludable alien detainees had rights comparable to those of other prisoners in U.S. jails and prisons, Esmor officials did not unreasonably interfere with their access to courts and legal representation, because:

1.      it is my understanding that the named Plaintiffs were represented by counsel;

2.      based on my layman's understanding of the law, even U.S. prisoners do not have a free-standing right to a law library;[74] and

3.      neither Plaintiffs nor their expert witness, **Miller**, has explained how any named Plaintiff suffered actual harm as a result of a lack of access to a law library.

## SECTION F          OPINIONS RELATED TO CONDITIONS OF CONFINEMENT

### F-1    Basic Essentials of Life

**Opinion F-1**          **It is my opinion that Esmor officials did not deprive of the basic necessities of life.**

#### Comments and Basis for Opinion

Plaintiffs alleged inadequate conditions of confinement; however, it is my opinion that Esmor provided detainees at the Elizabeth facility the basic necessities of life, including shelter, clothing, food, medical care, and exercise.  See the opinions F-2 through F-7.

---

[73]First Amended Complaint, ¶ 53.

[74]**Lewis v. Casey**, 116 S.Ct. 2174, 2181 (1996) ("Bounds did not create an abstract, free-standing right to a law library or legal assistance . . . any more than Estelle established a right to a prison hospital."  Thus, "an inmate cannot establish relevant injury simply by establishing that his prison's law library or legal assistance program is sub-par in some theoretical sense.");  **Carper v. DeLand**, 54 F.3d 613, 616 (CA10 1995) (A state may elect to provide legal assistance to inmates in lieu of maintaining an adequate prison law library).

**F-2    Shelter**

**Opinion F-2.1        It is my opinion that Esmor officials did not deprive detainees of shelter.**

### Comments and Basis for Opinion

One of the basic necessities of life identified by the U.S. Supreme Court is shelter. I have not inspected or toured the Elizabeth Facility, although I have received and reviewed photographs taken of various parts of the facility. Quite clearly, the Elizabeth facility provided shelter for detainees.

**Opinion F-2.2        It is my opinion that there is no justification for a conclusion that the design of the Elizabeth facility was flawed to a level that it created a substantial threat of serious harm to detainees or that it was otherwise inadequate to humanely house detainees.**

### Comments and Basis for Opinion

The Elizabeth facility is a modern facility designed initially for short term housing. Because the facility was intended for short-term housing the primary cell layout is dormitory.[75] According to Defendants, the Elizabeth facility was designed by an architectural firm whose chairman was at the time "on the Standard Board for the American Correctional Association."[76] As I discussed in Section A of this report, the standards of ACA are the most recognized correctional standards in the U.S. They are also the standards which are frequently referenced and quoted by Plaintiffs' expert **Miller** as factors considered in forming his opinions. While I do not consider ACA to be the foremost authority on facility design, utilizing ACA standards to aid in the design process could provide useful guidance, and ACA standards tend to be very prisoner-friendly. Even after drafting the initial design, Esmor's design plans had to be submitted to INS for approval. INS, according to Defendants, "made 'significant changes"[77] to the initial

_____

[75]It should be noted; however, that dormitory cells are not limited to short-term housing. There are many facilities which house prisoners much longer than that faced by Elizabeth facility detainees. In fact, I am familiar with jail facilities which house prisoners a year or more and prison facilities which, of course, house prisoners for years at a time which have dormitories as a part of their overall housing design.

[76]Statement of Undisputed Facts Submitted By Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant To Local Court Rule 56.1, ¶ 5.

[77]Statement of Undisputed Facts Submitted By Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant To Local Court Rule 56.1, ¶ 5.

design; thus, it is hard to understand how Esmor could be deemed as culpable for any perceived design flaws.

The housing units are, as mentioned, dormitory style. The sleeping area is furnished with single-level metal beds, a mattress, a pillow, and a plastic storage bin for s' property. The rows of beds are separated from each other by privacy walls approximately 3½ feet in height. The walls create the sleeping area into two- and four-bed spaces. There are also additional beds on a mezzanine level accessed by a stairway at the back end of the housing unit. The dormitories are also furnished with several four-person tables, a drinking fountain, wall-mounted telephones, and electrical outlets. In each dormitory there is a shower/toilet area with:

- four single-person showers with soap dispensers (at least one shower appears to have been designed to be compliant with the Americans With Disabilities Act, with safety bars and a hand-held shower nozzle which can be used at any height level);

- porcelain toilets with seats which can be placed in both up and down positions;

- porcelain sinks with soap dispenser, and stainless steel mirrors (at least one sink appears to have been designed to be compliant with the Americans With Disabilities Act, with a stainless steel mirror located at a level convenient to wheelchair users); and

- a large plastic rubbish can.

In addition to electrical lights, natural light is provided to the dormitory cells through windows at the back of the dormitory which are approximately three feet high and run the length of the wall. The emergency door to the dormitory is very clearly marked.

**Opinion F-2.3**      **It is my opinion regarding lighting that Stovall took reasonable measures to remedy the concerns of detainees regarding the light levels during sleeping hours.**

### Comments and Basis for Opinion

Detainees complained that lights were left on all night in the dormitories making it difficult to sleep. Plaintiffs allege Defendants never effectively resolved this problem. According to Defendant **Stovall**, he took steps to resolve the complaints about the lights. Defendants assert, "Plaintiffs do not dispute the specific assertions . . . that **Stovall**:

- directed in February 1995 that only one light per dorm be kept on after lights out;

- criticized his Chief of Security for failing to follow his directive;

- personally stayed overnight in the Facility to observe the problem;

- aggressively pursued the light issue with officers; and

- put the "no-lights" policy in writing and posted it on the bulletin board in each dormitory.[78]

It is important to note that some illumination is necessary in detainee sleeping areas at night to protect the safety of detainees and staff and to further facility security. In total or near total darkness, more aggressive detainees could easily move about the dormitory area without being seen by staff. Such undetected movement would put weaker detainees at risk and would threaten other legitimate safety and security interests. On the other hand, during sleeping hours light levels should be lowered to try to create a balance which would accommodate an environment more conducive to sleeping, while creating sufficient illumination for doing ordinary surveillance of detainees. The actions taken by **Stovall** to change policy (leave only one light on in each dormitory) and to enforce the policy[79] justify an inference that he was not indifferent to the requests of detainees to reduce the light levels in the dormitories at night. **Stovall** testified at deposition that detainee complaints about lighting dropped off to just a few, and "**Uzzle** recalled hearing complaints about lights being left on at night. This was brought to Esmor's attention and they responded by reducing the brightness."[80]

## Opinion F-2.4   It is my opinion regarding heating and air conditioning that Stovall made reasonable efforts to upgrade the heating and air conditioning in the kitchen area.

### Comments and Basis for Opinion

Detainees complained that the kitchen area was to hot in the summer and too cold in the winter. Plaintiffs do not state what the high or low temperatures were. There must were the temperatures simply uncomfortable or were they so hot and so cold that they risk causing a health problem? As warm as Texas is in the summer, their prisons are not, as a

---

[78]Reply Brief on Behalf of Defendant Willard Stovall in Further Support of Motion for Summary Judgment, p. 14.

[79]The Chief of Security had to by admonished due to his being slow to implement the policy change.

[80]Reply Brief on Behalf of Defendant Willard Stovall in Further Support of Motion for Summary Judgment, p. 14.

general rule, equipped with air conditioners. I have toured Texas prisons in the summer and the heat can definitely be uncomfortable. Nothing in the materials I have reviewed indicate that Plaintiffs have made any claims as to high or low temperature readings. Neither have I seen any information which would indicate the duration of any extreme temperatures. I have, however, reviewed a memorandum from **Stovall** to **Staley** briefing him on temperatures which widely fluctuated over the course of the year through out the facility. **Stovall** had specific concerns regarding kitchen temperatures which fell to lows of 50 degrees in the winter and could rise into the 120's in August.[81] On May 10, 1995, **Stovall** received a memorandum from **Joseph Sanabria**, Food Services Director for Aramark Correctional Services, that temperatures were between 85 and 90 degrees on May 10, 1995.

**Stovall** followed up on his concerns by efforts to have better heating and cooling equipment installed.[82] The file contains numerous documents memorializing **Stovall**'s contact with Clauss Air Conditioning and Heating (for HVAC system) and Blausberg Electric (wiring) for bids to improve the heating and cooling system and a memorandum dated April 13, 1995 (60 days prior to the termination of Esmor's contract) to **Staley** summarizing the need for the improvements and providing the cost information for the upgrade of the heating, ventilation, and air conditioning system.

**Opinion F-2.5**     **It is my opinion regarding sanitation that Elizabeth facility officials engaged in efforts to meet sanitation needs.**

### Comments and Basis for Opinion

Maintenance and sanitation in facilities used for involuntary incarceration are difficult to sustain. Success depends to a significant degree on the cooperation and efforts of those incarcerated. Unfortunately, among the incarcerated there is a wide range of sanitation habits practiced. In addition wear and tear on facilities–even new ones such as the Elizabeth facility–results in the need for constant repair and preventative maintenance. It appears from some of the documents that I reviewed **Stovall** consistently submitted any maintenance issues for repair and contracted with a pest control service, Western Quality Assured Pest Control and Sanitation, which made monthly visits to spray and made pest inspections in the facility. When the pest control service found problems, they noted them on their inspection reports so facility officials could take care of them. There were also reports that indicated **Stovall** was adding a cleaning service. I saw multiple memoranda from **Stovall** directing the repair or replacement of broken, damage, or malfunctioning equipment.

---

[81]Memorandum from Stovall to Staley, April 13, 1995.

[82]Reply Brief on Behalf of Defendant Willard Stovall in Further Support of Motion for Summary Judgment, p. 15.

There were some indications that sometimes individual dormitories, lavatory areas, or other areas were dirty. Sanitation for detainee living areas are the responsibility of the detainees who live there. Every jail, prison, or detention facility that I have ever inspected, toured, or managed requires detainees to clean their own living areas. I am aware of some claims that staff denied detainees cleaning supplies on at least some occasions in some areas of the facility; however, I have seen nothing to support a conclusion that it was the policy or practice of Elizabeth facility officials to deny detainees cleaning supplies. To the contrary, the Elizabeth facility manual had very clear requirements regarding sanitation and maintenance. See for Example 7-1, "Preventative and Institutional Maintenance Program," 7-2, "Reporting Maintenance Discrepancies," and 7-4, Environmental Health Independent Audits, 12-1, "Housekeeping/Inspection of Sanitation Practices," 12-2, "Waste Disposal and Pest Control," 12-3, "Detainee Clothing, Bedding and Linen Supplies," and 12-4, "Bathing and Hair Care Facilities for Detainees."

## F-3    Clothing

**Opinion F-3    It is my opinion that Esmor officials did not deprive detainees of adequate clothing.**

### Comments and Basis for Opinion

Plaintiffs allege they were not provided adequate and clean clothing.[83] According to the Complaint, "Plaintiffs were given a change of clothes only weekly or every few weeks."[84] Defendants counter that "Plaintiffs each received a change of clothing at least weekly."[85] Plaintiffs also allege that both male and female prisoner were given men's underwear, often in sizes that were too big and "dirty and ill-fitting clothing, including vestiges of human waste."[86] I have seen no corroboration for these conclusory claims. I did see a report that a detainee refused to surrender his personal underwear and had to be forced to change into facility-supplied underwear. The report said some of the detainees did not like to wear "used" underwear, preferring instead to wash out their own underwear in the sink. Laundered *used* clothing is not unclean. Officials tried to accommodate detainees by allowing them to wash underwear in their sinks. While I would not find that practice

---

[83]First Amended Complaint, ¶¶ 3, 49-50, 145(h), 147(h), 182(h), 184(h), 221(h), 223(h); 258(h), 260(h).

[84]First Amended Complaint, ¶¶ 49-50.

[85]Statement of Undisputed Facts Submitted By Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant To Local Court Rule 56.1, ¶ 78.

[86]First Amended Complaint, ¶ 3.

to be as sanitary as requiring all clothing to be washed in the laundry at 160 degrees in a proper detergent, I am aware of no detainee suffering harm as a result of rinsing out his or her own underwear.

Emsor policies call for an exchange of clothing twice weekly. Defendants state clothing was changed *at least weekly*. Because this is a suit for damages rather than injunctive relief, the important question is did any detainee suffer objective serious harm. Plaintiffs' Complaint does not allege that any named of the named Plaintiffs suffered physical harm. It is my understanding that even American prisoners must make a showing of physical harm. According to the Prison Litigation Reform Act, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody **without a prior showing of physical injury**."[87]

Throughout his report, **Miller** cites ACA standards as a basis for his opinions. Although Emsor policies call for twice weekly clothing exchanges, the ACA standards do not. ACA requires only that, "There is no delay in replacing clothing, linen, and bedding."[88] ACA does recommend clothing be "properly fitted." As I have previously opined, however, the issue is not what ACA recommends–or, for that matter, what Eugene Miller, or Gary DeLand would do if they were running the facility--but rather does the clothing exchange policy fall below any applicable legal requirements, and what, if any, harm has been suffered by any of the named Plaintiffs as result. I have seen nothing which justifies a conclusion that **Staley, Slattery, Speisman, Lima**, or **Stovall** were indifferent to detainees regarding their clothing needs.

**F-4    Food**

**Opinion F-4**        **It is my opinion that Emsor officials did not deprive Plaintiffs of adequate food.**

**Comments and Basis for Opinion**

Plaintiffs allege they were "served food that was not fit for human consumption"[89] food

---

[87]42 U.S.C. § 1997ee (emphasis added).

[88]Standard 4-ALDF-4B-04, *Performance Based Standards for Adult Local Detention Facilities, Fourth Edition,* American Correctional Association, 2004.

[89]First Amended Complaint, ¶ 3.

that was "well past the expiration date on the packages,"[90] and spoiled food.[91] **Miller** makes similar assertions in his expert report.

Defendants aver that the diet was reviewed by a registered dietician, that monthly reviews of the diet are made by a certified dietician or a physician to ensure that they meet national dietary requirements, and the INS COTR ensured that the diet satisfied INS requirements.[92] It should also be noted that Esmor contracted with Szabo Food Services (Aramark) to handle food service for the facility.[93]

Aramark/Szabo is a capable food provider well known in the corrections field, and it was a reasonable decision for Esmor officials to have contracted with them for food services. Obviously, it is not acceptable to serve spoiled food; however, I am aware of nothing that would justify a conclusion that the serving of spoiled food was consistent with the policies of Esmor officers, Aramark, **Stovall**, or **Lima**.

## F-5    Health Care

**Opinion F-5.1**        **It is my opinion that detainees were provided medical care at the Elizabeth Facility, and that the system as described in written policies and procedures met basic medical care requirements for a correctional or detention facility.**

### Comments and Basis for Opinion

Plaintiffs allege inadequate medical care.[94] Defendants counter that detainees were provided a medical care system which they could access by completing a medical request form and that instructions were provided for detainees. Also, according to Defendants, INS paid for both the medical care received at the Elizabeth facility and for off-site

---

[90]First Amended Complaint, ¶¶ 47-48.

[91]First Amended Complaint, ¶¶ 49-50, 145(h), 147(h), 182(h), 184(h), 221(h), 223(h); 258(h), 260(h).

[92]Statement of Undisputed Facts Submitted By Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant To Local Court Rule 56.1, ¶¶ 57-58.

[93]Statement of Undisputed Facts Submitted By Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant To Local Court Rule 56.1, ¶¶ 59-60.

[94]First Amended Complaint, ¶¶ 42(1), 108-113,145(k), 147(k), 182(k), 184(k), 221(k), 223(k); 258(k), 260(k).

medical visits.[95]  The Esmor policies and procedures as written appear to provide the basis for a competent medical care program providing:

- management and direction of the program by a licensed physician and all in matters of medical judgments are in his "sole province";[96]

- seven-days-a-week 16-hour on-site medical coverage augmented by 24-hour on-call medical coverage;[97]

- routine medical care, emergency medical care, clinic care, and hospitalization;[98]

- medical intake screening, physical examinations, dental assessments, and chemical dependency detoxification;[99]

- mental health care;[100] and

- dental care.[101]

The medical program as outlined in Esmor policies and procedures appears to be sound and reasonably structured.  Since I am not a physician and not competent to examine medical charts to analyze individual diagnosis and treatments, or the protocol under which the medical staff worked, I can say that I have seen nothing to justify a conclusion that any of the Esmor Defendants have approved, condoned, or acquiesced to a system of

---

[95]Statement of Undisputed Facts Submitted By Defendants Esmor, Slattery, Speisman, Lima, and Staley Pursuant To Local Court Rule 56.1, ¶¶ 82-83, citing, Lima deposition at 458.

[96]13-1.4(A), "Administration of Medical Services," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[97]13-1.4(D), 13-1.5(A), "Administration of Medical Services," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[98]13-2, "Administration of Medical Services," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[99]13-3, "Administration of Medical Services," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[100]13-4, "Administration of Medical Services," Esmor INS Elizabeth Facility Policies and Procedures Manual.

[101]13-6, "Administration of Medical Services," Esmor INS Elizabeth Facility Policies and Procedures Manual.

indifference to detainees' medical care needs.

**Opinion F-5.2**        **It is my opinion that Stovall also sought to add stress management assistance to the health care program.**

### Comments and Basis for Opinion

**Stovall** actively sought mental health care for what he perceived as stress being experienced by detainees.

**F-6    Exercise**

**Opinion F-6.1**        **It is my opinion that detainees were provided an opportunity for exercise.**

### Comments and Basis for Opinion

Plaintiffs allege that detainees were denied adequate exercise.[102]  The allegations regarding inadequate recreation seem to be focused mostly on the lack of natural light in the recreation areas[103] and a lack of recreation for detainees in administrative segregation.[104]  I certainly agree with the Supreme Court's assessment that exercise is and "identifiable human need."[105]  Exercise is important because:

1.      it prevents atrophy of large muscle groups;

2.      provides stimulation of the cardiovascular system; and

3.      facilitates the burning of calories/fat.

Plaintiffs have alleged inadequate access to exercise; however, they have made absolutely no claims or provided any explanation of how any of the named detainees suffered significant atrophy of muscle tissue or damage to the cardiovascular system as a result of the inability to engage in exercise.  The indoor recreation area had various types of strength equipment for use by detainees which is more than adequate for working muscles.  There was also a ping pong table (on which was held a table tennis tournament).  Even without the provided exercise equipment, detainees could engage in

---

[102]First Amended Complaint, ¶ 56.

[103]See for example, First Amended Complaint, ¶¶ 42(d), 56.

[104]First Amended Complaint, ¶ 78.

[105]**Wilson v. Seiter**, 111 S.Ct. 2321, 2327 (1991).

fitness exercises. Exercise has significant health values, but it does not require a fully equipped exercise yard or center.

Detainees can achieve the primary benefits of exercise and conduct the basic elements of an exercise program in a small area. **Stretching exercises** (yoga and related exercises) require minimal movement; thus, can be done in a very small area. **Strength exercises** (pushups, curls, squats, isometric contractions, and other such muscle stressing movements) can be done in a day room or even in a cell. **Cardiovascular exercises,** such as running in place, can also be done in a limited amount of area. Anyone who has ever participated in (or observed) an organized aerobic exercise class would be aware that many participants crowd into a finite space for their exercise (e.g., bouncing on their feet, running in place, performing dance-like steps, and engaging in other body movements). A relatively small area is allotted for each individual participating in the exercise. Astronauts exercise daily in a small space capsule. While in Iraq, I exercised daily in a small hotel room. Running in place replaced running outdoors, because of the danger of attempting to jog the streets of Baghdad and the absence of running area within the perimeter of the Baghdad Hotel.

Obviously, team sports do require more space; however, I am unaware of a protected right for detainees or other prisoners to participate in team sports. Team sports while fun, offer no health benefits which cannot be more effectively achieved in individual workouts. While outdoor exercise yards may provide to be a more enjoyable exercise experience for some, day rooms and other common areas are adequate for detainees to engage in exercise and recreation. Simply making a conclusory statement that exercise is inadequate, fails to explain how the quality of exercise negatively effected the health of any named Plaintiff. The Supreme Court has also recognized the utility of day rooms in providing exercise in lieu of an outdoor exercise yard.[106]

**Opinion F-6.2**      **It is my opinion that limited natural light and *fresh* air do not prevent detainees from receiving the primary benefits of exercise.**

### Comments and Basis for Opinion

As discussed above, even if access the outdoor recreation areas was less than what Plaintiffs would have preferred, indoor recreation room and day room exercise can meet exercise needs and ensure cardiovascular stimulation, large muscle weight training, and fat burning. In Opinion F-6.1, I used the example of astronauts and my own experience engaging in exercise in a limited environment in Iraq to demonstrate that people are fully capable of engaging in stretching, strength, and cardiovascular exercise indoors. If more examples are needed, submariners are under water for weeks, even months, at a time without damaging their health. NBA basketball players are among the best conditioned

---

[106]**Rhodes v. Chapman**, 452 U.S. 337, 365 (1981).

athletes in the world, yet they get the vast majority of their exercise indoors. And, people pay substantial sums of money to join fitness centers which provide running tracks, weights, and other exercise opportunities **in an indoor environment.** My wife is a certified yoga instructor. Her classes are all provided indoors. It is understandable that detainees might have preferred outdoor recreation as a break in the monotony of being confined inside a detention facility; however, what the Plaintiffs may have preferred and what was necessary to maintain their health needs was not necessarily the same.

Natural light and *fresh air* seem to be the main benefits claimed for outside recreation. I am aware of no claims by Plaintiffs that the air quality in the jail was below any health standard or that inside air has been found to be less healthy than the air in the outdoor recreation yards. In fact, it might be interesting to compare the pollution and particulates in the air outdoors in Elizabeth with the filtered air provided by the ventilation system indoors.[107] As far as the natural light claims are concerned, there has been no showing that any of the named Plaintiffs suffered a vitamin D deficiency due to a lack of sunlight during recreation.[108] Thus, it remains my opinion that there has been no showing that any of Plaintiffs' claimed exercise inadequacies have adversely effected the health of detainees.

It is my opinion that any claim that outdoor recreation yards are of critical importance to establishing viable exercise opportunities cannot be substantiated. I believe my opinion is consistent with the U.S. Supreme Court's analysis of two Circuit Court decisions regarding outdoor recreation. The Court agreed with two seemingly different Court Appeals decisions; one that held that outdoor exercise was required when prisoners were confined in small cells almost 24 hours per day,[109] and the other which held that outdoor exercise was **not required** when prisoners had access to a day room 18 hours per day.[110]

## F-7   Privacy

**Opinion F-7.1**      **It is my opinion that privacy is inconsistent with the requirements of incarceration.**

---

[107] Since I have seen no comparisons, I offer no opinion as to what such a study would reveal.

[108] As previously mentioned in this report, there is natural light in the dormitories.

[109] **Wilson v. Seiter**, 111 S.Ct. 2321, 2327 (1991), *citing*, **Spain v. Procunier**, 600 F.2d 189, 199 (CA9 1979).

[110] **Wilson v. Seiter**, 111 S.Ct. 2321, 2327 (1991), *citing*, **Clay v. Miller**, 626 F.2d 345, 347 (CA4 1980)

**Comments and Basis for Opinion**

The bases for my opinion are:

• **Privacy from view by staff or other detainees is inconsistent with the realities of incarceration.** Secure facilities must incarcerate detainees and other prisoners in relatively tight and confined spaces where they are subject to constant surveillance. Incarceration also expose detainees to a lack of privacy from fellow detainees. I have no doubt that in some cultures, such exposure may be more difficult to deal with than in others; however, the Plaintiffs are being confined in the U.S. where deference must be given to officials to protect the safety of staff and other detainees, facility security, and other legitimate penological interests. In addition to my years of experience working in the corrections field, I also draw support for my opinion from Supreme Court rulings.

> Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. **Loss of** freedom of choice and **privacy** are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."[111]

> [W]e hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell . . . .[112]

• **Privacy for detainees from being viewed by officers of the opposite sex should be protected within the limits imposed by the surveillance, supervision, and other security needs.** Policies, procedures, and practices should be followed to reasonably protect detainees from viewing by officers of the opposite sex while naked or using toilet facilities. It must also be said that some inadvertent viewing during surveillance rounds, responding to exigencies, deliberate or negligent exposure, or under other circumstances occurs in correctional facilities despite efforts to avoid it. Even American prisoners do not enjoy absolute protection against being seen by officers in cross-gender

---

[111]**Bell v. Wolfish**, 441 U.S. 529, 537 (1979) (emphasis added).

[112]**Hudson v. Palmer**, 468 U.S. 517, 525-526 (1984).

supervision.  Of course, intentional voyeurism of prisoners/detainees is not acceptable.

## SECTION G          OPINIONS RELATED TO WORKING DETAINEES

### G-1    Work Assignments

**Opinion G-1.1          It is my opinion that many detainees prefer to work to escape the boredom of confinement individual housing units.**

#### Comments and Basis for Opinion

Anyone who has worked for any length of time in correctional facilities knows that there is no shortage of sentenced prisoners who volunteer for available work assignments.  This is also true of pretrial detainees.  In fact, it is source of contention in some jails which by policy make pretrial detainees ineligible for work assignments.  That was also the case in Iraq, where prisoners not only volunteered to work, but often became agitated and angry if denied work opportunities.

**Opinion G-1.2          It is my opinion that un-sentenced detainees should not be subjected to forced labor.**

#### Comments and Basis for Opinion

It is not appropriate to engage in forced labor for un-sentenced prisoners.  I should qualify that, however, by saying that **it is appropriate** to require detainees to clean their living areas and participate in other light chores and assignments.  Obviously, breaking rocks or working on road crews would not meet the description of light chores, but cleaning dorms, sweeping, mopping, kitchen work, laundry work, and related tasks reduce detainees' idle time.  I believe such work opportunities should be given to detainees.

## SECTION H          OPINIONS RELATED TO DISCIPLINE AND SEGREGATION

### H-1    Punitive Versus Non-Punitive Actions

**Opinion H-1.1          It is my opinion that detainee discipline is essential to maintaining safety, security, and order.**

#### Comments and Basis for Opinion

It requires little discussion to justify the need for a system of detainee discipline.  Involuntarily confining many detainees in a confined environment requires strong ongoing efforts to maintain order and discipline.  Detainee discipline systems are intended to ensure (and, when necessary, coerce) compliance with rules.  It is absolutely

essential to safety and security to maintain order and discipline, or in the event that order or discipline are degraded to restore order and discipline. I noted in the records examples of detainees being insubordinate, physically assaulting officers, fighting, attempting to urinate on officers, and other misconduct. Regardless of the status of detainees, such misconduct cannot be permitted.

**Opinion H-1.2**     **It is my opinion that there is a difference between discipline (which is punitive) and classification or other housing decisions which are implemented for non-punitive management reasons.**

### Comments and Basis for Opinion

How a prisoner is supervised, where he is housed, and what restrictions he is subjected to are important factors in successfully managing prisoners. Those decisions may be made to carry out the punitive requirements of discipline or they may be made to further non-punitive classification or other management goals and objectives. Classification is a non-punitive process used to screen, group, house, supervise, and manage prisoners. Detainee classification may result in actions which are perceived by detainees as punishment (i.e., separation from general population, administrative segregation, reduction in privileges, and other restrictions).

These management restrictions which are part of the classification outcomes are not intended to be punitive and are not disciplinary in nature. The subtleties of the differences in the purpose/intent between discipline and classification may not be understood by individual detainees. In fact, they may perceive all restrictions to be punitive. In some cases, non-punitive actions can result in greater restrictions and disadvantages than actions taken pursuant to the disciplinary process. For example, a prisoner may receive a punishment of 15 days in a restrictive housing assignment, coupled with some loss of privileges as a disciplinary punishment. However, the same misconduct may also trigger a reassessment of the detainee's classification and housing assignment, resulting in a decision that tighter controls and supervision in a more restrictive housing assignment are necessary to properly manage the detainee. The detainee under those circumstances may well spend substantially more time in a restrictive housing assignment as a classification decision, than he did as a disciplinary punishment, yet classification decisions, unlike the punitive disciplinary decisions, do not trigger the need for due process (as the Supreme Court has ruled many times over the last 30 years).

**H-2**   **Due Process**

**Opinion H-2.1**     **It is my opinion that due process is not required for non-punitive segregation.**

### Comments and Basis for Opinion

Due process is required before disciplinary punishments are imposed if the punishment is serious or grievous or would create an atypical and substantial reduction of a detainees circumstances. On the other hand, due process has not been required for classification and other non-punitive management actions. In fact, to require due process for non-punitive housing or other classification decisions would hamstring corrections administrators and essentially place the courts in a position of judicially reviewing every contested housing assignment. To require due process before a detainee could be removed from general population, before a classification could be adjusted, before a housing assignment was changed, or before privilege levels were adjusted to meet safety and security needs would lead to a chaotic management environment. Loss of that management flexibility would greatly hamper officials trying to take actions to protect vulnerable detainees, segregate disruptive or predatory detainees, or trying to create a more positive chemistry among those incarcerated.

**Opinion H-2.2**     **It is my opinion that if a detainee is segregated for punitive reasons minimal due process is required.**

### Comments and Basis for Opinion

American prisoners are entitled to due process–though not the full panoply of rights offered at a criminal or civil hearing–to refute alleged violations of administrative rules. Even if the detainees enjoyed the same rights as American prisoners, they would only be entitled to:

- written notice 24 hours prior to a hearing of the charges and the date, time, and location of the alleged misconduct;

- an opportunity to refute the charges, including:

  - a limited opportunity to call witnesses and present evidence;

  - assistance to understand conduct rules, discipline procedures, and, if there, is a communication problem, assistance in communicating with the person or persons handling the hearing;

  - an impartial hearing officer or panel (impartial meaning that none of those who will serve as hearing officers were involved in the event which led to the disciplinary write-up); and

  - written documentation of the evidence relied upon by the hearing entity to find "some evidence" of guilt.

As a part of the administrative discipline process,  American prisoners are not entitled to:

- be represented by counsel at a disciplinary hearing;

- confront accusers or cross examine adverse witnesses; or

- comprehensive discovery.

Detainee discipline is an informal process intended to provide an opportunity to refute allegations of misconduct.  To the extent that detainees would be permitted similar rights, I have seen nothing to cause me to believe they were disciplined in an arbitrary or capricious manner or that they did not receive, an opportunity to refute charges against them.

## SECTION I          OPINIONS RELATED TO CLAIMS OF BRUTALITY, ABUSE, AND EXCESSIVE FORCE

### I-1    Brutality

**Opinion I-1.1          It is my opinion that torture or other brutality against detainees would be unacceptable and unlawful.**

#### Comments and Basis for Opinion

There can be legitimate reasons for using force, restraining prisoners, and restricting rights and privileges; however, brutality cannot be condoned.  Nothing that I have reviewed would cause me to believe that Esmor officials operated the Elizabeth facility in a brutal manner. I have seen nothing that would indicate that Esmor's detainee care at the Elizabeth Facility even approached a level which could be considered to be brutality.  As in any jail, prison, or other detention facility individual officers may act contrary to policy and engage in excessive force.  That would be, however, a far cry from a pattern of abusive conduct.

**Opinion I-1.2          It is my opinion that Esmor officers Slattery, Spiesman, and Staley, and Elizabeth facility administrators Lima and Stovall were not involved in torture or other brutality against detainees, nor did they condone such actions or acquiesce to it.**

#### Comments and Basis for Opinion

Having reviewed the records at hand, I have seen nothing to support a conclusion that brutality was allowed or was acquiesced to by Esmor or Elizabeth administrators.  With regard specifically to **Slattery, Spiesman, Staley, Stovall,** and **Lima** they adopted and implemented policies and procedures to guide the actions of Elizabeth Facility staff.  The

policy manual is a primer for the proper care, treatment, and supervision of detainees. The tone of Esmor's official policies is one which is intended to further safety, security, order, and discipline while respecting the rights and dignity of detainees. Indeed the Esmor manual is devoid of even a hint that brutality toward detainees is encouraged, condoned, or excused.

## I-2   Use of Force

**Opinion I-2.1**       **It is my opinion that use of force is not the equivalent of brutality and use of force is sometimes necessary to maintain or restore order.**

### Comments and Basis for Opinion

Use of force is not an uncommon occurrence in jails, prisons, or other detention facilities. When prisoners/detainees engage in riots, disturbances, assaults, or other violent acts or defy legitimate instructions or orders from staff, or otherwise threaten the safety, security, orders, discipline, or other legitimate interests of the facility, it may be necessary to maintain or restore order by use of force. It is my opinion that corrections administrators must have the option of employing force when necessary. The records I have reviewed document examples of insubordination, defiance of lawful orders, attempts to urinate on officers, and assaults by detainees. It is sometimes necessary to employ force to restore or maintain order.

**Opinion I-2.2**       **It is my opinion that force should not be applied in a brutal, sadistic, or malicious manner.**

### Comments and Basis for Opinion

Obviously, such force should not be reasonable and engaged at a level consistent with the threat faced by officers. It should not be applied in a brutal, sadistic, malicious, or purposeless manner. Esmor policies and procedures limit the use of force to:

- cases of self-protection;

- protection of others including the community;

- protection from self-inflicted harm; and

- prevention of loss or damage to property.

Nothing in the policy in anyway justifies or permits officers to use excessive force. No staff member could read the Esmor policies and procedures and have the slightest sense that excessive force is permitted.

DeLand Report: Hawa Abdi Jama v. U.S. - 60

**Opinion I-2.3 It is my opinion, based on my review of the documents I have been provided, that there is no record of a policy or practice of excessive force.**

### Comments and Basis for Opinion

Individual claims of use of force should be evaluated by considering:

- the threat perceived by the responsible officer;

- whether the threat was such that force was required to resolve it;

- the level of force used in comparison to the level and nature of the need for force;

- what efforts were made to limit the severity of the forceful response; and

- whether injuries suffered were inconsistent with nature of the threat and need for force.

Nothing that I have reviewed would indicate that there is a pattern of arbitrary use of force. To the contrary, it would appear that as a general rule, force was applied within reasonable boundaries.

## SECTION J          OPINIONS RELATED TO SEARCHES

**Opinion J-1          It is my opinion that searches are a critical element of facility security and safety.**

### Comments and Basis for Opinion

It would seem so obvious as to require no discussion that searches are one of the most critical elements of facility security plans. Without thorough searches, it is not possible to ensure security, safety, or order in prisons, jails, and other detention facilities.

Searches are needed at admission:

- to interdict contraband (e.g., weapons, drugs, or other such items); and

- to discover health problems or risks (e.g., existing injuries, infections, or illnesses; evidence of past suicide attempts).

Searches are needed thereafter to:

- prevent the manufacture, possession, trafficking, movement, and/or use of weapons;

DeLand Report: Hawa Abdi Jama v. U.S. - 61

- prevent the smuggling, possession, trafficking, and/or use of drugs;

- interdict movement of messages between housing units;

- discover damage to living areas, equipment, or security barriers;

- prohibited hoarding of clothing, food, or other materials;

- discover evidence of preparation for escape attempts; and

- discover any other threats to safety, security, order, discipline, or other penological interests.

**Opinion J-2**  **It is my opinion that living areas are not the equivalent of the detainee's home and cannot be afforded protection from searches.**

### Comments and Basis for Opinion

Detainees' clothing, bodies, and living areas provide an abundant array of places to hide weapons, drugs, and other contraband which have a seriously adverse impact on safety, security, and order. I have not doubt that many detainees may feel uncomfortable when being strip searched or frisk or rub searched.[113] The discomfort of rub searches increases when the searches include buttocks and genital areas. However, allowing any area of the body or a living area to be exempt from search ensures that the exempt areas will become the primary hiding area for contraband. To allow detainees exemption from the thorough searches that American prisoners routinely are subjected to would **degrade** officer and **detainee safety** and facility security, order, and discipline. **It is not possible to protect safety and security while having search-free zones, requiring articulation of levels of suspicion to justify searches, or accommodating of cultural taboos.** Detainees and their living areas should be searched thoroughly and often and on both a random and routine basis.

**Opinion J-3**  **It is my opinion that the appropriateness of personal searches should be evaluated considering the degree of intrusion, justification for the search and level of intrusion, and the manner in which searches were conducted.**

### Comments and Basis for Opinion

---

[113]Frisk and rub searches are accomplished by rubbing the body of the subject over their clothing.

The scope of intrusion will vary according to the type of search conducted. The types of searches in increasing order of intrusiveness include: frisk or rub searches, strip searches, visual body-cavity searches (observing the anus and exterior genitalia), and physical body-cavity searches. Justification for searches, generally, can be stated as a result of the inherent nature of jails, prisons, and other detention facilities. As the Supreme Court recognized, "A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence."[114] While searches are justified by the very nature of correctional facilities, more intrusive searches (strip searches and body cavity searches) should be supported with greater justification.

The manner in which the search is conducted is also important. Searches should be conducted in a professional manner (no taunting, belittling, or sexually oriented comments), with an appropriate level of privacy for strip searches, and with proper attention to sanitation. If physical body cavity searches (penetration of body cavities with gloved fingers or instruments) are needed and justified, such searches should only be conducted by qualified medical personnel.

Unfortunately, even when the intrusiveness and manner of a search are entirely permissible under the U.S. Constitution, the search may offend the cultural sensibilities of some prisoners. Cultural mores and beliefs, while important to the individuals who embrace them, should not be permitted to shield prisoners from legitimate and necessary search procedures.

**Opinion J-4**          **It is my opinion that Esmor/Elizabeth policies and procedures for searching detainees balance the safety and security interests of the facility with interests of detainees.**

### Comments and Basis for Opinion

Esmor and Elizabeth officials cannot eliminate or compromise the important elements of detainee searches simply because such searches may offend the customs of individual detainees. I have reviewed the nine-page Esmor policies and procedures and find nothing that is not an ordinary and necessary part of searches in the jails, prisons, and other detention facilities in the U.S. There is nothing in the record which would support a conclusion that the written policies and procedures for the Elizabeth facility caused unlawful searches of detainees, nor did I see any provision of the search policies and procedures which should be changed to accommodate detainees unique cultural expectations.

Should I review other documents or become aware of other information which justifies

---

[114]**Bell v. Wolfish**, 441 U.S. 520, 559 (1979)

expanding the scope of my report or modifying any of my opinions, I reserve the right to supplement my report prior to being deposed.

Submitted August 14, 2006,

Gary W. DeLand

# Appendix A
# Qualifications and Expertise:  Gary W. DeLand

This section of my report provides a synopsis of key elements of my qualifications and expertise to serve as an expert witness in the above captioned case.

A.   **Criminal Justice Work and Experience**

| | |
|---|---|
| **1994-present** | Executive Director, **Utah Sheriffs' Association** |
| **1975-present** | President, **DeLand and Associates, Inc.**, Criminal Justice Consulting |
| **2001-present** | Executive Editor, *Corrections Managers' Report*, a profession journal published by Civic Research Institute, Kingston, New Jersey |
| **2003** | Senior Advisor, **Iraq Ministry of Justice, Department of Prisons** (now called the Iraqi Correctional Services)[115] |
| **2002-2006** | Officer, **National Sheriffs' Association**, Presidents and Executive Directors Committee (Immediate-Past President, 2005-2006; President, 2004-2005;Vice President, 2002-2004; Secretary, 2001-2002) |
| **1994-2001** | Editor-in-Chief, *Corrections Managers' Report* |
| **1999-2001** | Adjunct Professor, Criminal Justice Dept., **Dixie State College** (Corrections Process) |
| **1988-1994** | Adjunct Professor, Political Science Dept., **University of Utah** (Corrections Administration; Corrections Law) |
| **1985-1992** | Executive Director, **Utah State Department of Corrections** |
| **1963-1980** | **Salt Lake County Sheriff's Office**; final rank: Captain (Jail Administration, 1973-1979) |

B.   **Consulting and Training Experience**

Consulting and training experience includes:

1.     over 335 **legal issues seminars** in 36 states and the District of Columbia (corrections law, probation and parole law, civil rights litigation);

---

[115]I served in Iraq in June, July, and August, 2003, during which time I established the Iraqi Correctional Services Training Academy, and together with other members of the team helped the Iraqi Ministry of Justice form the Iraqi Correctional Services, renovated and opened several detention and prison facilities, and created a personnel system to support the hiring and staffing of the facilities.  One of those facilities was at Abu Ghraib, where after our team's departure from Iraq, Commanding Officer for the 800th MP Brigade turned the Iraqi facilities over to military intelligence.  Subsequently, Abu Ghraib went from being a major accomplishment under difficult and dangerous circumstances to a stain on the reputation of the military and civilian personnel who did the hard work, but then rotated home before the scandalous events of the fall of 2003 occurred.

DeLand Report: Hawa Abdi Jama v. U.S. - 65

2. more than 40 jail **operations/management training programs** in 14 states (mostly in conjunction with the National Institute of Corrections) and the nation of Iraq;

3. more than 80 **technical assistance** projects in 27 states (primarily in conjunction with the National Institute of Corrections), evaluating jail and prison operations, policies, procedures, and practices and making recommendations to resolve problems and improve operations;

4. writing, instruction and/or technical assistance in the development of **jail/prison standards**, including:

    a. technical assistance to 13 states, the National Institute of Corrections (instructor in standards writing training), and the American Correctional Association (review and evaluation, 1980);

    b. author of the **Utah Jail Standards**; and

    c. author of the **Model Standards for Prison Management** (purchased for use as an internal audit tool by Gerald Prod, Legal Services Bureau, California Department of Corrections; and adopted by the Utah Department of Corrections, Exec. Dir. O. Lane McCotter to guide development and writing of the policies and procedures manual for the Promontory Correctional Facility--a private prison operated at the state prison site in Draper);

5. writing of **policies and procedures manuals** for seven jails/prisons in three states and providing training for other jurisdictions concerning how to outline, format, write, and validate policies and procedures manuals;

6. **pre-architectural, architectural, and correctional systems development planning** and assistance on more than 20 projects in seven states; plus, Nova Scotia Provence, Canada (1997); the Barberton APOPS Youth Detention Center, Republic of South Africa (1997); Iraq Ministry of Justice (2003);

7. 34 **addresses given at national criminal justice conferences** over the last 25 years; and

8. training and technical assistance for several federal agencies (National Institute of Corrections, U.S. Bureau of Prisons, U.S. Marshals Service, Bureau of Indian Affairs, National Indian Police Academy, Federal Bureau of Investigation, U.S. State Department, and National Parks Service).

C. **Education**

| **Master of Public Administration,** | 1985,  University of Utah |
| **Bachelor of Arts,** | 1969,  University of Utah, Sociology (criminal justice emphasis) |
| **Bachelor of Science,** | 1964,  University of Utah, Physical Education (corrective therapy certificate) |

D.   **Published Material**

*Model Standards for Prison Management*, 1995

*Standards for the Operation and Construction of Utah Jails*, 1995

**Articles in *Corrections Today***
American Correctional Association: Lanham, Maryland

> DeLand, Gary W., **"Counterpoint: Rethinking the Value of Accreditation,"** (Vol. 59, No. 5, August, 1997)

**Articles in ACA's *Point Counterpoint: Correctional Issues***
American Correctional Association: Lanham, Maryland

> DeLand, Gary W., **"Rethinking the Value of Accreditation,"** 1998

**Articles in *Correctional Health Care Report***
Civic Research Inc.: Kingston, New Jersey

> DeLand Gary W., **"Standards and Liability: The Effect of Professional Standards Litigation,"**   (Vol. III, No.  5, July/August, 2002)

**Articles in Corrections Managers Report**
Civic Research Inc.: Kingston, New Jersey

> DeLand, Gary W., **"Developing A 'Rationale' For Administrative Policies and Practices: The Key To Thriving In A Litigious Environment,"**   (Vol. I, No. 1, June/July, 1995)

> DeLand, Gary W., **"Negotiating The Hazards Of State-Created Liberty Interests: Hitting A Moving Target While Avoiding Self-Inflicted Injury,"** (Vol. I, No. 3, October/November, 1995)

> McCotter, O. Lane, Frank D. Mylar, and Gary W. DeLand, **"STOP Restores Rightful Separation Of Powers in Managing Corrections Facilities,"**   (Vol. I, No. 5, February/March, 1996)

DeLand, Gary W., **"Preventing And Defending Administrator Liability: A Proactive Approach,"**   (Vol. I, No. 6, April/May, 1996)

DeLand Gary W., **"Cross-Gender Searches and Supervision: A Clash Between Female Employment Rights and Prisoner Privacy Interests,"**   (Vol. II, No. 1, June/July 1996)

DeLand, Gary W., Sandbaken-Hill, Carrie, **"Rule 68e Offer of Judgement: A Defense Tool in Corrections Litigation,"**   (Vol. II, No. 1, June/July 1996)

DeLand, Gary W., **"Standards and Liability: The Effect of Professional Standards Litigation,"**   (Vol. II, No. 3, October/November, 1996)

DeLand, Gary W., **"Race As a Factor in Classifying Prisoners: Can it Ever Be a Constitutional Practice,"**   (Vol. II, No. 5, February/March, 1997)

DeLand, Gary W., **"Strip Searches of Arrestees in Jails,"**   (Vol. II, No. 5, February/March, 1997)

DeLand, Gary W., **"Classification: A Key Tool for Safely and Securely Managing Prisoners,"**   (Vol. II, No. 6, April/May, 1997)

DeLand, Gary W., **"Access to Courts in the Wake of *Lewis v. Casey*,"**   (Vol. III, No. 3, October/November, 1997)

DeLand, Gary W., **"Probation and Parole Searches: Special Law Enforcement Powers,"**   (Vol. III, No. 4, December/January, 1998)

DeLand, Gary W., **"Jail Contracting: Utah's New Twist in 'Privatized' Corrections,"**   (Vol. III, No. 5, February/March, 1998)

DeLand, Gary W., **"Prisoner Recreation: Right or Privilege,"**   (Vol. III, No. 6, April/May, 1998)

DeLand, Gary W., and Richard A. Billings, **"Use of Force in Corrections Facilities,"**   (Vol. IV, No. 1, June/July, 1998)

DeLand, Gary W., **"ADA Applies to Prisoners, Supreme Court Says,"**   (Vol. IV, No. 2, August September, 1998)

DeLand, Gary W., **"Exclusionary Rule Not Applicable at Probation or Parole Revocation Hearings,"**   (Vol. IV, No. 2, August September, 1998)

DeLand, Gary W., **"Civil Liability for Prisoner Suicides,"** (Vol. IV, No. 4, December/January, 1999)

DeLand, Gary W., **"Assessing The Benefits And Limitations of Intake Screening to Identify Suicide Risks"** (Vol. IV, No. 5, February/March, 1999)

DeLand, Gary W., **"Prisoners' Rights to Free Exercise of Religion in the Post-RFRA Period,"** (Vol. IV, No. 6, April/May, 1999)

DeLand, Gary W., **"Testifying in Prisoner Litigation, Part I: Effective Preparation,"** (Vol. V, No. 1, June/July, 1999)

DeLand, Gary W., **"Internal Audits and Vulnerability Assessments,"** (Vol. V, No. 2, August/September, 1999)

DeLand, Gary W., **"Testifying in Prisoner Litigation, Part II: Providing Effective Testimony,"** (Vol. V, No. 3, October/November, 1999)

DeLand, Gary W., **"Hard Times for Soft Porn,"** (Vol. V, No. 3, October/November, 1999)

DeLand, Gary W., **"Rational Policies are Key to Restricting Prisoners' Access to Pornography,"** (Vol. V, No. 4, December/January, 2000)

DeLand, Gary W., **"Staff Safety: A Top Priority in Corrections Management,"** (Vol. V, No. 6, April/May, 2000)

DeLand, Gary W., **"*Jordan v. City of New London*: Too Intelligent to Be a Cop,"** (Vol. V, No. 6, April/May, 2000)

DeLand, Gary W., **"Liability Defenses in Litigation Against Privatized Corrections Facilities,"** (Vol. VI, No. 1, June/July, 2000)

DeLand, Gary W., **"*Price v. County of San Diego*: Re-Evaluating Positional Asphyxia in Use of Force and Restraint Cases,"** (Vol. VI, No. 2, August/September, 2000)

DeLand, Gary W., **"Restraint Chairs, Part I: Reasonable Control Aid or the 'Devil's Chair',"** (Vol. VI, No. 3, October/November, 2000)

Sampson, Stephen, Dr. and Gary W. DeLand, **"How Expert is Your Expert: Part I: Evaluating Experts and Their Opinions,"** (Vol. VI, No. 4, December/January, 2001)

DeLand, Gary W., **"Managing Known Suicide Risks,"**  (Vol. VI, No. 5, February/March, 2001)

DeLand, Gary W., **"Restraint Chairs, Part II: Tools Not Punishment,"**  (Vol. VI, No. 6, April/May, 2001)

DeLand, Gary W., **"Oleoresin Capsicum: Effective and Nonlethal,"**  (Vol. VII, No. 1, June/July, 2001)

DeLand, Gary W., **"E-Training: The Smart Choice for Training in the 21ˢᵗ Century,"**  (Vol. VII, No. 2, August/September, 2001)

DeLand, Gary W., **"Cell Searches: No Right to Privacy for Prisoners,"**  (Vol. VII, No. 3, October/November, 2001)

DeLand, Gary W., **"A Primer on the Basic Provisions of the Prison Litigation Reform Act,"**  (Vol. VII, No. 4, December/January, 2002)

DeLand, Gary W., **"In-Custody Death Investigations,"**  (Vol. VII, No. 5, February/March, 2002)

DeLand, Gary W., **"Searches of Visitors in Jails and Prisons,"**  (Vol. VIII, No. 1, June/July, 2002)

DeLand, Gary W., **"Ruiz v. Johnson (Estelle) Dies on 30ᵗʰ Birthday,"**  (Vol. VIII, No. 2, August/ September, 2002)

DeLand Gary W., **"Narrative Writing Following Use of Force Incidents,"** (Vol. VIII, No. 4, December/January, 2003)

DeLand, Gary W., **"*Bazzetta v. McGinnis*, Part I: Authority to Regulate and Restrict Prisoner Visits,"**  (Vol. VIII, No. 6, April/May, 2003)

DeLand, Gary W., **"*Bazzetta v. McGinnis*, Part II: First Amendment Visitation Issues,"**  (Vol. IX, No. 1, June/July, 2003)

DeLand, Gary W., **"Prisoner Discipline, Part I: The Foundation for an Effective Discipline System,"**  (Vol. IX, No. 5, February/March, 2004)

DeLand, Gary W., **"Rebuilding the Iraqi Correctional Service,"**  (Vol. IX, No. 5, February/March, 2004

DeLand, Gary W., **"Prisoner Discipline, Part II: Pre-Hearing Administrative**

Segregation," (Vol. IX, No. 6, April/May, 2004)

DeLand, Gary W., **"Prisoner Discipline, Part III: Initiating Disciplinary Action,"** (Vol. X, No. 6, December/January, 2005)

DeLand, Gary W., **"Prisoner Discipline, Part IV: Conducting Due Process Hearings,"** (Vol. XI, No. 1, June/July, 2005)

DeLand, Gary W., **"Prisoner Discipline, Part V: Self-Incriminating Testimony by Prisoners,"** (Vol. XI, No. 2, August/September, 2005)

DeLand, Gary W., **"Rebuilding Iraqi Corrections: Boots on the Ground,"** (Vol. XI, No. 2, August/September, 2005)

DeLand, Gary W., **"Staff Training and Prisoner Litigation,"** (Vol. XI, No. 3, October/November, 2005)

DeLand, Gary W., **"Rebuilding Iraqi Corrections: Part III: Infrastructure Assessment,"** (Vol. XI, No. 4, December/January, 2006)

DeLand, Gary W., **"Duty to Protect, Deliberate Indifference, and Administrator Liability,"** (Vol. XI, No. 6, April/May, 2006)

E.    **Operations Manuals Written**

**California**    *Sonoma County Jail Policies and Procedures Manual* (1983)

**Montana**    Wrote selected chapters required by *Langford v. Racicot* and *U.S. v. Montana* (1997)

**Utah**    *Salt Lake County Jail Manual* (1971)
*Salt Lake County Sheriff's Office Operations Manual* (1972)
*Salt Lake County Jail Policies and Procedures Manual* (1973)
*Iron County/Utah State Corrections Facility Policies and Procedures Manual* (combined state/county facility) (1982)
*Promontory Correctional Facility Policies and Procedures Manual* (1995)
*Purgatory Correctional Facility Operations Manual* (Washington County) (1997)
*Summit County Jail Policies and Procedures Manual* (1997)
*Cache County Jail Policies and Procedures Manual* (2002)

Utah State Department of Corrections manual system (1985-1992), including:

DeLand Report: Hawa Abdi Jama v. U.S. - 71

1.   *Utah State Department of Corrections Policies and Procedures Manual.*
2.   *Utah State Department of Corrections Administrative Services Policies and Procedures Manual.*
3.   *Utah State Department of Corrections Adult Probation and Parole Policies and Procedures Manual.*
4.   *Utah State Department of Corrections Community Corrections Centers Policies and Procedures Manual.*
5.   *Utah State Department of Corrections  Personnel and Training Division Policies and Procedures Manual.*
6.   *Utah State Department of Corrections Institutional Operations Division Policies and Procedures Manual.*
7.   *Utah Correctional Industries Policies and Procedures Manual.*

For the UDC manual system, I designed the format, trained the writers, reviewed and evaluated written drafts, corrected copy, and over the first three years that I was Executive Director did much of the original writing.

F.   **Experience in Training and Developing Training Systems**

| | | |
|---|---|---|
| **Utah** | **1996-present** | Director, **Utah Sheriffs' Association's Advanced Management Training Institute** |
| | **2000-2001** | Member, **Planning and Development Committee, Utah Law Enforcement Command College** |
| | **1996-1997** | Chairman, **Utah Law Enforcement Training Study Committee**, studied and evaluated training and certification requirements for Utah law enforcement, adult corrections, youth corrections, county corrections, and private corrections officers; recommended curriculum revisions; and participated in writing model legislation. |
| | **1985-1998** | Instructor, **Fred House Corrections Academy** (Utah) |
| | **1973-1992** | Instructor, **Utah Police Academy** |
| | **1985** | Created a system-wide, state-wide corrections academy (the **Fred House Corrections Academy**), which included designing and building a full-service training facility and developing comprehensive pre-service and in-service training courses for jail, prison , probation and parole, and private corrections officers, supervisors, and managers. Pre-service courses ranged from 7 to 14 weeks depending on which types of officers were being trained and certified. |
| | **1978-1983** | Provided **National Institute of Corrections** sponsored and funded two- and three-week jail officer training courses in several states (Nebraska, Iowa, Indiana, Mississippi, Alabama, Montana, South Dakota, Oklahoma, Georgia and |

|  |  | Kansas) |
|--|--|--|
|  | **1980** | Coordinated the development of a state jail officer training program for Iowa county jails (designed program and assisted in selecting and training instructors, setting training objectives and curriculum development) funded by a grant from the **National Institute of Corrections** |
|  | **1973-1979** | Started the State of Utah's first pre-service jail training program, the **Utah Pre-Service Corrections Training School** (Westminster College)--a three-week course, and served as Co-director and Instructor, |
|  | **1976-1978** | Provided **Bureau of Indian Affairs** sponsored and funded two- and three-week jail officer training courses on several Native American reservations (Pine Ridge Reservation, South Dakota; Yakima Reservation, Washington; Navajo Reservation, Arizona; Flathead Reservation, Montana; Uintah-Ouray Reservation, Utah) |
| **California** | **1982-present** | STC certified in-service training instructor |
|  | **1989-2002** | Instructor, **Jail Managers' Program, Santa Rosa College Training Center** |
|  | **1983-1995** | Instructor, **Jail Managers' Program**, coordinated by **San Diego County Sheriff's Office** |
| **National** | **1975-present** | Instructor in corrections and other criminal justice instruction in over 40 states |
|  | **1996-present** | Instructor, **American Jail Association** |
|  | **1977-2000** | Instructor, **National Institute of Corrections** |
|  | **1996-2001** | Instructor, **Americans for Effective Law Enforcement** |
|  | **1991** | Instructor, **Law Enforcement Training Network** (national televised law enforcement and corrections training program) |
|  | **1981** | Participated in the development of a national training program for prisoner classification for the **National Institute of Corrections** |
|  | **1975-1978** | Instructor, **National Indian Police Academy** |
|  | **1977-1978** | Instructor, **Bureau of Indian Affairs Outreach Training Program** |
| **Iraq** | **2003** | Senior Advisor for the **Ministry of Justice, Iraqi Correctional Services**. Created the **Iraqi Correctional Services Training Academy**, established the training and certification curriculum, assisted with the development of training outlines, and supervised the operation of the academy. |

G. **Cases In Which I Have Testified As An Expert Witness During the Past Four Years**

1. **At Trial**

   *Blackwell v. Valenzuela*  (State Court, Arizona, 9/2003)
   *Pierce v. Orange County*  (Federal District Court, California, ½004)
   *Stewart v. Gates*  (Federal District Court, California, ½004)

2. **At Deposition Only**

   *Berrera v. JCW Electronics*  (State Court, Texas, 10/2002)
   *Eppinger v. Fayette County*  (Federal Court, Georgia, 5/2003)
   *Asbury v. West Virginia Regional Jail and Correctional Authority and Department of Corrections*  (Federal Court, West Virginia, 5/2003)
   *Edwards v. State of West Virginia*  (Federal Court, West Virginia, 5/2003)
   *Hughes v. CCA*,  (State Court, Florida, 2004)
   *Laymen v. Alexander*  (Federal Court, North Carolina, 2004)
   *Williams v. CCA*,  (Federal Court, Tennessee, 2005)
   *Ludlow v. Arpaio*,  (State Court, Arizona, 2005)
   *Gingras v. Mascaro*,  (State Court, Florida, 2005)
   *Odoms v. Cleveland County*  (Federal Court, North Carolina, 2005)
   *Prison Legal News v. Cheshire*  (Federal Court, Utah, 12/2005)
   *Cervantes v. Maricopa County*  (Federal Court, Arizona, 1/2006)
   *Wilson v. Arpaio*  (Federal Court, Arizona, 5/2006)