**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| HAWA ABDI JAMA, et al. | : | Civ. No. 97-3093(DRD) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ESMOR CORRECTIONAL SERVICES, | : | **O P I N I O N** |
| INC., et al., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

Frank Askin, Esq.
Penny M. Venetis, Esq.
Rutgers Constitutional Litigation Clinic
Rutgers Law School
123 Washington Street
Newark, New Jersey 07102

Sean Mack, Esq.
Mary Beth Hogan, Esq.
Drew M. Dorman, Esq.
Debevoise & Plimpton, LLP
919 Third Avenue
New York, New York 10022
      Attorneys for Plaintiffs Hawa Abdi Jama, Jeyakumar Anantharajah,
      Abu Bakar, Cecilia Jeffrey, Abraham Kenneh, Shaminus Nanteza,
      Dennis Raji, Agatha Serwaa, and Sarah Tetteh Yower

Larry S. Reich, Esq.
Blank Rome LLP
405 Lexington Avenue
New York, New York 10174

Steven D. Weinstein, Esq.
New Jersey Resident Partner
Kira Feeny Spaman
Blank Rome, LLP

210 Lake Dr. E.
Woodland Falls Corporate Park, Suite 200
Cherry Hill, NJ 08002

Frank R. Volpe, Esq.
Matthew B. Hsu, Esq.
Sidley Austin Brown & Wood, LLP
1501 K Street, NW
Washington, DC 20005
  Attorneys for Defendants,
  Esmor Correctional Services, Inc.
  James F. Slattery
  John Lima
  Richard Staley
  Aaron Speisman

**<u>Debevoise, Senior District Court Judge</u>**

  There are presently before the court Plaintiffs' and Defendants' <u>Daubert</u> motions.

## I.  <u>Background</u>

  The Plaintiffs in this action, Hawa Abdi Jama, Jeyakumar Anantharajah, Abu Bakar, Cecilia Jeffrey, Abraham Kenneh, Shamimu Nanteza, Dennis Raji Agatha Serwaa, and Sarah Tetteh Yower, were undocumented aliens who were detained at a facility (the "Facility") that the Immigration and Naturalization Service ("INS") maintained in Elizabeth, New Jersey pending determination of their asylum status.  Defendant, Esmor Correctional Services, Inc. (now Correctional Services Corporation) ("Esmor") operated the facility under contract with the INS. The other defendants are James Slattery (Esmor's President and CEO), Aaron Speisman (Esmor's Vice President of Finances), Richard Staley (Vice President of Operations), John Lima (a facility administrator for a period of time and assistant facility administrator for a period of time), and Willard Stovall (facility administrator for a period of time), Diane McClure and Phillip Johnson (Esmor employees).

2

On June 16, 1997, Plaintiffs filed their original complaint in this court alleging that while they were detainees at the Facility, they were tortured, beaten, harassed and otherwise mistreated by Esmor guards, and they were subjected to abysmal living conditions, including inadequate sanitation, exercise and medical treatment.  The original and an amended complaint asserted numerous causes of action and named numerous defendants.  Many of the causes of action and defendants have been dismissed from the case.

There remain the following claims against Esmor its officers Slattery, Speisman, Staley, Lima and Stovall, and its employees McClure and Johnson:

     i) Plaintiffs' claims under the Alien Tort Claims Act, 28 U.S.C. § 1350 (the "ATCA"), alleging that the inhumane treatment of a large number of persons detained on account of no criminal acts was a violation of the law of nations;

     ii) Plaintiffs' claims under the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000 bb, et seq. (the "RFRA");

     iii) Plaintiffs' state law claims based on Esmor's and its Defendant Officers' alleged negligent failure to safeguard Plaintiffs' property and negligent hiring, training, supervision and retention of employees[1].

Plaintiffs have moved on Daubert grounds to strike or limit the testimony of the following of Defendants' experts: Gary W. DeLand (concerning detention facilities); Dr. Stuart Grassian (concerning Plaintiffs' psychiatric conditions); and Dr. Lawrence Mendel (concerning the

---

[1] One of Plaintiffs' claims against the Esmor guards was held not to be barred by the statute of limitations and thus survived the summary judgment motions - Cecilia Jeffrey's claim against Defendant Phillip Johnson for sexual assault, a claim that may be pursued as a Bivens claim for violation of the Fifth Amendment and as a claim pursuant to New Jersey State law.

3

medical condition and treatment of plaintiffs).  In addition, plaintiffs moved to preclude the

testimony of Dr. Grassian for Defendants' alleged spoliation of evidence.  Defendants have

moved to exclude the testimony of Dr. Frances Geteles (concerning Plaintiffs' psychiatric

conditions).

The parties submitted extensive briefs, declarations and exhibits in support of their

motions.  The court conducted a hearing on June 21, 2007.

## II. <u>Discussion</u>

A.  <u>General Principles</u>: The admissibility of expert testimony is governed by Rule 702 of

the Federal Rules of Evidence, which provides: "[i]f  scientific, technical or other specialized

knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a

witness qualified as an expert by knowledge, skill, experience, training or education, may testify

thereto in the form of opinion or otherwise."  Fed. R. Evid. 702.

In <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), the United States Supreme

Court held that the Court must exercise a gatekeeping function when determining the

admissibility of proposed expert testimony under Rule 702.  The objective of the gatekeeping

requirement "is to ensure the reliability and relevancy of expert testimony" and "to make certain

that an expert, whether basing testimony upon professional studies or personal experience,

employs in the courtroom the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field."  <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 152 (1999).

The standards of admissibility under Rule 702 and the Court's gatekeeping function are

applicable not only to scientific expert testimony, but also to any expert testimony that is based

on technical and other specialized knowledge.  <u>Id.</u> at 141.  "[T]he permissible scope of expert

testimony is quite broad, and District Courts are vested broad discretion in making admissibility determinations." Hill v. Reederei F. Laeisz G.M.B.H., Rostock, 435 F.3d 404, 423 (3d Cir. 2006).

Under Rule 702, there are two major requirements for admissibility. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). First, the expert must be qualified as an expert based on a broad range of specialized knowledge, skill or training. Id. While the level of expertise may affect the reliability of a particular expert, the Third Circuit Court of Appeals generally has espoused a policy of liberal admissibility with respect to an expert's qualifications. See id.

"The second requirement of Rule 702 is that the expert must testify to 'scientific, technical or other specialized knowledge [that] will assist the trier of fact.'" Id. at 742 (quoting Fed. R. Evid. 702). The testimony is admissible so long as the "process or technique the expert used in formulating the opinion is reliable." Id. "[T]he expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." Id. The factors that are important in this determination include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Id. However, the test of reliability is a flexible one and the list of factors 'neither necessarily nor exclusively applies to all experts or in every case." Kumho Tire, 526 U.S. at 141. "Rather, the

5

law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Id. at 142 (citing General Electric Co. v. Joiner, 522 U.S. 136, 143 (1997).

Additionally, "rule 702 requires that the expert's testimony must assist the trier of fact." 35 F.3d at 742-43. The "admissibility depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" Id. at 743 (quoting U.S. v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985)). "Thus, the requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." Id.

B.  Gary W. DeLand: Mr. DeLand's 63 page single-spaced Report is accompanied by a nine page Appendix A setting forth Mr. DeLand's "Qualifications and Expertise" and a 27-page Curriculum Vitae, reciting his vast range of experience, all in the criminal field.

1.  The Report:  At the outset, the Report states that Mr. DeLand, in giving his opinions, relies on his 34 years of corrections experience, including Executive Director, Utah Department of Corrections; Jail Commander, Salt Lake County Jail; Executive Director, Utah Sheriffs' Association; technical assistance provider and trainer for the National Institute of Corrections, American Jail Association, Americans for Effective Law Enforcement, National Indian Police Academy Fred House Corrections Academy (State of Utah), and Utah Sheriffs' Association's Advanced Management Training Institute; the Ministry of Justice, Iraqi Correctional Services; jail and prisons standards writer; and policy and procedures writer for several agencies. In addition, Mr. DeLand states that he relied on "ongoing professional interaction with various state corrections officials, county and other local jail administrators, criminal justice researchers and

writers, and other corrections experts and officials . . . my experience in writing policies and procedures, writing jail standards and development of corrections academic and other training procedures . . my layman's understanding of prisoners' rights as defined in federal case law."

Further, the Report sets forth files and documents provided by defense counsel upon which he relied, including correspondence, pleadings and documents filed by Defendants supporting their position in the case, Plaintiffs' expert reports, miscellaneous documents, and exhibits.

Section A of Mr. DeLand's Report concerns the use of detention standards to establish authoritative benchmarks for the operation and management of detention facilities.  The opinions are as follows:

> A-1 It is my opinion that it is important to understand what is meant by standards to be able to properly evaluate whether they have any value in establishing operational benchmarks.
>
> A-2 It is my opinion that detention standards reflect the agendas, philosophies, doctrines and beliefs of the organizations that created them; however, they do not provide the scientific or objective validation for individual provisions of the standards or even the rationale that drives each provision.
>
> A-3 It is my opinion that the various standards differ regarding what is deemed to be acceptable or required to comply with the organization's version of best corrections practice; thus, allowing standards to set the benchmarks would result in confusion as to exactly what the minimum standards are.
>
> A-4 It is my opinion that international standards are even less well suited to evaluate the validity of policies, procedures, practices or conditions in U.S. jails and prisons.
>
> A-5 It is my opinion that there is no consensus among officials regarding best corrections practices.

Mr. DeLand sets forth extensive Comments to these opinions.  The long and short of the

opinions, as explicated by the Comments, is that there is no agency in the field of detention that is qualified to create or has created useful standards applicable to detention facilities or that could confirm or dispute the opinions expressed by Mr. DeLand.  This leaves Mr. DeLand as the only qualified expert in the field.

Mr. DeLand grudgingly acknowledges two sets of national standards which receive significant attention from correction officials, "(1) those promulgated by the American Correctional Association (ACA) which are reasonably comprehensive and provide separate sets of standards for many different types of corrections; and (2) the standards promulgated by the National Commission on Correctional Health Care which focus only on medical and mental health care for prisoners."  Acknowledging that "some (perhaps many) of the individual provisions of the standards may have a salutary effect of some aspects of a corrections facility's operations"  Mr. DeLand goes on to state "these standards are not a viable benchmark against which to determine whether a facility is being operated in a constitutional or otherwise legal manner."  Like all the other standards that Mr. DeLand rejects as driven by the ideological and philosophical agendas of their drafters, these two minimally acceptable standards are "based on the philosophy, doctrine, or beliefs of the organization that promulgated the standards."  Further, "[n]one of the organizations have promulgated corrections standards that create, define, or mirror constitutional minima.  Thus, compliance with or accreditation under any of these standards does not ensure that the user is compliant with constitutional or other legal requirements and does not provide a defense against prisoner-filed litigation."

Apparently, Mr. DeLand, unlike every other creator of detention standards, is capable of opining that facility practices and conduct do or do not comply with "constitutional or other legal

8

requirements."

The next section of the Report provides opinions related to administrative liability.  The

opinions are as follows:

> B-1.1 It is my opinion that the operation and management of any jail or prison facility offers very difficult challenges to administrators to reasonably ensure safety, security, order, and discipline within the facility while providing humane care to detainees; however, the degree of difficulty is dramatically higher for Elizabeth facility officials who house detainees from a wide variety of nations, who speak a multitude of languages and dialects, and whose cultural expectations are very different from those that generally exist in the United States.
>
> B-1.2 It is my opinion that James Slattery, Aaron Speisman and Richard Staley as corporate officials lack the responsibility and capability of micro-managing the Elizabeth Facility.
>
> B-1.3 It is my opinion that the most efficient and effective way for Slattery, Speisman, and Staley to manage the corporation was to delegate to qualified, trained subordinates the responsibility for the individual facilities and functions within the corporation.  While delegation is an indispensable management function, it also separates administration from real-time knowledge of events, decisions and actions as they occur.
>
> B-1.4 It is my opinion that the most efficient and effective way for Stovall and Lima to manage Elizabeth Facility was to delegate to trained subordinates the responsibility of the day-to-day functions of the facility.
>
> B1-1.5 It is my opinion that proper delegation requires that corporate administrators such as Slattery, Speisman, and Staley provide a reasonable degree of structure and direction to their subordinates.  The structure and direction should be in the form of written policies and procedures, staff training and staff supervision.
>
> B-2.1 It is my opinion that Defendants Slattery, Speisman, Staley and Lima adopted and implemented reasonable screening and hiring practices.
>
> B-2.2 It is my opinion that INS had the authority to control the selection and hiring process; thus, could remedy any problems related to hiring by denying clearances to the candidates for employment.

Opinion B-2.2 constitutes Mr. DeLand's interpretation of the contract between Esmor and

9

INS.  This, of course, constitutes a legal opinion or, if the contract is ambiguous, a factual

determination for a jury to make.

> B-3.1 It is my opinion that Defendants Slattery, Speisman, Staley and Lima
> adopted and implemented adequate and competent written policies and procedures
> to guide staff.

> B-3.2 It is my opinion that procedures were in place to ensure staff access to the
> manual and to verify that they have read it.

> B-3.3 It is my opinion that Stovall had no role in the writing or adopting of the
> Esmor manual.

The authority for this factual statement is a Reply Brief on Behalf of Defendant Willard

Stovall in Further Support of Motion for Summary Judgment.  If Plaintiffs dispute this fact,

Stovall's Reply Brief is hardly authority for this "opinion."

> B-3.4 It is my opinion that Stovall made reasonable efforts to improve the
> operations by negotiating with the INS COTR modifications in the contract.

> B-3.5 It is my opinion that Stovall made reasonable efforts to improve policy,
> procedure, and practices by seeking to become ACA accredited.

> B-4.1 It is my opinion that Defendants Slattery, Speisman, Staley, Stovall and
> Lima adopted and implemented a reasonable training program.

> B-4.2 It is my opinion that nothing in the record which I have reviewed (including
> the report of Plaintiffs' expert, Miller) would lead to a reasonable inference that
> allegedly inadequate training was the cause of any staff misconduct.

Obviously, Mr. DeLand has not read the entire record in the case and does not know what

the evidence will be at the trial.  He is not in a position to make the factual finding set forth in

Opinion B-4.2, and even if he were, "cause" is for the jury.

> B-4.3 It is my opinion that training programs should provide instruction to staff
> regarding those topics which they know to a moral certainty are necessary to
> protect the lives, safety, and clearly established rights of the detainee population;
> however, no matter how competent and well-designed a program may be the level

of comprehensive and achievement will vary widely among trainees.

B-4.4 It is my opinion that training, regardless of how well designed and delivered, cannot guarantee perfect outcomes.

B-4.5 It is my opinion that the training program adopted by Defendants Slattery, Speisman, and Staley and implemented by Lima and Stovall was adequate and met the requirements set by INS.

B-5.1 It is my opinion that the Esmor Defendants have adopted and implemented a chain of command to facilitate efficient supervision of staff members.

B-5.2 It is my opinion that the Esmor Defendants adopted and implemented an employee evaluation system as a part of managing and supervising employees.

B-5.3 It is my opinion that Esmor officials facilitated the supervision process by maintaining personnel records.

B-5.4 It is my opinion that Esmor officials facilitated the supervision process by having a probationary period of employment during which they can more closely observe and evaluate employees before giving them full-time status.

B5.5 It is my opinion that Esmor officials facilitated the supervision process by adopting standards of conduct, ethics requirements, and an employee discipline system.

C-1 It is my opinion that many of the religion-related claims were of questionable validity.

C-2 It is my opinion that some detainee claims appear to have been exaggerated.

D-1 It is my opinion that if any Esmor staff misappropriated detainee money or property, as alleged, the theft could be handled as a violation of criminal law; however, such cases are often difficult to prosecute.

D-2 It is my opinion that there is nothing in the record that would support an inference that corporate or facility were involved in, approved of, or acquiesced to the misappropriation of detainees' money or property.

D-3 It is my opinion that any guards involved in misconduct would make every effort to limit the potential for discovery by facility or corporate officials.

D-4 It is my opinion that Esmor has adopted policies and procedures which

11

provide a reasonable and appropriate process for receiving, inventorying, receipting, and safely storing detainee property until it is appropriate to release the property to the detainee from whom it was taken.

D-5 It is my opinion that any detainee who suffered the loss of property whether by theft or mishandling should have been compensated for such losses.

E-1 It is my opinion the Esmor policies and procedures provide access to courts and counsel.

E-2 It is my opinion that Plaintiffs were permitted to telephone their attorneys from the Elizabeth facility.

E-3 It is my opinion that Plaintiffs were permitted to correspond with their attorneys.

E-4 It is my opinion that Plaintiffs were permitted to visit and communicate with their attorneys at the Elizabeth facility.

E-5 It is my opinion that Plaintiffs' rights of access to courts and counsel were not violated due to the lack of a law library, an inadequate law library, or inadequate access to an existing law library.

In his Comment to Opinion E-5, Mr. DeLand states that "I offer no opinions regarding when a law library was provided, whether it was adequate, or how much access detainees had to the library. He then explains that the basis for an opinion that the Esmor officials did not unreasonably interfere with Plaintiffs' access to courts and legal representation was: "1. it is my understanding that Plaintiffs were represented by counsel; 2. based on my layman's understanding of the law, even U.S. prisoners do not have a free-standing right to a law library; and 3. neither Plaintiffs nor their expert witness, Miller, has explained how any named Plaintiff suffered actual harm as a result of a lack of access to a law library." Thus, Mr. DeLand's opinion is based on a factual finding made without resort to a full record or trial evidence, a layman's understanding of the law, and an argument related to the issue of causation.

12

F-1 It is my opinion that Esmor officials did not deprive [Plaintiffs] of the basic necessities of life.

F-2.1 It is my opinion that Esmor officials did not deprive detainees of shelter.

F-2.2 It is my opinion that there is no justification for a conclusion that the design of the Elizabeth facility was flawed to a level that it created a substantial threat of serious harm to detainees or that it was otherwise inadequate to humanely house detainees.

F-2.3 It is my opinion regarding lighting that Stovall took reasonable measures to remedy the concerns of detainees regarding the light levels during sleeping hours.

F-2.4 It is my opinion regarding heating and air conditioning that Stovall made reasonable efforts to upgrade the heating and air conditioning in the kitchen area.

F-2.5 It is my opinion regarding sanitation that Elizabeth facility officials engaged in efforts to meet sanitation needs.

F-3 It is my opinion that Esmor officials did not deprive detainees of adequate clothing.

In the last two paragraphs of his Comments upon Opinion F-3, Mr. DeLand engages in a legal analysis of Plaintiffs' claims, citing out of context a provision of the Prison Litigation Reform Act.

F-4 It is my opinion that Esmor officials did not deprive Plaintiffs of adequate food.

F-5.1 It is my opinion that detainees were provided medical care at the Elizabeth Facility, and that the system as described in written policies and procedures met basic medical care requirements for a correctional or detention facility.

F-5.2 It is my opinion that Stovall also sought to add stress management assistance to the health care program.

F-6.1 It is my opinion that detainees were provided an opportunity for exercise.

F-6.2 It is my opinion that limited natural light and fresh air do not prevent detainees from receiving the primary benefits of exercise.

13

The last paragraph of the comment to Opinion F-6.2 finds support for the opinion in "the

U.S. Supreme Court's analysis of two Circuit Court decisions regarding outdoor recreation."

> F-7.1 It is my opinion that privacy is inconsistent with the requirements of incarceration.

In the Comments to Opinion F-7.1, Mr. DeLand quotes from two Supreme Court

decisions that refer to privacy rights in prisons, <u>Bell v. Wolfish</u>, 441 U.S. 529, 537 (1979) and

<u>Hudson v. Palmer</u>, 468 U.S. 517, 525-526 (1984).

> G-1.1 It is my opinion that many detainees prefer to work to escape the boredom of confinement [in] individual housing units.

> G-1.2 It is my opinion that un-sentenced detainees should not be subjected to forced labor.

> H-1.1 It is my opinion that detainee discipline is essential to maintaining safety, security, and order.

> H-1.2 It is my opinion that there is a difference between discipline (which is punitive) and classification or other housing decisions which are implemented for non-punitive management reasons.

Mr. DeLand concludes his perfectly reasonable Comment about Opinion H-1.2 with the

observation "(as the Supreme Court has ruled many times over the last 30 years)."

> H-2.1 It is my opinion that due process is not required for non-punitive segregation.

> H-2.2 It is my opinion that if a detainee is segregated for punitive reasons minimal due process is required.

> I-1.1 It is my opinion that torture or other brutality against detainees would be unacceptable and unlawful.

> I-1.2 It is my opinion that Esmor officers Slattery, Speisman, and Staley and Elizabeth facility administrators Lima and Stovall were not involved in torture or other brutality against detainees, nor did they condone such actions or acquiesced in it.

In his Comment upon Opinion I-1.2, Mr. DeLand states that he reviewed "the records at hand" and saw nothing to support a conclusion that brutality was allowed or acquiesced in by Esmor or Elizabeth administrators.  He also notes the policy manual which "is devoid of even a hint that brutality toward detainees is encouraged, condoned, or excused."  This is a totally inadequate basis for the "opinion" Mr. DeLand expresses.

> I-2.1 It is my opinion that use of force is not the equivalent of brutality and use of force is sometimes necessary to maintain or restore order.

> I-2.2 It is my opinion that force should not be applied in a brutal, sadistic, or malicious manner.

> I-2.3 It is my opinion on my review of the documents I have been provided, that there is no record of a policy or practice of excessive force.

> J-1 It is my opinion that searches are a critical element of facility security and safety.

> J-2 It is my opinion that living areas are not the equivalent of the detainees' home and cannot be afforded protection from searches.

> J-3 It is my opinion that the appropriateness of personal searches should be evaluated considering he degree of intrusion, justification for search and level of intrusion, and the manner in which searches were conducted.

The Comment to Opinion J-3 includes for support a quotation from <u>Bell v. Wolfish</u>, 441 U.S. 520, 559 (1970) but otherwise constitutes a general discussion of the objectives of, need for and problems encountered during body searches.

> J-4 It is my opinion that Esmor/Elizabeth policies and procedures for searching detainees balance the safety and security interests of the facility with interest of detainees.

2. <u>Plaintiffs' Objections</u>: Plaintiffs initially challenge Mr. DeLand's qualifications to testify as an expert.  They note, correctly, that all of his vast experience has been in the

corrections field, the detention of persons charged with, or sentenced for, criminal acts.  By way of contrast, the Esmor Facility was an INS detention center housing civil detainees awaiting hearings on their immigration status.  Mr. DeLand himself recognizes that INS detention facilities are different from criminal facilities and that INS detainees are different from criminal offenders.  (DeLand Dep. at 16:24-17:9, 317:21 - 318:2).  He acknowledges that these differences necessarily affect the policies and procedures that a facility should implement.  (Id. at 139:22 - 140:16, 142:23 - 144:9).  Mr. DeLand has no academic training or practical experience at such a facility.  Thus, Plaintiffs argue, "DeLand lacks the specialized expertise to opine on whether or not the Facility's policies and procedures were appropriate and adequate for the special needs of the detained population."  (Plaintiffs' Memo, at 3).

I conclude, however, that despite the differences between correctional and INS facilities and between their detainees, they are sufficiently comparable to enable Mr. DeLand's experience with all kinds of correctional facilities to be transferable to INS facilities.  Correctional institutions encompass a huge range of inmates.  There are those that have the most violent criminals; there are those that house youths; there are those that handle non-dangerous defendants who can be given extensive privileges both within and outside the institution; and there are those falling at all levels of security in between the extreme ranges.  Policies and procedures have to be adapted to meet each level of security, and Mr. DeLand undoubtedly dealt with them all.

INS facilities, even though they house persons involved in civil proceedings, include many persons who have been convicted of crimes, which may be the reason they are involved in deportation proceedings.  The Facility, like other INS facilities, detained not only perfectly

harmless individuals but also persons who have committed and been convicted of crimes in the past or who pose a potential danger to the staff and other detainees.  Thus, conditions in this and other INS facilities are not so dissimilar from conditions in many correctional facilities that Mr. DeLand is disqualified from expressing his opinions as to standards to be applied to places of detention, including INS facilities.  Elcock v. Kmart Corp., 233 F.3d 734, 743-44 (3d Cir. 2000). His lack of experience specifically with INS detentions centers will, no doubt, be a subject of cross-examination.

As Plaintiffs point out, however, Mr. DeLand's Report covers subjects that extend far beyond detention facility standards and about which he is clearly unqualified to testify as an expert.  He distinguishes himself from other formulators of prison standards on the basis of his knowledge of federal constitutional law.  He cites Supreme Court and Court of Appeals decisions in support of certain of his opinions, quoting snippets of the texts of opinions.  Undoubtedly in the course of his career, Mr. DeLand has heard lectures or taken courses on developing case law relating to prisons, but this in no way makes him an expert on the law of prisons.  Even if he were, it would be totally inappropriate for him to tell a jury that Supreme Court or other court decisions are a basis for his opinion.

For similar reasons, Mr. DeLand is not qualified to interpret the contract between Esmor and the INS.  He has no special expertise in contract law, and even if he did, contract interpretation is not the function of an expert in detention standards.

Plaintiffs also contend that Mr. DeLand has no medical expertise and is not qualified to give an opinion with regard to health or medical care.  As in a number of his opinions, Mr. DeLand's opinions concerning medical care are ambiguous.  He states:

17

> It is my opinion that detainees were provided medical care at the Elizabeth Facility, and that the system as described in written policies and procedures met basic medical care requirements for a correctional or detention facility.  (Opinion F-5.1).

This can be interpreted to mean that Esmor's written policies and procedures for medical care met general correctional standards for medical care in detention facilities.  If that is all that Mr. DeLand meant, he is qualified by training and experience to give that opinion.  On the other hand, if Mr. DeLand was opining that the Facility, in practice, met basic medical care requirements, he is not qualified to give that opinion.  He has not reviewed all the evidence concerning that issue and is making a factual finding (in the form of an opinion) that he is not qualified to make.

Mr. DeLand's Opinion F-6.2 is a pure medical opinion which he is unqualified to give:

> It is my opinion that limited natural light and fresh air do not prevent detainees from receiving the primary benefits of exercise.

This defect occurs quite often throughout Mr. DeLand's Report.  For example Opinion B-3.1 states:

> It is my opinion that Defendants Slattery, Speisman, Staley and Lima adopted <u>and implemented</u> adequate and competent written policies and procedures to guide staff.  (emphasis added).

To the extent that this is an opinion that the written policies and procedures to guide staff were adequate and competent to guide staff, this is within Mr. DeLand's area of expertise.  To the extent that it is an opinion that Slattery, Speisman, Staley and Lima <u>implemented</u> these adequate and competent policies and procedures, it is totally outside Mr. DeLand's area of competency and constitutes a finding of fact based on only a partial review of the record.

This defect occurs in a number of opinions concerning policies and procedures that

18

Esmor adopted.  Finding that the policies and procedures were adequate and appropriate, Mr.

DeLand suggests or states that some or all of the Defendants acted in accordance with the

policies and procedures.  There are occasions where, based on a review of a smattering of the

record, Mr. DeLand delivers an opinion that is an undisguised factual finding.  For example:

> It is my opinion that nothing in the record which I have reviewed (including the
> report of Plaintiffs' expert, Miller) would lead to a reasonable inference that
> allegedly inadequate training was the cause of any staff misconduct (Opinion B-
> 4.2).

This is inappropriate as it is based on an inadequate foundation and beyond Mr. DeLand's

competence.  <u>Bickerstaff v. Vassar College</u>, 196 F.3d 435, 449 (2d Cir. 1999).

Plaintiffs challenge the reliability of all of Mr. DeLand's opinions, not just those for

which he lacks the necessary expertise and those in which he makes factual findings in the form

of an opinion.  As stated earlier in this opinion, the Court of Appeals has listed a number of

factors to consider when determining if an expert opinion is reliable.  <u>In re Paoli R.R. Yard PCB</u>

<u>Litig.</u>, 35 F.3d 717 (3d Cir. 1994).  Most of the factors enumerated in <u>Paoli</u> are pertinent when an

opinion concerns a scientific or technical subject, e.g., testable hypothesis, subject to peer review,

known or potential rate of error, etc.  In a field such as that involved in the present cases the

experience of the expert and the confirming or negating opinions of others who are expert in the

field are reference points to which a court can look to evaluate the reliability of the expert's

opinion.

The problem in this case is that, if Mr. DeLand is to be taken at his word, there are no

experts in the field, other than himself, to which the court can turn to test the reliability of his

opinions.  All existing "detention standards reflect the agenda, philosophies, doctrines, and

beliefs of the organizations that created them; however, they do not provide the scientific or objective validation for individual provisions of the standards or even the rationale that drives each opinion."  (Opinion A-2).  Even the two standards to which Mr. DeLand gives some credence (those adopted by the American Correctional Association and those adopted by the National Commission on Correctional health Care) "are not a viable benchmark against which to determine whether a facility is being operated in a constitutional or otherwise legal manner." (Comment to Opinion A-5).

This comment reveals what it is that Mr. DeLand believes separates him from the other persons and entities that have created detention standards; "compliance with accreditation under any of these standards does not ensure that the user is compliant with constitutional or other legal requirements and does not provide a defense against prisoner-filed litigation."  By implication, Mr. DeLand believes that only his opinions do not reflect agendas, philosophies, doctrines and beliefs, and he alone can give an opinion whether a detention facility complies with constitutional or other legal standards.

As previously stated, the court concludes that while Mr. DeLand is qualified to give his opinion as to whether a detention facility meets general detention facility standards, he is not qualified to express his opinion in constitutional or legal terms.  This puts him on a par with many other creators of detention facility standards.  During the course of nearly 28 years on the bench, the court has encountered a number of such standards against which Mr. DeLand's opinions can be tested.  After the objectionable portions of Mr. DeLand's opinions and comments are deleted, the remaining portions, when tested against other detention center standards, do not constitute subjective belief or unsupported speculation and survive the test for

reliability.

To be admissible, a substantial portion of Mr. DeLand's Report must be struck and his

testimony limited accordingly.  The categories of material that must be struck are:

1.  Improper legal opinions;

2.  Improper medical opinions;

3.  Opinions setting forth factual conclusions for which Mr. DeLand did not have
a sufficient basis in the record.  Mr. DeLand listed the material on which he based
his opinion.  This included Defendant's briefs, certifications and statements of
undisputed facts.  Significantly it did not include critical depositions and record
material.  The most grievous omission was his failure to review the INS's
Elizabeth, New Jersey Contract Detention Facility Operated by Esmor Interim
Report which Mr. DeLand received but admitted that he did not use in
formulating any of his opinions concerning the manner in which the Esmor
Facility had been conducted.  There could hardly be a more reliable statement of
INS policies and procedure and findings as to what actually happened at the
Facility while Esmor managed it.  An expert's opinion based on insufficient facts
or data is unreliable. e.g., U.S. v. Tim Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004).

4.  A subset of item 3 above consists of opinions that find policy and procedure
manuals to be appropriate.  To that extent, they are permissible but they are
followed by the impermissible factual conclusion that Esmor and its officers acted
in accordance with the manuals.

5.  Opinions as to the credibility of witnesses.

In accordance with the foregoing, the following Opinions of Mr. DeLand must be struck

or limited.  His testimony must reflect these modifications of his Report:

Introduction: Part C, D and E must be deleted as stating legal opinions and an incorrect

statement as to his role in this case.

Opinions A-1 through A-5: These opinions will be deleted in their entirety.  They set

forth Mr. DeLand's opinion that, other than Mr. DeLand's standards, all national and

international detention guidelines and standards lack authoritativeness because their authors are

influenced by their philosophies, doctrines and beliefs and because ". . . these standards do not ensure that the user is compliant with constitutional or other legal requirements and [do] not provide a defense against prisoner - filed litigation" (Comment to Opinion A-1).  Mr. DeLand's opinions, on the other hand, presumably are not influenced by philosophies, doctrines and beliefs and do ensure that the user is compliant with constitutional or other legal requirements and is provided a defense against prisoner - filed litigation.  Based on his experience in the practical and real-world operational context and his understanding of the law Mr. DeLand proposes to "provide opinions relating [to] the issues/claims being litigated . . ." (Introduction at C and D).

The court has rejected Mr. DeLand's opinion that there is no other person or agency that has provided or is capable of providing expert opinions concerning the operations of correctional facilities.  Had it not done so, in all likelihood Mr. DeLand's opinions would have to be excluded in their entirety, because there would be no other professional standards against which his opinions could be judged.  His opinions would be unsupported by any objective standards and would constitute merely "subjective belief or unsupported speculation."  In re Paoli, 35 F.3d at 742.  The existence of other correctional standards saves him.

The court has also held that Mr. DeLand's opinions cannot rely upon his interpretation of the law.  Opinions A-1 through A-5 rest upon the premise that Mr. DeLand is qualified, and others are not, because of his knowledge of the law, a knowledge he gives as a basis for many of his opinions.  This too is error and a reason why Opinions A-1 and A-5 must be struck.

Opinion B-1.2: Plaintiffs object to this opinion because it concerns corporate management, an area beyond Mr. DeLand's expertise.  Mr. DeLand's wide experience running or otherwise dealing with correctional institutions qualifies him to give opinions concerning prison

22

management.  To the extent that the Comment purports to opine that in fact the Esmor management properly exercised its management facilities, it extends beyond Mr. DeLand's competence.

Opinion B-2.1: This Opinion is permissible except to the extent that the word "implement" suggests that Defendants acted in accordance with the screening and hiring practices.  The last paragraph of the Comments must be struck as argumentative and as making factual findings Mr. DeLand is not competent to make.

Opinion B-2.2: This Opinion purports to construe the INS contract with Esmor.  As such it constitutes an improper legal opinion and will be struck.

Opinion B-3.1: In reciting that Defendants adopted adequate and competent written policies to guide staff, this opinion also states the Defendants "implemented" the policies and procedures.  This is a factual finding that Mr. DeLand is not competent to make and the word "implemented" will be struck from the opinion.

Opinion B-3.5: The first paragraph of the Comment to this Opinion must be struck for the reasons that Opinions A - through A-5 were deleted.

Opinion B-4.1: This Opinion describes the training program that Defendants adopted.  It is permissible except to the extent it suggests that Defendants acted fully in accordance with the training program.

Opinion B-4.2: This is an Opinion about the ultimate factual and legal conclusion of proximate cause.  The Opinion and Comment must be struck as making an impermissible legal conclusion and factual finding on an inadequate record.

Opinion B-4.4: The Opinion is permissible, but the second paragraph of the Comment

23

cites and quotes Supreme Court opinions and must be struck.

Opinion B-4.5: This Opinion is permissible except to the extent that the word "implemented" suggests that Defendants acted fully in accordance with the training program.

Opinion B-5.1: This Opinion is permissible except to the extent that the word "implemented" suggests that Defendants acted fully in accordance with the chain of command to facilitate efficient supervision of staff members.

Opinion B-5.2: This Opinion is permissible except to the extent that the word "implement" suggests that Defendants acted fully in accordance with its evaluation system.

Opinion C-1 and C-2: The Comments to Mr. DeLand's general opinions "that many of the religion-related claims were of questionable validity" and that "some detainee claims appear to have been exaggerated" establish that the Opinions are based solely on arguments from the facts in portions of the record and casting doubt on the credibility of the plaintiffs.  This is beyond the role of an expert and these two Opinions and the Comments to them will be struck.

Opinion D-2: This Opinion also constitutes a factual finding based on an incomplete review of the record and the Opinion and the Comment will be struck.

Opinion D-5: This Opinion is permissible, but the second paragraph of the Comment constitutes a legal opinion and must be struck.

Opinion E-5: This constitutes a legal opinion as to Plaintiffs' right of access to courts and counsel based, as stated in the Comments, upon Mr. DeLand's understanding of the law and Supreme Court and Tenth Circuit Court of Appeals authority.  Thus, it is an improper opinion that must be struck.

Opinion F-2.1: The reference to the Supreme Court must be deleted from the Comment to

this Opinion.

Opinion F-3: While this Opinion, like Opinions F-2.3, F-2.4 and F-2.5, is supported by Comments that contain factual findings, Mr. DeLand balances what was reported by Plaintiffs and what Defendants asserted and presented his views based on his wide knowledge of prisons and other detention centers.  However, the last two paragraphs of the Comments to Opinion F-3 veer off into an exposition of the law.  This is beyond his area of expertise and inappropriate even if it were accurate, which it is not.  Those two paragraphs will be struck.

Opinion F-5.1: To the extent that this Opinion states "that the system [of medical care] as described in written policies and procedures met basic medical care requirements for a correctional or detention facility," it is permissible as within Mr. DeLand's area of expertise.  To the extent that it implies that Plaintiffs "were provided [such] medical care at the Elizabeth Facility," it goes beyond Mr. DeLand's area of expertise and is further based on an inadequate familiarity with the record.  To that extent the Opinion will be struck.

Opinions F-6.1 and F-6.2: These Opinions must be struck because they constitute medical opinions that are beyond Mr. DeLand's area of expertise.  Further, they are buttressed in the Comments by legal opinions supported by five Supreme Court and Court of Appeals decisions.

Opinion F-7.1: The Opinion that "privacy is inconsistent with the requirement of incarceration" can remain, but the extraordinary amount of court opinions summarized, quoted or cited in the Comments must be struck.  There can remain in the Comments the first paragraph up to the sentence that begins, "In addition to my years of experience working in the correction field, I also draw support for my opinion from Supreme Court rulings."  There can also remain in the Comments the final paragraph of the Comments.  The indented legal material coming between

25

the permitted section and the two footnotes citing Supreme Court cases must be deleted.

Opinion H-1.2: The last clause of the Comment to this Opinion (beginning "yet classification decisions . . .") must be deleted as an impermissible effort to reinforce Mr. DeLand's Opinion with Supreme Court authority.

Opinion H-2.1 and H-2.2: These Opinions are objectionable in that they are phrased in the legal terminology of "due process." This would inevitably enmesh the questioning of witnesses and embroil the jury in complex legal concepts. The Opinions may be replaced to express in laymen's terms when, in Mr. DeLand's opinion, a hearing or other procedures are appropriate and when they are not.

Opinion J-3: Because it relies on a reference to the Supreme Court and to U.S. Constitution, there must be deleted from the first paragraph of the Comment the sentence beginning, "As the Supreme Court recognized . . .", and there must be deleted the first sentence of the third paragraph of the Comments.

An order will be entered denying Plaintiffs' motion to preclude Mr. DeLand from testifying at trial but striking portions of his Report and limiting his testimony in the manner set forth in this opinion.

C. Dr. Francis Geteles:

1. The Reports: Dr. Francis Geteles, Ph.D. ("Dr. Geteles") states in her 2001 and 2006 Reports concerning Plaintiffs that she is a clinical psychologist and that she earned her Ph.D. from Columbia University in 1965. Dr. Geteles has received training in the medical detection and documentation of torture in a program jointly sponsored by Physicians for Human Rights, Columbia University, and the Bellevue Treatment Center

26

for Torture Victims, and for the past thirteen years has been working with victims of human rights abuses. She has submitted psychological expert reports to Immigration Courts in 78 asylum, stay of deportation, or T-visa cases and has testified as an expert witness in 15 of those cases. Dr. Geteles is Professor Emeritus at the City College of New York and had been the college's primary appointment in the SEEK Program, which serves under-prepared, low income, minority and immigrant students.

Dr. Geteles's 2006 Report (the "2006 Report"), which incorporates and supplements her 2001 Report (the "2001 Report"), sets forth her opinions and conclusions about the psychological effects on the Plaintiffs of the alleged abuses at the Esmor Detention Facility. Dr. Geteles's Reports and psychological evaluations are based primarily on her interviews with each of the Plaintiffs. She also refers to the Diagnostic and Statistical Manual of Mental Disorders, 4th edition ("DSM IV"); the "Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment" ("The Istanbul Protocol"); as well as numerous materials provided by the Plaintiffs' attorneys regarding submissions and decisions of the trial at hand. (2001 Report at 2).

The Reports are accompanied by detailed descriptions of Dr. Geteles's interviews and evaluations of each of the Plaintiffs. The Conclusion of the 2001 Report sets forth an overall summary of her opinion:

> In view of the above, it is my judgment that the detainees at the Esmor Detention Center under the auspices of the INS were the victims of cruel, inhuman, and degrading treatment and continue to suffer the effects of these experiences. The conditions at Esmor were sufficiently brutal to cause one detainee, who was not an asylum seeker and who did not have psychological problems when her detention

27

began, to develop such problems so that she is now suffering from PTSD and depression. The asylum seekers who had experienced severe trauma in their home countries and who already had psychological problems with symptoms of depression and PTSD or other stress or anxiety disorders as a result of those experiences, had no chance for their psychological injuries to heal and instead were re-traumatized. For most of the asylum seekers, the symptoms of psychological impairment have been increased in number and severity, have become enduring and chronic, and will likely result in permanent disabilities. Moreover, most of the Plaintiffs have developed medical problems that are related to these psychological impairments, which are also likely to have permanent effects. Thus their mental health and their physical health have been compromised by their treatment at Esmor.

(2001 Report at 19-20)

Defendants do not challenge Dr. Geteles's qualifications, her psychological diagnoses or the appropriateness of her techniques in seeking these diagnoses. Rather, Defendants challenge Dr. Geteles's bases and methodology, or lack thereof, "for offering opinion testimony regarding the causes of plaintiffs' mental conditions." (Defs. Reply Br. 6). In so doing, Defendants move to preclude Dr. Geteles from testifying pursuant to Rule 702 on the grounds that her Reports are unreliable because they are excessively dependent on self-reports of Plaintiffs as to the cause of their psychological conditions, biased, neglectful of alternative explanations for Plaintiffs' alleged injuries, and subjective and speculative.

2. Plaintiffs' "Self-Reports":  Defendants assert that because Dr. Geteles relied almost solely on her conversations with Plaintiffs and did very little additional research or analysis, her opinion is unreliable and should be excluded.

In re Paoli establishes that one applies the same reliability standard under Fed. R. Evid. 703 (applicable in this situation because the analysis is of the data underlying the

28

expert's opinion) as under Rule 702, 35 F.3d at 749. The court noted::

> Rule 703 permits experts to rely upon hearsay. The guarantee of trustworthiness is that it be of the kind normally employed by experts in the field....Nevertheless, the court may not abdicate its *independent* responsibilities to decide if the bases meet minimum standards of reliability as a condition of admissibility. *See* Fed. R. Ev. 104(a). If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded.

35 F.3d at 748 (emphasis added) (quoting In re "Agent Orange" Prod. Liab. Litig., 611 F.Supp. 1223, 1245 (E.D.N.Y. 1985)).

In re Paoli thus acknowledges the appropriateness of Dr. Geteles basing her opinions on the accounts of the Plaintiffs, even if they are unverified. The burden is on the court to analyze the bases on which the expert relied. Dr. Geteles' professional expertise equipped her to evaluate the truthfulness and accuracy of Plaintiffs' statements. Regarding other sources, Plaintiffs correctly point out that Rule 703 dictates that Dr. Geteles should not base her opinion about a patient's mental health on documents that she is not trained to evaluate (Pls. Br. 15).

For a physician's (in this case psychologist's) expert report to be admissible under Rule 703, it is sufficient that he/she examine the patient. In re Paoli, 35 F.3d at 762. Dr. Geteles and Plaintiffs' lawyers have, at a considerable expense, met this guideline for admissibility set forth in In re Paoli by having Dr. Geteles examine each of the Plaintiffs.

3.  Bias: Defendants assert that Dr. Geteles's testimony is biased. Defendants' primary illustration of alleged bias is Dr. Geteles's statement regarding the purpose of her interviews as being to discern the "psychological effects of the persecution" at the Esmor

facility. (Defs. Br. 21). Defendants contend that this is reflective of a bias because it shows a presumption of persecution at Esmor and a presumption regarding causation before the interviews ever commenced. Plaintiffs counter that Dr. Geteles's stated purpose does not indicate any presumption regarding psychological harm. (Pls. Br. 27-28).

Dr. Geteles's purpose was to evaluate the Plaintiffs, ascertain the state of their psychological health, and to give an opinion whether conditions at the facility were the cause of any impairments. This is not reflective of bias. She was not assigned the task of determining the existence of abuse at the detention center. She did, however, evaluate the Plaintiffs in anticipation of litigation regarding abuse at the facility.

Defendants' other primary example of Dr. Geteles's alleged bias is her disregard of how monetary incentives may have factored into the Plaintiffs' statements to her. (Defs. Br. 22). Defendants refer to the applicable passage from the DSM IV which states that, "[m]alingering should be ruled out in those situations in which financial remuneration, benefit eligibility, and forensic determinations play a role." (Defs. Br. Ex. D). Defendants are correct in contending that Dr. Geteles failed to specifically rule out malingering in her evaluations of any of the Plaintiffs. This might be deemed a flaw. Nevertheless, this flaw, if it be one, is not egregious enough so as to disqualify the Reports or risk misleading the jury. Defendants do not proffer sufficient reasons, either regarding Dr. Geteles's presumptions or her evaluation techniques, to warrant exclusion of any of her findings on account of bias.

4. Alternative explanations for Plaintiffs' alleged injuries: Defendants point out that there are multiple other possible causes of Plaintiffs' psychological distress "e.g.,

30

trauma suffered in their home countries, detention by the INS attendant to their attempt to illegal (sic) enter the United States, intrinsic stress of confinement, fear of deportation, current life stressors, or plaintiffs' self-interest in the litigation" (Defs. Reply Br. at 4). As an example, Defendants point to the devastating effect upon Ms. Jama of the receipt of news that her mother had died in a Kenyan refugee camp. As another example Defendants note that Mr. Anantharajah was adjusting well to life after his release from detention and his establishment of a successful business, but that his mood deteriorated after his business failed, a result he and Dr. Geteles attribute to his detention at the Esmor facility.

Defendants argue that the basis of Dr. Geteles's opinion that the conditions at the Esmor facility were the cause of Plaintiffs' psychological conditions is nothing more than the Plaintiffs' own statements that those conditions were the cause of their psychological impairments. When there are multiple possible causes of PTSD, Defendants contend, "experts must use differential diagnosis to both diagnose and "to rule out alternative causes." Paoli, 35 F.3d at 759 n.27; Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. [2d] 584, 609 (D.N.J. 2002)." (Def. Reply Br. At 8).

In Paoli, the Court of Appeals articulated a two prong test for determining whether a medical expert's opinion as to the specific source or cause of a Plaintiff's medical conditions is unreliable. The test is:

> (1) [the doctor] engaged in very few standard diagnostic techniques by which doctors normally rule out alternative causes or . . . (2) the defendants pointed to some likely cause of the plaintiff's illness other than the defendants' actions and . . . [the doctor] offered no reasonable explanations as to why he or she still believed that the defendants' action were a substantial factor in bringing about that illness.

Paoli, 35 F.3d at 760.

The Court of Appeals has recognized differential diagnosis "as a technique that involves assessing causation with respect to a particular individual." Kannankeril v. Terminix Int'l. Inc, 128 F.3d 802, 807 (3d. Cir. 1997) (citing In re Paoli, 35 F.3d 717, 758). Differential diagnosis is "the determination of which of two or more diseases with similar symptoms as the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." Kannankeril, 128 F.3d at 807.

Defendants may criticize the results of Dr. Geteles's analysis, but her methodology met the requirements of a differential analysis. She did far more than consider each Plaintiff's self report. She interviewed each of the Jama Plaintiffs for several hours twice-once in 2001 and again in 2006. The average time for each interview was approximately six hours. As Paoli requires, an expert "should seek more than a patient's self report of symptoms or illness and hence should either examine the patient or review the patient's medical records simply in order to determine that a patient is ill and what illness the patient has contracted." 35 F.3d at 762. This requirements applies equally to the determination of causation.

Dr. Geteles stated that she based her conclusion on several factors including body language, signs of appropriate effort, and consistency of Plaintiffs' narratives. This was not a situation in which Dr. Geteles relied solely on summaries of plaintiffs' physical complaints produced by employees of plaintiffs' counsel, In re TMI Litigation, 193 F.3d 613, 698 (3d Cir. 1999); or a situation in which the medical expert based his opinion on a medical history questionnaire completed by Plaintiffs without examination of plaintiffs by the expert, In re Paoli, 35 F.3d at 763; or a situation in which an expert based her opinion

32

on form statements signed by each plaintiff or plaintiffs' counsel, or both, accompanied by a checklist of symptoms, In re Agent Orange, 611 F.Supp. at 1223.

In her Reports Dr. Geteles repeatedly referred to the other causes of trauma to the Plaintiffs. Devastating experience in their countries of origin was one of them, e.g.: "Refugees, including asylum seekers, carry with them past experiences of severe oppression and trauma. They may have experienced military harassment, threats of death, the death of family or friends, imprisonment, violence, rape or other forms of abuse and torture." (2001 Report 4; see also 2001 Report at 16; 2006 Report at 25).

Dr. Geteles noted the status of detention even under benevolent conditions as a cause for stress, e.g.: "Detention centers are prisons, and share those conditions that make captivity stressful in any context: confinement and lack of freedom, including freedom from harm; loss of control over almost all aspects of one's life; separation from family members; and, the loss of social networks. (2001 Report at 5; see also 2006 Report at 23).

Dr. Geteles noted that most of the Plaintiffs suffered social and/or family problems which could be a cause of stress or the result of conditions suffered at the Esmor facility, e.g., 2001 Report at 18. She referred to business failure, which could be another form of stress.

Dr. Geteles has not, as Defendants contend, simply accepted Plaintiffs' statements that the conditions of confinement caused their present distress. She set forth her reasons for concluding that the events at the Esmor facility superseded the effects of the terrible things that may have happened to them in their home countries. (2006 Report at 24). She explains the interactions between post traumatic stress syndrome resulting from the Esmor

facility experiences and current life stressors. (2006 Report at 31-32). Dr. Stuart Grassian, Defendants' expert psychiatrist, in his expert opinion criticizes these causation conclusions and even the methods of arriving at them, but Dr. Geteles's methods meet the requirements of <u>Daubert</u> and <u>In re Paoli</u>, and it will be up to the jury to evaluate the strengths and weaknesses of Dr. Geteles's Reports.

5. <u>Subjectivity and Speculation</u> : In order to pass <u>Daubert</u> and Rule 702 muster, Dr. Geteles must elucidate the reliability of her methodology and convey to the court that her conclusions are not based on subjective or speculative reasoning. The Court of Appeals for the Third Circuit, however, employs a flexible standard in evaluating an expert's work, and it is liberalized further in consideration of Dr. Geteles's vast experience and expertise in making such psychological evaluations as those at issue in this case. <u>General Electric Co. V. Joiner</u>, 522 U.S. 136, 143 (1997); <u>Kumho Tire</u>, 526 U.S. at 141.

Defendants contend that because Dr. Geteles does not in certain instances specifically link particular tortuous activities at the detention center to particular symptoms of the diseases, her testimony is speculative and excludable. (Defs. Reply Br. 7). But unlike many of the circumstances in cases Defendants cite, issues of psycho-analysis, particularly regarding causation, are in a sense inherently subjective; thus, when evaluating reliability, a greater emphasis is placed on the psychologist's qualifications. <u>Ferris v. Pennsylvania Federation Broth.of Maintenance of Way Employee</u>, 153 F.Supp. 2d 736, 741-42 (E.D. Pa. 2001). Therefore, in the case at hand, the court need only evaluate Dr. Geteles's qualifications, whether she has discerned tortuous activities/conduct, whether she has discerned symptoms of the diseases she diagnoses, and finally whether the latter

34

symptoms could reasonably follow from the former tortuous activities/conduct.

Dr. Geteles indicates that she has specifically detected a causal connection between the alleged tortuous circumstances at the detention center and the Plaintiffs' particular symptoms of mental illness. (2006 Report at p. 31). Dr. Geteles also delineates such a connection for each of the individual plaintiffs. This analysis is sufficient to render her opinion admissible.

6. Medical Opinions: Dr. Geteles's Reports include opinions about medical conditions that affect Plaintiffs. The concluding summary of the 2001 Report states "[m]oreover, most of the plaintiffs have developed medical problems that are related to these psychological impairments, which are likely to have permanent effects." (2001 Report at p. 19).

In particular Dr. Geteles describes the medical conditions that Mr. Kenneh related to her in an October 2005 interview. In the past few years "[h]e has twice had surgery for a heart condition (which he says was diagnosed as cardiomiopathy), which he has been told by his doctor is very unusual for someone her age - i.e. 35 years old." (2006 Report at p. 90).

Further on in the Report Dr. Geteles states: "As noted above, Mr. Kenneh has had potentially life-threatening medical problems. According to the suggestions of her physician, these problems may have resulted, at least in part, from her psychological problems, which in turn stem from the extreme stresses to which he has been subjected." (2006 Report at p. 92).

This would be completely impermissible testimony. Dr. Geteles is not herself

35

qualified to give a medical opinion and she cannot testify about the medical opinions of an

unidentified physician whose qualifications are unknown and who has not been the subject

of examination by the Defendants.

The medical opinions of Dr. Geteles must be stricken.

7. Conclusion: For the reasons set forth above the Defendants' motion to exclude

the testimony of Dr. Geteles will be denied except that she will not be permitted to give

medical opinions.

D.   Dr. Lawrence Mendel: Dr. Lawrence Mendel, Acting Medical Director for the

Ohio prison system, prepared a twelve-page report (the "Mendel Report" or "Report")

dated July 31, 2006. The Report is accompanied by a six-page curriculum vitae setting

forth his experience in correctional medicine.

The Report states that Dr. Mendel, in providing his opinions and conclusions,

relies on his twenty-two years of experience in medicine, including: Staff Physician, Ohio

Reformatory for Women; Correctional Consultant, Jackie Moore and Associates; Clinical

Assistant Professor, Ohio State University; Staff Physician, Franklin County Jail;

Consultant on accreditation and operational issues, Franklin County Jail; Acting Regional

Medical Director and consultant, Central Region; Medical Monitor, Northeast Ohio

Correctional Center; Telemedicine Consultant; Medical Director, Ohio Department of

Rehabilitation and Correction; Emergency Medicine at various hospitals; and accreditation

surveyor, National Commission on Correctional Healthcare. Dr. Mendel is also a member

of three national correctional healthcare organizations and regularly attends and

participates in correctional medical conferences. Dr. Mendel has testified in five cases and

been deposed in eleven, and states that he is "familiar with the standard of care and reasonable practice of correctional healthcare." (Mendel Report 2).

1. <u>The Report</u>: Section I of the Report lists the documents upon which the Report is based, including: Dr. Steven Spencer's deposition and report on medical care at the Facility; Plaintiffs' medical records and depositions; Facility policies; the Facility contract; INS detention standards and interim report; National Commission on Correctional Healthcare (NCCHC) standards for health services in jail; and discovery excerpts.

Section II describes the clinical care Plaintiffs received, as recorded in their charts. The summaries of such care are as follows:

Jaykumar Anantharajah completed a physical exam, a tuberculosis skin test that indicated a 12 mm induration, and a chest x-ray. Dr. Mendel notes that Mr. Anantharajah "received no further tests or treatment for this condition before he departed the facility on April 17, 1995." (<u>Id.</u>).

Abu Bakar[2] completed a physical exam, which indicated dental caries and poor oral hygiene. He underwent dental treatment and received Ibuprofen and Anbesol for his pain. Mr. Bakar's tuberculosis skin test was non-reactive. Dr. Mendel states that Mr. Bakar "submitted a total of sixteen requests for medical treatment. His complaints were addressed promptly and appropriately, averaging 1.44 days for treatment after submission." (<u>Id.</u> at 3).

Hawa Abdi Jama completed a physical exam, a tuberculosis skin test that indicated

---

[2] Although Abu Bakar is also referred to as "Moussa Sacko" in the Report, the Court will refer to him only as "Abu Bakar."

a 10 mm induration, and a chest x-ray. She reported various medical concerns, including dental pain and fingernail infections, and submitted twenty-eight medical request forms. According to Dr. Mendel, "The Esmor staff appears to have been responsive to her medical concerns and she was seen on the day the form was submitted 16 times and overall within an average of 1.59 days." (Id.). After the death of her mother, Ms. Jama exhibited a "strong grief reaction," refused to eat, had difficulty sleeping and depressive symptoms, and expressed thoughts of suicide. (Id. at 4). A psychiatrist diagnosed her as having severe depression "with extrinsic factors including her detention noted as a major factor. Antidepressant medication was prescribed but Ms. Jama expressed reluctance to take medication." (Id.).

Cecilia Jeffrey[3] sought medical care for skin conditions on three occasions and received medication. (Id. at 5).

Abraham Kenneh completed a physical exam, a tuberculosis skin test that indicated a 4 mm induration, a chest film, a blood count, and a syphilis test. He underwent oral surgery and was also seen by an optometrist. Dr. Mendel states that Dr. Spencer "listed no specific criticisms of the care of Mr. Kenneh in his report except for his general comments about tuberculosis prevention and testing."  (Id. at 5).

Sahimu Nanteza completed a physical exam, a tuberculosis skin test that indicated a 20 mm induration, and a chest x-ray. She submitted eleven health requests, each of which "resulted in a prompt nurse or physician evaluation." (Id.). Dr. Mendel further

_____

[3] Although referred to as "Kou Jeffrey" in the Report, the Court will refer to her only as "Cecilia Jeffrey."

notes, "[m]edical access occurred on the same day that the form was received in nine instances, on the following day in another . . . . Average waiting time for medical care was 0.2 days." (Id.).

Dennis Raji completed a physical exam and tuberculosis skin test that indicated an 8 mm induration, but his chest x-ray "was not obtained and was not required by the prevailing practice of jails and short-term detention centers." (Id. at 5-6). Mr. Raji requested medical care on five occasions and was seen within two days of his request.

Agatha Serwaa completed a tuberculosis skin test and submitted four health requests for rash, itching, and stomach pains. Despite the policy requirement of a physical exam within fourteen days of admission into the Facility, she did not undergo a physical examination. However, Dr. Mendel opines that Ms. Serwaa had regular access to the medical staff and that "the lack of a few physical exams would not prevent the facility from receiving accreditation if it had been sought and does not constitute deliberate indifference." (Id. at 9).

Sarah Tetteh completed a physical exam but no tuberculosis skin test, which she completed at another facility. She sought medical care on various occasions for itchy skin, pimples, and a boil.  Dr. Mendel states that her records "demonstrate repeated episodes of timely and appropriate care."  (Id.).

Section III of the Report summarizes the healthcare issues Dr. Spencer raised in his two reports and addresses his criticism of Plaintiffs' inadequate medical treatment. Dr. Mendel points out that Dr. Spencer's claims do not reference specific detainee cases and are not supported by evidence of alleged harm.

39

With regard to tuberculosis screening, Dr. Mendel maintains that "published testing standards consider 10 mm to represent a positive test and an indication for a chest x-ray." (Id. at 7). He concedes that various medical conditions may necessitate a chest film, but notes that "there is no indication that any of these medical conditions applied in any of the cases cited by Dr. Spencer in his report." (Id.).

In response to Dr. Spencer's criticism of the absence of HIV testing for detainees with reactions to their tuberculosis skin tests, Dr. Mendel states that such testing was not required by accrediting bodies such as the NCCHC and ACA, and was not routine practice in jails until the end of 1996. (Id.).

The Report also addresses Dr. Spencer's criticism of the lack of Isoniazid (INH) treatment, which may increase the lifetime risk of tuberculosis. Dr. Mendel explains that since a patient must undergo at least six months of INH therapy, such treatment was rarely initiated in jails and not required by the accrediting agencies in 1994 or 1995. In addition, he notes that the Facility was "a short-term detention facility and this was undoubtedly a factor in their decision not to provide this therapy." (Id.). Dr. Mendel further states that the greatest risk of developing tuberculosis occurs in the first two years after exposure, if preventive treatment is not administered.

With regard to dental treatment at the Facility, Dr. Mendel opines that "Motrin and other non-steroidal anti-inflammatory medications are the most widely used medications for dental pain and represent the standard of care for most dental conditions. . . . these agents yield effective pain relief equivalent to Tylenol with codeine . . . ." (Id.).

In response to Dr. Spencer's claim that Mr. Bakar's dental condition "was probably

deserving of something stronger than Tylenol and Motrin for relief," Dr. Mendel notes that Mr. Bakar had received Anbesol and did not require stronger medication. (Id. at 8). He also states that Mr. Bakar's dental appointment "was completed within a timeframe comparable to, or better than most detention facilities and in fact is well within the access timeframe for non-incarcerated individuals in the general community." (Id.).

The next section of the Report discusses the clinical care of Ms. Jama. In discussing her depression, Dr. Mendel argues that her "records and subsequent course are more consistent with a grief reaction that was self-limited" and that the Facility medical staff responded "with supportive measures and psychotropic medication." (Id.). Ms. Jama later visited a psychiatrist when her symptoms worsened, but refused to take medication. In response to the claim that Ms. Jama should have been sent to a psychiatrist sooner, Dr. Mendel states that Dr. Spencer neither explains "how the earlier referral would have changed her unwillingness to take a prescribed medication," nor addresses the "strong role of extrinsic factors that were cited by a psychiatrist as a major factor in her condition." (Id.). He dismisses Dr. Spencer's claim that the Facility displayed "a gross degree of systemic indifference to mental health problems" and that the detainees had a high rate of mental illness. (Id. at 9).

The Report next assesses the existence of mental illness at the Facility. Dr. Mendel dismisses Dr. Spencer's opinion that depression was a pervasive problem among detainees. Dr. Mendel states in particular, "[w]hile a prevalence of depression of 40% is

claimed, none of the 79[4] health request forms sought mental health treatment and even complaints that could be reflect [sic] somatic complaints represent only eight of the forms submitted." (Id.).

Dr. Mendel states that the hours of physician coverage exceeded NCCHC guidelines for physician staffing, response to sick calls was timely, the physicians followed immunization recommendations, and Plaintiffs' charts did not reveal any chronic medical illnesses.

Section IV of the Report describes favorably Plaintiffs' medical treatment at the Facility. Dr. Mendel uses the words "timely," "appropriate," and "effective" to describe the medical care, and states that "facility residents were evaluated by a nurse in an average of 1.24 days after submitting medical requests. Cases referred to a physician were seen in 1.9 days on average." (Id. at 10). He further opines that "[m]edical care was provided in a manner consistent with accreditation standards." (Id.).

Section IV also describes the terms of the 1994 contract between the Facility and INS. According to Dr. Mendel, the contract required that medical care comport with 1992 NCCHC standards and that the Facility monitor "infectious and communicable disease among inmates." (Id. at 11). However, the contract did not require the Facility to conduct HIV testing, INH preventive treatment, counseling, or tuberculosis testing to become accredited. With regard to the latter, Dr. Mendel states that every Plaintiff "had documentation of a timely TB test result and every individual with a positive result

---

[4] Although the parties refer to seventy-eight medical request forms, Dr. Mendel states in his Report that he analyzed seventy-nine forms of the nine plaintiffs.

completed a chest x-ray within one week of arrival, averaging 6.25 days and written documentation was obtained of a negative result in every case." (Id.).

Dr. Mendel concludes in Section V that Plaintiffs received "timely and appropriate access to medical care" and treatment "consistent with applicable correctional standards." (Id.). Plaintiffs "waited an average of 1.24 days to be evaluated by a nurse" and the overall tuberculosis screening program "would have required few changes to achieve full accreditation." (Id.). Finally, Dr. Mendel opines that treatment different than that which Plaintiffs received would not have "substantially altered the outcomes in these cases." (Id.).

2. <u>Discussion</u>: In the present case, Dr. Mendel is clearly qualified to provide an expert opinion regarding the medical care of detainees at the Facility. Dr. Mendel is a physician with twenty-two years of experience in correctional medicine (Mendel Report 1). He has worked for over eleven years as a medical director for the Ohio prison system, has produced four publications regarding correctional medicine, and regularly attends correctional medical conferences. (Id.). Dr. Mendel has also previously testified in five cases, and is familiar with the standard of care and reasonable practices of correctional healthcare, including NCCHC and ACA accreditation standards. (Id. at 2). Given his extensive curriculum vitae focusing on correctional medicine, Dr. Mendel satisfies the first admissibility requirement of Rule 702.

Plaintiffs do not dispute the qualifications of Dr. Mendel, but rather move to prohibit him from testifying as to certain statements made in his expert report. In particular, they seek to preclude on grounds that: (1) Dr. Mendel's conclusions regarding

43

the overall quality of Esmor medical services are drawn from a non-representative sample;

and (2) Dr. Mendel's statistical analysis could potentially mislead and confuse the jury.

(Pls. Br. 3). Plaintiffs list the particular conclusions from the Report they find

objectionable:

> On average, facility residents were evaluated by a nurse in an average of 1.24 days after submitting medical requests. Cases referred to a physician were seen in 1.9 days on average. . . . Medical orders were consistently completed as ordered within an acceptable timeframe. . . . The large volume of medical encounters on a timely basis . . . provides incontrovertible evidence of an effective healthcare system that directly contradicts the claims of systemic deficiencies. . . . [T]he records in this case demonstrate timely and appropriate access to medical care and medical treatment consistent with applicable correctional standards. Requests for care were promptly processed and detainees waited an average of 1.24 days to be evaluated by a nurse.

(Mendel Report 10-11). Plaintiffs contend that Dr. Mendel's statistical analysis is

unreliable and lacks the "standards to control the techniques and operations," In re Paoli,

35 F.3d at 740 n. 8, because Dr. Mendel's conclusions about the general quality of Esmor

medical care are not drawn from a randomly selected sample. (Pls. Br. 4).

To evaluate the effectiveness of the Esmor medical staff, Dr. Mendel analyzed

seventy-nine medical request forms drawn solely from the nine plaintiffs. (Mendel Dep.

168:25, 169:1-4; Mendel Report 9). Plaintiffs argue that since "78 forms for 9 individuals"

do not represent all forms submitted by the 1600 detainees at the Facility, Dr. Mendel's

conclusions about the general quality of Esmor medical care are flawed and therefore

excludable. (Pls. Br. 6).

Plaintiffs claim that Dr. Mendel engaged in "convenience sampling": the selection

of items for a sample because they are easy to obtain rather than representative of the

whole population. (Pls. Reply Br. 4). They contend that Dr. Mendel's sample "consisted

solely of those forms that it was easy for him to obtain rather than those randomly selected

from all of the medical request forms submitted by detainees during the operation of the

Facility." (Pls. Br. 7). Plaintiffs argue that since it is impossible to know how the results

from this non-randomly selected sample will compare to the results of the overall detainee

population, Dr. Mendel's use of convenience sampling is unreliable. (Pls. Reply Br. 2).

In addition, Plaintiffs maintain that Dr. Mendel's analysis is flawed because his

sample size is too small to generate reliable statistics. They cite Int'l Bhd. of Teamsters v.

United States, 431 U.S. 324, 339 n. 20 (1977), for the proposition that an inadequate

sample size may detract from the value of statistical evidence, and State v. Harvey, 151

N.J. 117, 291 (N.J. 1997), which provides that small sample size does not represent, to a

certainty, the actual population.

Plaintiffs further contend that Dr. Mendel's statistical analysis fails to account for

similarities between the Plaintiffs that the general detainee population did not share, such

as the Plaintiffs' lengthier stay at the Facility. (Pls. Br. 8). Such differences among the

detainees, according to Plaintiffs, are relevant to both the speed and level of medical care

at the Facility. (Id.).

Defendants' primary argument is that Plaintiffs' challenge to Dr. Mendel's

conclusions is a weight rather than an admissibility issue, and that admissibility requires

only that the methodology in formulating the expert opinion is reliable. (Defs. Br. 4).

Defendants claim that Dr. Mendel's methodology of taking a sample is scientifically

45

accepted in the field of statistics. (Id. at 2). They maintain that seventy-eight medical

requests constitutes a valid sample size, especially "given Plaintiffs' relatively lengthy

stays at the Facility." (Id. at 7). Dr. Mendel himself testified that "evaluation of more than

30 health care request forms would have been sufficient to establish internal validity."

(Mendel Dep. 169:17-20.)  In response to Dr. Mendel's supposed convenience sampling,

Defendants assert that any potential bias arising from the size of Dr. Mendel's sample

would favor the Plaintiffs, given their lengthy stays at the Facility and dissatisfaction with

their medical care (Defs. Br. 5), and the fact that  the medical staff would take longer to

respond to Plaintiffs' medical requests than they would for the average detainee. (Pls.

Reply Br. 5-6).

    The Supreme Court has recognized that samples may qualitatively be too small to

yield reliable statistical evidence. See Mayor of Philadelphia v. Educ. Equal. League, 415

U.S. 605, 620-21 (a sample of only 13 people cannot generate significant findings); United

States v. Landsdowne Swim Club, 713 F. Supp. 785 (E.D. Pa. 1989) ("The Supreme Court

has recognized that small sample size may detract from the value of statistical evidence.

The danger posed by small samples is that they may produce short-term results that would

not hold over in the long run."). However, some statisticians have asserted a rule of thumb

that "a sample size numbering thirty provides stable statistics." J. Loewen, Social Science

in the Courtroom 222 (1982). Applying this rule, Dr. Mendel's use of seventy-nine

medical request forms submitted by the nine plaintiffs is a sample sufficiently sized to

have probative value. Since each request form represents an independent occurrence, each

bears independent statistical significance. Dr. Mendel could arguably have collected a

larger sample size from the 1600 detainees, but the court in Boehringer has concluded that surveys need not be excluded if they do not randomly draw samples from the entire universe. Boehringer Ingelheim G.m.b.H. v. Pharmadyne Labs., 532 F. Supp. 1040, 1054 (D.N.J. 1980) (emphasis added).

Further, Plaintiffs have not shown that Dr. Mendel's methodology of taking a sample is scientifically flawed. Instead, they focus on their disagreement with the conclusions he generated from his sample. The Supreme Court in Daubert has stated that the focus of the inquiry should be solely on principles and methodology, not on the conclusions that they generate. Daubert, 509 U.S. at 596. Regardless of whether Dr. Mendel's conclusions were correct, his methodology was reasonably reliable.

Defendants correctly state that Plaintiffs' challenges to the accuracy of Dr. Mendel's conclusions go to the weight of the evidence. Indeed, courts have recognized that minor methodological errors affect the weight given the survey's conclusions, rather than to their admissibility as evidence. J & J Snack Foods, Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 369 (D.N.J. 2002) ("Methodological deficiencies in a survey generally relate to the weight given the survey's conclusions rather than to its admissibility"). The judge should only exclude evidence if the flaw is large enough that the expert lacks "good grounds" for his conclusion. Daubert, 35 F.3d at 746 n. 19.

In the present case, Dr. Mendel has committed no major errors in his methodology. He uses the scientifically accepted technique of sampling to draw general conclusions about Esmor medical services, his sample size of seventy-nine forms is adequate, and he bases his conclusions on sound review of Plaintiffs' deposition transcripts, the INS interim

report, and NCCHC accreditation standards. Dr. Mendel's statistical data is of a type reasonably relied upon by experts, and will aid the jury in making factual determinations. Plaintiffs may challenge the weight of Dr. Mendel's conclusions by cross-examination at trial, but his methodology is reliable and his opinion will not be excluded.

Plaintiffs' second argument to preclude Dr. Mendel from testifying is that his statistical analysis could potentially confuse or mislead the jury. They assert that Dr. Mendel's conclusion that Plaintiffs were medically evaluated an average of 1.24 days after submitting medical requests is not probative, since the data shows that "95% of the time, the Esmor nurses' response time to medical complaints could be anywhere from 0 to 6 days, and, in fact, could be as much as 15 days." (Pls. Br. 13). According to Plaintiffs, average response times can mislead the jury into believing that they represent the usual response times. (Pls. Reply Br. 7). Plaintiffs additionally claim that Dr. Mendel's explanation of the high variance of data would confuse the jury because the concepts of standard deviation and data variability are difficult to explain, (Pls. Br. 14), and because Dr. Mendel is a doctor, not a statistician trained to interpret and explain statistical analysis. (Pls. Reply Br. 8).

Defendants maintain that Dr. Mendel's conclusions will not confuse the jury. They contend that if anything, it is imperative that Dr. Mendel explain standard deviations, averages, and other statistics; otherwise, his evidence would be "meaningless, confusing, and irrelevant." (Defs. Br. 11, citing Wingfield v. United Tech. Corp., 678 F. Supp. 973, 983 (D. Conn. 1988)). Defendants point out that Plaintiffs offer no support for their conclusion that statistical information will be difficult to communicate effectively to the

jury. (Id. at 12).

Plaintiffs' attempt to preclude Dr. Mendel's statistical analysis on grounds that it would confuse or mislead the jury is baseless. Courts increasingly feel comfortable evaluating statistical testimony and consequently exercise their judgment in assessing the probative value of sampling evidence. See, e.g., Int'l Bhd. of Teamsters v. United States, 431 U.S. 324 (1977); J & J Snack Foods, Corp. v. Earthgrains Co., 220 F. Supp. 2d 358 (D.N.J. 2002); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 129 F. Supp. 2d 351 (D.N.J. 2000). Courts "cannot exclude a scientific technique as too confusing and overwhelming simply based on its conclusion that scientific techniques . . . confuse and overwhelm the jury. There must be something about the particular scientific technique such as its posture of mythic infallibility that makes it especially overwhelming." United States v. Downing., 723 F.2d 1224, 1239 (3d Cir. 1985).

In the instant case, Dr. Mendel's statistics are a necessary aspect of his evaluation of Plaintiffs' medical care at the Facility; if explained appropriately, his data would assist rather than confound the jury. Plaintiffs' statement that Dr. Mendel is a doctor, not a statistician, bears no significance to their argument to exclude Dr. Mendel's testimony on grounds that statistics would mislead or confuse the jury. Statistics are an integral part of the medical school curriculum, and Dr. Mendel himself used numerous statistical measures when he was a medical director. (Mendel Dep. 168:9-13). Dr. Mendel's statistical analysis does not fall short of Daubert standards of evidentiary reliability and is therefore admissible.

49

E. Stuart Grassian, M.D.: Dr. Stuart Grassian ("Dr. Grassian"), a Board-certified psychiatrist, prepared a forty-eight-page report (the "Report") concerning the psychological issues in the case with respect to the Plaintiffs.  He states that he has "substantial experience in evaluating the psychiatric status of individuals in confinement, and in evaluating the psychological effects of such confinement."  (Report 1).  Attached to the Report are a list of documents that Dr. Grassian reviewed and an eleven-page curriculum vitae ("C.V.") which sets forth his extensive education and experience in the field of psychiatry.

According to Dr. Grassian's C.V., he is licensed to practice medicine in the Commonwealth of Massachusetts and received his B.A. from Harvard University, his M.A. in sociology from Brandeis University, and his M.D. from New York University School of Medicine.  In addition to serving as a clinical instructor in psychiatry at Harvard Medical School for over twenty-five years, Dr. Grassian has been in private practice in psychiatry since 1977 and has practiced at several other treatment facilities.  Dr. Grassian has several board certifications in psychiatry and has served as a consultant and board member to multiple organizations with respect to his knowledge in the field of psychiatry and correctional facilities.  He is a member of several professional psychiatric societies, has had multiple teaching appointments, and has conducted numerous scholarly and media presentations.  Dr. Grassian's C.V. states that his major interests in forensic psychiatry include: (1) psychiatric effects of solitary confinement; (2) strip search procedures, sexual and physical assault; (3) addictive disorders; and (4) civil rights issues.

The list of documents that Dr. Grassian reviewed include: (1) Reports on Health

Care at Esmor of Steven Spencer, M.D.: (2) Reports of Frances Geteles, Ph.D. dated May 30, 2001 (the 2001 Report") and March 30, 2006 (the "2006 Report"); (3) Report of Penologist E. Eugene Miller; (4) Report of R.W. Powitz and Associates; (5) Interim Report of INS regarding Esmor Detention Facility; (6) Esmor medical record of Abdi Hawa Jama; (7) contract between INS and Esmor; (8) Medical Policies and Procedures governing Esmor detention; (9) depositions of Plaintiffs, Abu Bakar, Jeyakumar Anantharajah, Abraham Kenneh, Dennis Raji, Abdi Jama, Agatha Serwaa, and Cecilia Jeffrey; (10) deposition of Frances Geteles, Ph.D. dated May 30, 2006; (11) several statements of facts by the parties from 2003 and 2004; and (12) Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment dated November 26, 2003.

1.  The Report:  In the Report, Dr. Grassian states that he was asked to review the 2001 and 2005 reports of Frances Geteles, Ph.D. ("Dr. Geteles") and other documents and offer his feedback regarding the opinions expressed in the reports.  (Report 1).

Dr. Grassian begins his analysis by adopting Dr. Geteles's accounts of non-disputed factual assertions as to the Plaintiffs' histories.  (Id. at 1-2).  He describes these non-disputed facts as follows: (1) all but one Plaintiff arrived in the U.S. with invalid or falsified documents; (2) all but one Plaintiff came to the U.S. seeking political asylum, and many were ultimately adjudicated to have had a legitimate fear of persecution if returned to their native country; (3) however, at the time of their arrival in the U.S., the veracity of their claims had not yet been adjudicated; (4) as a result, they were arrested by the INS and placed in Esmor pending judicial review of their application for asylum.  (Id. at 2).

51

The Report does not attempt to independently evaluate the Plaintiffs' psychological conditions, and in fact, Dr. Grassian never interviewed or otherwise examined the Plaintiffs.   Rather, the Report criticizes and attacks Dr. Geteles's methodology in reaching her conclusions regarding the cause of Plaintiffs' psychological disorders.  Specifically, the Report finds that Dr. Geteles's findings are flawed and unreliable because she failed to distinguish between the many possible causes of Plaintiffs' psychological distress, in particular, the trauma each experienced in their home countries before traveling to the United States.  Additionally, Dr. Grassian criticizes Dr. Geteles for accepting, as fact, allegations about the conditions at Esmor and ignoring undisputed evidence which contradicts her assertions.

### a.  Plaintiffs' Trauma Prior to Arriving in the United States

Citing portions of Dr. Geteles's 2001 Report, Dr. Grassian first notes that it appears that many of the Plaintiffs arrived in the United States after having suffered severe trauma in their native country.  (Report 7).   Dr. Grassian also points out that Dr. Geteles emphasized that Plaintiffs's sudden and indefinite detention caused the Plaintiffs to suffer additional trauma upon there arrival in the United States.  Dr. Grassian states that despite these two traumatic events, "Dr. Geteles appears oblivious to the fact that the decision to arrest and detain the plaintiffs was made by the INS, and that Esmor had absolutely no input into these decisions."  (Report 8-9).

### b.  Medical Care at Esmor

In the Report, Dr. Grassian states that although Dr. Geteles and Dr. Spencer, the Plaintiffs' medical expert, complain about conditions, policies, and procedures at Esmor, it

is not clear whether the Plaintiffs' descriptions of those conditions are accurate.  (Id. at 9).

Dr. Grassian provides two examples regarding Plaintiffs' medical care.

First, Dr. Grassian points to the care provided to Plaintiff, Abu Bakar ("Bakar"),

for an abscessed tooth.  Dr. Grassian notes that in Bakar's interview with Dr. Geteles,

Bakar claimed that he had to wait an excessive amount of time ro receive dental care, and

that the Esmor staff were indifferent to his suffering.  (Id.).  Dr. Grassian states in his

Report, that despite this claim by Bakar, the record shows that: (1) Bakar's dental problem

was noted by staff on the day he arrived at Esmor; (2) he was seen by a facility physician

the next day, August 5, 1994; (3) a request was placed to the INS to allow for a dental

consultation; (4) Bakar continued to be seen in clinic everyday until a dental consultation

was approved by the INS; (5) after approval, an appointment was scheduled and

transportation was arranged; (6) Bakar saw a dentist and the tooth was extracted on August

9, 1994.  (Id.).  Dr. Grassian states that the record shows the Esmor staff did all they could

for Bakar by giving him Ambusol and over-the-counter pain killers.  (Id. at 9-10).

Second, Dr. Grassian states that although Dr. Geteles argues that Esmor was

indifferent to Hawa Abdi Jama's ("Jama") psychiatric difficulties, especially her

depression, the record reveals that the Esmor staff and its site manager, Willard Stovall

("Stovall"), made great efforts to help her.  (Id. at 10).  Dr. Grassian states that after

Jama's November 1994 hospitalization, the medical record suggests that her psychiatric

status was stable until February 1995, when she heard bad news about her family in Kenya

and was informed of delays in her judicial proceedings.  (Id.).  He states that when it

became clear she was still depressed, Stovall made a request that an outside psychiatrist be

brought in; the psychiatrist saw Jama and prescribed her the anti-depressant medication

Zoloft, which Jama refused to take.  (Id.).  Dr. Grassian also points out that Stovall's

mother came in to provide emotional support to Jama and that Stovall noted that Jama was

smiling one day.  (Id. at 10-11).  Dr. Grassian concludes that "[i]nstead of demonstrating

indifference, Ms. Jama's situation clearly demonstrates both the willingness of Esmor to

bring in outside professional help and also a deep concern for Ms. Jama shown by the head

of the Esmor facility.  (Id. at 11).

c.  Conditions at Esmor

Dr. Grassian's Report states that Dr. Geteles "appears to uncritically accept a

sweeping proposition - that plaintiffs' allegations are accurate that there was a systematic

pattern of abuse and indifference manifest in the practices at the Esmor facility."  (Id.).  He

further contends that this assumption "is actually a factual predicate for her conclusion that

the Esmor experience was terribly traumatic and frightening for the detainees."  (Id.).  Dr.

Grassian states that there is dispute regarding many factual issues concerning the

conditions at Esmor "as well as issue regarding the locus of responsibility and authority

for structural and policy decisions governing immigrant detention at the facility."  (Id. at

12).

Dr. Grassian uses the quality of the food at Esmor as an example.  (Id.).  Dr.

Grassian states that although plaintiffs endorse the proposition that the food was spoiled,

rotten, and unhygienic, Defendants vigorously dispute this allegation and the record

reveals at least one fact that would contradict plaintiffs' allegation: the INS Interim Report

notes that the same food which was provided to the detainees was also offered to the

Esmor staff, who were required to pay for their meals.  (<u>Id.</u>).  Dr. Grassian opines that in

this example and others, Dr. Geteles fails to conduct a differential diagnosis and states that

"an expert must consider the full range of possible explanations of a claimant's statement .

. . the expert must seek evidence from sources <u>other</u> than the claimant's statements."  (<u>Id.</u>

at 13).  Dr. Grassian adds that "the convincing evidence that Esmor staff were paying to

eat the same food which was served to the detainees decisively contradicts the plaintiff's

assertion of systematic indifference to the freshness of food of the hygienic standards used

in its preparation."  (<u>Id.</u>).

Dr. Grassian contends that allegations of theft by Esmor staff are another example.

Dr. Grassian opines that while the records provide some evidence of a few instances of

theft, "the records do not demonstrate a systematic pattern of indifference toward this

problem."  (<u>Id.</u>).  Dr. Grassian states that "[t]o the contrary, contemporaneous records

actually support the assertion that . . . Stovall[ ] was quite concerned about the issue, and

confronted in writing the night shift supervisor, whom he felt had some involvement or

responsibility in the thefts."  (<u>Id.</u>).

Finally, Dr. Grassian opines that "Dr. Geteles accepts uncritically the reports by

detainees that they were physically or sexually abused by Esmor staff, and by accepting all

these reports as valid, she concludes that there was a pervasive pattern of abuse at Esmor."

(<u>Id.</u> at 14).  Dr. Grassian contends that the fact that Plaintiffs are in a lawsuit would tend to

bias there memory and reporting and that the fact that they were victims in their homeland

would "inevitably predispose them to be overly vigilant to the possibility of abuse, and

over identify situations as situations of abuse."  (<u>Id.</u>).  Dr. Grassian reiterates his view that

Dr. Geteles again "accepts uncritically the plaintiffs' claims, while ignoring other explanations– failing to examine the "differential diagnosis."  (Id.).

d.  <u>Causation</u>

In the Report, Dr. Grassian states that although it is "inherently difficult to disentangle all the factors which might have contributed to causing" Plaintiffs' psychological harm, "the most obvious factor of all is the trauma . . . [they] experienced in their native land, prior to their arrival at Esmor."  (Id.).  Dr. Grassian adds:

> Moreover, this task is made more complex because not only are the interviewed former detainee plaintiffs in a lawsuit, but also, as Dr. Geteles herself recognizes, trauma victims are hyper-sensitive–all too prone to react to new situations as though they were akin to the traumas of the past.  In the face of this difficulty, Dr. Geteles at times resorts to virtually arbitrary attribution of cause.

(Id. at 14-15).

Before addressing each individual Plaintiff, Dr. Grassian concludes, in part, the following:

> There is in the records at least evidence that the Esmor facility was indeed envisioned as a short-term housing facility.  The detainees' lengthy detention there, and the indefinite nature of that detention, must have contributed greatly to their distress and frustration.  In addition to the length of detention, there may well have been some

56

instances at Esmor of staff abuse towards detainees; probably that evidence applies especially to a few individuals on the night shift. There may well have been some instances of undercooked food. There may have been structural problems with the facility, especially when it was used to house detainees for prolonged period of times [sic]. But systematic abuse and indifference? The evidence clearly suggests the opposite. What is not in dispute is that almost universally, the Esmor detainees had experienced severe trauma prior to their arrival at the facility, and that their arrest and detention immediately upon arrival in the United States, along with their consequent fear of deportation, were terrible and frightening shocks. And, clearly the fact of arrest and detention was very difficult, especially so because the detainees were apparently unprepared for it. These stressors were enormous, and certainly would cause many or most of them to suffer severe psychological harm. The plaintiffs attempt to assert that conditions of confinement over which Esmor had control were so egregious and traumatic as to add substantially to that harm. Their experts fail entirely to establish these propositions.

(Id. at 16-17).

Finally, Dr. Grassian's Report criticizes Dr. Geteles's opinions with respect to each Plaintiff and opines that "[t]he deficiencies of Dr. Geteles's report are highlighted in her

57

evaluations of the *Jama* plaintiffs." (Id. at 17).  With respect to almost every Plaintiff, Dr.
Grassian concludes that "there is simply no evidence to support the proposition that
particularities of his conditions of detention at Esmor created any meaningful additional
harm."[5]  (Report at 27, 31, 34, 38, 40, 42, 44-45, 47).

 2. Plaintiffs' Objections: In Plaintiffs' ninety-one-page brief, they assert a plethora of
arguments why Dr. Grassian should be precluded from testifying as an expert.

a. Qualifications

 Plaintiffs challenge Dr. Grassian's qualifications as an expert and contend that he is
unqualified because: (1) he has no basis upon which to evaluate the cause of Plaintiffs'
psychological conditions or to critique Dr. Geteles's findings; and (2) his report and testimony
are filled with extensive discussions about topics he is not qualified to address.

 First, Plaintiffs contend that because he failed to examine Plaintiffs,  he is not qualified
to testify about the causes of Plaintiffs' "psychological suffering."  (Pls.' Br. 7).  Plaintiffs
argue that "[a] medical expert must either examine a patient or review that patient's medical
records.  (Id. at 8 (citing Paoli, 35 F.3d at 762)).  Plaintiffs argue that throughout the Report,
Dr. Grassian reaches the "unsupportable psychological conclusion" that "there is simply no
evidence to support the proposition that particularities of his conditions of detention at Esmor
created any meaningful additional harm."  (Pls.' Br. 11).

 In addition, Plaintiffs list several portions of the Report which Plaintiffs characterize as
"unsupportable findings":

---

  [5]Although the language of each conclusion is not identical to the one quoted, the
similarity in each statement makes the recitation of each unnecessary.

58

Hawa Jama

- "First of all, there is no evidence presented that Ms. Jama was decompensating at Esmor prior to hearing of her mother's death.  In fact, her record suggests that during the first two months of her detention at Esmor, Ms. Jama's psychological status apparently did not markedly change, though possibly it improved a bit; she began to "connect with the other girls" and took a job in the facility laundry." (Report 19).

- "Her mother's death was clearly a terrible blow, leaving her orphaned and bringing back all the deaths and traumas she had experienced before she arrived in the United States. The evidence clearly points to the conclusion that Ms. Jama's suffering was a product of the traumas she had experienced prior to her arrival in the United States, rather than being a product of conditions of her detention at Esmor."  (Id.).

- "Clearly, such instinctive reactions must have caused her to greatly fear the Esmor staff without the staff having done anything to her.  Entering the facility with such a fearful and biased mindset, it would not be surprising to find her over identifying situations at Esmor as intimidating or

59

abusive."  (<u>Id.</u> at 20).

- "And while Ms. Jama apparently believes that the Esmor staff was punitive in its response to her suffering, the medical record strongly suggests otherwise - that Esmor staff appear to have been quite empathic in their response to her."  (<u>Id.</u>).

- "This contemporaneous memo [written by Stovall] thus not only evidences that Ms. Jama was <u>not</u> emotionally deteriorating prior to hearing about the judicial delay, but also evidences an attitude of caring about her welfare by Esmor staff."  (<u>Id.</u> at 22).

- "Ms. Jama claims that her psychological distress is primarily a response to the conditions she experienced at Esmor, rather than a product of all the horrors she had experienced before her arrival in the United States.  It is almost a grotesque assertion."  (<u>Id.</u> at 23).

- "Dr. Geteles' report states that Ms. Jama can 'barely talk about what happened in Somalia.  At the slightest question, she began crying and could not stop.' . . . This is consistent with my opinion that any psychological damage that Ms. Jama sustained was the result of events extrinsic to her detention at Esmor . . . ."  (<u>Id.</u> at 24).

Abu Bakar

- "Over the years of this litigation, Ms. Jama apparently came to believe increasingly that Esmor was the major cause of her emotional problems.  The same is true of Mr. Bakar.  He even came to magnify his perception of how impaired he in fact was after his release from detention."  (Id. at 26).

Jeyakumar Anantharajah

- "Given both Mr. Anantharajah's strong adjustment to life after his release from confinement, and also the content . . . of the psychological burdens which he was still carrying at the time of the 2001 Geteles interview, it would seem quite clear that Mr. Anantharajah had no supportable claim of psychological harm as a result of the detention conditions at Esmor."  (Id. at 29).

- "Dr. Geteles re-interviewed Mr. Anantharajah in 2005, and as was the case with Ms. Jama, by 2005 Esmor had morphed grotesquely in Mr. Anantharajah's mind into the greatest source of his psychological problems."  (Id. at 30).

- "Now, clearly here Mr. Anantharajah's anger at 'Esmor' is actually anger at the entire 29 ½ months of his life which he

wasted in U.S. jails, not just that relatively small part of his

detention which was spent at Esmor: 'Mr. Anantharajah

says that he thinks a lot about his experiences at Esmor

because it was the start of a horrible period of 29 ½ months

in jails here in the United States.'"  (Id.).


Abraham Kenneh

• "First, [Dr. Geteles] offers Mr. Kenneh's report to her that

he began having suicidal thoughts while housed at Esmor.

Yet, even if this is an accurate report, it does virtually

nothing to establish causation.  After all, before arrival in

the United States, Mr. Kenneh was scared for his life.  His

time in detention–no matter what the conditions of

detention–would undoubtedly given him much time to

reflect on the catastrophic losses he had suffered.  (Id. at

36-37).


Shamimu Nanteza

• "Ms. Nanteza arrived in the United States in a terrible state

of fear and despair.  Immediately she was placed in

detention, where she had little to do besides remember the

pain and horror of what she had just experienced in

Uganda.  Almost inevitably, her experience at Esmor would

become contaminated by traumatic memories of her past."

(Id. at 40).


Sarah Tetteh Yower

•        "By the time of the follow-up interview in 2005, Ms.

Yower apparently declared to Dr. Geteles that 'the changes

in her personality, which had resulted from her experiences

at Esmor, are still part of her . . .'  How does Ms. Yower

reach this medical conclusion about causation?"  (Id. at 47).


Plaintiffs argue that "Paoli dictates that because Dr. Grassian did not consult medical

reports or examine Plaintiffs, he was not qualified to make any of the above listed evaluations

or other assessments of the causes of Plaintiff's psychological suffering."  (Pls.' Br. 14).

Plaintiffs seek to exclude his testimony in its entirety.

In Paoli, the Third Circuit Court of Appeals distinguished between the requirements

for a doctor evaluating the cause of an illness and what illness the patient is suffering from.

As to causation, the Court held that "the opinion of a doctor who has engaged in few standard

diagnostic techniques should be excluded unless the doctor offers a good justification for his

or her conclusion . . . ."  35 F.3d at 761.  In distinguishing causation from what illness the

patient is suffering from, the Court stated:

We also think that the view of defendants' experts that a physical

63

> examination and review of medical records are integral parts of
>
> differential diagnosis is not based solely on their claim that these
>
> diagnostic techniques are necessary to assess <u>causation</u> but also on
>
> a view that these techniques are necessary to determine <u>what</u>
>
> <u>illness</u> a patient has contracted in the first place.

<u>Id.</u> (emphasis added).  As to the latter, the Court concluded that "generally, a doctor only

needs one reliable source of information showing that the plaintiff is ill and either a physical

examination or medical records will suffice-but the doctor does need at least one of these

sources."  <u>Id.</u>

     As to the former, the court noted that "there will be some cases in which a physician

can offer a reliable differential diagnosis without examining the patient, looking at medical

records, taking a medical history, and performing laboratory tests."  <u>Id.</u> at 762.  However, the

Court also found that "performance of physical examinations, taking of medical histories, and

employment of reliable laboratory tests all provide significant evidence of a reliable

differential diagnosis, and that their absence makes it much less likely that a differential

diagnosis is reliable."  <u>Id.</u> at 758.

     Here, Defendants make clear that "Dr. Grassian is not giving a clinical diagnosis at all

. . . [and that] the fundamental purpose of his testimony is [to] point out the methodological

flaws of another expert."  (Defs.' Br. 9).  Additionally, Defendants state that Dr. Grassian "is

not challenging either Dr. Geteles's clinical diagnosis that the Plaintiffs are suffering

depression, PTSD and other psychological conditions.  Dr. Grassian's critique of Dr. Geteles

is that because of her flawed methodology, she cannot reliably opine on the *cause* of Plaintiffs' injuries." (Id. at 11 n.4).

Given the stated purpose given by Defendants for Dr. Grassian's testimony, i.e., to critique Dr. Geteles's methodology, he will be permitted to testify in that capacity.  See United States v. Velasquez, 64 F.3d 844, 848 (3d Cir. 1995) (district court erred in excluding handwriting expert's testimony criticizing "the standards employed in that field of expertise"). The Velasquez Court found that the expert's "testimony as a critic of handwriting analysis would have assisted the jury in evaluating the Government's expert witness." Id.  Similarly, Dr. Grassian will be permitted to testify as to his criticism of Dr. Geteles's methodology because Dr. Grassian is qualified as an expert and his testimony will assist the trier of fact.


However, Dr. Grassian will not be permitted to testify as to the causes of Plaintiff's psychological conditions.  Although he may give his opinion as to whether Dr. Geteles has reliably opined on the causes of Plaintiff's injuries, he may not himself opine as to the causes. While Paoli does not foreclose on the situation where "a physician can offer a reliable differential diagnosis without examining the patient, looking at medical records, taking a medical history, and performing laboratory tests[,]" Id. at 762, this is not such a case.  Given the extensive psychological illnesses that the Plaintiffs are suffering from, in order to be reliable, any opinion by Dr. Grassian as to causation would have to be as the result of a thorough examination of the Plaintiffs or their medical records.  Here, because Dr. Grassian has done neither, he will be precluded from testifying as to the cause of Plaintiffs

psychological conditions.[6]

Thus, the Court will strike the following portions of the Report: (1) the fourteen bulleted statements listed above (Report at 19, 20, 22, 23, 24, 26, 29, 30, 36-37, 40, 47); (2) the last sentence of the individual opinions as to Abu Bakar, Jeyakumar Anantharajah, Cecilia Jeffrey, Abraham Kenneh, Shamimu Nanteza, Dennis Raji, Agatha Serwaa, and Sarah Yower to the effect that "there is simply no evidence to support the proposition that particularities of his conditions of detention at Esmor created any meaningful additional harm." (Report at 27, 31, 34, 38, 40, 42, 44-45, 47); (3) the paragraph of the Report beginning on page three, starting with "Assuming these assertions to be true . . ." and the first sentence of the paragraph on page four beginning with "Thus, if one accepts . . ." (Report at 3-4); (4) the section titled "Conclusion" on page sixteen to seventeen, except that paragraph one and the second sentence of paragraph two will not be stricken.

Second, Plaintiffs contend that "Dr. Grassian should be excluded as a witness because he is not qualified to offer expert testimony on matters outside his area of expertise." (Pls.' Br. 21). Specifically, Plaintiffs seek to preclude Dr. Grassian's testimony with respect to medical and dental care and penology and sanitation at Esmor.

Dr. Grassian provides two examples concerning medical and dental care. First, Dr. Grassian opines with respect to the dental care of Abu Bakar, that "[c]ontrary to the plaintiff's accusation, the record indicates that Esmor clinical staff acted professionally and compassionately in their care of Mr. Bakar." (Report 9-10). Second, provides an opinion with

_____

[6]Although Dr. Grassian states in his Report that he reviewed the Esmor Medical Record of Ms. Jama, the review of one record of one Plaintiff is insufficiently reliable.

respect to the medical care of Ms. Jama.  (Report 10-11).  Dr. Grassian concluded that "[i]nstead of demonstrating indifference, Ms. Jama's situation clearly demonstrates both the willingness of Esmor to bring in outside professional help and also a deep concern for Ms. Jama shown by the head of the Esmor facility."  (Id. at 11).

Dr. Grassian also provided an opinion concerning the conditions and sanitation at Esmor.  Dr. Grassian found that "[c]ontrary to Dr. Geteles's uncritical acceptance of the plaintiffs' assertions, there is in fact dispute regarding many factual issues concerning the conditions at the Esmor facility, as well as issues regarding the locus of responsibility and authority for structural and policy decisions governing immigrant detention at the facility." (Id. at 12).  Grassian provided three examples of such factual disputes: (1) allegations that the food was spoiled; (2) allegations of theft; and (3) allegations of physical and sexual abuse. (Id. at 12-14).

Defendants state that "Dr. Grassian has not and will not offer expert opinions regarding the dental care provided at the Esmor facility nor will he offer opinions regarding penology or sanitation."  (Defs.' Br. 11).  Defendants contend that "Dr. Grassian's discussion of the dental care provided to Plaintiff Abu Bakar is meant only to illustrate the disconnect between the documentary record of his dental care and his account of that care in his interview with Dr. Geteles."  (Id. at 12).  Similarly, Defendants argue that, with respect to Plaintiffs' contention that Dr. Grassian opines on penological or sanitation matters, "[t]he single observation from which Plaintiffs manufacture this contention is Dr. Grassian's observation that Plaintiffs' other experts commit the same analytical error as Dr. Geteles: accepting

everything that the Plaintiffs say as true."  (Id.).

Rule 702 requires that in order to testify as an expert, the expert must be qualified "as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702. Additionally, the testimony must assist the trier of fact.  Id.  The court has already found, and it is uncontested, that Dr. Grassian is qualified to testify in the filed of psychiatry.  However, Dr. Grassian is not qualified to testify as to medical, dental, penological, or sanitation matters. Although Defendants characterize his testimony as illustrating a disconnect between the documentary record and the Plaintiffs' contentions, the court finds that the testimony in the Report impermissibly opines on issues that are not within his area of expertise and that those opinions will not assist the trier of fact.  Thus, Dr. Grassian will not be permitted to testify as to these matters and  the following portions of Dr. Grassian's Report will be excluded: (1) section 1.3 in its entirety (Report at 9-11); and (2) section 2 in its entirety, except that the following portion will not be excluded:

> Dr. Geteles ignores one of the most fundamental concepts in all of clinical medicine, and especially so in the practice of forensic analysis–that of differential diagnosis; the expert must consider the full range of possible explanations of a claimant's statement.  In the course of litigation, the expert must always remain aware of the possibility that a claimant may consciously or unconsciously distort his memory of a past event.

(Report at 11-14).

b. <u>Reliability</u>

Plaintiffs contend that "[i]n addition to not being qualified to testify as an expert, Dr. Grassian should be precluded from testifying because his report is unreliable."  (Pls.' Br. 31). First, Plaintiffs contend that Dr. Grassian should be excluded as a witness because his theories concerning Plaintiffs' credibility have been previously rejected.  Plaintiffs contend that the court in <u>United States v. You</u>, 1997 WL 269341 (4th Cir. 1997) specifically rejected Dr. Grassian's testimony on this issue.  (Pls.' Br. 33).  Affirming the district court, the <u>You</u> Court held that "Grassian's testimony concerning how traumatic events influence perception and memory would essentially challenge the victim's credibility and therefore invade the exclusive purview of the jury."  <u>Id.</u> at *1.  Plaintiffs argue that the theory rejected by the <u>You</u> Court permeates the Report in that Grassian "repeatedly concludes that Plaintiffs' perceptions were somehow altered because they suffered trauma before arriving to the U.S."  (<u>Id.</u>).

Defendants argue that <u>You</u> bears little resemblance to the present case because there, "Dr. Grassian was asked to opine specifically on a witness's memory, a topic that the *You* court found strayed too close to impermissible credibility testimony."  (Defs.' Br. 18). Defendants contend that here, "Dr, Grassian will offer no opinions about whether Plaintiffs are credible or not credible–his purpose is to critique Dr. Geteles's analysis."  (<u>Id.</u>).

Because the court has determined that, as Defendants point out, Dr. Grassian's testimony will be limited to his criticism of Dr. Geteles's methodology, the following statement will be excluded: "Ms. Jama's perception of widespread abuse and indifference thus appears to reflect a significant distortion of the objective record - a distortion which is

consistent with her history of terrible trauma prior to her arrival at Esmor."  (Report 22).[7]

Additionally, any similar testimony as to Plaintiffs' credibility will also be excluded as

invading the exclusive purview of the jury.

Second, Plaintiffs contend that Dr. Grassian should be excluded because he uses

unscientific methods to critique Dr. Geteles's methodology.  (Pls.' Br. 35).  They argue that

"Dr. Grassian wrongfully challenges Dr. Geteles's methodology, alleging that she failed to

conduct a 'differential diagnosis' of each Plaintiff."  (Id.).  Plaintiffs further contend that the

Report is unreliable because his definition of "differential diagnosis" is wrong and that Dr.

Geteles did, in fact conduct a differential diagnosis of each Plaintiff.  (Id. at 36, 40).  Plaintiffs

add that "[c]ontrary to Dr. Grassian's beliefs, a differential diagnosis does not require an

expert to conduct independent research to verify Plaintiff's statements. Instead, a differential

diagnosis consists of considering and rejecting diagnosis of diseases from which patients are

suffering."  (Id. at 38).

Defendants argue that Plaintiffs mischaracterize Dr. Grassian's Report and testimony

"which never claimed that a differential diagnosis must address every 'conceivable'

alternative explanation."  (Defs.' Br. 13-14).  Defendants add that "an expert performing a

forensic analysis–unlike a clinical analysis which focuses on treatment and is less concerned

with issues of causation–must consider a broader array of sources than the patient's self-report

and must at least consider alternative causation."  (Id. at 13).

In Paoli, the Court addressed the requirements of a differential diagnosis.  There, the

---

[7]Although Plaintiffs seek to exclude other portions of the Report, those portions have
already been excluded and will not be repeated.

Court stated, "at the core of differential diagnosis is a requirement that experts at least

consider alternative causes-this almost has to be true of any technique that tries to find a cause

of something."  35 F.3d at 759.  The Court added:

> Moreover, performance of standard diagnostic techniques provides
>
> prima facie evidence that a doctor has considered such causes and
>
> has attempted to test his or her initial hypothesis as to cause.  But .
>
> . . a doctor does not always have to employ all of these techniques
>
> in order for the doctor's differential diagnosis to be reliable.

Id.

The court finds that, to the extent Dr. Grassian has opined that a physician must

conduct independent research in performing a "differential diagnosis," his testimony will be

precluded.  Defendants have not cited, nor has the court found, any support for this

proposition.  However,   this error will not preclude Dr. Grassian's testimony critiquing Dr.

Geteles's methodology.  As Paoli points out, the core requirement of a differential diagnosis is

that experts consider alternative causes.  Dr. Grassian's main critique of Dr. Geteles is that she

failed to do so.

Third, Plaintiffs seek to preclude Dr. Grassian from testifying that Dr. Geteles's

theories and conclusions are not supported by medical or psychological literature.  In his

Report, Dr. Grassian makes the following statements:

•    "Yet there is no medical literature at all supporting such a proposition . . . ."  (Report

15).

71

- "Yet there is no medical literature to support the idea that an experience of starvation leads to a persistent avoidance of food; indeed the literature generally indicates that the opposite is true." (Id. at 26).

- "The medical literature is quite clear that for many individuals, PTSD becomes a chronic, resistant burden, and that a failure to achieve significant remission of symptoms within six months after the trauma predicts very poor prognosis.  Dr. Geteles herein offers an opinion which simply has no basis in the psychiatric literature." (Id. at 37).

Because these statements are unsupported by any citation to an actual source and because Dr. Grassian did not list any medical or psychological literature in the Report as having been reviewed, they will be excluded, and Dr. Grassian will be precluded from testifying in this regard.

Fourth, Plaintiffs argue that Dr. Grassian's Report is unreliable because it is based on incorrect facts with respect to the following issues: (1) medical care; (2) dental care; (3) the cause of Ms. Jama's psychological suffering; and (4) the placement of the Plaintiffs in segregation.  Because the court has already excluded Grassian's testimony in the areas of medical and dental care, the court will not discuss those issues.

Plaintiffs argue that Dr. Grassian's finding that the conditions at Esmor were not a major factor in Ms. Jama's decompensation because she did not discuss Esmor's conditions when she was hospitalized in November 1994 concerning Ms. Jama "demonstrates the complete lack of reliability of Dr. Grassian's assessment of the conditions at the Facility and the cause of Ms. Jama's psychological suffering."  Plaintiffs point to the following excerpt

72

from the Report:

> [W]hen [Ms. Jama] was able to talk with medical professionals
> who were not Esmor employees–she could have spoken about her
> experience at Esmor, yet the medical record fails to reveal any
> mention of it.  Instead, her preoccupation during the hosptalization
> was entirely with the her [sic] mother's death and with the trauma,
> tragedies and losses she had experienced before arrival in the
> United States.

(Report 19).  Plaintiffs contend that in reaching his conclusion, Dr. Grassian relied on a two-page report by Dr. L. Hankoff dated April 25, 1995 but that Dr. Hankoff was retained on April 25, 1995, five months after Ms. Jama's November hospitalization.  (Pls.' Br. 53).  Additionally, Plaintiffs contend that "despite Dr. Grassian's attempt to assert the contrary, the April 1995 psychiatric record supports Dr. Geteles's diagnoses that Ms. Jama suffers from major depression, and that the depression was, in part, caused by the conditions at Esmor."  (Id. at 54).  Plaintiffs assert that his Report is unreliable because he "invented facts about Ms. Jama's November hospitalization, and misrepresented the findings of the only psychological evaluation that was conducted on Ms. Jama while she was at Esmor."  (Id. at 55).

"It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record."  Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002).  That is not the case here.  Although it is unclear how Dr. Grassian's findings relate to Ms. Jama's November hospitalization, his opinion is not "lacking

73

any foundation in the record."  Any discrepancies will be resolved at trial through cross-examination.

Plaintiffs also contend that Dr. Grassian's Report is based on incorrect facts and is excludable because: (1) it conflicts with the I.N.S. Report finding that segregation was used punitively; and (2) it conflicts with the Plaintiffs' testimony that segregation was used in an arbitrary and punitive way.

In the Report, Grassian states the following:

> Consider also that after Ms. Jama learned that her mother had died, she became agitated and subsequently was restrained in four-points restraints, and later she was placed in a segregation cell.  Dr. Geteles and Ms. Jama both describe this as a cruel and punitive response to Ms. Jama's suffering.  Yet was it really?  The reality is that after she learned of her mother's death, Ms. Jama became very agitated, flailing about.  In reality, she <u>had</u> to be restrained in some fashion; this might well have occurred even if she were in a psychiatric hospital, rather than a detention facility.  And while Ms. Jama apparently believes that the Esmor staff was punitive in its response to her suffering, the medical record strongly suggests otherwise - that Esmor staff appear to have been quite empathic in their response to her.  When she was placed in restraints, she was given Valium to try to help her calm herself, and then an interpreter sat with her continuously for <u>three hours</u> in an effort to help her

calm herself.   That degree of effort would be extremely commendable, _even_ in a psychiatric hospital.  Moreover, while it is true Ms. Jama _was_ then placed in a segregation cell, there is no evidence that this was done with punitive intent.  Instead, as Dr. Spencer (plaintiffs' medical expert) actually notes, it was explained to her at the time that she was being taken to segregation on order to have time for grieving.  The record reveals that she was, in fact, being placed in a segregation cell for her own protection–because of concern that she might be suicidal.  And she did calm down; she was subsequently noted to be rational and cooperative with staff, and then, two days after being housed in segregation, she was transferred back to the women' dormitory.  Where, then, is the evidence of abuse?  Agitated or suicidal patients in a psychiatric hospital are often treated in a similar manner–they are kept in a segregated "quiet room" until the acute risk is over.  In the end, especially given the limited resources available to the Esmor staff (they could not, for example, simply page a psychiatrist to come to their residential unit), they appear to have responded with commendable compassion to Ms. Jama's crisis.  The allegation that they responded with cruelty and indifference is not consistent with the record, but rather appears to demonstrate a distortion and selective reading of that record.

(Report 20-21).

Plaintiffs contend that the I.N.S. Interim Report "found that 'the segregation unit was used as a means both of punishing detainees for relatively minor offenses, and for more general harassment.'" (Pls.' Br. 56).  Plaintiffs argue that the I.N.S. Report supports Dr Geteles's findings that segregation use was arbitrary and punitive and that the I.N.S. Report "concluded that such practices constitute a serious violation of both Esmor policy but also the standards of the American Correctional Association (ACA)." (Id.).  Plaintiffs argue that Dr. Grassian completely ignores the findings of the I.N.S. Report and that his "failure to consider the Interim Report demonstrates that his report's conclusion regarding the use of solitary confinement are based on incorrect facts." (Id.).

As an initial point, Plaintiffs take the language of the I.N.S. Report out of context.  The portions referred to states as follows:

> Another serious policy violation was alleged during a confidential interview with an ESMOR guard.   The guard revealed that placement of detainees into segregation without a charging document was a frequent occurrence.  This would be a violation of ESMOR's policy and procedures as well as the standards of the American Correctional Association (ACA) . . . . According to the interviewed guard, the segregation unit was used as a means both of punishing detainees for relatively minor offenses, and for more general harassment.

(I.N.S. Interim Report at 8).  Thus, the I.N.S. Report characterizes the practice of segregation as an allegation and not, as Plaintiffs do, as a "finding."

In essence, Plaintiffs' argument is that because Dr. Grassian did not consider the I.N.S. Report, his Report should be excluded.  The court disagrees.  First, Dr. Grassian lists the I.N.S. Report as one of the many documents he reviewed in developing his Report.  Second, the fact that the I.N.S. Report identified *allegations* of segregation that, if true, would be a violation, by no means converts those allegations into undisputed facts.  Thus, the court will not preclude Dr. Grassian from testifying on this ground.

Next, Plaintiffs contend that Dr. Grassian should be precluded from testifying about segregation because his opinion conflicts with the Plaintiffs' testimony that segregation was used in an arbitrary and punitive way.  (Pls.' Br. 56-65).  Plaintiffs maintain that because Dr. Grassian ignored Plaintiffs' testimony, his conclusions are unreliable.  (Id.).  Plaintiffs also contend that Dr. Grassian's own testimony contradicts his Report's conclusions about solitary confinement.  (Id. at 65).  Plaintiffs' argument is based on the assumption that Plaintiffs' allegations are undisputed.  Plaintiffs argue that because Dr. Grassian testified that certain acts would be punitive and arbitrary and Plaintiffs testified that those acts occurred, this demonstrates that Dr. Grassian's discussions in his Report on solitary confinement are unreliable.  (Id. at 65-67).

The court rejects these arguments as well.  Just as the allegations of an Esmor guard in the I.N.S. report are not undisputed facts, Plaintiffs' testimony does not make their allegations undisputed.  "A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming fact and assumptions as the basis for his opinion can highlight

those weaknesses through effective cross-examination." Stecyk, 295 F.3d at 414.

Fifth, Plaintiffs contend that Dr. Grassian should be precluded as an expert because he "grossly mischaracterizes and distorts the facts to support his conclusions." (Pls.' Br. 67). Plaintiffs seek to preclude Dr. Grassian from testifying because they claim he: (1) makes critical errors in his discussion of Ms. Jeffrey's allegations of sexual abuse; (2) unprofessionally critiques Dr. Geteles for allegedly concluding that Mr. Kenneh's cardiomyopathy was caused by the conditions at Esmor[8]; (3) omits critical portions of Dr. Geteles's expert report to reach conclusions that Esmor was not responsible for Plaintiffs' suffering[9]; (4) improperly concludes that Dr. Geteles is biased; (5) distorts the report of Dr. Spencer with respect to segregation; and (6) mischaracterizes and distorts the documents he reviewed with respect to Ms. Jama's as well as others' psychological suffering and the conditions at Esmor.  Thus, Plaintiffs argue his testimony is unreliable and should be excluded.

Plaintiffs challenge the following statement as to Ms. Jeffrey: "She claims that she was a strong and vocal advocate for the women in her dorm.  If so, why did she not reveal her own sexual abuse during those meetings?"  Because this statement is not reliable and could not possibly assist the jury, it will be excluded.

As to bias, Plaintiffs challenge Dr. Grassian's opinion that Dr. Geteles "has reached her conclusion about causation before she ever begins the evaluation."  (Report 33-34).

_____

[8]Because Dr. Geteles's opinion regarding  Mr. Kenneh's cardiomyopathy has been excluded, this argument is moot.

[9]This contention is specifically addressed to a statement in the Report with respect to Mr. Anantharajah that the court has already excluded.

Plaintiffs contend that Dr. Grassian uses the following portion of Dr. Geteles's Report to support his conclusion: "[t]he purpose of these interviews was to evaluate the psychological effects of the persecution, which [Ms. Jeffrey] reports having experienced during her detention . . . ." (Geteles Report 70). Plaintiffs argue that Grassian "dishonestly omitted" the end of this statement in Dr. Geteles's Report which states: "[m]y assessment is based on the history she related as well as my observation of her demeanor and mood in the course of the interview." (Id.). Plaintiffs claim that this demonstrates Dr. Geteles is not biased and further highlights that Dr. Grassian's conclusions cannot be trusted. (Pls.' Br. 71-72). The court finds that, contrary to Plaintiffs' argument, Dr. Grassian's omission does not taint his Report to the extent that it should be excluded.

Further, Plaintiffs contend that "Dr. Grassian improperly quotes a citation to the medical record in Dr. Spencer's Expert Report referencing Ms. Jama's 'flailing her arms and legs.'" (Id. at 72). Plaintiffs argue that "Dr. Spencer's report states clearly that 'in [his] experience with witnessing the grieving of death in west and east African cultures, loud moaning and crying, and flinging the body about and onto the ground is a normal and expected behavior.'" (Id.). The court finds that Dr. Grassian did not improperly quote the comment in Dr. Spencer's Report that Ms. Jama was "flailing her arms and legs." Dr. Spencer's Report in fact states that Ms. Jama "became agitated, flailing her arms about . . ." (Spencer Report 5). The fact that Dr. Spencer has witnessed the grieving process in African cultures does not make Dr. Grassian's opinion that she had to be restrained in some fashion unreliable or otherwise inadmissible.

Finally, Plaintiffs contend that Dr. Grassian mischaracterizes and distorts the

documents he reviewed with respect to the Plaintiffs' psychological suffering and the
conditions at Esmor.  Specifically, Plaintiffs refer to Dr. Grassian's opinion that: "At Esmor,
no one was being murdered; there is even one document noting that the detainees were
enjoying a table tennis tourney, and another commenting on an upcoming volleyball
tournament."  (Report 24).  Plaintiffs argue, "[t]hat Dr. Grassian would even refer to these
documents as evidence that the conditions at Esmor were benign demonstrates his lack of
intellectual rigor and lack of candor."

     Dr. Grassian's statement regarding the lack of murder and reference to recreational
activities that may or may not have taken place, clearly does not demonstrate that abuse did
not occur at Esmor.  Moreover, Dr. Grassian testified to this effect:

> Q.    My question is, does the fact that there may have been a
> table tennis tournament or there may have been a volleyball
> tournament preclude that the conditions at the facility at
> Esmor were harmful?
>
> A.    No, not at all.

(Grassian Dep. 273:2-7, Nov. 2, 2006).  Because there is nothing in this statement that would
assist the jury, it will be excluded.

c.  <u>Helpfulness to the Jury</u>

     Finally, in a blanket effort to completely preclude Dr. Grassian from testifying,
Plaintiffs contend that Dr. Grassian: (1) reaches legal conclusions that are not helpful to the

80

jury and invade the court's province; and (2) calls into question the credibility of the Plaintiffs and Plaintiffs' experts.  Specifically, Plaintiffs seek to preclude the following statements as legal conclusions[10]:

- "[Ms. Jama's] course at Esmor certainly does reflect some of the limitations of the policies and procedures governing medical care as Esmor, although it is also quite clear that these procedures were created and controlled by INS, <u>not</u> by Esmor."  (Report 23).

- "Dr. Geteles clearly fails to appreciate the fact that this situation was the result of decisions of the INS, and not at all under the control of Esmor itself."  (<u>Id.</u> at 25).

- "[Ms. Nanteza] claimed that Ms. Jama was beaten, and that other women were sexually abused by female guards, but it is not clear how much of this description was merely hearsay . . ."  (<u>Id.</u> at 38-39).

- "[Dr. Geteles] ignores entirely, undisputed evidence which contradicts her assertions of abuse and indifference by

---

[10]For the sake of efficiency, the court will not address those statements that have been excluded.

Esmor staff . . ."  (<u>Id.</u> at 6).

- "Where then, is the evidence of abuse?"  (<u>Id.</u> at 21).

- "The allegation that [Esmor] responded with cruelty and indifference is not consistent with the record, but rather appears to demonstrate a distortion and selective reading of that record."  (<u>Id.</u>).

The court finds that the foregoing statements are impermissible legal or factual conclusions which will not assist the jury.  Thus, they will be excluded.

Plaintiffs also seek to preclude the following statements, which they argue improperly question the credibility of the Plaintiffs:

- "[Dr. Geteles] does not even consider the possibility that plaintiffs in a lawsuit will have a natural inclination to distort their memory in a direction which advances their lawsuit."  (<u>Id.</u> at 5).

This statement will not be excluded because, contrary to Plaintiffs' assertion, this statement reflects Dr. Grassian's critique of Dr. Geteles's methodology rather than Dr. Grassian's opinion on the Plaintiffs' credibility.

- "[Dr. Geteles] fails to raise any questions as to whether Mr. Bakar might have misinterpreted the officer's intentions, or might have experienced something in a dream or a confused, half-awake state." (Id. at 25).

This statement goes beyond a critique of Dr. Geteles's methodology and instead suggests that Mr. Bakar is not credible. Because the statement will not assist the jury, it will be excluded.

Finally, Plaintiffs contend that Dr. Grassian impermissibly criticizes the Plaintiffs' expert witnesses[11]. Plaintiffs argue that Dr. Grassian's critique of Dr. Geteles is the most objectionable because he repeatedly calls her credibility into question in a disrespectful manner. (Pls.' Br. 89). Plaintiffs provide the following examples:

- "There are times in her report when Dr. Geteles appears to be on kind of a witch hunt. . . . [A]t times the report reads more like the diatribes of a zealot, than like the sober, thoughtful, balanced approach of an expert." (Report 31).

- "[A]t times Dr. Geteles stretches credulity in order to argue that Mr. Raji has remained very impaired since his release from detention." (Id. at 42).

- "[Dr. Geteles's] opinion stretches credulity to the breaking

---

[11]Although Dr. Grassian stated that Plaintiffs "experts fail entirely to establish these propositions[,]" (Report 17), this statement has already been excluded by the court.

point."  (Id.).

- "Dr. Geteles simply distorts the facts in order to get them to fit into her preconceived conclusions."  (Id.).

- "[Dr. Geteles's] report is more a polemic than an expert report."  (Id. at 48).

The court finds that these statements add nothing to the Report and will not assist the jury in its fact-finding.  Thus, the foregoing statements will be excluded.

F.  Plaintiffs' Motion to Preclude the Testimony of Dr. Grassian for Defendants'
     Spoliation of Evidence and for Violating Fed. R. Civ. P. 37(c)(1)

In addition to their Daubert motion, Plaintiffs move for sanctions against Defendants for spoliation of evidence and for failure to comply with discovery requests pursuant to Fed. R. Civ. P. 37(c)(1).  Plaintiffs seek the exclusion of Dr. Grassian's testimony, costs, and attorneys' fees.

In reviewing the documents and certifications submitted to the court, the court finds that the following occurred.  On June 30, 2006, Plaintiffs sent a document request to Defendants and Dr. Grassian requesting the production of all drafts and other documents considered or created in connection with the Report.  (Certification of Penny M. Venetis ("Venetis Cert.") Ex. C).

At Dr. Grassian's November 2, 2006 deposition, the following colloquy took place:

84

Q.      Did you write any drafts of the report before you signed the
        final copy?

A.      Oh, yes.  Well, I mean, there was - - you know, working in
        a - - with a word processor, with a computer, it's a
        continuing process of changing, growing, adding as you
        move along.

Q.      Did you share any of these prior incarnations of the report
        with Defendants' lawyers?

A.      Yes.

Q.      In what form did you do that?

A.      Electronic.

Q.      So you emailed them the - -

A.      Yes.

Q.      And did - - who in particular did you send the copies to?

A.      Must have been Matt, Matt Hsu.

Q.      Anybody else, any of the other lawyers?

A.      I don't recall whether it was broadcast to other people.  I
        think I just sent it to Matt, and he - - I'm sure he sent it to
        others.  I don't know.

***

Ms. Venetis: We would ask that you produce the prior drafts of the
document.  We requested it in our document request.  We have not

85

received those.

Mr. Reich: Well, we'll take that under advisement.

Q.      And did any of the Defendants' lawyers comment to you
        about your prior drafts?

A.      Sure.

Q.      In what form was that done?

A.      You mean whether it was done electronically or by phone?
        One or the other or both.

Q.      So you did receive electronic communications from
        Defendants' lawyers with comments about your previous
        drafts?

A.      Well, I don't - -

Mr. Livelli: Objection.

A.      You know, I don't recall whether I received feedback just
        over the phone or - - or whether there were any written
        things sent to me.  I don't recall that.

***

Ms. Venetis: Again, I also renew my request for any - - any
electronic or other correspondence that defense counsel had with
Doctor Grassian about his expert report.  And we requested that in
our - - in our document requests, and you all should have produced
it.

86

Mr. Reich: We'll take it under advisement.  Same as before.

(Grassian Dep. 29:18-31:4, Nov. 2, 2006).  Thereafter, Plaintiffs' counsel sent two letters to

Defendants' counsel, one on November 13, 2006 and the second on November 22, 2006,

requesting the draft documents of the Report that Dr. Grassian referenced at his deposition.

(Venetis Cert. Ex. D).  In the November 22, 2006 letter, Plaintiffs' counsel threatened to file a

motion to compel the production of documents and a motion for sanctions.  (Id.).  Thereafter,

Defendants complied and sent Plaintiffs additional documents.  (Pls.' Br. 2, Venetis Cert. ¶ 9).

In early December, 2006, the court granted Plaintiffs' request to re-depose Dr. Grassian.

(Venetis Cert. ¶ 10).

At Dr. Grassian's January 12, 2007 deposition, Dr. Grassian testified as follows:

Q.    In May were you asked when you were retained by the

defendant's lawyers, were you ever asked by any of them to

make sure that you kept copies of correspondence with

them, or communications with them?

A.    No.  To the best of my recollection, the first time the issue

came up, was at the time of my first deposition.

Q.    So prior to that - -

A.    To my best of my knowledge.

Q.    So prior to that you have no recollection of anyone saying

we need any documents you have related to the Jama case

in your files?

87

A.     No, no.   I probably would have printed them out or
something if I had, if I had been told that.


(Grassian Dep. 385:2-18, Jan. 12, 2007).  Additionally, Dr. Grassian testified that in June or

July 2006, he experienced a problem with his computer and lost many documents and may

have lost documents relating to this case.  He stated:

And he also - - either Larry or Frank reminded me one of

the reasons I was a little dicey on my documents and stuff,

you know, correspondence or whatever for this case, was

that I had some problems with my computer - - oh, I don't

know if the computer or my handling of the computer, but I

lost a lot of documents.  They ended up all as aliases, but

the original seemed to disappear in to the ethers.  I actually

lost a lot of stuff, including stuff for this case.  If you ask

me what stuff, of course I don't know, because I can't find

it.  Who knows what it was.  Hopefully it was all recovered.

I mean, not my notes or anything, notes I might have taken,

but other stuff.

Q.     So what do you think, do you have a sense of what you may

have lost related to this case?

A.     I mean, I hope it's all been recovered, and - - I don't know.

That was a long time ago.  That was back - -

(Id. at 367:2-20).  Dr. Grassian did not hire a computer specialist to try and recover any lost documents.  (Id. at 368:19-23).

On February 1, 2007, Plaintiffs' counsel sent a letter to Defendants' counsel indicating that Dr. Grassian referenced documents that had not been produced and requesting the same. (Venetis Cert. Ex. F).  At a status conference before this court on February 5, 2007, counsel for Plaintiffs informed the court that, according to Dr. Grassian's testimony, Defendants' counsel never instructed Dr. Grassian to preserve documents and that certain documents were never produced.  (Venetis Cert. ¶ 15).  In response, Defendants' counsel stated that no additional documents existed and that Dr. Grassian was informed to preserve discoverable documents.  (Id.).  The court instructed Defendants' counsel to either produce an affidavit from Dr. Grassian stating that he was instructed to preserve discoverable documents, or to submit an affidavit in his own name providing that information.  (Id. at ¶ 16).

On April 30, 2007, Defendants' counsel sent a letter to Plaintiff's counsel stating that they had located two additional pieces of correspondence between Ryan Nelson, a former attorney who worked at Defendants' law firm, and Dr. Grassian.  (Venetis Supp. Cert. Ex. B). On May 1, 2007, Defendants' counsel sent another letter to Plaintiffs' counsel indicating that, during a search of their files, Defendants discovered a July 18, 2006 e-mail and draft report, which had not previously been provided to Plaintiffs.  (Id. at Ex. C).

On May 2, 2007, Defendants submitted a declaration of Matthew Hsu, counsel for Defendants, in support of their opposition to Plaintiffs' motion, which included a declaration of Dr. Grassian.  Mr. Hsu's declaration indicates that after receiving Plaintiffs' June 30, 2006 document request, Mr. Hsu mailed the document request to Dr. Grassian and advised Dr.

Grassian that after he completed his Report, that Mr. Hsu would need to collect all of his case-related documents and materials, including his notes, and produce them to Plaintiffs. (Declaration of Matthew B. Hsu ("Hsu Decl.") ¶1).  After Dr. Grassian completed his Report and it was submitted to Plaintiffs, Mr. Hsu called Dr. Grassian to remind him that he needed to collect his documents and sent him an e-mail reminder.  (Hsu Decl. ¶ 2).  Mr. Hsu also indicated that he performed the April 30, 2007 search that revealed the July 18, 2006 e-mail and draft report.  (Id. at ¶ 9).  His declaration indicates that the e-mail and draft report were omitted inadvertently from the production to Plaintiffs.  (Id.).  The declaration also indicates that the July 18 draft report falls between a draft dated July 10 and a draft dated July 21, both of which were previously produced to Plaintiffs, and that the July 18 draft incorporates an e-mail that Dr. Grassian sent to Mr. Hsu on July 16, which had been previously provided to Plaintiffs.

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  MOSAID Technologies Inc. v. Samsung Elecs. Co., Ltd., 348 F. Supp. 2d 332, 335 (D.N.J. 2004) (citation omitted).  Sanctions for spoliation include: (1) dismissal of a claim or granting summary judgment in favor of a prejudiced party; (2) suppression of evidence; (3) an adverse inference; (4) fines; and (5) attorneys' fees and costs.  Id.  "There is no rule of law mandating a particular sanction upon a finding of improper destruction or loss of evidence; rather, such a decision is left to the discretion of the Court."  Sarmiento v. Montclair State Univ., Civ. A. No. 04-4176, 2007 WL 1381755, at *17 (D.N.J. May 9, 2007) (citing Paramount Pictures Corp. v. Davis, 234 F.R.D. 102, 111 (E.D. Pa. 2005).  Sanctions serve

three functions: (1) a remedial function by leveling the playing field or restoring the prejudiced party to the position it would have been without the spoliation; (2) a punitive function by punishing the spoliator for its actions; and (3) a deterrent function by sending a message to other potential litigants that the behavior will not be tolerated.  348 F. Supp. at 335.

In deciding which sanctions are appropriate, the court must consider that dismissal or suppression of evidence are the two most drastic sanctions and that they should only be imposed in the most extraordinary circumstances.  Id.  The key considerations in determining the proper sanction are: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party . . . ."  Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994).

The spoliation inference is a less drastic sanction which "permits a jury to infer that 'destroyed evidence might or would have been unfavorable to the position of the offending party.'"  348 F. Supp. at 335-36 (quoting Scott v. IBM Corp., 196 F.R.D. 233, 248 (D.N.J. 2000)).  In order for the inference to apply, four factors must be satisfied: (1) the evidence in question must be within the party's control; (2) there must have been actual suppression or withholding of the evidence; (3) the evidence must have been relevant to the claims or defenses; and (4) it must have been reasonably foreseeable that the evidence would later be discoverable.  Id. (citations omitted).  Importantly,

> negligent destruction of relevant evidence can be sufficient to give
> rise to the spoliation inference.  If a party has notice that evidence
> is relevant to an action, and either proceeds to destroy that

91

evidence or allows it to be destroyed by failing to take precautions, common sense dictates that the party is more likely to have been threatened by that evidence.

Id. at 338.

Plaintiffs similarly seek sanctions under the Federal Rules of Civil Procedure. Pursuant to Fed. R. Civ. P. 37 (c)(1):

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed.  In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.  In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure.

Fed. R. Civ. P. 37 (c)(1).  "Notwithstanding its mandatory language, the Rule vests courts with discretion in its provision that no sanction should be imposed if there was substantial justification for the non-disclosure, or if the non-disclosure was harmless."  ABB Air Preheater, Inc. v. Regenerative Envtl. Equip. Co., Inc., 167 F.R.D. 668, 671 (D.N.J. 1996).

1.  Spoliation

Plaintiffs contend that Defendants should be sanctioned for spoliation of evidence because they willfully failed to preserve information considered by Dr. Grassian in forming his opinion.  First, Plaintiffs assert that Grassian's testimony should excluded.  They contend that under the considerations articulated in Schmid, Defendants' degree of fault warrants suppression and that under Rule 26(a)(2)(B), Defendants had a duty to preserve relevant

92

evidence and had an obligation to automatically disclose such evidence.  (Pls.' Br. 7-9).
Plaintiffs argue that Defendants did neither.  (Id. at 13).  Relying on Trigon Ins. Co. v. United
States, 204 F.R.D. 277 (E.D. Va. 2001), Plaintiffs argue that "Defendants failure to discharge
its known duty is sufficient to support a finding of willful destruction."  (Pls.' Br.15).

In Trigon, plaintiffs requested drafts of the defendant's testifying experts' reports.  204
F.R.D. at 281.  At that time, defendant's counsel directed its litigation consultant, AGE, and
its testifying experts to preserve all draft reports and communications.  Id.  However, by that
time, much of that information had been deleted as a result of AGE's document retention
policy and the individual practices of each of the testifying experts.  The Court found that the
"documents and communications were willfully and intentionally destroyed by the United
States' non-testifying and testifying experts."  Id. at 289.

The facts of this case are clearly distinguishable.  Although Dr. Grassian testified that
he did not recall whether he was ever asked by Defendants' counsel to make sure that he kept
copies of correspondence and communications with them, Defendants' counsel states in his
certification that he did in fact tell Dr. Grassian to do so.  Furthermore, even if counsel did not
advise Dr. Grassian to retain all documents, Dr. Grassian states in his certification that
because it is his practice to retain all factual material that he reviews, he "is confident that [he]
did not dispose of any factual material that [he] reviewed during the drafting process or relied
upon to reach [his] opinions in the case."  (Grassian Decl. ¶ 7).

Additionally, there is no evidence that: (1) any evidence was destroyed; or (2) that any
evidence was destroyed willfully and intentionally.  In fact, the only evidence that Dr.

Grassian <u>may</u> have lost discoverable documents is that, when he had computer problems,  he

lost documents and never recovered all of them.  Thus, although Plaintiffs may have been

prejudiced to some degree, there is no evidence of willful or intentional destruction and Dr.

Grassian's testimony will not be excluded.

Second, Plaintiffs argue that if the court finds exclusion is not warranted, the court

should  instruct the jury on the spoliation inference.  (Pls.' Br. 21).  Plaintiffs argue that

because the four factors have been satisfied, they are entitled to such a sanction.

The court finds that although the first, third, and fourth factors have been satisfied, the

second factor has not.  Clearly, the evidence in question was within Defendants' control, was

relevant to Plaintiffs' claims, and it was reasonably foreseeable that the evidence would be

discoverable.  However, the court finds that there was no actual suppression or withholding of

evidence.  Although intentional or willful conduct is not required, and negligent destruction

can be sufficient to give rise to the spoliation inference, the court finds that Defendants did not

fail to take reasonable precautions to prevent it from being destroyed.  As noted above,

although Dr. Grassian testified that he did not recall whether he was advised to retain all his

case-related documents, Defendants' counsel states that he advised Dr. Grassian that he would

be collecting all of Dr. Grassian's materials to produce to Plaintiffs.

Third, Plaintiffs seek attorneys' fees and costs associated with obtaining compliance

with discovery rules.  Specifically, Plaintiffs seek fees and costs for attorney time: (1) drafting

letters requesting documents; (2) drafting letters to the court requesting a conference call and

outlining the dispute; (3) preparing for and conducting Dr. Grassian's re-deposition; and (4)

94

drafting the subsequent motion to strike and preclude Dr. Grassian's testimony.  (Pls.' Br. 26).

Although the court has found that Defendants' conduct with respect to advising Dr. Grassian

was not negligent, wilful, or intentional, Defendants failure to promptly respond to discovery

demands requires some monetary sanction.  Therefore, Plaintiffs will be permitted to recover

attorneys' fees and costs associated with the tasks listed above.

2. <u>Rule 37(c)(1)</u>

_____Plaintiffs contend that sanctions under Fed. R. Civ. P. 37 (c)(1) are mandatory because

Defendants failed to comply with their disclosure obligations under Fed. R. Civ. P.

26(a)(2)(B).  (Pls.' Br. 26).   Plaintiffs argue that Defendants "clearly violated Rule

26(a)(2)(B)" because they never instructed Dr. Grassian to preserve discoverable documents

and, as a result, documents were not produced, not preserved, or destroyed.  (<u>Id.</u> at 27).

Because, as previously stated, the court does not find, as a matter of fact, that Defendants

failed to advise Dr. Grassian on his obligations to retain discoverable documents, any failure

to comply with Rule 26(a)(2)(B) is substantially justified.  Any other technical violations that

may have occurred will be accounted for in the court's order permitting attorney's fees and

costs set forth above.

### III.  <u>Conclusion</u>

The various <u>Daubert</u> motions and Plaintiffs' motion to strike the testimony of Dr.

Grassian are resolved as follows:

1.  Plaintiffs' motion to preclude Mr. DeLand from testifying at trial will be denied.

There shall be struck from his Report, and he shall be precluded from testifying about, those

subjects specified above.

2.  Defendants' motion to exclude the testimony of Dr. Geteles will be denied.  There shall be struck from her Report, and she shall be precluded from testifying about, her medical opinions, the medical opinions that medical doctors purportedly gave to one or more of the Plaintiffs and any other matters specified above.

3.  Plaintiffs motion to preclude Dr. Mendel from testifying about the statistical conclusions at which he arrived will be denied.

4.  Plaintiffs' motion to exclude Dr. Grassian's testimony concerning his critique of the methodology that Dr. Geteles employed in rendering an opinion on causation will be denied. There shall be struck from his Report, and he shall be precluded from testifying about, the subject matters set forth in this opinion.

5.  Plaintiffs' motion to strike Dr. Grassian's Report on grounds of spoliation of evidence will be granted to the extent that Plaintiffs will be awarded their attorneys' fees and costs associated with the four tasks described in Part II F1 of this opinion and is denied in all other respects.

The court will enter an order implementing this opinion.


                                                **/s/ Dickinson R. Debevoise**
                                            DICKINSON R. DEBEVOISE

Dated:   June 25, 2007                               U.S.S.D.J.